No. 25-1160

# UNITED STATES COURT OF APPEALS
## For The First Circuit

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY
COSHOW; JAMES WHITE; J. WHITE GUNSMITHING;  ADAM
HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY,

Plaintiffs-Appellees,

v.

AARON M. FREY, in his personal capacity and in
his official capacity as Attorney General of Maine,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE (CASE NO. 1:24-cv-00384-LEW)

## MOTION OF DEFENDANT-APPELLANT FOR STAY OF
## PRELIMINARY INJUNCTION ORDER PENDING APPEAL

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
PAUL SUITTER
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
(207) 626-8880
Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Table of Authorities ........................................................................ ii

Introduction and Relief Requested................................................. 1

Background ..................................................................................... 2

Argument........................................................................................ 3

I.     The Attorney General is sufficiently likely to prevail
on the merits .......................................................................... 4

     A.    The Second Amendment's plain text does not cover the
purchase of firearms...................................................... 4

     B.    Maine's waiting period law is consistent with the Nation's
historical tradition of firearm regulation..................... 11

II.    Maine and its residents will suffer irreparable harm if
a stay is not granted .......................................................... 18

III.   A stay will not substantially injure the plaintiffs................ 18

IV.   A stay would promote the public interest by saving lives.................. 19

Conclusion .................................................................................... 21

Certificate of Compliance ............................................................ 22

Certificate of Service ................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) ............................ 6, 9

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151
    (1st Cir. 2004) ............................................................................ 18

*Common Cause Rhode Island v. Gorbea*, 970 F.3d 11 (1st Cir. 2020).................... 4

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................... 5, 8, 10

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ............................................................ 4

*Lodge 207 v. Raimondo*, 18 F.4th 38 (1st Cir. 2021) ............................................ 18

*McDonald, v. City of Chicago, Ill.*, 561 U.S. 742 (2010)........................................ 8

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) ............................................ 6, 9

*Mills v. New York City*, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024)...................... 6

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .........*Passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................... 4

*Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027 (D.N.M. 2024) ............ 7, 9, 10, 16

*Providence J. Co. v. Fed. Bureau of Investigation*, 595 F.2d 889
    (1st Cir. 1979) ................................................................................ 4

*Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15 (1st Cir. 1998)................................. 4

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    127 F.4th 583 (5th Cir. 2025) ............................................................ 6

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) .......... 4, 8, 11

*Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121
    (D. Colo. 2023) ...................................................................... 7, 9, 16

*United States v. Rahimi*, 602 U.S. 680 (2024) ............................................... 8, 11, 12

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham*,
  741 F. Supp. 3d 172 (D. Vt. 2024) ...................................................... 7, 10, 14, 16

**Statutes**

18 U.S.C. 922(t) ............................................................................................... 2, 10

Pub. L. 117-159 .................................................................................................... 10

15 M.R.S. § 395 ..................................................................................................... 2

25 M.R.S. § 2016 ............................................................................................... 2, 10

P.L. 2023, ch. 678 ................................................................................................. 2

**Rules**

Fed. R. App. P. 25 ................................................................................................ 23

Federal Rule of Appellate Procedure 27 ............................................................. 22

## INTRODUCTION AND RELIEF REQUESTED

In April 2024, Maine's Legislature enacted a law imposing a modest 72-hour waiting period for certain purchases of firearms. The undisputed record evidence demonstrates that waiting periods meaningfully reduce firearm suicides and homicides, with one study suggesting that a waiting period law would have prevented twelve suicides in Maine in just one year. Below, the district court entered a preliminary injunction barring the appellant (Maine's Attorney General) from enforcing the law, concluding that plaintiffs were likely to prevail on the merits of their Second Amendment challenge and that the other factors supported an injunction. The court erred.

The Attorney Geneal will likely prevail on the merits of his appeal. The Supreme Court has declared that laws regulating the commercial sale of firearms are "presumptively lawful." The Second Amendment's plain text protects the right to "keep" and "bear" arms. It does not apply to a law regulating the acquisition of arms unless the law is so burdensome that it effectively prohibits keeping and bearing arms. The Fifth, Ninth, and Tenth Circuits have all rejected Second Amendment challenges to laws imposing restrictions on the commercial sale of firearms, and three district courts have rejected challenges to waiting period laws. Even if the Second Amendment applied, waiting period laws are, as other courts have held, consistent with the "Nation's historical tradition of firearm regulation" and thus pass

muster under the Supreme Court's Second Amendment test. As to the other relevant factors, this Court has recognized that a government suffers irreparable harm when a court enjoins it from enforcing its duly-enacted laws. Any harm to plaintiffs if the waiting period law is not enjoined is speculative, at best. And given the undisputed evidence that waiting period laws save lives, the public interest would suffer if Maine's law were enjoined.

Accordingly, the Attorney General ask this Court to stay the district court's order enjoining enforcement of the waiting period law pending resolution of this appeal.

## BACKGROUND

In April 2024, following extensive testimony that firearm waiting period laws save lives, the Maine Legislature enacted P.L. 2023, ch. 678, which is now codified at 25 M.R.S. § 2016. In relevant part, it provides: "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement." 25 M.R.S. § 2016(2). The law applies only to sales for which state or federal law requires a background check. *Id*. § 2016(4)(C)(3).[1] The law does not

---

[1] Under Maine law, and with some exceptions, background checks are required for sales at gun shows and sales resulting from advertisements. 15 M.R.S. § 395. Under federal law, federal firearms licensees must contact the national instant criminal background check system to verify an individual's eligibility to possess firearms before transferring firearms to non-licensees. 18 U.S.C. § 922(t). Federal statute allows up to three business days, and in the case of a transferee under age 21, ten business days, for a response. *Id*.

apply to sales to law enforcement officers, correction officers, certain private security guards, licensed firearm dealers, to sales between certain family members, or to sales of curio, relic, and antique firearms. *Id*. § 2016(4). The law went into effect on August 9, 2024.

On November 12, 2024, plaintiffs filed a lawsuit against the Attorney General alleging that the waiting period law violates the Second Amendment. ECF No. 1. With the complaint, plaintiffs filed a motion seeking to preliminarily enjoin the Attorney General from enforcing the law. ECF No. 4. On February 13, 2025, the court issued an order granting plaintiffs' preliminary injunction motion. ECF No. 30. On February 17, 2025, the Attorney General appealed the court's order to this Court. ECF No. 31. That same day, the Attorney General filed a motion asking the district court to stay its order pending appeal. ECF No. 32. On March 12, 2025, the district court denied the motion. ECF No. 42.

## ARGUMENT

In deciding whether to stay an order pending an appeal, the Court considers four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009); *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020).[2]

**I. The Attorney General is sufficiently likely to succeed on the merits.**

In resolving a Second Amendment challenge to a firearm regulation, a court must first determine whether "the Second Amendment's plain text covers an individual's conduct." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). If it does, the regulation is nevertheless valid if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

*A. The Second Amendment's plain text does not cover the purchase of firearms.*

On the first prong of the test, the plaintiffs did not meet their burden of establishing that the Second Amendment's plain text applies to Maine's waiting period law.[3] As the Supreme Court as recognized, to "keep" arms means to "have" or "possess" arms, and to "bear" arms means to "carry" arms. *District of Columbia*

---

[2] This Court has suggested that when a "powerful showing of irreparable injury" is made by a party seeking a stay, the party need only establish that its claims "provide[] fair grounds for further litigation." *Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 26-27 (1st Cir. 1998). And in a case where denial of a stay would result in arguably confidential documents being disclosed, this Court found it sufficient that the appeal presented "serious legal questions." *Providence J. Co. v. Fed. Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979).

[3] Plaintiffs do not dispute that they bear this burden. *See, e.g., Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024).

*v. Heller*, 554 U.S. 570, 583-84 (2008). The Second Amendment says nothing about any right to purchase or otherwise acquire arms, much less to do so immediately. The Second Amendment thus confers a right to retain arms, not an unfettered right to immediately acquire them free of any regulation.

The Supreme Court has recognized that laws causing delays in carrying firearms do not, absent unusual circumstances, implicate the right to keep and bear arms. In *Bruen,* the Court clarified that it was not calling into question "shall-issue" licensing regimes that impose delays by requiring applicants to undergo a background check or pass a firearms safety course before being allowed to carry a handgun in public. 597 U.S. at 38 n.9. [4] Such laws "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" and "appear to contain only narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id*. (cleaned up). Maine's waiting period law is the same. By deterring impulsive behavior, it helps ensure that purchasers will act responsibly with their newly acquired firearms. It has objective standards—it imposes a uniform 72-hour delay unless the sale falls within any expressly described exception and does not require government officials to exercise

---

[4] Under a "shall-issue" licensing regime, no showing beyond a general desire for self-defense need be made to obtain a public carry license.

discretion.  As with public carry licensing laws, then, the law does not run afoul of the Second Amendment.[5]

In cases challenging laws regulating firearm sales (including waiting period laws), numerous courts have recognized that the Second Amendment's plain text does not apply to the purchase of firearms, or at least not the immediate purchase of firearms.  *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) ("The plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms.  On its face, that language says nothing about commerce. . . ."); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("The plain text covers plaintiffs' right 'to keep and bear arms.'  And on its face 'keep and bear' does not include purchase—let alone without background check.") (citation omitted);[6] *Mills v. New York City*, No. 23-CV-07460 (JSR), 2024 WL 4979387, at *9 (S.D.N.Y. Dec.

---

[5]  The Supreme Court noted that "because any permitting scheme can be put toward abusive ends," it was "not rul[ing] out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  *Bruen*, 597 U.S. at 38 n.9.  Maine's waiting period law imposes only a 72-hour wait time, does not impose fees, and is not otherwise being put to "abusive ends."

[6]  In *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583 (5th Cir. 2025), the Fifth Circuit did not question its prior decision in *McRorey*.  At issue in *Reese* was a federal law prohibiting the sale or delivery of handguns to persons under the age of 21.  127 F.4th at 586.  In the context of that "outright ban," the court stated that "the right to 'keep and bear arms' surely implies the right to purchase them."  *Id*., 590 & n.2.  But Maine's law is not an outright ban on a category of sales – it simply delays the purchase of some sales for 72 hours.  This is a much briefer delay than the ten-day delay that the law at issue in *McRorey* could cause.

4, 2024) ("[N]othing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time."); *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 207 (D. Vt. 2024) ("The Court concludes that the 'right of the people to keep and bear Arms,' does not facially include a right to immediately obtain a firearm through a commercial sale.") (citation omitted); *Ortega v. Lujan Grisham*, 741 F.Supp.3d 1027, 1072 (D.N.M. 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees with the Defendants that the Second Amendment's plain text does not cover purchasing firearms.") (cleaned up); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("From this reading of the [Second Amendment's] plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered.").

That the Second Amendment's plain text does not apply to the purchase of firearms is reinforced by the Supreme Court's statements that regulations on commercial sales are presumptively valid. In *Heller*, the Court cautioned that the right to keep and bear arms is not "unlimited," and clarified that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or <u>laws imposing conditions and qualifications on the commercial sale of arms</u>.

554 U.S. at 626-27 (emphasis added). Such measures, the Court explained, are "presumptively lawful regulatory measures." *Id.* at 627 n.26. Two years later, the Supreme Court "repeat[ed] those assurances" and affirmed that *Heller's* holding "did not cast doubt" on "longstanding regulatory measures," including "laws imposing conditions and qualifications on the commercial sale of arms." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *see also Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring); *United States v. Rahimi*, 602 U.S. 680, 735 (2024) (Kavanaugh, J., concurring).

Lower federal courts have applied this presumption in challenges to laws regulating the sale of firearms. In *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), plaintiffs challenged a law establishing 21 as the minimum age to purchase firearms. The Tenth Circuit upheld the law, explaining that ""embedded within the quartet of recent Supreme Court Second Amendment cases is the recognition that certain 'longstanding' regulations – including 'laws imposing conditions and qualifications on the commercial sale of arms' – are 'presumptively lawful.'" *Id*. (quoting *Heller*, 554 U.S. at 626–27 & n.26). Similarly, in a case challenging a law prohibiting firearm sales on state property, the Ninth Circuit concluded that the "most reasonable interpretation" of *Heller's* statement that regulations on the commercial sale of arms are presumptively lawful "is that

commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *B & L Prods.*, 104 F.4th at 119.

Several courts have applied this presumption to waiting period laws. *See Ortega*, 741 F. Supp. 3d at 1077 ("Accordingly, if a firearm regulation falls into one of the presumptively Constitutional categories that *Heller* outlines, the regulation does not implicate the Second Amendment's plain text, and, thus, a court need not proceed to *Bruen's* second prong."); *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1135 (explaining that its conclusion that the plain text of the Second Amendment does not apply to a waiting period law was "reinforced" by the presumption that commercial regulations of the sale of firearms are lawful).

Theoretically, regulations on firearm sales could be so burdensome that they effectively prohibit the acquisition of firearms and interfere with the right to keep and bear arms, thus overcoming any presumption of lawfulness. *Bruen*, 597 U.S. at 38 n.9 (referring to permitting scheme that could be put toward "abusive ends" to "deny ordinary citizens their right to public carry"); *McRorey*, 99 F.4th at 838 n.18 ("There is no question that regulations on purchase so burdensome that they act as de facto prohibitions on acquisition would be subject to constitutional challenge under *Bruen's* rigorous historical requirement."). The Attorney General is thus not suggesting that a law establishing, for example, a 25-year waiting period would withstand a Second Amendment challenge simply because it could be characterized

as a "law[] imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. But a law requiring certain buyers to wait 72 hours before taking possession of a firearm is neither abusive nor a de facto prohibition on keeping and bearing arms. *See Ortega*, 741 F. Supp. 3d at 1075 (concluding that a seven-day waiting period was "minimally burdensome" and did "not so substantially impinge the ability to acquire firearms that it functions as a de facto prohibition on the right to keep and bear arms"); *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 209 (finding that 72-hour waiting period did not unduly burden the right to keep and bear arms and noting that Second Circuit has suggested that "thirty-day waiting periods are not unconstitutionally long"). Indeed, federal law already can delay a firearm sale for up to three days pending completion of a background check. 18 U.S.C. § 922(t)(1)(B)(ii)).[7] The Maine statute explicitly provides that the 72 hours "must be concurrent with any waiting period imposed by any background check process required by federal or state law." 25 M.R.S. § 2016(2). In some instances, then, Maine's law will impose no additional delay.

The Maine law imposes objective and definite standards. With the exception of certain sales expressly identified in the statute, buyers must wait 72 hours before taking possession of a firearm. The statute allows for no exercise of discretion—so,

---

[7] Under the Bipartisan Safer Communities Act enacted in 2022, Pub. L. 117-159, the allowance for a background check for persons under 21 is up to ten business days. 18 U.S.C. 922(t)(1)(C).

for example, a government official cannot extend or shorten the waiting period for a particular person. *See Polis*, 121 F.4th at 123 (a state's "minimum age requirement for firearm sales and purchases is nondiscretionary because it sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions"). There is thus no potential for abuse.

In sum, the Second Amendment, on its face, does not apply to Maine's 72-hour waiting period law, nor does the law impose such a burden as to interfere with what the Second Amendment does protect—the right to keep and bear arms.

### B.  Maine's waiting period law is consistent with the Nation's historical tradition of firearm regulation.

Even when the Second Amendment's plain text applies to the conduct at issue, a firearm regulation survives a Second Amendment challenge if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  The *Bruen* Court emphasized that this inquiry will sometimes be straightforward, but "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27.

In 2024, the Supreme Court clarified how courts should conduct this historical inquiry. *Rahimi*, 602 U.S. 680.  The Court noted that it did not mean to suggest "a law trapped in amber," and that "the Second Amendment permits more than just

those regulations identical to ones that could be found in 1791." *Id.* at 691-92. The central questions are why and how the regulation at issue burdens Second Amendment rights:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* (quoting *Bruen*, 597 U.S. at 30).

Maine's waiting period law addresses a societal problem that did not exist at our founding—the impulsive use of firearms to commit homicides and suicides. As Professor Randolph Roth explains, homicide rates were low in the colonial era, and even though household ownership of firearms was widespread, only ten to fifteen percent of family, household, and intimate partner homicides were committed with firearms. Roth Decl. (ECF No. 17), ¶ 16 (Exhibit A).[8] Professor Roth attributes this low rate to the technological limitations of firearms of that period—they were liable to misfire, usually had to be reloaded after every shot, reloading was time-consuming, and firearms could not be kept loaded for any length of time. *Id.*, ¶ 17.

---

[8] The exhibits attached to the declarations cited in this motion are not included here but are available via the district court's PACER docket.

"[C]olonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*, ¶ 19. So, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id.*, ¶ 18.

Suicide rates were also low at the founding, and suicide by firearm was rare. After analyzing suicides in Vermont and New Hampshire from 1783 to 1824, Professor Roth determined that the suicide rate was between 3.1 and 5.7 per 100,000 persons ages 16 and older, and that only six percent of suicides were committed with firearms (despite the fact that 50–60 percent of households owned a firearm). *Id.*, ¶ 43. By the late 1920s and early 1930s, though, when technology had advanced and firearms could be kept loaded and used impulsively, not only did suicide rates increase, but so did the percentage of suicides committed with firearms. *Id.*, ¶ 44.[9] In sum, impulsive firearm homicides and suicides were simply not the societal problem that they are now.

Another significant difference between now and then is that, as Professor Robert Spitzer explains, firearms were not readily available during the 17th, 18th, and most of the 19th centuries. Spitzer Decl. (ECF No. 15), ¶¶ 9-10 (Exhibit B). Rather, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved

---

[9] In 2021, 277 Mainers committed suicide, and 56 percent of them used a firearm. ECF No. 13-14.

technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.*, ¶ 10. Professor John Donohue concurs with Professor Spitzer:

> There was a built-in waiting period for everyone who purchased a gun in 1791 because of issues of travel time, scarcity of gun parts, and the time it took to make a gun. The world today allows almost unlimited access to weaponry within minutes because there are far more licensed gun sellers than the combined number of McDonald's and Starbuck's stores.

Donohue Decl. (ECF No. 16), ¶ 51 (Exhibit C); *see also Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 213 ("There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding."). There was thus no need to impose waiting periods until recent times because, as a practical matter, a person necessarily had to wait before taking possession of a firearm.

While impulsive firearm purchasing was not a problem, other impulsive behavior was. As Professor Spitzer details, there were many laws in early America designed to keep firearms out of the hands of intoxicated individuals. Spitzer Decl., ¶¶ 14-31. From the 1600s through the early 1900s, laws in at least twenty states criminalized the carrying or use of firearms when intoxicated; laws in at least fifteen states regulated the commercial sale or distribution of alcohol when firearms were also present; and laws in at least two states barred gun sales to those who were intoxicated. *Id.*, ¶ 20.

In addition, this country has a long history of weapon licensing and permitting. *Id*., ¶¶ 32-63.  Licensing and permitting laws date to the 1600s and became more widespread in the 1800s and early 1900s.  *Id*., ¶ 34.  "Historic weapons licensing laws contemplated an evaluation process to improve the likelihood that individuals who sought access to firearms did not obtain that access until they were approved to receive a license." *Id*., ¶ 75.  And as Professor Spitzer notes, "licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand." *Id*., ¶ 33.

Given that firearm homicides and suicides were relatively rare in our Nation's history, and because firearms were not readily available until the late 19th century, it is not surprising that there are no early examples of waiting period laws.  Rather, it is "unprecedented societal concerns" (the increased use of firearms in homicides and suicides) and "dramatic technological changes" (the ability to quickly acquire firearms and easily use them) that call for the imposition of waiting periods.  *See Bruen*, 597 U.S. at 27.  In this circumstance, then, the Court should apply a "nuanced" approach and look for historical analogues by comparing the "how" and "why" of Maine's waiting period law to historical precursors.

In upholding waiting period laws against Second Amendment challenges, federal courts in Vermont, New Mexico, and Colorado held that such laws are consistent with the Nation's historical tradition of firearm regulation.  *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 210-14; *Ortega*, 741 F. Supp. 3d at

1085-89; *Polis*, 701 F. Supp. 3d at 1141-46. In two cases, courts held that laws restricting firearm acquisition and use by intoxicated persons are appropriate analogues. *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 212 (concluding that for intoxication laws and waiting period laws, "the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety"); *Polis*, 701 F. Supp. 3d at 1144 (concluding that intoxication laws and waiting period laws "both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm"). These courts found that licensing laws are also an appropriate analogue "because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *Polis*, 701 F. Supp. 3d at 1145; *see also Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 212.[10]

---

[10] In *Ortega*, rather than focusing on laws relating to intoxication and licensing, the court considered "regulations demonstrate[ing] a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society." 741 F. Supp. 3d at 1088-89. Plaintiffs argued that such laws cannot serve as analogues because they were "rooted in racism and bias." *Id.,* 1093. The *Ortega* court rightly acknowledged that "[m]any founding-era gun regulations . . . undoubtedly are repugnant," but nevertheless concluded that it had to consider them "if it is to adhere faithfully to the Supreme Court's instruction to assess the Constitutionality of modern firearm regulations against those laws in existence in the eighteenth and early nineteenth century." *Id*.

The "how and why" Maine's waiting period law burdens Second Amendment rights (assuming for the sake of argument that the Second Amendment applies), is the same as the "how and why" of intoxication and licensing laws. With respect to "how," Maine's law imposes only a minor burden. It does not apply to sales for which no background check is required, and not all firearm purchases require a background check. The law does not prohibit anyone from acquiring a firearm. Instead, it simply imposes on covered sales a modest 72-hour waiting period. Intoxication and licensing laws imposed a similarly minor burden.

As to "why," the purpose of the waiting period law is to decrease the likelihood that firearm purchasers act irresponsibly by using firearms to harm themselves or others. Laws prohibiting intoxicated persons from acquiring or carrying firearms were similarly designed to reduce firearm violence by persons who might act impulsively. Licensing laws served a similar purpose—helping to ensure that persons acquiring firearms were responsible citizens who would be less likely to use firearms unlawfully.

In short, because both the "how" and the "why" are the same, Maine's modern waiting period law is sufficiently analogous to intoxication and licensing laws and is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## II. The State and its residents will suffer irreparable harm if a stay is not granted.

As the district court recognized, while the Attorney General is the named defendant, the lawsuit is functionally against the State of Maine.  ECF No. 30, at 3 n.3.  And this Court has recognized that "any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (cleaned up).  Here, moreover, enjoining enforcement of the waiting period law is more than just an abstract injury to Maine's interest in enforcing its laws.  As is discussed below, the Attorney General presented undisputed evidence that Maine's waiting period law will save lives by reducing both homicides and suicides.  This is precisely why the Legislature enacted the law.  Real harms that are truly irreparable will result if the waiting period law cannot be enforced, and a stay will prevent those harms.

## III. A stay will not substantially injure the plaintiffs.

As an initial matter, although the waiting period law was enacted in April 2024 and took effect in August 2024, the plaintiffs did not file this lawsuit until November 2024, undermining their claim of irreparable harm.  *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004).  In any event, any harm to plaintiffs from a stay is, at best, speculative.

The firearm-dealer plaintiffs claim that the waiting period law is causing them to lose income. White, Hendsbee, and Cole Decls. (ECF Nos. 1-3, 1-4, and 1-5). Assuming that firearm dealers even have standing to challenge the waiting period law, the extent of any economic harm is, at this point, speculative. Plaintiff Coshow has purchased a firearm and expressed no intent to purchase another one, Coshow Decl. (ECF No. 1-2), so a stay will not cause her harm. Finally, plaintiff Beckwith already carries a gun and by now presumably has purchased the second gun that she alleged she wanted to purchase. Beckwith Decl. (ECF No. 1-1, ¶ 2). A stay will not harm her personally. While she alleges that her clients are at risk if they cannot immediately purchase firearms, it is doubtful that she has standing to allege harm on the part of people with whom she works, and plaintiffs have not demonstrated that the waiting period law harms Beckwith's clients. There is no competent evidence in the record that immediate access to firearms protects one's safety; her clients could borrow a firearm or acquire one through a sale not subject to the waiting period law; and the Maine Coalition to End Domestic Violence testified that services are available to keep victims safe during the waiting period. Stark Test (ECF No. 13-12).

## IV.  A stay would promote the public interest by saving lives.

The undisputed evidence in the record is that waiting periods save lives.  As

Professor Donohue explains:

> Substantial empirical evidence illustrates that waiting periods prior to the purchase of weapons such as those enacted by Maine will reduce suicides – particularly among young adults – and would be expected to reduce the risk of the type of episodes seen in recent years of enraged individuals buying firearms on the way to commit mass violence and other criminal acts.

Donohue Decl., ¶ 27.  One study concluded that waiting period laws reduce firearm

suicides by 7.4 percent—the same reduction in Maine's 158 firearm suicides in 2021

would have saved twelve lives that year alone.  *Id*., ¶ 40.  Professor Donohue's own

research found that waiting period laws "are able to disrupt suicidal ideation and

thereby significantly decrease firearm suicides," and reduce suicides by 21-34-year

olds by 6.1 percent.  *Id*., ¶ 41.  As he notes, "[i]f a particularly lethal mechanism like

a gun is readily available, many despondent individuals with what could be a merely

passing moment of despair will end up committing suicide when a lapse of time

would be enough to dissuade or divert them from such an irreversible action."  *Id*.,

¶ 43.  Professor Donohue further opines that waiting periods may reduce the risk of

at least some mass shootings.  *Id*., ¶ 47; *see also Handgun waiting periods reduce*

*gun deaths*, Luca, M., et al. (ECF No. 13-9) (study concluding that states adopting

waiting periods experienced a seventeen percent decrease in homicides and a six

percent decrease in suicides).   In short,  the public  interest  in  saving  lives  by

preventing homicides and suicides overwhelmingly militates in favor of allowing the Attorney General to continue enforcing the waiting period while this appeal is heard.

## CONCLUSION

The Attorney General requests that this Court stay the district court's preliminary injunction order pending resolution of this appeal.

Dated: March 12, 2025          Respectfully submitted,

AARON M. FREY
Attorney General

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
Thomas.A.Knowlton@maine.gov
PAUL SUITTER
Assistant Attorney General
Paul.Suitter@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8880
Fax (207) 287-3145

## CERTIFICATE OF COMPLIANCE

This motion contains 5,198 words, excluding the items exempted by Federal Rule of Appellate Procedure 27(a)(2)(B), and complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2). For this Certification, I relied on the word count function of the word-processing software used to prepare this brief (Microsoft Word 2007). I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size.

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Bar No. 65217
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 12th day of March, 2025, I filed the above brief electronically via the ECF system. I further certify that on this, 12th day of March, 2025, I served the above brief electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

ERIN E. MURPHY
erin.murphy@clementmurphy.com

JOSHUA A. TARDY
 jtardy@rudmanwinchell.com

KEVIN J. WYNOSKY
kevin.wynosky@clementmurphy.com

MATTHEW ROWEN
matthew.rowen@clementmurphy.com

PAUL D. CLEMENT
paul.clement@clementmurphy.com

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
Bar No. 65217
Six State House Station
Augusta, Maine 04333-0006
(207) 626-8800
