# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

ANDREA BECKWITH, et al.,

*Plaintiffs-Appellees*,

v.

AARON M. FREY,

*Defendant-Appellant*.

———————————

On Appeal from the United States District Court
for the District of Maine, No. 1:24-cv-00384-LEW

———————————

## APPELLEES' OPPOSITION TO APPELLANT'S
## MOTION FOR A STAY PENDING APPEAL

———————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

March 24, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees hereby certify that:

- Plaintiff-Appellee East Coast School of Safety does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock;

- Plaintiff-Appellee J White Gunsmithing does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock;

- Plaintiff-Appellee A&G Shooting does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock; and

- Plaintiff-Appellee TLC Gunsmithing and Armory does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 5

    A.    Legal Background ................................................................ 5

    B.    Procedural Background ....................................................... 9

ARGUMENT ....................................................................................................11

I.    Maine Is Not Likely To Succeed On The Merits........................................ 12

II.    The Remaining Factors Weigh Overwhelmingly Against A Stay ................ 17

CONCLUSION ................................................................................................. 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
50 Tenn. 165 (1871) ........................................................................13

*B&L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ..........................................................16

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ...........................................................18

*Davis v. Pension Benefit Guard. Grp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......................................................12

*Dist. 4 Lodge v. Raimondo*,
18 F.4th 38 (1st Cir. 2021) ...............................................................17

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................... 16, 21

*Elrod v. Burns*,
427 U.S. 347 (1976) ..........................................................................18

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................18

*Free Speech Coal. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) .............................................................17

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) ..............................................................18

*Hyde Park Partners, L.P. v. Connolly*,
839 F.2d 837 (1st Cir. 1988) ............................................................20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ..................................................................... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) .............................................................11, 12, 18

*Ortega v. Lujan Grisham*,
    741 F.Supp.3d 1027 (D.N.M. 2024) ........................................................ 9, 14, 15

*Payne-Barahona v. Gonzales*,
    474 F.3d 1 (1st Cir. 2007) ...................................................................18

*Planned Parenthood League of Mass. v. Bellotti*,
    641 F.2d 1006 (1st Cir. 1981) ........................................................ 4, 18

*Printz v. United States*,
    521 U.S. 898 (1997)..............................................................................7

*Pub. Citizen v. DOJ*,
    491 U.S. 440 (1989)............................................................................21

*Public Service Co. v. Patch*,
    167 F.3d 15 (1st Cir. 1998) ...............................................................12

*Reese v. ATF*,
    127 F.4th 583 (5th Cir. 2025).............................................................13

*Rocky Mountain Gun Owners v. Polis*,
    701 F.Supp.3d 1121 (D. Colo. 2023) .......................................... 5, 12, 14

*Silvester v. Becerra*,
    138 S.Ct. 945 (2018)..................................................................... 4, 18

*Silvester v. Harris*,
    41 F.Supp.3d 927 (E.D. Cal. 2014)............................................... 8, 12

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016).................................................... 5, 6, 8

*Thomas v. Collins*,
    323 U.S. 516 (1945)............................................................................21

*United States v. Langston*,
    110 F.4th 408 (1st Cir. 2024) ............................................................14

*United States v. Rahimi*,
   602 U.S. 680 (2024)....................................................................... *passim*

*United States v. Williams*,
   113 F.4th 637 (6th Cir. 2024)....................................................15

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) .....................................................18

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
   741 F.Supp.3d 172 (D. Vt. 2024)..............................................14

*Yukutake v. Lopez*,
   No. 21-16756, --- F.4th ---,
   2025 WL 815429 (9th Cir. Mar. 14, 2025) ...........................13, 14

## Constitutional Provision

U.S. Const. amend. II ....................................................................5

## Statutes

18 U.S.C. §921 .............................................................................19

18 U.S.C. §922 ...............................................................................7

25 M.R.S. §2016 ..................................................................... *passim*

2023 Colo. Legis. Serv. Ch.125 (H.B. 23-1219) ........................9

Act of July 8, 1932, ch.465, 47 Stat. 650....................................6

Fla. Stat. §790.0655 ...................................................................10

Law of Mar. 30, 1927, ch.321, 1927 N.J. Laws 742...................6

Maine Bill LD 2238 (SP 958) ...................................................10

Md. Code Ann., Pub. Safety §5-101 ..........................................10

Md. Code Ann., Pub. Safety §5-123 ..........................................10

Md. Code Ann., Pub. Safety §5-124 ..........................................10

Minn. Stat. §624.7132.................................................................10

N.M. Stat §30-7-7.3 ....................................................................10

Vt. H.230, https://tinyurl.com/msddz287 ..................................9

**Regulation and Other Authorities**

27 C.F.R. §478.11..........................................................................19

1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976),
    https://tinyurl.com/3f8xr6uy ...............................................6

Condition, *Black's Law Dictionary* (12th ed. 2024) ..............17

David B. Kopel, *Background Checks for Firearms Sales and Loans*,
    53 Harv. J. Legis. 303 (2016)................................................6

Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun
    Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t..............6

Qualification, *Merriam-Webster*, https://tinyurl.com/2dvpxhft..........................16

Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees*,
    https://tinyurl.com/5yx9rc52 (last visited Mar. 24, 2025)....................6

Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs ...........................9

# INTRODUCTION

In most of the country, once a law-abiding citizen passes a background check and confirms that she may lawfully possess a firearm, she can take possession and begin exercising her fundamental constitutional right to keep and bear arms without delay. That is no small matter in the Second Amendment context. When it comes to the need to defend oneself and one's loved ones, time is often of the essence. A victim of domestic violence facing a concrete threat of harm and seeking an effective means to defend herself and her children, for instance, does not have days to spare. Yet owing to a recently enacted Maine law, an individual facing such dire straits would be left defenseless for at least three days. New Section 2016 of Title 25 of the Maine Revised Statutes mandates a 72-hour "cooling-off period" on nearly all firearm sales in Maine. Under Section 2016, it does not matter why a Mainer seeks to buy a firearm; nor does it make a difference if she has a concealed-carry permit or a hunting license. It does not even matter if she faces a credible, imminent threat of violence and needs a firearm for self-defense. Everyone must wait at least three days—even after passing a background check—before they can take possession of a new firearm, on the theory that even people who have proven themselves law-abiding and satisfied all regulatory requirements to acquire a firearm are likely to be inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental constitutional right.

Nothing in our Nation's historical tradition of firearm regulation supports that kind of "cooling-off period" measure, which is a late-twentieth-century regulatory innovation that is at odds with the very premise of the Second Amendment—i.e., that people *can* be trusted to keep and bear firearms unless and until there is a reason to think otherwise as to an individual. To be sure, our Nation's tradition recognizes that the government may keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others." *United States v. Rahimi*, 602 U.S. 680, 700 (2024). That is why laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" typically will pass constitutional muster. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). But our Nation's tradition has never endorsed efforts to "broadly restrict arms use by the public generally," without regard to any individualized concerns. *Rahimi*, 602 U.S. at 698. And Section 2016 falls decidedly in that camp. Making nearly everyone wait at least 72 hours before they can use firearms at all is a classic "broad[] restrict[ion] [on] arms use by the public generally," *id.*, and one that finds no analogue in our Nation's historical tradition. On the contrary, a law that requires nearly all law-abiding citizens to "cool off" for days, *even after they have passed a background check*, before they can exercise their Second Amendment rights, is the very model of an unconstitutional effort to "deny ordinary citizens their right to [keep and] carry [arms]." *Bruen*, 597 U.S. at 38 n.9.

The district court correctly understood all of this and promptly entered a preliminary injunction blocking enforcement of Section 2016. There is no reason to stay that injunction pending resolution of an appeal that the state has not even asked this Court to expedite. Indeed, in addition to being far out of step with historical tradition, Maine's radical approach has little to recommend it. For people facing credible, imminent threats of violence, stripping their Second Amendment rights—even temporarily—can be deadly. Section 2016 exposes such individuals to grave danger, emboldening those who threaten them and eliminating any real possibility of defending themselves and their loved ones.

The state brushes off the Second Amendment rights of these law-abiding citizens, insisting that people living in fear of imminent violence not only do not need a firearm, but fail to realize that they are actually better off without one. That ivory-tower response is not just callous, but contrary to the record developed below. Plaintiff Andrea Beckwith is a domestic-violence survivor who has dedicated her life to helping and advocating for people in crisis situations. Several times a month, she is connected with a woman facing violent threats from a former or current intimate partner. When this happens, she drops what she is doing and meets the victim as soon as possible at the closest gun range. Relying on her skills as a certified firearms instructor, she helps the victim select a handgun she feels comfortable using and provides instruction so the victim can safely and competently defend herself—

and often her children too.  Beckwith then connects the victim with a local gun shop where, pending the instant background check that federal law requires, she can purchase the firearm and leave feeling safer that very day.  The record evidence shows that, for someone in that situation, the first few days are the most critical.  Yet if the Court grants Maine's motion and stays the preliminary injunction, it will deny domestic-violence victims and others facing imminent threats this critical measure of safety when they face the gravest danger.  *See* D.Ct.Dkt.1-1 ¶¶8, 15-17.

If Maine enacted a 72-hour "cooling-off period" on inflammatory speech, this Court would doubtless leave in place a preliminary injunction on First Amendment grounds "notwithstanding a State's purported interest in giving the speaker time to calm down."  *Silvester v. Becerra*, 138 S.Ct. 945, 951-52 (2018) (Thomas, J., dissenting from denial of certiorari).  So too if Maine enacted a 72-hour "cooling-off period" on a substantive-due-process right.  Indeed, in the era predating *Dobbs v. Jackson Women's Health Organization*, this Court preliminarily enjoined a law imposing a *24-hour* "cooling-off period" before a woman could obtain an abortion.  *See Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981). There is simply no reason to tolerate a 72-hour "cooling-off period" in the Second Amendment context.  In fact, as this case illustrates, there is every reason not to—especially when the state has not even bothered to expedite its appeal.  The Court should leave in place the order preliminarily enjoining Section 2016.

## BACKGROUND

### A.    Legal Background

1. Since the advent of the firearm, it has been an unfortunate reality that some people want firearms for illicit purposes.  Yet the Founders nevertheless saw fit to "enshrine" in the Constitution "'the right of the people to keep and bear Arms.'" *Bruen*, 597 U.S. at 20, 26, 50 (quoting U.S. Const. amend. II).  Consistent with that "unqualified command," *id.* at 17, states and the federal government have experimented over the centuries with various measures to combat illicit firearm use, *e.g.*, penalty-backed prohibitions on using firearms for improper purposes; bans on possession by individuals likely to misuse them; background checks to identify individuals subject to such disqualifications; and permits and licenses to carry firearms outside the home.  But no government imposed any sort of "waiting period" on firearms purchases "until 1923."  *Rocky Mountain Gun Owners v. Polis* ("*RMGO*"), 701 F.Supp.3d 1121, 1137 (D. Colo. 2023).

In the 1920s and 1930s, a handful of states enacted waiting-period laws to facilitate rudimentary background-check regimes, which were just then coming into vogue.  For example, in 1923 California imposed a one-day wait for retail handgun purchases, during which time dealers were required to provide the identity of the purchaser to the local police or county clerk.  *See Silvester v. Harris*, 843 F.3d 816, 823-24 (9th Cir. 2016); *see also* Law of Mar. 30, 1927, ch.321, §6(4)(b), 1927 N.J.

Laws 742, 746 (New Jersey), Act of July 8, 1932, ch.465, §8, 47 Stat. 650, 652 (D.C.).  From the 1970s to 1990s, waiting-period laws enjoyed a brief renaissance as additional states sought to facilitate background checks in the pre-Internet era. *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

With the advent of better background-check technology like the National Instant Criminal Background Check System ("NICS"), however, fixed waiting-period laws now serve little investigatory purpose, as most background checks are resolved within minutes.  So many states that previously imposed waiting periods have since abandoned them.  *See, e.g.*, David B. Kopel, *Background Checks for Firearms Sales and Loans*, 53 Harv. J. Legis. 303, 310 (2016) (noting that "[t]he availability of NICS has led some states to repeal waiting periods"); Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://tinyurl.com/5yx9rc52 (last visited Mar. 24, 2025) (Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun was eliminated effective November 1, 1998," when "[t]he Tennessee Instant Check Law became effective").

Federal law followed a similar path. Congress first mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. Although the Brady Act contemplated a nationwide instant-background-check system, the technology did not exist when it was passed. Congress thus gave the FBI five years to create what ultimately became NICS and, in the meantime, embraced a five-day waiting period to facilitate more cumbersome background checks. *See Printz v. United States*, 521 U.S. 898, 902-04 (1997). Recognizing the constitutional concerns that waiting periods implicate, however, Congress not only eliminated the five-day waiting period once NICS came online, but replaced it with an affirmative *protection* to ensure that delays do not impede lawful Second Amendment activity. *See* 18 U.S.C. §922(t)(1)(B)(ii) (authorizing dealers to transfer a firearm three business days after requesting a background check, even if the check is not yet complete).

2. While Congress and some states responded to NICS and related improvements by jettisoning lengthy waiting-period laws that were no longer needed, a few tried to re-justify laws originally intended to facilitate background checks. Again, California is illustrative. After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*,

843 F.3d at 823-24. By the 1990s, California had adopted an electronic system that processed background checks far more expeditiously. But although the legislature recognized at that point that it no longer had a good reason to force Californians to wait 15 days to acquire a firearm, it still balked at entrusting law-abiding citizens who have passed a background check with a firearm. So in 1996, California reduced its waiting period, but only to ten days, on the theory that everyone should have to wait out a "'cooling off' period" before they can have a handgun, even if they have already passed a background check. *See Silvester v. Harris*, 41 F.Supp.3d 927, 947 (E.D. Cal. 2014).

The Ninth Circuit upheld California's cooling-off period law under the means-end balancing that it applied in Second Amendment cases before *Bruen*. *Silvester*, 843 F.3d at 828. But the Supreme Court subsequently rejected means-end balancing, abrogating that decision and others applying similar tests. *Bruen*, 597 U.S. at 22-23.

3. To put it mildly, cooling-off periods do not sit comfortably with *Bruen* and *Rahimi*. The former explicitly cautioned against efforts to impose obstacles solely to delay law-abiding citizens' ability to carry a firearm. *Id.* at 38 n.9. And the latter distinguished between permissible efforts to keep firearms away from "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698-700.

Unfortunately, those pronouncements have not stopped a few states in recent years from enacting unadorned cooling-off period laws for the first time in their histories.  For example, Colorado recently subjected nearly all firearm sales to a three-day hold, even if the buyer passes a background check instantly, positing that "[d]elaying immediate access to firearms … can help prevent impulsive acts of firearm violence." 2023 Colo. Legis. Serv. Ch.125 §1(2)(a) (H.B. 23-1219) (West).  Vermont followed suit, enacting its own three-day cooling-off period that starts once a buyer passes a background check, on the theory that doing so will "help to prevent impulsive … violence," H.230, §1(10), https://tinyurl.com/msddz287, despite the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs.  New Mexico recently joined the bandwagon too, passing a seven-day cooling-off period for the "primary purpose" of "preventing impulsive suicides and homicides."  *Ortega v. Lujan Grisham*, 741 F.Supp.3d 1027, 1041 (D.N.M. 2024).  In total, 13 states (including Maine) plus the District of Columbia currently have some sort of waiting-period law.  But no court of appeals has addressed the constitutionality of any since *Bruen*.

## B.    Procedural Background

1. Last year, Maine joined this late-breaking party, imposing a 72-hour delay between when someone agrees to purchase a firearm and when she can possess it.  25 M.R.S. §2016(2).  Section 2016 does not purport to facilitate any inquiry into

whether someone is a law-abiding citizen; to the contrary, it imposes a 72-hour wait even if the purchaser passes a background check immediately, and it does not require any additional investigation during that period. The 72-hour wait is instead an unadorned "cooling-off" period, justified on the theory that it may curb impulsive violence or self-harm—as is evident from the bill's title: "An Act To Reduce Suicides and Violent Crimes by Requiring a 72-hour Waiting Period after the Sale of a Firearm." Maine Bill LD 2238 (SP 958).

Even among the states with waiting periods, Section 2016 is an outlier. Some states allow law enforcement to waive the waiting period upon finding that the buyer faces threats to herself or her family. Minn. Stat. §624.7132, subd.4. Others make exceptions for buyers who already have a concealed handgun license, Fla. Stat. §790.0655(2)(a); N.M. Stat §30-7-7.3(H)(2), or for those who are certified in hunting-safety and seeking to buy a rifle or shotgun, Fla. Stat. §790.0655(2)(c). And some states at least leave open some avenue to acquire a firearm by limiting the cooling-off period to only certain types of firearms, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1), or by allowing certain private sales, Fla. Stat. §790.0655(1)(a). Maine does none of those things.

2. Plaintiffs are law-abiding citizens and businesses harmed by Section 2016. Andrea Beckwith has dedicated her life to helping domestic-violence victims; through her business East Coast School of Safety, she has provided self-defense

training to thousands of women seeking to take back their lives with confidence. D.Ct.Dkt.1-1. James White and Adam Hendsbee own federally licensed firearm dealers; before the district court's injunction, Section 2016 slashed their sales and stymied their ability to help customers with a time-sensitive need for a firearm. D.Ct.Dkt.1-3, 1-4. Thomas Cole owns a federally licensed dealer specializing in gun-show sales; Section 2016 drove Cole's business to the verge of liquidation, as it makes gun-show sales virtually impossible. D.Ct.Dkt.1-5.

The district court granted Plaintiffs' motion seeking a preliminary injunction on Second Amendment grounds. D.Ct.Dkt.30. After noticing an appeal, Maine asked the district court to stay its injunction pending appeal, but did not expedite that request. Maine now seeks to stay that preliminary injunction pending appeal—and, once again, has not sought expedited consideration. Nor has Maine moved to expedite its appeal.

## ARGUMENT

A stay "intru[des] into the ordinary processes of administration and judicial review," so it is never awarded as "a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009). Instead, Maine "bears the burden of showing" four factors: (i) "a strong showing that [it] is likely to succeed on the merits"; (ii) that the state "will be irreparably injured absent a stay"; (iii) that a "stay will [not] substantially injure"

Plaintiffs; and (iv) that "the public interest" favors a stay. *Id.* at 433-34. Maine cannot show any—let alone all—of those factors.[1]

## I. Maine Is Not Likely To Succeed On The Merits.

Maine identifies no reason to disturb the district court's holding that Plaintiffs "are likely to succeed on the merits of their Second Amendment claim." D.Ct.Dkt.30 at 15. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Cooling-off periods that apply even *after* someone has already passed a background check are decidedly not. They are a late-twentieth-century innovation that would have been "unimaginable at the founding." *RMGO*, 701 F.Supp.3d at 1142. They "did not exist near the time of adoption of the Second and Fourteenth Amendments, and they are not common now." *Silvester*, 41 F.Supp.3d at 963. And even crediting Maine's theory that "impulsive firearm homicides and suicides" was not a problem until the early-twentieth century, Mot.13, cooling-off period laws did not come around until the *end* of the century and remain

---

[1] Although Maine claims that *Public Service Co. v. Patch*, 167 F.3d 15 (1st Cir. 1998), allows "a 'powerful showing of irreparable injury'" to excuse a relatively weak merits position, Mot.4 n.2, intervening Supreme Court decisions render that "sliding-scale approach … 'no longer controlling, or even viable,'" *Davis v. Pension Benefit Guard. Grp.*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

uncommon even today. That lands about as far from "the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, as it gets.

Tacitly acknowledging as much, Maine spends the bulk of its submission arguing that this Court need not consider history *at all*, on the theory that "[t]he Second Amendment's plain text does not cover the purchase of firearms." Mot.4. Maine is wrong. As the Ninth Circuit recently explained, a law that "regulates and burdens the acquisition of firearms by ordinary citizens"—which is the *raison d'être* of a "cooling-off" requirement like Section 2016—"regulates conduct that is covered by the text of the Second Amendment and 'presumptively protect[ed]' by it." *Yukutake v. Lopez*, No. 21-16756, --- F.4th ---, 2025 WL 815429, at *18 (9th Cir. Mar. 14, 2025) (brackets in original) (quoting *Bruen*, 597 U.S. at 24). Indeed, the commonsense conclusion that "th[e] right of keeping arms" "necessarily involves the right to purchase and use them" has been a feature of judicial opinions from 1871, *Andrews v. State*, 50 Tenn. 165, 178 (1871), to the present, *e.g.*, *Reese v. ATF*, 127 F.4th 583, 589-90 (5th Cir. 2025). And rightly so, as "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether." *Id.* at 590.

"[T]he State therefore must carry its burden to 'justify its regulation by demonstrating that [Section 2016] is consistent with the Nation's historical tradition

of firearm regulation.'" *Yukutake*, 2025 WL 815429, at *18 (quoting *Bruen*, 597 U.S. at 24). It cannot. As this Court has explained, "*Rahimi* held only that an individual may be temporarily disarmed, consistent with the Second Amendment, if a court has found that the individual poses a credible threat to the physical safety of another." *United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024). Yet, under Section 2016, people are "temporarily disarmed" even after passing a background check that identifies no reason to think they are a credible threat to anyone.

Maine halfheartedly suggests that Section 2016 "sufficiently" resembles early-American laws prohibiting drunken carry and historical licensing regimes, because those laws countenanced briefly delaying the exercise of Second Amendment rights. Mot.17. Those analogies fall flat, because neither involves "imposing [a] similar restriction[]" on arms-bearing conduct "for [a] similar reason[]" as Section 2016. *Rahimi*, 602 U.S. at 692. Indeed, although district courts in Vermont and Colorado preliminarily upheld cooling-off period laws based on these analogies, a district court in New Mexico declined to stretch them to cover that state's cooling-off period law—and this Court should too. *Compare Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F.Supp.3d 172, 211-14 (D. Vt. 2024), *and RMGO*, 701 F.Supp.3d at 1142-45, *with Ortega*, 741 F.Supp.3d at 1086-93.[2]

---

[2] *Ortega* upheld New Mexico's law by analogizing to racist colonial laws restricting firearm sales to Native Americans and slaves on the odious premise that

Start with the historical-intoxication laws. Temporarily burdening Second Amendment rights "once a defendant has been found to pose a credible threat to the physical safety of others" is one thing; "broadly restrict[ing] arms use by the public generally" is quite another. *Rahimi*, 602 U.S. at 698, 700. Perhaps Maine could use intoxication laws to justify a narrow regulation burdening the arms-bearing right of a sliver of the population that has engaged in some kind of conduct that evidences a predisposition to dangerous or impulsive behavior. But Maine cannot muster a single example of a historical law that imposed a blunderbuss burden on *everyone*'s arms-bearing right, on the theory that *some* might carry while drunk. The reason is obvious: Any such law would hoodwink the Founders' decision to *entrust* law-abiding citizens with firearms.

The analogy to licensing regimes fares no better. True, it took time in the horse-and-buggy days to assess whether someone was a law-abiding citizen. Yet that was what the wait was for; "the officials of old" investigated "each individual's specific characteristics." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). Under Section 2016, however, someone who has already passed a background check proving their law-abiding character still must wait three extra

_____

those groups were dispositionally violent. 741 F.Supp.3d at 1086-93. Maine conspicuously does not urge that equally strained analogy here, and "principle[s] of party presentation" oblige the Court "to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6.

days, on the theory that *everyone* should have to "cool off" before obtaining a firearm. Maine cannot identify any tradition whatsoever of intentionally delaying the exercise of Second Amendment rights (or any other fundamental right) for the express purpose of delaying their exercise.

3. As a last gasp, Maine tries to fit Section 2016 within Supreme Court dictum deeming "longstanding … laws imposing conditions and qualifications on the commercial sale of arms" "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). But there is nothing longstanding about "cooling off" restrictions like Section 2016.

In all events, Maine's welter of cases actually illustrates why Section 2016 is *not* a condition or qualification on the commercial sale of firearms. Requiring sellers to obtain a license, or to keep records of their sales, or to secure a background check for each would-be purchaser, fits that mold, as those are conditions a seller can fulfill before selling a firearm. *See* Qualification, *Merriam-Webster*, https://tinyurl.com/2dvpxhft ("a quality or skill that fits a person (as for an office); a condition or standard that must be complied with (as for the attainment of a privilege)"). So too with a law identifying where firearms may be sold. *Cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024). But Section 2016 has nothing in common with those laws: No matter how many background checks a buyer passes, or where/when/how she tries to buy a gun, Section 2016 forces her to

wait.  *Cf.* Condition, *Black's Law Dictionary* (12th ed. 2024) ("An act or event, *other than a lapse of time*, that must exist or occur before a duty to perform something promised arises." (emphasis added)).

*   *   *

Cooling-off-period laws like Section 2016 implicate the Second Amendment, are not conditions or qualifications on commercial sales, and did not exist until 1996. The district court thus correctly recognized that they are highly unlikely to survive Second Amendment scrutiny.  Maine has not identified *any* basis to doubt that conclusion, let alone one sufficient to justify reinstating Section 2016 while the state litigates its appeal.

## II.    The Remaining Factors Weigh Overwhelmingly Against A Stay.

1. Maine likewise comes nowhere close to showing the irreparable injury needed for a stay.  The state invokes its interest in "effectuating statutes enacted by representatives of its people."  Mot.18 (quoting *Dist. 4 Lodge v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021)).  "But [a] government suffers no injury when a court prevents it from enforcing an unlawful law."  *Free Speech Coal. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024).  Nor has Maine shown any potential injury necessitating immediate relief.  Maine went more than 200 years without imposing *any* waiting period to obtain a firearm, and it has not seen fit to act with the kind of urgency in litigating

either its stay request or its appeal that one would expect if reinstating Section 2016 were truly an immediate imperative.

2. On the flip side, a stay *would* harm Plaintiffs and their clients.[3] This Court has recognized that certain constitutional rights have "such qualitative importance as to be irremediable by any subsequent relief," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009), and at least three circuits have held that the Second Amendment fits that bill, *see Baird v. Bonta*, 81 F.4th 1036, 1046-47 (9th Cir. 2023); *Wrenn v. District of Columbia*, 864 F.3d 650, 667-68 (D.C. Cir. 2017); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Courts likewise have held that even the temporary loss of such a right "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also, e.g.*, *Planned Parenthood*, 641 F.2d at 1023 (holding, before *Dobbs*, that a 24-hour waiting period on abortions constituted an irreparable injury). So too here. After all, a 72-hour loss of Second Amendment rights is every bit as irreparable as a 72-hour loss of any other fundamental constitutional right. *Cf. Silvester*, 138 S.Ct. at 951-52 (Thomas, J., dissenting). If anything, it poses even greater risks since the ability to timely exercise Second

---

[3] The district court correctly held that Beckwith and the firearm-dealer plaintiffs have standing both in their own right and to vindicate their customers' Second Amendment rights. Dkt.30 at 2 n.2; *accord Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007); *Gazzola v. Hochul*, 88 F.4th 186, 194-95 (2d Cir. 2023).

Amendment rights may literally be a matter of life or death—as the record here amply shows. *See, e.g.*, D.Ct.Dkt.1-1 ¶¶15-19; D.Ct.Dkt.1-3 ¶¶5-7; D.Ct.Dkt.1-4 ¶9.

Maine contends that "access to firearms" will not "protect[]" domestic-violence victims or others facing imminent threats. Mot.19. Beckwith and the many people she has helped beg to differ. D.Ct.Dkt.1-1 ¶¶3, 6-9, 13, 15-17. Maine suggests that people who do not share its views about the utility of firearms can "borrow a firearm" or "acquire one through a sale not subject to" Section 2016—i.e., "sales between certain family members" or "sales of curio, relic, and antique firearms." Mot.3, 19.[4] But even if a someone facing a concrete threat to their safety has a trusted and qualifying relative nearby who has a gun they are willing to lend or sell, Maine fails to explain how it serves *anyone*'s interest to force people to defend themselves with borrowed (or, worse yet, antique) firearms instead of letting them work with people like Beckwith, White, Hendsbee, and Cole to acquire the

---

[4] A "curio" or "relic" must be either 50 years old; certified by a public-museum curator to be of museum interest; or "novel, rare, bizarre, or … associat[ed] with some historical figure, period, or event." 27 C.F.R. §478.11; *see* 25 M.R.S. §2016(4)(C)(2)(a). An "antique firearm" must either be "manufactured in or before 1898" (or a period-correct replica) or a "muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition." 18 U.S.C. §921(16); *see* 25 M.R.S. §2016(4)(C)(2)(b).

firearm with which they feel most comfortable and the training to safely store and use it.

On top of that, staying the injunction would cause substantial irreparable harm to the gun-store Plaintiffs' businesses. While the state tries to dismiss those harms as "speculative," Mot.18-19, that claim flouts the preliminary-injunction record, which confirms that Section 2016 caused plummeting sales and "compounding harm to" their "business." D.Ct.Dkt.1-4 ¶¶6-7, 9 (Hendsbee); *see* D.Ct.Dkt.1-3 ¶4 (White: "handgun sales are down 50% and rifle sales down 25% from the typical sales volume in prior years"). For Cole, who specializes in gun shows, the potential injury if Section 2016 returns is particularly stark: The 2025 gun-show season is fast approaching, and Section 2016 "makes it impossible to transfer possession of any firearm sold during [a] show." D.Ct.Dkt.1-5 ¶4. If Section 2016 springs back during the several months it takes to resolve this appeal, he will again face the prospect of "paus[ing] … operations" and potentially "liquidat[ing] [his business'] substantial inventory at auction." *Id.* at 3.

3. The public interest also weighs decisively against a stay. Courts routinely observe that "the public interest would be adversely affected by" enforcing an "unconstitutional" law. *E.g.*, *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988). While Maine posits that important policy interests "militate[] in favor of allowing the Attorney General to continue enforcing" Section 2016, Mot.21,

"it is not [the] function [of] judges to read [their] views of policy into a Constitutional guarantee," *Thomas v. Collins*, 323 U.S. 516, 557 (1945), or "to arrogate to [themselves] the power to adjust a balance settled by the explicit terms of the Constitution," *Pub. Citizen v. DOJ*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring in the judgment). And while Maine may genuinely (albeit misguidedly) believe that Section 2016 "will save lives," Mot.2, 9, 18, 20, states will virtually always make that claim when it comes to restrictions on Second Amendment rights, so that alone cannot be enough to justify reinstating such a restriction when it is likely unconstitutional. After all, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," *Heller*, 554 U.S. at 634, based on vaguely Orwellian statistics that leave those with an acute self-defense need out in the cold. Properly understood, "[t]he Second Amendment 'is the very *product* of an interest balancing by the people,'" and "[i]t is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 597 U.S. at 26.

## CONCLUSION

The Court should deny the state's motion.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

March 24, 2025

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with Federal Rule of Appellate Procedure 27(d)(2) because, according to Microsoft Word for Microsoft 365's word-count function, the brief contains 5,085 words, excluding the parts that Federal Rule of Appellate Procedure 32(f) exempt from the word-count.

2. This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because, consistent with the requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6), this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that all participants are registered CM/ECF users and that the CM/ECF system will accomplish service.

<u>s/Erin E. Murphy</u>
Erin E. Murphy