No. 25-1160

# UNITED STATES COURT OF APPEALS
## For The First Circuit

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY COSHOW; JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY,

Plaintiffs-Appellees,

v.

AARON M. FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE (CASE NO. 1:24-cv-00384-LEW)

**REPLY BRIEF OF DEFENDANT-APPELLANT IN SUPPORT OF MOTION FOR STAY OF PRELIMINARY INJUNCTION ORDER PENDING APPEAL**

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
PAUL SUITTER
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME 04333-0006
(207) 626-8880
Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Table of Authorities ................................................................................... ii

Argument ..................................................................................................... 1

I. Maine's waiting period law is functionally no different than
firearm regulations that Appellees agree are constitutional .................. 1

II. The plain text of the Second Amendment does
not apply to Maine's waiting period law ................................................ 3

III. Maine's waiting period law is consistent with the Nation's
historical tradition of firearm regulation ................................................ 7

IV. The remaining factors support issuing a stay ......................................... 9

Conclusion ................................................................................................ 10

Certificate of Compliance ......................................................................... 12

Certificate of Service ................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871)................................................................5

*B & L Products, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) ..............................6

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583
   (5th Cir. 2025).................................................................................................. 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................4

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .................... 1, 2, 7

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)...............................5, 6

*United States v. Langston*, 110 F.4th 408 (1st Cir. 2024) .........................................8

*Yukutake v. Lopez*, 2025 WL 815429 (9th Cir. Mar. 14, 2025) ........................... 5, 6

## I. Maine's waiting period law is functionally no different than firearm regulations that Appellees agree are constitutional.

Appellees concede that "laws 'designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens' typically will pass constitutional muster." Opp. Br., 2 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (cleaned up)). Appellees thus apparently acknowledge that states can condition acquisition of firearms on passing a background check. *Id.*, at 1-2. Appellees also seem to concede that even when a firearm sale is delayed for up to three days pending completion of a background check, there is no Second Amendment violation. *Id.*, at 7. These concessions doom Appellees' challenge. If a state can constitutionally delay a firearm sale for three days to ensure that a person does not have a background indicating that they might act irresponsibly with the firearm, a state can surely delay a sale for three days to ensure that a person is not in an emotional state indicating that they might act irresponsibly with the firearm.

Appellees offer no relevant distinction between background checks and waiting periods. Instead, they argue that a waiting period assumes that every buyer might act irresponsibly with the firearm, while a background check looks at a buyer's individual characteristics to predict whether they might act irresponsibly. Opp. Br., 1-2, 14. But what Appellees fail to recognize is that background check requirements also assume that every buyer might act irresponsibly. A background check is

performed – and the sale delayed – regardless of the buyer's individual characteristics.  It is true that with background checks, whether the sale can be completed depends on the buyer's individual characteristics, while with waiting periods, whether the sale can be completed depends only on the passage of time. But this is not a distinction of any constitutional difference.  In both cases, the sale is delayed to ensure that the buyer will act responsibly, and Appellees concede that delays for such a purpose do not run afoul of the Second Amendment.

Moreover, the Supreme Court has approved of laws imposing restrictions on carrying firearms (which, unlike the acquisition of firearms, is core Second Amendment conduct) that have nothing to do with a person's individual characteristics.  In *Bruen,* the Court noted that it was not calling into question licensing regimes requiring applicants to pass a firearms safety course before being allowed to carry a handgun in public.  597 U.S. at 38 n.9.  Just like a waiting period law, such a requirement presumes that every person might act irresponsibly with a firearm and imposes a delay in order to employ a measure designed to mitigate that risk.  And just like a waiting period law, there is no individualized assessment – regardless of how knowledgeable a person is regarding the safe handling of firearms, they still must pass a safety course.

Appellees appear to agree that Maine could delay a sale if the purpose of the delay was to conduct some sort of individualized assessment as to whether the buyer

might be acting impulsively or in an agitated emotional state. But it is difficult to see how a state could do that short of imposing a waiting period, which the undisputed evidence demonstrates meaningfully reduces homicides and suicides. Background checks would not reveal this information – they look at past conduct and reveal nothing about a buyer's current state of mind. Perhaps some sort of psychological assessment could be conducted at the time of sale, but firearm sellers are likely not competent to accurately assess a buyer's emotional state. Requiring buyers to be assessed by a medical professional does not seem feasible and would likely result in longer delays. The most effective and least intrusive way to guard against persons buying firearms while in an agitated emotional state is to impose a brief delay. Maine's waiting period law is designed to ensure only that firearm buyers will act responsibly and, as Appellees concede, such laws do not violate the Second Amendment.

## II. The plain text of the Second Amendment does not apply to Maine's waiting period law.

With respect to the first prong of the *Bruen* test, Appellees do not dispute that they bear the burden of establishing that the Second Amendment's plain text applies to Maine's waiting period law. They fail to meet their burden. As the Attorney General explained in his motion (at 6-10), numerous federal courts, including the Fifth and Ninth Circuits, have held that the Second Amendment's plain text does not apply to the purchase of firearms. And the Supreme Court has determined that "laws

imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008).[1] While a firearm regulation could be so burdensome that it effectively prohibits the acquisition of firearms and interferes with the right to keep and bear arms (thereby overcoming the presumption of lawfulness), Maine's law delaying sales for 72 hours is not such a regulation.

Appellees make a linguistically tortured argument that Maine's law does not impose a "condition" within the meaning of *Heller* because there is nothing a buyer can do to become eligible to purchase a firearm other than wait. Opp. Br., 16-17. This argument makes no sense – waiting <u>is</u> the condition. Telling a child that they must wait an hour after eating before going into the water is just as much imposing a condition as telling them that they must put on sunscreen or pass a swim test.[2]

---

[1] Appellees claim that this presumption applies only to "longstanding" laws. Opp. Br., 16. This is a misreading of *Heller*. The Court's reference to "longstanding" either related to the first item in the list of laws that are presumptively lawful ("prohibitions on the possession of firearms by felons and the mentally ill") or was intended to characterize the listed laws as being longstanding. Nothing suggests that the Court was saying that a particular law within one of those categories had to be longstanding to be presumed lawful.

[2] Appellees claim that *Black's Law Dictionary* defines "condition" as "an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." Opp. Br., 17. In fact, this is *Black's* definition of "condition precedent," and it is referring to the term as used in a contract or similar agreement. It is doubtful that when the Supreme Court referred to "conditions" that can be imposed on the sale of firearms, they were using it as a contractual term of art.

Moreover, Appellees agree that passing a background check is a condition, Opp. Br., 16, even though there is nothing a buyer can do but wait for the results of the background check.

Appellees' reliance on a recent decision from the Ninth Circuit is misplaced. Opp. Br., 13 (citing *Yukutake v. Lopez,* 2025 WL 815429, *11 (9th Cir. Mar. 14, 2025)).[3] In *Yukutake*, a divided panel held that that "the purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment." 2025 WL 815429, at *11. As the dissent recognized, though, that holding relied on a misreading of one Ninth Circuit case and conflicted with another one. *Id.*, at *29-30 (Bea, J., dissenting).

The *Yukutake* court purported to rely on *Teixeira v. County of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) (en banc), where the court stated that the Second Amendment imposes limits on the extent to which restrictions can be imposed on the acquisition of firearms. But the *Teixeira* court was not suggesting that the plain text of the Second Amendment applies to regulations on the purchase of firearms. Rather, the court was recognizing that "the Second Amendment protects <u>ancillary rights</u> necessary to the realization of the core right to possess a firearm for self-

---

[3] Appellees also cite *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583 (5th Cir. 2025), and *Andrews v. State*, 50 Tenn. 165 (1871). The Attorney General addressed *Reese* in his stay motion (at 6 n.6), and a 150-year-old decision from a state appellate court is not persuasive in light of the more recent contrary federal authority.

defense." *Id*. at 677 (emphasis added). Because the court concluded that the regulation at issue did not impede the acquisition of firearms, it found no need to "define the precise scope of any such acquisition right under the Second Amendment to resolve this case." *Id*. at 678. The *Yukutake* majority erred by "conflat[ing] *Teixeira's* acknowledgment of a <u>relationship</u> between the possession and acquisition of arms—a premise not in dispute—with an affirmative holding that the two activities are protected to the same extent." *Id.* at *29 (Bea, J., dissenting) (emphasis in original).

The *Yukutake* majority's holding is also contrary to *B & L Products, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), decided after *Teixeira*. There, the Ninth Circuit stated that the "plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms" and "[o]n its face, that language says nothing about commerce." *Id*. at 117-18. The court acknowledged that the Second Amendment protects the ancillary right to acquire firearms, but recognized that under its holding in *Teixeira*, "the plain text of the Second Amendment only prohibits <u>meaningful constraints</u> on the right to acquire firearms." *Id.* (emphasis added). Thus, "the ancillary right . . . to acquire firearms . . . only implicates the Second Amendment in limited circumstances," and the test is "whether a challenged regulation meaningfully impairs an individual's ability to access firearms." *Id*. at 118-19. The *Yukutake* majority erred by failing to apply this test and instead ruling

6

that the Second Amendment is implicated when <u>any</u> constraint is placed upon the acquisition of firearms. Because delaying sales for 72 hours does not meaningfully impair a person's ability to acquire firearms, the plain text of the Second Amendment does not apply to Maine's waiting period law.

### III. Maine's waiting period law is consistent with the Nation's historical tradition of firearm regulation.

Even if the plain text of the Second Amendment were implicated, the Attorney General has "demonstrate[d] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Appellees claim the Attorney General made only a "halfhearted" attempt to make this demonstration, but what is halfhearted is Appellees' response to the Attorney General's thorough arguments on this point. The Attorney General presented testimony from three well-qualified scholars demonstrating that firearms were not readily available in the early years of our Nation, that the impulsive use of firearms to commit suicides and murders was relatively rare, and that while there was no need for waiting period laws, there is a long history of analogous laws keeping firearms away from intoxicated individuals and imposing licensing and permitting requirements. Appellees did not controvert any of this testimony and submitted no evidence (other than their own declarations discussing the purported harm caused by the waiting period law).

Appellees' response remains halfhearted in their opposition brief. They begin by noting that in *United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024), this Court said that "*Rahimi* held only that an individual may be temporarily disarmed, consistent with the Second Amendment, if a court has found that the individual poses a credible threat to the physical safety of another." Opp. Br., 14. But the Court was not suggesting that a person cannot be disarmed unless there has been an individualized finding that they pose a threat; rather, the Court was simply noting the limit of *Rahimi's* holding. And in any event, the waiting period does not disarm anyone – it simply briefly delays some acquisitions of additional firearms.

Appellees argue that intoxication and licensing and permitting laws are different from waiting periods because whether they allow a person to have access to a firearm is premised on a person's individual characteristics. Opp. Br., 15-16. But as Professor Spitzer explained, historical licensing and permitting laws involved a "process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted." Spitzer Decl., ¶ 33. This process "by its nature thwarts any unrestricted ability to acquire or use firearms on demand." *Id*. So, just

like Maine's waiting period law, historical licensing and permitting laws delayed everyone's access to firearms regardless of their individual circumstances.[4]

## IV. The remaining factors support issuing a stay.

Appellees do not controvert the evidence in the record that waiting period laws save lives by preventing gun-related suicides and homicides. Instead, they argue that Maine will not suffer irreparable harm if the law is enjoined because Maine had no waiting period for over 200 years. Opp. Br., 17-18. Apparently, Appellees' position is that since people have already been needlessly killed by firearms for many years, any future deaths cannot constitute irreparable harm. To the extent this argument even warrants a response, whether irreparable harm has occurred in the past has nothing to do with whether a stay will prevent it in the future.

Appellees argue that they will be irreparably harmed because they will lose their Second Amendment rights for 72 hours. Opp. Br., 18. As the Attorney General has argued, though, delaying a sale for 72 hours does not deprive anyone of their Second Amendment rights. And in any event, saving lives outweighs any inconvenience caused by briefly delaying acquisition of a firearm (or any speculative financial harm to the firearm dealer Appellees).

---

[4] And intoxication laws did not impose restrictions only on persons who were intoxicated. Some laws, including one dating back to 1679, restricted the distribution of alcohol in places where firearms were present. Spitzer Decl., ¶¶ 20 & 27. As with a waiting period law, these laws did not consider a person's individual characteristics.

9

Appellees claim that the record "amply shows" that delaying firearm sales for 72 hours "poses even greater risks since the ability to timely exercise Second Amendment rights may literally be a matter of life or death." Opp. Br., 18-19. But the portions of the record they cite to do not come close to supporting this claim, and the Appellees have never put forth any competent evidence suggesting that delaying some sales of firearms for 72 hours puts people at risk.[5] The Attorney General, by contrast, presented uncontroverted empirical evidence that waiting periods save lives by reducing firearm suicides and homicides. Donohue Decl., ¶¶ 36-44.[6]

## CONCLUSION

The Attorney General requests that this Court stay the district court's preliminary injunction order pending resolution of this appeal.

---

[5] Appellees did reference two anecdotal reports of people in other states who were supposedly harmed because they could not immediately acquire a firearm. Pltfs. Prelim. Inj. M., at 12 (ECF No. 4). One report is likely not true, and in the other report there is nothing to suggest that a 72-hour waiting period would have made any difference. Donohue Decl., ¶¶ 52-54.

[6] Appellees claim that the "record evidence" demonstrates that for someone facing violent threats from an intimate partner, "the first few days are the most critical." Opp. Br., 3-4. In support, they cite only Ms. Beckwith's declaration, and what she actually says there is that "Many studies [she does not cite them] show that domestic-violence victims face the highest risk of death in their first <u>3 months</u> after leaving their abuser." Beckwith Decl., ¶ 16 (emphasis added). And again, no cites for these studies are provided.

10

Dated: March 31, 2025

Respectfully submitted,

AARON M. FREY
Attorney General


/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
Thomas.A.Knowlton@maine.gov
PAUL SUITTER
Assistant Attorney General
Paul.Suitter@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8880
Fax (207) 287-3145

## CERTIFICATE OF COMPLIANCE

This motion contains 2,589 words, excluding the items exempted by Federal Rule of Appellate Procedure 27(a)(2)(B), and complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2). For this Certification, I relied on the word count function of the word-processing software used to prepare this brief (Microsoft Word 2007). I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size.

s/ Christopher C. Taub<br>
Christopher C. Taub<br>
Chief Deputy Attorney General<br>
Bar No. 65217<br>
Six State House Station<br>
Augusta, Maine 04333-0006<br>
(207) 626-8800

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 31st day of March, 2025, I filed the above brief electronically via the ECF system. I further certify that on this, the 31st day of March, 2025, I served the above brief electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

ERIN E. MURPHY
erin.murphy@clementmurphy.com

JOSHUA A. TARDY
jtardy@rudmanwinchell.com

KEVIN J. WYNOSKY
kevin.wynosky@clementmurphy.com

MATTHEW ROWEN
matthew.rowen@clementmurphy.com

PAUL D. CLEMENT
paul.clement@clementmurphy.com

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
Bar No. 65217
Six State House Station
Augusta, Maine 04333-0006
(207) 626-8800
