IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 25-1160

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY;
NANCY COSHOW; JAMES WHITE; J. WHITE GUNSMITHING;
ADAM HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY;
A&G SHOOTING,

Plaintiffs-Appellees

v.

AARON M. FREY,
in their personal capacity and in their official capacity as Attorney General of
Maine,

Defendant-Appellant

On Appeal from Order of the United States District Court, District of Maine
Case No. #: 1:24−cv−00384−LEW

---

**BRIEF OF *AMICI CURIAE* MAINE GUN SAFETY COALITION, MAINE
COALITION TO END DOMESTIC VIOLENCE, MAINE ASSOCIATION
OF PSYCHIATRIC PHYSICIANS, BRADY CENTER TO PREVENT GUN
VIOLENCE, AND GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE IN SUPPORT OF DEFENDANT-APPELLANT'S MOTION
FOR STAY PENDING APPEAL**

---

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT
GUN VIOLENCE
840 First Street, NE Suite 400

Julia B. MacDonald, Bar No. 1215565
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100
*Attorney for Amici Curiae*
*(Additional Counsel on Next Page)*

Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Esther Sanchez-Gomez
William T. Clark
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org
wclark@giffords.org

**CORPORATE DISCLOSURE STATEMENT**

Maine Gun Safety Coalition ("MGSC"), Maine Coalition to End Domestic Violence ("MCEDV"), Maine Association of Psychiatric Physicians ("MAPP"), Brady Center to Prevent Gun Violence ("Brady"), and Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") are non-profit corporations, have no parent corporations, do not issue stock, and have no publicly held affiliates.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

IDENTITY AND INTERESTS OF *AMICI CURIAE* ...............................................1

ARGUMENT ..................................................................................1

I.    Mainers face grave irreparable harm in the absence of the Act, and the balance of the equities and public interest also favor the Act's continued enforcement. ...............................................4

    A.    Waiting periods reduce firearm suicides. ...................................6

    B.    Waiting periods reduce firearm homicides. .............................10

    C.    Waiting periods reduce domestic violence homicides..............10

II.    The State is highly likely to succeed on the merits of its appeal. .......14

    A.    The Act is presumptively lawful and does not implicate the plain text of the Second Amendment.................................14

    B.    The Act addresses Maine's unprecedented modern crisis of firearm suicides, as well as the modern problem of impulsive firearm homicides.....................................................17

    C.    Analogous regulations temporarily impeding access to firearms provide ample historical precedent for the Act. .........21

CONCLUSION..............................................................................22

CERTIFICATE OF COMPLIANCE WITH RULE 32...........................................24

CERTIFICATE OF SERVICE ..............................................................25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ........................................................... 4

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers*
*Local Lodge 207 v. Raimondo*,
18 F.4th 38 (1st Cir. 2021) .............................................................. 4

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................... 15, 16

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................... 4

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)....................................................................... 15

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022)................................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .............................................................. 2

*Ortega v. Lujan Grisham*,
741 F. Supp. 3d 1027 (D.N.M. 2024),
*appeal filed*, No. 24-2121 (10th Cir. 2024) ............................. 1, 10, 16, 22

*Rocky Mountain Gun Owners v. Polis*,
701 F. Supp. 3d 1121 (D. Colo. 2023),
*appeal dismissed*, No. 23-1380, 2024 WL 5010820 (10th Cir. Aug.
23, 2024) .............................................................................. *passim*

*Tracy Rifle & Pistol LLC v. Harris*,
118 F. Supp. 3d 1182 (E.D. Cal. 2015),
*aff'd*, 637 F. App'x 401 (9th Cir. 2016) .......................................... 5

*United States v. Castleman*,
572 U.S. 157 (2014)....................................................................... 12

*United States v. Rahimi*,
　602 U.S. 680 (2024)........................................................ 2, 3, 17, 21

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
　741 F. Supp. 3d 172 (D. Vt. 2024),
　*appeal filed*, No. 24-2026 (2d Cir. 2024) ............................................. *passim*

## STATUTES

25 M.R.S. § 2016 ........................................................................ *passim*

## RULES

Fed. R. App. P. 29(a) .................................................................1

## CONSTITUTIONAL PROVISIONS

Me. Const. art. 1, § 1................................................................4

U.S. Const. amend. II......................................................... *passim*

## LEGISLATIVE DOCUMENTS

*Annual Reporting of Firearm Fatalities and Hospitalizations*, Joint Standing
　Committee on Health and Human Services (Sept. 3, 2024), *available
　at*: https://legislature.maine.gov/doc/11090 .......................................... 19, 20

Hearing Testimony, Testimony of David Moltz, MD, Chair, Clinical
　Practice Committee, MAPP, *available at*:
　https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182
　715 ........................................................................................19

Hearing Testimony, Testimony of Francine Garland Stark, *available at*:
　https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182
　699 ........................................................................ 11, 12, 13

Hearing Testimony, Testimony of Greg Marley, NAMI Maine, *available at*:
　https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182
　710 ........................................................................................19

Hearing Testimony, Testimony of Lily Bohen James, Maine Women's
Lobby, *available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=100
30520 ...............................................................................................14

Hearing Testimony, Testimony of Morgan Rielly, Representative, District
127 *Available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=100
30624 .................................................................................................4

Hearing Testimony, Testimony of Peggy Rotundo, Senator, District 21,
*available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182
718 ...............................................................................................18

Maine Bill LD 2238 (SP 598)..................................................................2

## OTHER AUTHORITIES

*2023 Annual Homicide List*, Maine Department of Public Safety, *available
at* https://www.maine.gov/dps/msp/media-center/homicide-lists/2023-
homicides.......................................................................................20

*Advisory on 72 Hour Waiting Period*, Maine Department of Public Safety
and Maine Office of the Attorney General, *available at*:
https://www.maine.gov/dps/sites/maine.gov.dps/files/inline-
files/Advisory%20on%20Waiting%20Period%20Law_1.pdf.....................15

Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and the American
Experiment* (Knopf 2024)............................................................17

Amanda Kippert, *Women Serve Longer Prison Sentences After Killing
Abusers* (June 22, 2020), *available at*:
https://www.domesticshelters.org/articles/in-the-news/women-serve-
longer-prison-sentences-after-killing-abusers...............................13

Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States,
2007 to 2014: A Nationwide Population-Based Study*,
171 Ann. Intern. Med., 885 (2019).......................................... 6, 7, 8

Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 J. Am. College of Surgeons 37 (2023) ......................................8

David M. Studdert, et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220 (2020).................................................7

G. Lowenstein & J.S. Lerner, "The Role of Affect in Decision Making," *Handbook of Affective Sciences* (2003): 619 ................................21

German Lopez, *What Many People Get Wrong About Suicide*, Vox (Sept. 17, 2015), *available at*: https://www.vox.com/2015/7/30/9068255/suicide-impulsive-gun-control ........................................................................................7

*Gun Violence: Purchase Waiting Periods*, Nat'l All. on Mental Illness, *available at*: https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Gun-Violence-Purchase-Waiting-Periods .............................................................................7

Madeline Drexler, Harvard Public Health, *Guns & Suicide: The Hidden Toll* (Spring 2013) .............................................................................9

Maine Domestic Abuse Homicide Review Panel, *13th Biennial Report – A 20 Year Lookback* (2021), *available at*: https://www.maine.gov/ag/docs/DAHRP-Report-for-Posting-ACCESSIBLE.pdf .......................................................... 11, 12, 13

Marcie-Jo Kresnow, et al., *An Unmatched Case-Control Study of Nearly Lethal Suicide Attempts in Houston, Texas: Research Methods and Measurements*, 32 Suicide & Life Threatening Behavior 1 Suppl. (2001).......................................................................................7

Matthew Miller, et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. of Trauma 1029 (2007)............................................6

Michael Anestis & Joye Anestis, *Suicide Rates and State Laws Regulating Access and Exposure to Handguns*, Am. J. Pub. Health (Oct. 2015), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/............................9

Page(s)

Michael Luca, et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114
Proc. Natl. Acad. Sci. 12162 (2017)............................................................ 8, 10

Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making
Sense of Limits on the Right to Keep and Bear Arms in the Founding
Era*, 51 Fordham Urb. L. J. 25 (2023)............................................................20

Stephen N. Oliphant, *Effect of Wisconsin's Handgun Waiting Period Repeal
on Suicide Rates*, 28 Inj. Prev. 580 (Dec. 2022), *available at*:
https://pmc.ncbi.nlm.nih.gov/articles/PMC9726970/ .....................................9

*Suicide Data and Statistics*, Centers for Disease Control (Oct. 29, 2024),
*available at:*
https://www.cdc.gov/suicide/facts/data.html?CDC_AAref_Val=https:/
/www.cdc.gov/suicide/suicide-data-
statistics.html#cdc_data_surveillance_section_3-suicide-deaths-plans-
and-attempts-in-the-united-states ..................................................................20

*Suicide Mortality by State*, Centers for Disease Control (Feb. 15, 2023),
*available at*: https://www.cdc.gov/nchs/pressroom/sosmap/suicide-
mortality/suicide.htm ....................................................................................18

Vini Simas, et al., *Factors Influencing Marksmanship in Police Officers: A
Narrative Review*, 19 Int. J. Environ. Res. Public Health 14236 (2022) ......12

Violence Policy Center, *A Deadly Myth: Women, Handguns, and Self-
Defense* (2001), *available at*: http://www.vpc.org/studies/myth.htm .... 11, 12

*Which States Require a Waiting Period Before Gun Purchases?*,
Everytown for Gun Safety Support Fund (Jan. 4, 2024), *available at*:
https://everytownresearch.org/rankings/law/waiting-periods/ ........................8

## IDENTITY AND INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* MGSC, MCEDV, MAPP, Brady, and Giffords Law Center are Maine-based and national non-profit organizations dedicated to reducing gun violence, domestic violence, and suicide through education, research, legal advocacy, and political action. All five *amici* have a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live and in protecting the authority of democratically elected officials to address the Nation's gun violence epidemic.

## ARGUMENT

Every District Court that has examined a waiting period law following the Supreme Court's landmark decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) has concluded that such laws are constitutional.[2] Until now. The District Court's Order here, granting Plaintiffs' Motion for Preliminary

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), *Amici* state that all parties have consented to the filing of this brief. Further, pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than amicus or its counsel, contributed money that was intended to fund preparing or submitting the brief.

[2] *See Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 215 (D. Vt. 2024), *appeal filed*, No. 24-2026 (2d Cir. 2024); *Rocky Mountain Gun Owners v. Polis,* 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023), *appeal dismissed*, No. 23-1380, 2024 WL 5010820 (10th Cir. Aug. 23, 2024); *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1097 (D.N.M. 2024), *appeal filed*, No. 24-2121 (10th Cir. 2024).

Injunction (ECF No. 30, the "Order"), is an anomaly that deviates both from the Supreme Court's Second Amendment jurisprudence and from basic principles governing injunctive relief.

The Maine Legislature enacted Maine Bill LD 2238 (SP 598), now codified as 25 M.R.S. § 2016 (the "Act"), to save lives. Defendant Aaron M. Frey (the "State") presented unrebutted evidence to the District Court that the Act would achieve this goal by reducing both suicides and homicides. In its order denying the State's motion for a stay, the District Court found that the State's interest in preventing "loss of life . . . does not inform the merits inquiry," interpreting *Bruen* as barring any consideration of "the lifesaving benefits of a three-day waiting period," (ECF No. 42 at 3). Respectfully, that is not what the *Bruen* test requires.

As the Supreme Court clarified in *United States v. Rahimi*, the Second Amendment does not create "a law trapped in amber." 602 U.S. 680, 691-92 (2024). Rather, legislatures have the power to respond to "unprecedented societal concerns" like the modern crisis of impulsive gun violence. *Bruen*, 597 U.S. at 27.[3] To read *Bruen* to preclude any consideration of a law's life-saving benefits would raise "serious problems," as it would "force[] 21st-century regulations to follow

---

[3] *See also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 52 (1st Cir. 2024) (recognizing Rhode Island's power to ban large-capacity magazines because they implicate a "societal concern . . . [that] is unprecedented and growing, and could not have been confronted –  let alone resolved – by our founders.").

late-18th century policy choices." *Rahimi*, 602 U.S. at 739 (Barrett, J., concurring).

With the Act enjoined, Mainers face irreparable harm of the gravest order— the loss of additional lives to the modern epidemics of suicide- and homicide-by-firearm. This grave irreparable harm outweighs any harm Plaintiffs claim to face, and the balance of the equities and public interest also plainly favor the Act's continued enforcement.

The State is also highly likely to succeed on the merits of its appeal, because: (1) the Act does not implicate the plain text of the Second Amendment; and (2) even if the Act could be read to implicate the plain text, the Act is consistent with historical tradition when appropriately evaluated using the "more nuanced approach" recognized by *Bruen* and reaffirmed by *Rahimi*. The Second Amendment does not bar states from addressing the unprecedented modern public health crises of suicide-by-firearm and impulsive firearm homicides by passing laws that research shows save lives.

Because all four of the factors this Court must consider when deciding whether to grant a stay weigh in the State's favor, this Court should stay the District Court's Order enjoining the Act's enforcement during the pendency of this appeal.

**I.    Mainers face grave irreparable harm in the absence of the Act, and the balance of the equities and public interest also favor the Act's continued enforcement.**

The District Court enjoined a public health measure enacted by the Maine legislature to advance a crucial state goal and constitutional duty: protecting the health and safety of the community by reducing firearm-related suicides and homicides.[4] *See* Me. Const. art. 1, § 1 (recognizing right to "safety and happiness"). With the Act barred from enforcement, even temporarily, the State is prevented from achieving that fundamental goal and is thus irreparably harmed. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).[5]

---

[4] *See An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases: Hearing on L.D. 2238 Before the Joint Standing Committee on Judiciary*, 131st Legis. 2 (2024) ("Hearing Testimony"), Testimony of Morgan Rielly, Representative, District 127 ("Waiting periods are designed to prevent individuals who pose an immediate threat to themselves or others from the impulsive purchase and use of a firearm."). *Available at*: https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=10030624.

[5] *See also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024) ("Courts rightly hesitate to interfere with exercises of executive or legislative authority. There is always a public interest in prompt execution of the laws. That is doubly true when federal courts are asked to block states from enforcing their laws.") (citations omitted).

The State faces the potential permanent loss of Maine lives with the Act enjoined; the Plaintiffs face mere monetary losses and three days of inconvenience. Here, "[t]he costs of being mistaken, on the issue of whether the [stay] would have a detrimental effect on handgun crime, violence, and suicide, would be grave." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016). By contrast, the cost of enforcement to Plaintiffs—none of whom has experienced any concrete harm beyond alleged lost time and purported lost sales—would be minimal. *See Birmingham*, 741 F. Supp. 3d at 215 ("compliance with legitimate regulatory standards . . . is part of responsible gun ownership" and does not qualify as irreparable harm); *Polis*, 701 F. Supp. 3d at 1149 ("[S]aving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities."); *see also* Declarations of Andrea Beckwith, Nancy Coshow, James White, and Adam Hendsbee (ECF Nos. 1-1 through 1-5).

As the District Court itself recognized below, there is substantial evidence that waiting periods "can prevent rash homicidal or suicidal behavior with firearms." Order at 10 n.9. Driven by this public health research, the Maine Legislature enacted a modest, commonsense measure to try to combat an epidemic of impulsive acts of gun violence. A court crafting equitable relief must consider the irreparable harm and threat to the public interest that comes from enjoining

such basic tools in the daily fight against gun violence.[6] This Court should grant the State's Motion for Stay.

### A. Waiting periods reduce firearm suicides.

There is an indisputable public interest in preventing suicide deaths in Maine, and continuing to enjoin the Act—a demonstrably effective means of reducing suicide deaths—poses a serious risk of irreparable harm.

Firearms are by far the most lethal method of suicide. A 2019 national study found that while only 8.5% of all suicidal acts between 2007 and 2014 were fatal, 89.6% of suicidal acts with a firearm resulted in death. Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 171 Ann. Intern. Med., 885 at 887 (2019). Studies have also found that places where firearms are more readily accessible have higher suicide rates than places where firearms are less prevalent. *See, e.g.*, Matthew Miller, et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. of Trauma 1029 (2007). And research shows that suicide is typically the result of a temporary crisis, rather than an act planned far in advance, with 71%

---

[6] *See Birmingham*, 741 F. Supp. 3d at 216 ("The State will be harmed by [the] injunction . . . . It has a legitimate interest in . . . reducing impulse-based violence both to the self and to others."); *Polis*, 701 F. Supp. 3d at 1148 (recognizing "the concrete public interest at stake: citizens' lives").

of suicidal individuals deliberating for less than one hour before their attempt, and 25% deliberating for less than five minutes.[7]

Waiting periods address transitory and impulsive suicidal urges by interposing a "cooling off" period, during which a suicidal crisis may pass. Because suicidal crises often escalate quickly and suddenly, "limiting access to means of suicide can play a significant role in prevention." *Gun Violence: Purchase Waiting Periods*, Nat'l All. on Mental Illness (last visited Jan. 10, 2025).[8] Even if a waiting period does not deter an individual from attempting suicide, redirecting the individual to a different method can still prevent a loss of life. The next-most lethal methods of suicide, drowning and hanging, are significantly less deadly, ending in death 56.4% and 52.7% of the time, respectively, compared with the nearly 90% fatality rate for guns. *See* Andrew Conner, et al., *supra*, at 887. Other methods are even less lethal—for instance, drug

---

[7] *See* Marcie-Jo Kresnow, et al., *An Unmatched Case-Control Study of Nearly Lethal Suicide Attempts in Houston, Texas: Research Methods and Measurements*, 32 Suicide & Life Threatening Behavior 1 Suppl. (2001); *see also* David M. Studdert, et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220 (2020); German Lopez, *What Many People Get Wrong About Suicide*, Vox (Sept. 17, 2015), *available at*: https://www.vox.com/2015/7/30/9068255/suicide-impulsive-gun-control ("[T]he majority of suicide attempts are within three hours of people deciding to kill themselves.").

[8] *Available at*: https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Gun-Violence-Purchase-Waiting-Periods.

poisoning accounted for 59.4% of suicidal acts but only 13.5% of deaths. *Id.* at 885.

Numerous studies substantiate the fact that waiting periods are effective in reducing suicide deaths. In enacting the Act, Maine joins twelve other states that impose a waiting period for firearm purchases. *See Which States Require a Waiting Period Before Gun Purchases?*, Everytown for Gun Safety Support Fund (Jan. 4, 2024).[9] One study of states that have already implemented waiting periods for gun purchases found that waiting periods led to a 7.4% reduction in gun suicides. Michael Luca, et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Natl. Acad. Sci. 12162 (2017). Using Maine's most recent data on gun suicides, this would be the equivalent of roughly twelve Maine lives saved per year—a fact that the State presented to the District Court and that Plaintiffs did not rebut. *See* Defendants' Opposition to Motion for Preliminary Injunction (ECF No. 13) at 19. Another recent study concluded that state-level background checks and mandatory waiting periods were correlated with lower firearm-related suicide rates. *See* Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 J. Am. College of Surgeons 37 (2023).

---

[9] *Available at*: https://everytownresearch.org/rankings/law/waiting-periods/.

Conversely, states that have rescinded mandatory waiting periods have seen increased numbers of suicide deaths. In the year following South Dakota's repeal of its waiting period requirement, the state's overall suicide rate increased by 7.6% compared to the much smaller 3.3% increase seen across the United States as a whole. *See* Michael Anestis & Joye Anestis, *Suicide Rates and State Laws Regulating Access and Exposure to Handguns*, Am. J. Pub. Health (Oct. 2015).[10] Wisconsin saw a similar effect when it repealed its waiting period, with firearm suicides in the state increasing by 6.5% after the repeal. *See* Stephen N. Oliphant, *Effect of Wisconsin's Handgun Waiting Period Repeal on Suicide Rates*, 28 Inj. Prev. 580 (Dec. 2022).[11]

Real life experiences help to illustrate the kinds of tragedies the Act is intended to help prevent. In November 2008, a 21-year-old man named Ryan Frazier died by suicide with a handgun soon after filing a lawsuit alleging childhood sexual abuse. Madeline Drexler, Harvard Public Health, *Guns & Suicide: The Hidden Toll* (Spring 2013). The very day he died, Ryan went to a gas station five minutes from his home, bought a semiautomatic handgun, and was found dead in his nearby car. *Id.*

---

[10] *Available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/.

[11] *Available at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC9726970/.

**B.  Waiting periods reduce firearm homicides.**

Waiting period laws also have "a large and robust effect" on reducing gun-related homicides. *See* Michael Luca, et al., *supra*. Based on an analysis of 45 years' worth of data, researchers found that waiting periods of only a few days "reduce gun homicides by roughly 17%." *Id.* The 17% reduction in firearm homicides equates to approximately 36 "fewer gun homicides per year for a state with an average number of gun deaths." *Id.* Even in Maine, with a comparatively low homicide rate, this would equate to four lives saved each year. If every state without waiting period requirements enacted legislation like the Act, the United States could prevent approximately 910 gun homicides per year. *Id.*

Post-*Bruen*, courts examining whether to allow the enforcement of waiting period laws in the face of requests for emergency relief have determined that the loss of lives "significantly outweighs . . . a temporary delay in the process of purchasing" firearms, and that "the public's interest in the preservation of dozens of . . . lives cannot be understated." *Ortega*, 741 F. Supp. 3d at 1096; *see also Polis*, 701 F.3d at 1149; *Birmingham*, 741 F. Supp. 3d at 216. This Court should do the same.

**C.  Waiting periods reduce domestic violence homicides.**

In their Complaint and Motion for Preliminary Injunction, Plaintiffs placed great emphasis on their claim that the Act will make domestic violence victims less

safe by preventing them from immediately obtaining access to firearms, and the District Court subsequently found that individuals "seeking to carry for self-defense in case of confrontation" were likely to be harmed by the Act. Order at 16. But, as MCEDV testified to the Legislature in support of the Act, the opposite is true: an abusive partner's access to firearms makes it five times more likely that a victim of domestic abuse will be killed, and domestic violence assaults involving firearms are twelve times more likely to result in death than assaults that do not involve guns. *See* Hearing Testimony, Testimony of Francine Garland Stark, MCEDV ("Stark Testimony").[12] This is true *regardless* of who actually owns the firearm. *Id.*

In Maine, 62% of all intimate partner homicides between 2000 and 2019 involved the use of a gun. *Id.*; *see also* Maine Domestic Abuse Homicide Review Panel, *13th Biennial Report – A 20 Year Lookback* (2021) ("20 Year Lookback") at 46.[13] All told, for every one woman who uses a handgun to kill an intimate partner in self-defense, 83 women are murdered by an intimate partner with a handgun. Violence Policy Center, *A Deadly Myth: Women, Handguns, and Self-Defense*

---

[12] *Available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182699.

[13] *Available at*: https://www.maine.gov/ag/docs/DAHRP-Report-for-Posting-ACCESSIBLE.pdf

(2001).[14] The Supreme Court summarized this problem succinctly in *United States v. Castleman*: "[A]ll too often . . . the only difference between a battered woman and a dead woman is the presence of a gun." 572 U.S. 157, 160 (2014) (citation omitted).

Because a domestic violence victim is statistically more likely to have a gun used against her than to defend herself with that gun, Maine's domestic violence experts do not advise victims to obtain firearms as part of their safety plan. *See* Stark Testimony; *see also* 20 Year Lookback at 20 (recognizing that "the presence of firearms may lead to increased danger for victims"). These experts also recognize that expecting a victim who likely shares deep ties of history, family, and even love with their abuser to shoot and disable or kill that abuser is unrealistic—both because these ties make the victim less likely to timely pull the trigger, and because even trained police officers discharging their firearms in high-stress situations hit their targets only occasionally. *See* Vini Simas, et al., *Factors Influencing Marksmanship in Police Officers: A Narrative Review*, 19 Int. J. Environ. Res. Public Health 14236 (2022). Moreover, those women who do kill their abusers are very often not protected by the legal system—at least 90% of women in prison for killing a man report having been abused by those men, and

---

[14] *Available at*: http://www.vpc.org/studies/myth.htm.

those women have historically faced sentences longer than men who kill their intimate partners. *See* Amanda Kippert, *Women Serve Longer Prison Sentences After Killing Abusers* (June 22, 2020).[15]

Put simply, the presence of a firearm in an abusive home is likely to decrease the victim's safety. Moreover, women in Maine who, despite these risks, determine they want to have a firearm as part of their safety plan are not impeded by the Act, because Maine's domestic violence resource centers can provide temporary lodging to those women during the three-day waiting period. *See* Stark Testimony; *see also* 20 Year Lookback at 20.

It is notable that among the eight Plaintiffs in this case, none is a woman who alleges she has been harmed (or imminently will be harmed) by an abuser as a result of the Act. In the affidavits accompanying their Complaint, Plaintiffs alluded to the hearsay statements of unidentified domestic violence victims, but the reality is that Maine's experts on domestic violence—and the evidence-backed research on which they rely—support the Act. Where one in seven women has experienced abuse with a gun by an intimate partner, domestic abuse victims will be best served

---

[15] *Available at*: https://www.domesticshelters.org/articles/in-the-news/women-serve-longer-prison-sentences-after-killing-abusers.

by enforcement of the Act. *See* Hearing Testimony, Testimony of Lily Bohen James, Maine Women's Lobby.[16]

* * *

Because in the absence of the Act Mainers will face grave irreparable harm, this Court should stay enforcement of the District Court's Order pending the outcome of this appeal.

## II.     The State is highly likely to succeed on the merits of its appeal.

The District Court's determination that Plaintiffs are likely to succeed on the merits of their claim is an anomaly in waiting periods challenges, that invites this Court to create a circuit split. Until the instant case, every post-*Bruen* court to examine a waiting period law has upheld the law as constitutional. This factor thus weighs in favor of the State's Motion to Stay.

### A.     The Act is presumptively lawful and does not implicate the plain text of the Second Amendment.

As persuasively argued in the State's motion, the regulation does not implicate the plain text of the Second Amendment. *See* Motion to Stay Preliminary Injunction Pending Appeal at 4-11.

As a regulation governing the *licensed sale* of firearms, rather than the manner in which they may be kept, carried, or used, the Act falls squarely within

---

[16] *Available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=10030520.

the category of commercial regulations the Supreme Court has deemed "presumptively lawful." *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008) (describing "conditions and qualifications on the commercial sale of arms" as "presumptively lawful"); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring); *Polis*, 701 F. Supp. 3d at 1136.[17]

Plaintiffs cannot rebut this presumption of lawfulness, because the plain text of the Second Amendment includes no right to obtain a firearm instantaneously. The Supreme Court has never said nor suggested otherwise, and the District Court's conclusion that the Second Amendment's plain text includes the right to immediately acquire firearms represents a drastic expansion of Second Amendment jurisprudence that is unsupported by any case law. Instead, the Supreme Court has merely held that the Second Amendment protects an individual's right to "keep" or "bear" arms for lawful self-defense. *Bruen*, 597 U.S.

---

[17] Contrary to Plaintiffs' statement that the Waiting Period Statute "applies to all firearm sales," *see* Motion for Preliminary Injunction (ECF No. 4) at 9, the Waiting Period Statute applies only to *commercial* sales. The Waiting Period Act neither prohibits nor otherwise applies to an unadvertised sale between private individuals, nor does it prohibit or apply to the temporary loan or rental of a firearm. *See Advisory on 72 Hour Waiting Period*, Maine Department of Public Safety and Maine Office of the Attorney General, *available at*: https://www.maine.gov/dps/sites/maine.gov.dps/files/inline-files/Advisory%20on%20Waiting%20Period%20Law_1.pdf.

at 17; *Heller*, 554 U.S. at 581. These terms must be given their "normal and ordinary" meaning. *Heller*, 554 U.S. at 576-77. The Supreme Court has construed "keep Arms" to mean "have weapons," *id.* at 582, and "bear" to mean "carry." *Id.* at 584.

The Act does not impair an individual's right to "have weapons" or to "carry" them. It prohibits no one from possessing or using firearms, and bars no one from purchasing them. The Act instead imposes a short delay on firearm sellers before they can convey a firearm. *See* 25 M.R.S. § 2016(2). For this reason, every other court to consider a waiting period law has correctly concluded that "acquiring a firearm through a commercial transaction on-demand . . . is not covered by the plain text of the Second Amendment." *Birmingham*, 741 F. Supp. 3d at 209; *see also Polis*, 701 F. Supp. 3d at 1136; *Ortega*, 741 F. Supp. 3d at 1069-1076.

Indeed, the Founders would not have understood the Second Amendment to guarantee a right to obtain a firearm *instantaneously*. In the Eighteenth Century and through most of the Nineteenth Century, delay in delivery of purchased goods was a practical reality of commerce—particularly in a place as rural as Maine. It is easy to forget that, even as late as Abraham Lincoln's birth in 1809, an American could move only as fast as a horse, wind sail, oar, or river flow would allow. Much of the country had little to no currency to speak of, and the economy in much of

the country was still primarily agricultural. Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and the American Experiment,* at 50-51 (Knopf 2024). At the time of the founding, the idea that someone like Plaintiff Coshow, living in a heavily wooded area of rural Maine, could obtain a firearm after only five total hours of travelling comfortably in a vehicle would not have been considered a burden on the right to keep and bear arms, as she so complains. *See* Declaration of Nancy Coshow (ECF No. 1-2, ¶¶ 2, 6-7). Far from it.

> **B.** **The Act addresses Maine's unprecedented modern crisis of firearm suicides, as well as the modern problem of impulsive firearm homicides.**

Even if the Act could be read to implicate conduct covered by the Second Amendment, it is constitutional because it addresses Maine's unprecedented modern crises of suicide-by-firearm and impulsive firearm homicide.

Under the *Bruen* test, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. At the same time, both *Bruen* and *Rahimi* recognize that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92; *see Bruen*, 597 U.S. at 30. For example, laws "implicating unprecedented societal concerns or dramatic technological changes" are subject to a "more nuanced approach" in determining whether they are consistent with historical tradition, because "[t]he regulatory

challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27.

The Act is intended to address the unprecedented societal scourge of gun suicides and impulsive violence—calamities not prevalent during the Founding and Reconstruction Eras. Specifically, the Act confronts the relatively recent phenomenon of individuals being able to acquire a firearm instantaneously for the purposes of engaging in acts of self-harm or impulsive violence against others. *See* Hearing Testimony, Testimony of Peggy Rotundo, Senator, District 21 (purpose of the Act "is to help protect the purchaser from acting on a short-lived impulse— suicide or homicide—that may have inspired the purchase in the first place.").[18]

Maine has a suicide rate of 17.7 deaths per 100,000 people—the second-highest suicide rate in New England, and well above the national average. *See Suicide Mortality by State*, Centers for Disease Control (Feb. 15, 2023).[19] Despite having roughly 5.6 million fewer residents than its neighbor, Massachusetts, Maine had only 358 fewer suicides in 2022. *Id.* Nearly 60% of Maine's suicides that year—156 in total—were with firearms. *See Annual Reporting of Firearm*

---

[18] *Available at:*
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182718.

[19] *Available at:* https://www.cdc.gov/nchs/pressroom/sosmap/suicide-mortality/suicide.htm.

*Fatalities and Hospitalizations* ("Annual Report"), Joint Standing Committee on Health and Human Services (Sept. 3, 2024).[20] Suicide is the eleventh leading cause of death in Maine, and the second leading cause of death among Maine's young people. *Id.* Suicides represent nearly 90% of all deaths by firearm in Maine. *Id.*

Concerned Maine physicians and mental health professionals testified in favor of the Act because they recognized the outsized role that firearms play in Maine's suicide crisis. These experts explained to the legislature how "[i]mpulsiveness plays a part in many suicide attempts," and that, due to the extreme lethality of firearms, "when you use a gun, there is no chance for a second thought." Hearing Testimony, Testimony of David Moltz, MD, Chair, Clinical Practice Committee, MAPP[21]; *see also id.*, Testimony of Greg Marley, NAMI Maine (noting that "[f]or most people, a suicide crisis is transient and treatable," but where "a firearm is chosen as the means for a suicide attempt, the lethality rate approaches 90%").[22]

This contemporary problem is not one the Founders could have envisioned—indeed, suicide rates have skyrocketed by nearly 40% in the past 22

---

[20] *Available at*: https://legislature.maine.gov/doc/11090.

[21] *Available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182715.

[22] *Available at*:
https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=182710.

years alone. *See Suicide Data and Statistics*, Centers for Disease Control (Oct. 29, 2024).[23] Nationwide, 49,000 people died by suicide in 2022, and firearms were used in over half of those suicides. *Id.* Suicides—and particularly suicides by firearm—represent an unprecedented modern concern for which a modern approach is required. As the State's experts discussed and as the State persuasively argues, the present, dire crisis of firearm suicides was not one confronting the Framers or Reconstruction-era legislators. *See* Defendants Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 13) at 12-14.[24]

In addition, the Act seeks to address the impulsive use of guns in homicides. Maine experienced 22 firearm homicides in 2022. *See* Annual Report.[25] Empirical studies indicate that some of the factors that incite violence against others, such as anger and rage, can be short lived, suggesting that a person with homicidal intent

_____

[23] *Available at:*
https://www.cdc.gov/suicide/facts/data.html?CDC_AAref_Val=https://www.cdc.gov/suicide/suicide-data-statistics.html#cdc_data_surveillance_section_3-suicide-deaths-plans-and-attempts-in-the-united-states.

[24] *See also generally* Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023).

[25] While firearm-specific homicide data is not yet available for later years, 2023 saw Maine's overall homicides skyrocket to 53 victims. *See 2023 Annual Homicide List*, Maine Department of Public Safety, *available at* https://www.maine.gov/dps/msp/media-center/homicide-lists/2023-homicides. Twenty-two of these killings were the results of two well-publicized mass shootings in Bowdoin and Lewiston, Maine. *Id.*

whose access to a gun is delayed may no longer experience homicidal thoughts by the time he gains gun access. *See* G. Lowenstein & J.S. Lerner, "The Role of Affect in Decision Making," *Handbook of Affective Sciences* (2003): 619–642.

### C.  Analogous regulations temporarily impeding access to firearms provide ample historical precedent for the Act.

Using the "more nuanced approach" set forth in *Bruen* and *Rahimi*, the Act's modest and temporary restrictions on gun sales are "consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26.[26]

At least three categories of longstanding gun regulations confirm that the Act aligns with the Nation's historical tradition of firearm regulation. Licensing regimes, surety laws, and intoxication regulations each reflect a centuries-old tradition of temporarily impeding immediate access to firearms for the purpose of protecting public safety. *See Polis*, 701 F. Supp. 3d at 1142-46; *Birmingham*, 741 F. Supp. 3d at 211-12.

The District Court differentiated the Waiting Period Statute from the shall-issue licensing regimes discussed in *Bruen*, concluding that the Waiting Period Statute does not apply a "narrow, objective, and definite standard[]," and instead

---

[26] Even if the Court does not conclude that suicide- and homicide-by-firearm are modern societal issues, the Waiting Period Statute is nevertheless "consistent with the principles that underpin our regulatory tradition" of temporarily impeding immediate access to firearms to protect public safety, as evidenced by the categories of regulations described above. *See Rahimi*, 602 U.S. at 692.

applies "no standard at all." *See* Order at 9 & n.6 (quoting *Bruen*, 597 U.S. at 38 n.9). But *Bruen* found problematic laws that used subjective standards, laws "requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'"—not laws like the Waiting Period Statute that apply a uniform, objective condition to all firearm sales. *Id.* The uniform requirement that three days' time must pass before a firearm purchase may be completed is precisely the type of narrow, objective, and definite standard the Supreme Court blessed in *Bruen*. *See Ortega*, 741 F. Supp. 3d at 1085 ("[T]he Waiting Period Act applies equally to all individuals seeking to purchase a firearm and does not require firearms sellers to appraise a buyer's need, and thus contains 'only "narrow, objective, and definite standards guiding licensing officials . . . ."'" (quoting *Bruen*, 597 U.S. at 38 n.9)).

* * *

Because the Act is presumptively lawful and does not implicate the plain text of the Second Amendment—and because, in any event, the Act addresses an unprecedented modern phenomenon via methods that are consistent with historical Second Amendment regulations—the State is highly likely to succeed on the merits of its appeal.

## CONCLUSION

For the foregoing reasons and the reasons articulated by the State in its Motion for Stay Pending Appeal, this Court should grant the State's motion.

DATED:  March 18, 2025

_/s/ Julia B. MacDonald_
Julia B. MacDonald
First Circuit Bar No. 1215565

PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
207-791-1100
jmacdonald@pierceatwood.com

_Attorney for Amici Curiae_

_Of Counsel:_

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Esther Sanchez-Gomez
William T. Clark
GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org
wclark@giffords.org

# CERTIFICATE OF COMPLIANCE WITH RULE 32

This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 5,075 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman size 14 font.

Dated:  March 18, 2025

*/s/ Julia B. MacDonald*
Julia B. MacDonald
First Circuit Bar No. 1215565

PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
207-791-1100
jmacdonald@pierceatwood.com

*Attorney for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that the within brief has been electronically filed with the Clerk of the Court on March 18, 2025. All attorneys listed below are ECF filers and will receive service by electronic means pursuant to Rule 4 of this Court's Rules Governing Electronic Filing:

Paul D Clement
Thomas A. Knowlton
Erin E. Murphy
Matthew D. Rowen
Paul Suitter
Joshua A. Tardy
Christopher C. Taub
Kevin Joseph Wynosky

Dated: March 18, 2025

 /s/ Julia B. MacDonald
Julia B. MacDonald
First Circuit Bar No. 1215565

PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
207-791-1100
jmacdonald@pierceatwood.com

*Attorney for Amicus Curiae*