No. 25-1160

## UNITED STATES COURT OF APPEALS
### For The First Circuit

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY
COSHOW; JAMES WHITE; J. WHITE GUNSMITHING; ADAM
HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY;
A&G SHOOTING,

Plaintiffs-Appellees,

v.

AARON M. FREY, in their personal capacity and in
their official capacity as Attorney General of Maine,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE (CASE NO. 1:24-cv-00384-LEW)

---

**BRIEF OF DEFENDANT-APPELLANT**

---

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
PAUL SUITTER
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME 04333-0006
(207) 626-8880
Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Introduction ................................................................................... 1

Jurisdictional Statement ................................................................ 2

Statement of the Issues ................................................................. 3

Statement of the Case ................................................................... 3

Summary of the Argument ........................................................... 10

Standard of Review ..................................................................... 12

Argument ................................................................................... 13

I.  The district court erred in concluding that Appellees are
    likely to prevail on the merits of their claim that Maine's
    waiting period law violates the Second Amendment ............................. 13

    A. The Second Amendment's plain text does not cover the
       purchase of firearms .......................................................... 14

    B. Maine's waiting period law is consistent with the Nation's
       historical tradition of firearm regulation ............................... 23

II. The district court erred in concluding that the remaining factors
    supported preliminarily enjoining enforcement of Maine's
    waiting period law ................................................................ 35

    A. Appellees will not suffer irreparable injury absent a
       preliminary injunction ........................................................ 36

    B. The balancing of the equities and the public interest warrant
       denying injunctive relief ..................................................... 38

Conclusion ............................................................................... 40

Certificate of Compliance .................................................. 42

Certificate of Service ........................................................ 43

Addendum ................................................................... Add. 1

# TABLE OF AUTHORITIES

## Cases

*Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86 (1st Cir. 2020) ............................ 12

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015) ................................................................ 12

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) .................. 16, 17, 20

*Capen v. Campbell*, 2025 WL 1135269 (1st Cir. Apr. 17, 2025).................... 13, 23

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151
(1st Cir. 2004) ................................................................ 36

*Chavez v. Bonta*, 2025 WL 918541 (S.D. Cal. Mar. 26, 2025)............................ 17

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013)........................................ 12

*Daggett v. Comm'n on Gov't'l Ethics & Election Practices*,
205 F.3d 445 (1st Cir. 2000) ................................................................ 13

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc.
Lodge 207 v. Raimondo*, 18 F.4th 38 (1st Cir. 2021) ......................................... 38

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ......................................................... 38

*Knight v. City of New York*, 2024 WL 1126309 (S.D.N.Y. Jan. 17, 2024)............ 18

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................ 38

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................. 13, 15, 19

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) .......................................... 17, 21

*Mills v. New York City*, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024).................... 17

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1
  (1st Cir. 2002) ........................................................................ 12, 35

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  597 U.S. 1 (2022) ........................................................................ passim

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024).............. 14

*Ortega v. Lujan Grisham*, 741 F.Supp.3d 1027 (D.N.M. 2024) .......... 18, 20, 21, 30

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  127 F.4th 583 (5th Cir. 2025) ................................................................ 17

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96
  (10th Cir. 2024)............................................................... 14, 19, 20, 22

*Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121
  (D. Colo. 2023) ........................................................................ passim

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) .............................. 16

*Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490 (1st Cir. 2016)...................... 12

*United States v. Rahimi*,  602 U.S. 680 (2024)................................................. 19, 24

*United States v. Salerno*, 481 U.S. 739 (1987)....................................................... 13

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham*,
  741 F. Supp. 3d. 172 (D. Vt. 2024)............................................................ passim

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)..................................... 12

*Yukutake v. Lopez*, 130 F.4th 1077 (9th Cir. 2025) ................................................ 16

**Statutes and Constitutional Provisions**

U.S. Const. amend II............................................................................................... 13

18 U.S.C. § 922(t) ............................................................................................... 6, 22

28 U.S.C. § 1292(a)(1)............................................................................................... 3

28 U.S.C. § 1331 ................................................................................ 2

28 U.S.C. § 1343 ................................................................................ 2

42 U.S.C. § 1983 ................................................................................ 2

15 M.R.S. § 395 ................................................................................. 6

25 M.R.S. § 2016 ..................................................................... 5, 6, 22

Me. P.L. 2023, ch. 678 ...................................................................... 5

L.D. 2238 (131st Legis. 2024) ........................................................... 3

**Other Authorities**

https://www.maine.gov/dps/sites/maine.
gov.dps/files/inline--files/Advisory%20on%20Waiting%
20Period%20Law_1.pdf .....................................................................6

## INTRODUCTION

In April 2024, Maine's Legislature enacted a law imposing a modest 72-hour waiting period for certain purchases of firearms. The undisputed record evidence demonstrates that waiting periods meaningfully reduce firearm suicides and homicides, with one study suggesting that a waiting period law would have prevented twelve suicides in Maine in just one year. Below, the district court entered a preliminary injunction barring Defendant-Appellant (Maine's Attorney General) from enforcing the law, concluding that Plaintiffs-Appellees were likely to prevail on the merits of their Second Amendment challenge and that the other factors supported an injunction. The court erred.

Maine's waiting period law does not violate the Second Amendment. The plain text of the Second Amendment protects the right to "keep" and "bear" arms. It does not apply to a law regulating the acquisition of arms unless the law is so burdensome that it effectively prohibits keeping and bearing arms. It is for this reason that the Supreme Court of the United States has declared that laws regulating the commercial sale of firearms are "presumptively lawful." The Fifth, Ninth, and Tenth Circuits have all rejected Second Amendment challenges to laws imposing restrictions on the commercial sale of firearms, and three district courts have rejected challenges to waiting period laws. But even if the Second Amendment applied, waiting period laws are, as several other courts have held, consistent with the

"Nation's historical tradition of firearm regulation" and thus pass muster under the Supreme Court's Second Amendment test. As to the other relevant factors, Appellees failed to establish irreparable harm, and given that the waiting period law will save lives, the balance of the equities and the public interest warrant against enjoining enforcement of the law.

Accordingly, this Court should vacate the district court's preliminary injunction order.

## JURISDICTIONAL STATEMENT

Below, Appellees filed a lawsuit against the Maine Attorney General, in both his personal and official capacities, pursuant to 42 U.S.C. § 1983. Appendix ("App.") 13-38. They alleged that a Maine statute imposing a 72-hour waiting period for certain purchases of firearms violates the United States Constitution's Second Amendment and filed a motion seeking to preliminarily enjoin the Attorney General from enforcing the law. ECF No. 4. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

On February 13, 2025, the district court (Walker, J.) issued an order granting Appellees' preliminary injunction motion and enjoining the Attorney General from enforcing the waiting period law. Addendum ("Add.") 2-18. On February 17, 2025, the Attorney General filed a notice of appeal to obtain review of the district court's

order.  App.  68-70.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C.

§ 1292(a)(1).

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in concluding that Appellees are likely to

prevail on the merits of their claim that Maine's waiting period law violates the

Second Amendment.

II.    Whether the district court erred in concluding that the remaining factors

supported preliminarily enjoining enforcement of Maine's waiting period law.

## STATEMENT OF THE CASE

### *Legislative Background*

On February 28, 2024, "An Act to Address Gun Violence in Maine by

Requiring a Waiting Period for Certain Firearm Purchases" was introduced into

Maine's Legislature.  L.D. 2238 (131st Legis. 2024).  The bill sought to impose a

72-hour waiting period on certain purchases of firearms.

The legislative history demonstrates that the purpose for imposing a waiting

period was to reduce suicides and homicides by preventing the impulsive purchase

of firearms.  *See, e.g.,* Rep. Cloutier Testimony ("Test.") (App. 167); Rep. Craven

Test. (App. 168-69); Rep. Speaker Talbot Ross Test. (App. 170-71); Sen. Rotundo

Test. (App. 172-74); Rep. Rielly Test. (App. 175); Sen. Vitelli Test. (App. 176-77);

Rep. Zager Test. (App. 178-79).  Many of these legislators pointed to a finding from

the American Academy of Pediatrics ("AAP") that states with firearm waiting period

laws had 51 percent fewer firearm suicides than did states without waiting periods.

According to the AAP report, the use of firearms is the most lethal form of suicide

(it has an approximate 90 percent mortality rate), and suicide survivors contemplated

their actions and acted within a very brief window of time. *Waiting Periods for*

*Firearm Purchases* (App. 180-81). Legislators also cited a study concluding that

states adopting waiting periods had a seventeen percent decrease in homicides and a

six percent decrease in suicides. *Handgun waiting periods reduce gun deaths*, Luca,

M., *et al*. (App. 182-85).

　　　The AAP testified that more than 90 percent of firearm deaths in Maine are

suicides and that, in 2021, 56 percent of suicides involved firearms. Anderson Test.

(App. 186-87). The Maine Medical Association and the Maine Osteopathic

Association testified that in 2020, firearms became the leading cause of death among

children. Cain Test. (App. 188-190). The Maine Coalition to End Domestic

Violence ("MCEDV") testified in support of the bill, explaining that domestic

violence advocates do not advise victims to obtain firearms as part of their safety

plans because "statistically, the victim is more likely to have it used against them

than to find it helpful." Stark Test. (App. 191-92). The MCEDV also testified that

for victims who feel that firearms are necessary for their safety, the waiting period

would not put them in jeopardy because services are available to keep victims safe

during the waiting period. *Id*. The Maine Association of Psychiatric Physicians referred to a study in which 70 percent of suicide survivors reported that less than an hour elapsed between when they first thought of suicide and when they attempted it, and 24 percent reported that less than five minutes elapsed. Moltz Test. (App. 193). The legislative record also includes a February 2023 report from the Maine Center for Disease Control and Prevention documenting that of the 178 firearm deaths in Maine in 2021, 158 were suicides (accounting for 56 percent of all suicides). *Report to the Legislature* (App. 194-96).

With some amendments, the bill was enacted as Me. P.L. 2023, ch. 678, and is now codified at 25 M.R.S. § 2016. In relevant part, the statute provides: "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement." 25 M.R.S. § 2016(2). The 72-hour waiting period is "concurrent with any waiting period imposed by any background check process required by federal or state law." *Id*. The law does not apply to sales to law enforcement officers, corrections officers, certain private security guards, or firearm dealers. *Id.* § 2016(4)(A), (B). It does not apply to sales between certain family members or to sales of curio, relic, and antique firearms. *Id.* § 2016(4)(C)(1), (2). Finally, the waiting period law does not apply to sales for which no background

check is required under state or federal law. *Id.* § 2016(4)(C)(3).[1] Sellers who

violate the law commit a civil violation for which a fine may be adjudged. *Id.*

§ 2016(3).[2]

### *Procedural History*

On November 12, 2024, federal licensed firearms dealers and their businesses

(James White and J White Gunsmithing, Adam Hendsbee and A&G Shooting, and

Thomas Cole and TLC Gunsmithing & Armory), an individual who provides

firearms classes and self-defense training to victims of domestic abuse and her

business (Andrea Beckwith and East Coast School of Safety), and an individual who

sought to acquire a handgun (Nancy Coshow) filed a lawsuit in the United States

District Court for the District of Maine alleging that Maine's waiting period law (25

M.R.S. § 2016) violates the Second Amendment. App. 13-38. They sued the

Attorney General in both his official and personal capacities and filed a motion for

---

[1] Under Maine law, background checks are required for sales at gun shows and sales resulting from advertisements (with exceptions for sales between family members and sales of curio, relic, and antique firearms). 15 M.R.S. § 395. Under federal law, federal firearms licensees (importers, manufacturers, and dealers) must contact the national instant criminal background check system (NICS) to verify an individual's eligibility to possess firearms before transferring firearms to non-licensees. 18 U.S.C. § 922(t). Federal statute allows up to three business days, and in the case of a transferee under age 21, ten business days, for a response. *Id*.

[2] Before the law took effect on August 9, 2024, the Maine Department of Public Safety and the Maine Attorney General issued guidance to firearm sellers and buyers regarding the law's requirements. *See* https://www.maine.gov/dps/sites/maine.gov.dps/files/inline--files/Advisory%20on%20Waiting%20Period%20Law_1.pdf.

a preliminary injunction to enjoin him from enforcing the law.  App. 17; ECF No. 4.[3]

The Attorney General opposed the motion.  ECF No. 13.  With his opposition, the Attorney General submitted expert witness declarations from three university professors addressing the historical regulation of firearms in the United States and the empirical evidence that waiting period laws reduce suicides and homicides.  John Donohue Decl. (App. 113-132); Randall Roth Decl. (App. 133-166); Robert Spitzer Decl. (App. 71-112).  Appellees offered no expert witness declaration of their own, nor did they dispute any statement of the Attorney General's experts.

On February 13, 2025, following briefing and oral argument, the district court granted Appellees' preliminary injunction motion.  Add. 2-18.  The court recognized that, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court set forth the test that courts currently use in resolving Second Amendment challenges to firearm regulations.  *Id*. at 5-6.  "[T]he first consideration is whether 'the Second Amendment's plain text covers' the conduct curtailed by the enactment."  *Id*. at 5.  (quoting *Bruen*, 597 U.S. at 17).  If it does, "it is the Government's burden not merely to justify its enactment based on its ability to

---

[3]  Because Appellees alleged no wrongful conduct on the part of the Attorney General, the Attorney General moved to dismiss the personal capacity claim.  ECF No. 26.  That motion was pending when the district court entered an order staying further proceedings pending appeal.  ECF No. 36.

'promote[] an important interest,' but to demonstrate that its curtailment of the right to keep and bear arms 'is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 6. (quoting *Bruen*, 597 U.S. at 17).

Although the Second Amendment's plain text protects only the right to "keep" and "bear" arms, the district court held that the plain text also applies to laws imposing restrictions on the commercial sale of arms. Add. 6-11. According to the district court, this is because "[a]cquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm." *Id*. at 8.[4] While the district court acknowledged that the Supreme Court expressly stated that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008), the court concluded that this did not bear on the lawfulness of the waiting period law because the Supreme Court may have been referring to things like "shop security measures." Add. 9.

In applying the second prong of the *Bruen* test, the district court concluded that Maine's waiting period law "is inconsistent with the Nation's historical tradition of firearm regulation." *Id*. at 11. The court acknowledged that because waiting period laws "implicate unprecedented societal concerns or dramatic changes," the

---

[4] The district court also found that the waiting period law results in "plain and simple" "indiscriminate dispossession" of firearms, Add. 7, despite that, by definition, the law delays acquisition of firearms that have not yet been possessed.

historical inquiry requires a "more nuanced approach" under which the focus is on "relevantly similar" laws. *Id*. at 12. But the court rejected the Attorney General's argument that the relevantly similar firearm laws from our Nation's early history are those imposing licensing requirements and restricting firearm use by intoxicated individuals. The distinctions, according to the district court, are that licensing laws and "drunken-carry" laws impose "definite conditions that can be met" and are based on an "individualized assessment." *Id*. at 14. The court did not explain why waiting 72 hours is not a "definite condition that can be met," and it ignored that licensing laws and some intoxication laws delay acquisition of firearms irrespective of a person's individual characteristics.

As to the other preliminary injunction factors, the district court held that any deprivation of a Second Amendment right is an irreparable injury. *Id*. at 17. Characterizing the State's interest only as "curtailing the right to keep and bear arms," and ignoring its overwhelming interest in protecting human life by preventing needless suicides and homicides, the court held that the balance of the equities and the public interest favored the Appellees. *Id*. at 18. The district court thus granted Appellees' preliminary injunction motion.

This appeal followed.[5]

---

[5] The Attorney General filed motions for a stay pending appeal both in the district court and this Court. Both Courts denied the motions. D. Ct. ECF No. 32; 1st Cir. M. for Stay, Mar. 12, 2025.

## SUMMARY OF THE ARGUMENT

Appellees are not likely to prevail on the merits of their claim that Maine's waiting period law violates the Second Amendment. Under *Bruen's* two-step test for resolving a Second Amendment challenge to a firearm regulation, the challenger bears the burden at the first step of demonstrating that the regulation implicates the "plain text" of the Second Amendment. Appellees cannot meet that burden here because the Second Amendment's plain text protects only the right to "keep" and "bear" arms, and, as numerous federal courts have held, it generally does not apply to regulations governing the purchase of firearms—like Maine's waiting period law. Indeed, the Supreme Court has made clear that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26. While a regulation could be so burdensome that it effectively prohibits the acquisition of firearms and interferes with the right to keep and bear arms, Maine's law, imposing a modest 72-hour delay between purchase and acquisition, does not rise to that level. Appellees' challenge thus fails at the first step.

Even if Maine's waiting period law did implicate the plain text of the Second Amendment, it satisfies the second step of the *Bruen* test because it is consistent with the Nation's historical tradition of firearm regulation. At this step, the government need not identify "historical twins" to the modern regulation. This approach is

especially pertinent when the regulation addresses a modern problem that did not exist at our founding. Here, the modern problem is the impulsive use of firearms to commit suicides and homicides. This was not a problem at our Nation's founding because due to technical limitations and other factors, firearm suicides and homicides were rare. There was thus no need for waiting periods. But there were two types of analogous laws – laws imposing licensing requirements and laws keeping firearms away from intoxicated individuals. Both types of laws were designed to ensure that persons seeking to acquire or use firearms would act responsibly with them. Maine's waiting period law is the same – to ensure that person is not acting impulsively or in an agitated emotional state when acquiring a firearm, it briefly delays the firearm transfer. The law thus fits comfortably within our Nation's historical regulation of firearms.

That Appellees are not likely to prevail on the merits is, by itself, sufficient reason to vacate the preliminary injunction order. Notably, the other factors also support vacatur. Appellees have not demonstrated that the waiting period law is causing them irreparable harm. And given the undisputed evidence that Maine's waiting period law will prevent needless suicides and homicides, the balancing of the equities and the public interest warrant reversal.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

> In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest.

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013); *see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The sine qua non of this four-part inquiry is likelihood of success on the merits." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). "If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

"The district court's grant or denial of a preliminary injunction is reviewed for an abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." *Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490, 493 (1st Cir. 2016). "[A]ppellate review is respectful to the district court's weighing of these elements but falls well short of giving carte blanche to the district court's views." *Akebia Therapeutics*, 976 F.3d at 92.

## ARGUMENT

### I. The district court erred in concluding that Appellees are likely to prevail on the merits of their claim that Maine's waiting period law violates the Second Amendment. [6]

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.[7] In *Heller*, 554 U.S. at 576-626, the Supreme Court held that the Second Amendment protects the individual right to possess a firearm unconnected with militia service. In *Bruen*, 597 U.S. at 17, the Supreme Court set forth the test that courts currently use in resolving Second Amendment challenges to firearm regulations. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it does, the regulation is nevertheless valid if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *see also Capen v. Campbell*, No. 24-1061, 2025

---

[6] Appellees appear to be making both a facial and an as-applied challenge to Maine's waiting period law. Complaint (ECF No. 1), at 25. In a facial challenge, "the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In an as-applied challenge, the challenger must only establish that the law is unconstitutional as to the challenger's specific conduct. *See Daggett v. Comm'n on Gov't'l Ethics & Election Practices*, 205 F.3d 445, 472 (1st Cir. 2000). Here, Appellees fail to establish that the waiting period violates the Second Amendment as applied to them, and this necessarily means that their facial challenge also fails.

[7] The Second Amendment is made applicable to the States via the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

WL 1135269, at *6 (1st Cir. Apr. 17, 2025) (rejecting Second Amendment challenge to law prohibiting sale and possession of assault weapons and large capacity feeding devices); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024) (rejecting Second Amendment challenge to law prohibiting possession of large capacity feeding devices).

### A. The Second Amendment's plain text does not cover the purchase of firearms.

At the first step of the *Bruen* test, "the plaintiff has the burden of establishing that 'the Second Amendment's plain text covers' either the conduct they engaged or intended to engage in." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (quoting *Bruen*, 597 U.S. at 17); *see also Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 189 (D. Vt. 2024).[8] Appellees fail to meet that burden here. The Second Amendment protects the right to "keep" and "bear" arms. As the Supreme Court has recognized, to "keep" arms means to "have" or "possess" arms, and to "bear" arms means to "carry" arms. *Heller*, 554 U.S. at 583-84. The Second Amendment says nothing about any right to purchase or otherwise acquire arms, much less to do so immediately. This distinction is not surprising. The impetus for the Second Amendment was not a desire to guarantee unregulated sales of firearms, but instead the fear that the federal

---

[8] Both below and in their briefing on the Attorney General's motion to stay in this Court, Appellees never disputed that they bear this burden.

government might try to disarm the populace, as King George III attempted to do to colonists in the 1760s and 1770s. *McDonald*, 561 U.S. at 768-69. The Second Amendment thus confers a right to retain arms, not an unfettered right to immediately acquire them free of any regulation.

That the plain language of the Second Amendment does not apply to the purchase of firearms is confirmed by the Supreme Court's recognition that laws causing delays in taking possession of firearms do not, absent unusual circumstances, implicate the right to keep and bear arms. In *Bruen,* the Court clarified that it was not calling into question "shall-issue" licensing regimes that require applicants to undergo a background check or pass a firearms safety course before being allowed to carry a handgun in public. 597 U.S. at 38 n.9. [9] These laws necessarily impose a delay before a person can take possession of a firearm. Such laws "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" and "appear to contain only narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id*. (cleaned up).

---

[9]  Under a "shall-issue" licensing regime, no showing beyond a general desire for self-defense need be made to obtain a public carry license.

Maine's waiting period law is the same. By deterring impulsive behavior, it helps ensure that purchasers will act responsibly with their newly acquired firearms. It has objective standards—it imposes a uniform 72-hour delay unless the sale falls within any expressly described exception and it does not require government officials to exercise discretion. As with public carry licensing laws, then, the law does not run afoul of the Second Amendment.[10]

In cases challenging laws regulating firearm sales (including waiting period laws), numerous courts have recognized that the Second Amendment's plain text does not apply to the purchase of firearms, or at least not the immediate purchase of firearms. *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) ("The plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms. On its face, that language says nothing about commerce. . . .");[11]

---

[10]  The Supreme Court noted that "because any permitting scheme can be put toward abusive ends," it was "not rul[ing] out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. Maine's waiting period law imposes only a 72-hour wait time, does not impose fees, and is not otherwise being put to "abusive ends."

[11]  In a more recent decision, a divided 9th Circuit panel held that "the purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment." *Yukutake v. Lopez,* 130 F.4th 1077, 1090 (9th Cir. 2025). As the dissent recognized, though, that holding relied on a misreading of one Ninth Circuit case and conflicted with another one. *Id*., at 1113-15 (Bea, J., dissenting). The *Yukutake* court purported to rely on *Teixeira v. County of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) (en banc), where the court acknowledged that the Second Amendment protects "ancillary rights" necessary to protect the right to keep and bear arms. The *Teixeira* court did not, though, "define the precise scope of any such

*McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("The plain text covers plaintiffs' right 'to keep and bear arms.' And on its face 'keep and bear' does not include purchase—let alone without background check.") (citation omitted);[12] *Chavez v. Bonta*, No. 19-CV-1226-L-AHG, 2025 WL 918541, at *7 (S.D. Cal. Mar. 26, 2025) (holding that the plain text of the Second Amendment was not implicated by a law prohibiting (with some exceptions) the commercial sale of firearms to persons under the age of 21); *Mills v. New York City*, No. 23-CV-07460 (JSR), 2024 WL 4979387, at *9 (S.D.N.Y. Dec. 4, 2024) ("[N]othing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time."); *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 207 ("The Court concludes that the 'right of the people to keep and bear Arms,' does not facially include a right to immediately

---

acquisition right under the Second Amendment." *Id.* at 678. The *Yukutake* majority erred by reading *Teixeira* as holding that <u>any</u> restriction on the acquisition of firearms implicates the Second Amendment. Further, the *Yukutake* majority's holding is contrary to *B & L Products*, 104 F.4th at 117-18, where the court stated that only "meaningful constraints" on the acquisition of firearms implicate the Second Amendment. The *Yukutake* majority ignored this test.

[12] In *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 590 & n.2 (5th Cir. 2025), the court stated that "the right to 'keep and bear arms' surely implies the right to purchase them." This statement was made in the context, though, of a federal law prohibiting the sale or delivery of handguns to persons under the age of 21, which the court characterized as an "outright ban." *Id*. *Reese*, then, does not call into question the 5th Circuit's earlier decision in *McRorey* that a law imposing a delay of up to ten days on firearm purchases did <u>not</u> implicate the Second Amendment.

obtain a firearm through a commercial sale.") (citation omitted); *Ortega v. Lujan Grisham*, 741 F.Supp.3d 1027, 1072 (D.N.M. 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees with the Defendants that the Second Amendment's plain text does not cover purchasing firearms.") (cleaned up); *Knight v. City of New York*, No. 22-CV-3215 (VEC) (VF), 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024) ("[B]ecause the requirement does not prevent a person from keeping or bearing arms, the 90-day waiting period does not infringe on core conduct protected by the Second Amendment."), *report and recommendation adopted in part*, 2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("From this reading of the [Second Amendment's] plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered.").

That the Second Amendment's plain text does not apply to the purchase of firearms is reinforced by the Supreme Court's statements that regulations on commercial sales are presumptively valid. In *Heller*, where the Supreme Court first recognized that the Second Amendment confers an individual right to keep and bear arms, the Court cautioned that the right is not "unlimited," and clarified that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such

as schools and government buildings, or <u>laws imposing conditions and qualifications on the commercial sale of arms</u>.

554 U.S. at 626-27 (emphasis added).  Such measures, the Court explained, are "presumptively lawful regulatory measures."  *Id.* at 627 n.26.  Two years later, the Supreme Court "repeat[ed] those assurances" and affirmed that *Heller's* holding "did not cast doubt" on "longstanding regulatory measures," including "laws imposing conditions and qualifications on the commercial sale of arms."  *McDonald*, 561 U.S. at 786.  In his concurrence in *Bruen*, Justice Kavanaugh reiterated that, "properly interpreted," the Second Amendment "allows a 'variety' of gun regulations," and "'laws imposing conditions and qualifications on the commercial sale of arms'" are "'presumptively lawful regulatory measures.'"  597 U.S. at 80-81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27 & n.26).  Most recently, in his concurrence in *United States v. Rahimi*, 602 U.S. 680 (2024), Justice Kavanaugh again noted that, under *Heller* and *McDonald*, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively constitutional."  *Id.* at 735 (Kavanaugh, J., concurring).  There is no reason to doubt, then, that the Supreme Court continues to recognize that regulations on the commercial sale of firearms are presumptively lawful.

Lower federal courts have applied this presumption in challenges to laws regulating the sale of firearms.  In *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), plaintiffs challenged a law establishing 21 as the minimum age

to purchase firearms. The Tenth Circuit upheld the law, explaining that "embedded within the quartet of recent Supreme Court Second Amendment cases is the recognition that certain 'longstanding' regulations – including 'laws imposing conditions and qualifications on the commercial sale of arms' – are 'presumptively lawful." *Polis*, 121 F.4th at 118 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Similarly, in a case challenging a law prohibiting firearm sales on state property, the Ninth Circuit concluded that the "most reasonable interpretation" of *Heller's* statement that regulations on the commercial sale of arms are presumptively lawful "is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *B & L Prods.*, 104 F.4th at 119.

Several courts have applied this presumption to waiting period laws. *See Ortega*, 741 F. Supp. 3d at 1077 ("Accordingly, if a firearm regulation falls into one of the presumptively Constitutional categories that *Heller* outlines, the regulation does not implicate the Second Amendment's plain text, and, thus, a court need not proceed to *Bruen's* second prong."); *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1135 (explaining that its conclusion that the plain text of the Second Amendment does not apply to a waiting period law was "reinforced" by the presumption that commercial regulations of the sale of firearms are lawful).

20

Theoretically, regulations on firearm sales could be so burdensome that they effectively prohibit the acquisition of firearms and interfere with the right to keep and bear arms, thus overcoming any presumption of lawfulness. *Bruen*, 597 U.S. at 38 n.9 (referring to permitting scheme that could be put toward "abusive ends" to "deny ordinary citizens their right to public carry"); *McRorey*, 99 F.4th at 838 n.18 ("There is no question that regulations on purchase so burdensome that they act as de facto prohibitions on acquisition would be subject to constitutional challenge under *Bruen's* rigorous historical requirement."); *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1136 n.11 (the presumption of lawfulness is "not a guarantee," and "[a]busive regulations may still be subject to constitutional challenges"). The Attorney General is thus not suggesting that a law establishing, for example, a 25-year waiting period would withstand a Second Amendment challenge simply because it could be characterized as a "law[] imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27.

But a law requiring certain buyers to wait 72 hours before taking possession of a firearm is neither abusive nor a de facto prohibition on keeping and bearing arms. *See Ortega*, 741 F. Supp. 3d at 1075 (concluding that a seven-day waiting period was "minimally burdensome" and did "not so substantially impinge the ability to acquire firearms that it functions as a de facto prohibition on the right to keep and bear arms"); *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 209

(finding that 72-hour waiting period did not unduly burden the right to keep and bear arms and noting that Second Circuit has suggested that "thirty-day waiting periods are not unconstitutionally long").

Federal law already can delay a firearm sale for up to three days pending completion of a background check.  18 U.S.C. § 922(t)(1)(B)(ii)).[13]  The Maine statute at issue expressly provides that the 72 hours "must be concurrent with any waiting period imposed by any background check process required by federal or state law."  25 M.R.S. § 2016(2).  In some instances, then, Maine's law will impose no additional delay.

The Maine law imposes objective and definite standards.  With the exception of certain sales expressly identified in the statute, buyers must wait 72 hours before taking possession of a firearm.  The statute allows for no exercise of discretion—so, for example, a government official cannot extend or shorten the waiting period for a particular person.  *See Polis*, 121 F.4th at 123 (a state's "minimum age requirement for firearm sales and purchases is nondiscretionary because it sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions").  There is thus no potential for abuse.

---

[13]  Under the Bipartisan Safer Communities Act enacted in 2022, Pub. L. 117-159, the allowance for a background check for persons under 21 is up to ten business days.  18 U.S.C. 922(t)(1)(C).

In sum, the Second Amendment, on its face, does not apply to Maine's 72-hour waiting period law, nor does the law impose such a burden as to interfere with what the Second Amendment does protect—the right to keep and bear arms.

### B.  Maine's waiting period law is consistent with the Nation's historical tradition of firearm regulation.

Even when the Second Amendment's plain text applies to the conduct at issue, a firearm regulation survives a Second Amendment challenge if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  The *Bruen* Court emphasized that this inquiry will sometimes be straightforward, but "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27; *see also Capen*, 2025 WL 1135269, at *3.  "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28.  Often, the historical inquiry will "involve reasoning by analogy" and may require a determination of "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." *Id.* at 28-29.  This "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical

precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphasis in original).

In 2024, the Supreme Court clarified how courts should conduct this historical inquiry. *Rahimi*, 602 U.S. 680. The Court noted that it did not mean to suggest "a law trapped in amber," and that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* The central questions are why and how the regulation at issue burdens Second Amendment rights:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* (quoting *Bruen*, 597 U.S. at 30).

Maine's waiting period law addresses a societal problem that did not exist at our founding—the impulsive use of firearms to commit homicides and suicides. As

Professor Randolph Roth explains, homicide rates were low in the colonial era, and even though household ownership of firearms was widespread, only ten to fifteen percent of family, household, and intimate partner homicides were committed with firearms.  Roth Decl., ¶ 16 (App. 142).  Professor Roth attributes this low rate to the technological limitations of firearms of that period—they were liable to misfire, usually had to be reloaded after every shot, reloading was time-consuming, and firearms could not be kept loaded for any length of time.  *Id*., ¶ 17 (App. 142-44).  "[C]olonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training."  *Id*. at ¶ 19 (App. 144-45).  So, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life."  *Id*. at ¶ 18 (App. 144).  By the 1820s, homicide rates remained low, and because people continued to generally refrain from going about armed, only a small percentage of homicides were committed with firearms.  *Id*. at ¶ 21 (App. 146-47).

Suicide rates were also low at the founding, and suicide by firearm was rare. After analyzing suicides in Vermont and New Hampshire from 1783 to 1824, Professor Roth determined that the suicide rate was between 3.1 and 5.7 per 100,000 persons ages 16 and older, and that only six percent of suicides were committed with firearms (despite the fact that 50–60 percent of households owned a firearm).  *Id*. at ¶ 43 (App. 163-64).  By the late 1920s and early 1930s, though, when technology had advanced and firearms could be kept loaded and used impulsively, not only did

suicide rates increase, but so did the percentage of suicides committed with firearms—41 percent in New Hampshire, 47 percent in Vermont, and 40 percent in Maine. *Id*. at ¶ 44 (App. 164).[14]  In sum, impulsive firearm homicides and suicides were simply not the societal problem that they are now.

Another significant difference between now and then is that, as Professor Robert Spitzer explains, firearms were not readily available during the 17th, 18th, and most of the 19th centuries.   Spitzer Decl., ¶¶ 9-10 (App. 75-76).   Rather, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get."  *Id*., ¶ 10 (App. 76).  Professor John Donohue concurs with Professor Spitzer:

> There was a built-in waiting period for everyone who purchased a gun in 1791 because of issues of travel time, scarcity of gun parts, and the time it took to make a gun.  The world today allows almost unlimited access to weaponry within minutes because there are far more licensed gun sellers than the combined number of McDonald's and Starbuck's stores.

Donohue Decl., ¶ 51 (App. 128-29); *see also Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 213 ("There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the

---

[14]  In 2021, 277 Mainers committed suicide, and 56 percent of them used a firearm. App. 196 (CDCP Report to Maine Legislature).

founding.").  There was thus no need to impose waiting periods until recent times because, as a practical matter, a person necessarily had to wait before taking possession of a firearm.

While impulsive firearm purchasing was not a problem, other impulsive behavior was.  As Professor Spitzer details, there were many laws in early America designed to keep firearms out of the hands of intoxicated individuals.  Spitzer Decl., ¶¶ 14-31 (App. 78-88).  From the 1600s through the early 1900s, laws in at least twenty states criminalized the carrying or use of firearms when intoxicated; laws in at least fifteen states regulated the commercial sale or distribution of alcohol when firearms were also present; and laws in at least two states barred gun sales to those who were intoxicated.  *Id*., ¶ 20 (App. 81).

In addition, this country has a long history of weapon licensing and permitting.  *Id*., ¶¶ 32-63 (App. 88-106).  Licensing and permitting laws date to the 1600s and became more widespread in the 1800s and early 1900s.  *Id*., ¶ 34 (App. 89).  In the 1800s, laws in at least 18 states imposed licensing requirements as a pre-requisite for carrying or owning weapons, and laws in 29 states did so in the early 1900s.  *Id*., ¶¶ 35, 41 (App. 90, 93).  "Historic weapons licensing laws contemplated an evaluation process to improve the likelihood that individuals who sought access to firearms did not obtain that access until they were approved to receive a license." *Id*., ¶ 75 (App. 111).  And as Professor Spitzer notes, "licensing by its nature thwarts

any unrestricted ability to acquire or use firearms on demand." *Id*. at ¶ 33 (App. 88-89).

Given that firearm homicides and suicides were relatively rare in our Nation's history, and because firearms were not readily available until the late 19th century, it is not surprising that there are no early examples of waiting period laws. Rather, it is "unprecedented societal concerns" (the increased use of firearms in homicides and suicides) and "dramatic technological changes" (the ability to quickly acquire firearms and easily use them) that call for the imposition of waiting periods. *See Bruen*, 597 U.S. at 27. In this circumstance, then, the Court should apply a "nuanced" approach and look for historical analogues by comparing the "how" and "why" of Maine's waiting period law to historical precursors.

In three recent cases—in Colorado, Vermont, and New Mexico—federal courts held that waiting period laws are consistent with the Nation's historical tradition of firearm regulation. In *Polis*, the federal district court in Colorado found that "firearms were not as readily available for purchase and . . . impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed," so "it is logical that waiting-period laws were not adopted during that period." 701 F. Supp. 3d at 1141. The court then determined that laws restricting firearm acquisition and use by intoxicated persons were an appropriate analogue because "the Waiting-Period Act and the intoxication laws both work to prevent

individuals in a temporary impulsive state from irresponsibly using a firearm." *Id.*

at 1144. The court further found that licensing laws were an appropriate analogue

"because they support that the Founders and Reconstruction generation would have

accepted a modest delay on the delivery of a firearm in order to ensure that those

receiving a firearm are law-abiding, responsible citizens." *Id.* at 1145. The court

concluded "that our Nation's historical tradition of firearm regulation is consistent

with the Waiting-Period Act." *Id.* at 1145-46.

The Vermont federal court reached the same conclusion in V*ermont

Federation of Sportsmen's Clubs*, 741 F. Supp. 3d at 210-14. It agreed that

"immediate availability of firearms is a modern development that requires modern

regulation" and that a "nuanced approach" was necessary. *Id.* at 211; *see also id.* at

213 (explaining that "the rapid availability of guns presents an 'unprecedented social

concern' that requires a 'more nuanced approach' to historical analogy"). It found

that

> restrictions on firearm use associated with alcohol are an apt historical
> analogue for Vermont's waiting period. In both cases, the relevant
> legislature identifies a period during which it believes that firearms
> pose an extreme risk to public safety. It then mandates that individuals
> refrain from carrying or using firearms until those people can exercise
> their Second Amendment rights safely and effectively. Vermont's
> statute operates in a manner that finds precedence in our nation's
> history and tradition of gun regulation.

*Id.* at 212. As the court noted, "[t]he only difference between the two laws is the

reason why the individual might make a reckless decision: one based upon alcohol,

and one based upon inflamed passions or fears." *Id*.  And, as in *Polis*, the court found that historical licensing laws were also appropriate analogues to a waiting period law because "[b]oth allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *Id*.  The court concluded that, while a waiting period law is "a novel solution to a novel problem," it is consistent with the Nation's historical tradition of firearm regulation because of the precedent for regulations disarming "individuals who might be likely to make rash decisions with a firearm." *Id.* at 214.

Finally, in *Ortega*, 741 F. Supp. 3d at 1088-89, the federal district court in New Mexico found that waiting period laws are consistent with the historical regulation of firearms.  Rather than focusing on laws relating to intoxication and licensing, the court considered "regulations demonstrate[ing] a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society." *Id*.[15]

---

[15]  Plaintiffs in *Ortega* argued that such laws cannot serve as analogues because they were "rooted in racism and bias." *Ortega*, 741 F. Supp. 3d 1093.  The *Ortega* court rightly acknowledged that "[m]any founding-era gun regulations . . . undoubtedly are repugnant," but nevertheless concluded that it had to consider them "if it is to adhere faithfully to the Supreme Court's instruction to assess the Constitutionality of modern firearm regulations against those laws in existence in the eighteenth and early nineteenth century." *Id*.

As these cases demonstrate, "how and why" Maine's waiting period law burdens Second Amendment rights (assuming for the sake of argument that the Second Amendment even applies), is the same as the "how and why" of intoxication and licensing laws.  With respect to "how," Maine's law imposes only a minor burden.  It does not apply to sales for which no background check is required, and not all firearm purchases require a background check.  The law does not prohibit anyone from acquiring a firearm.  Instead, it imposes on covered sales a modest 72-hour waiting period.  Intoxication and licensing laws imposed a similarly minor burden.  Intoxication laws simply prevented acquiring, carrying, or using firearms during the period of intoxication.  Licensing laws imposed a delay until licensing authorities could be certain that the relevant criteria were met.  In sum, the waiting period law imposes no more of a burden than early intoxication and licensing laws.

As to "why," the purpose of the waiting period law is to decrease the likelihood that firearm purchasers act irresponsibly by using firearms to harm themselves or others.  Laws prohibiting intoxicated persons from acquiring or carrying firearms were similarly designed to reduce firearm violence by persons who might act impulsively.  Licensing laws served a similar purpose—helping to ensure that persons acquiring firearms were responsible citizens who would be less likely to use firearms unlawfully.

For several reasons, all of which are wrong, the district court concluded that the "how" and "why" of Maine's waiting period law are not sufficiently analogous to the "how" and "why" of early firearm licensing and intoxication laws. First, the court stated that early laws were based on an "individualized assessment" that a particular person could pose a risk if given a firearm, while Maine's law essentially assumes that every person might pose a risk. Add. 14. But licensing and intoxication laws also assumed that every person could pose a risk. As Professor Spitzer explained, historical licensing laws involved a "process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted." Spitzer Decl., ¶ 33 (App. 88-89). This process "by its nature thwarts any unrestricted ability to acquire or use firearms on demand." *Id*. So, just like Maine's waiting period law, historical licensing laws delayed everyone's access to firearms regardless of their individual circumstances. In other words, it was assumed that everyone might pose a risk with a firearm, and acquisition was delayed until it was shown otherwise. Maine's waiting period law works the same way—it assumes everyone might be acting in an impulsive or agitated emotional state and delays acquisition until it is shown otherwise (by the person moving forward with the purchase after waiting 72 hours).

Some intoxication laws also assumed risk without regard to an individual's characteristics. It is true that many intoxication laws were based on whether a person was actually intoxicated. Spitzer Decl., ¶ 20 (App. 81). But there were also laws, including one dating back to 1679, restricting the distribution of alcohol in places where firearms were present. Spitzer Decl., ¶¶ 20 & 27 (App. 81, 85-87). As with a waiting period law, these laws did not consider a person's individual characteristics. Rather, they were based on the assumption that some people who had access to both alcohol and firearms would act irresponsibly.

In *Bruen*, the Supreme Court seemingly approved of firearm restrictions imposed regardless of a person's characteristics. The Court noted that it was not calling into question licensing regimes requiring applicants to pass a firearms safety course before being allowed to carry a handgun in public. 597 U.S. at 38 n.9. Just like a waiting period law, such a requirement presumes that every person might act irresponsibly with a firearm and imposes a delay in order to employ a measure designed to mitigate that risk. And just like a waiting period law, there is no individualized assessment – regardless of how knowledgeable a person is regarding the safe handling of firearms, they still must pass a safety course. Quite simply, there is nothing novel about laws making assumptions about risks people might pose when entrusted with firearms and employing measures to mitigate that risk.

The district court also sought to distinguish Maine's law from early licensing and intoxication laws by claiming that the latter laws imposed "conditions" that a person could satisfy (i.e., passing a background check or not being intoxicated), while Maine's law does not. Add. 15. But what the district court failed to recognize is that waiting 72 hours <u>is</u> the condition. Telling a child that they must wait an hour after eating before going into the water is just as much imposing a condition as telling the child to first put on sunscreen or pass a swim test. A condition need not always involve performance of some kind of affirmative act. Indeed, licensing laws often do not involve affirmative acts on the part of individuals. Every person is subject to the licensing requirements and must wait until the government has satisfied itself that an applicant can be entrusted with a firearm.

Finally, the district court erred by faulting the waiting period because it delays all sales rather than requiring an individualized assessment of each buyer's state of mind. Nothing in *Bruen* or any other case suggests that such laws are valid only if they employ individualized assessments of individuals. In *Bruen*, the Supreme Court made clear that it was not calling into question laws that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." 597 U.S. at 38 n.9. Moreover, it is difficult to see how Maine could confirm that a person is not acting impulsively or in an agitated emotional state other than by imposing a waiting period. Background checks would not reveal

this information – they look at past conduct and reveal nothing about a buyer's current state of mind. Perhaps some sort of psychological assessment could be conducted at the time of sale, but firearm sellers are likely not competent to accurately assess a buyer's emotional state. Requiring buyers to be assessed by a medical professional before acquiring a firearm does not seem feasible and would likely result in longer delays. The most effective and least intrusive way to guard against persons buying firearms while in an agitated emotional state is to impose a brief delay.

In short, because both the "how" and the "why" are the same, Maine's modern waiting period law is sufficiently analogous to intoxication and licensing laws and is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. All these laws impose modest delays to ensure that persons will act responsibly with firearms. So, even if the plain text of the Second Amendment were implicated here, the law survives Appellees' challenge.

## II. The district court erred in concluding that the remaining factors supported preliminarily enjoining enforcement of Maine's waiting period law.

Because Appellees are unlikely to prevail on the merits, the remaining factors are "matters of idle curiosity." *New Comm Wireless Servs.*, 287 F.3d at 9. In any event, though, the other factors do not support Appellees' request for injunctive relief, and the district court erred in concluding otherwise.

### A. *Appellees will not suffer irreparable injury absent a preliminary injunction.*

As an initial matter, although the waiting period law was enacted in April 2024 and took effect in August 2024, the Appellees did not file this lawsuit until November 2024, undermining their claim of irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Indeed, Appellees claims of irreparable harm are, at best, speculative. Below, Appellees argued that irreparable injury is the deprivation of their Second Amendment rights. But as argued above, Appellees are not likely to establish that the waiting period law violates the Second Amendment and thus fail to show a likelihood of irreparable injury.

Appellees also failed to make a sufficient showing of any individualized harm. Appellee Coshow alleges that she needs a firearm to protect herself and her husband. Coshow Decl., ¶¶ 2-5 (App. 49-50). She has that firearm. She has already purchased the firearm that she wanted and does not allege that she wants to purchase additional ones. *Id.*, ¶¶ 6-7 (App. 50-51). Appellee Beckwith already "regularly carrie[s] a gun for self-defense." Beckwith Decl., ¶ 2 (App. 40). While she alleged in her November 2024 declaration that she intended to purchase a second one, *id.*, she presumably has done so by now. And if she did not, it cannot have been because of the 72-hour waiting period.

Beckwith expresses concern on the part of her clients – survivors of domestic violence to whom Beckwith provides firearm training.  Beckwith alleges that her clients will be at risk if they cannot immediately acquire firearms.  *Id*. at ¶¶ 19-21 (App. 45-47).  It is doubtful, though, that Beckwith has standing to allege harm on the part of people with whom she works.  And if she does, there is no competent evidence in the record that a 72-hour delay in taking possession of a firearm puts survivors of domestic violence at risk.[16]  To the contrary, the evidence in the record is that gun possession <u>increases</u> the risk of being the victim of violence, and that defensive gun use is rare.  Donohue Decl., ¶¶ 29, 32-35, 48, 57 (App. 119, 120-21, 127-28, 131).  Moreover, during the legislative hearing on the waiting period bill, the Maine Coalition to End Domestic Violence testified that services are available to keep victims safe during the waiting period.  Stark Test. (App. 192).  Finally, nothing prevents Beckwith from lending firearms to her clients or assisting them in acquiring a firearm pursuant to a transaction not requiring a waiting period.

---

[16]  All Appellees can muster are two anecdotes – one involving a woman in New Jersey who was fatally stabbed by her ex-boyfriend while waiting for the state to process her handgun application, and one involving a woman in Wisconsin who was killed by a stalker before she could take possession of a handgun she was allegedly attempting to purchase.  Complaint, ¶ 18 (App. 19).  In the New Jersey episode, though, the delay in possessing the firearm was two months, not 72 hours, and, in any event, it is speculative that a firearm would have made any difference, given the nature of the attack.  Donohue Decl., ¶ 54 (App. 130).  And with respect to the Wisconsin episode, the claim that the victim was attempting to acquire a firearm has been "widely discredited."  *Id*., ¶ 53 (App. 129).

The firearm-dealer Appellees claim in their declarations that business has decreased since the waiting period law went into effect. *See* White, Hendsbee, and Cole Decls. (App. 53-57, 59-63, 65-67). As an initial matter, Appellees offer no support for the proposition that the Second Amendment confers on gun sellers a right to make money. Thus even if they are suffering a harm, it is not a harm resulting from a violation of their Second Amendment rights. In any event, given that the waiting period law has been in effect for a relatively short period of time, the financial impact on gun dealers in the long term is speculative.

### B. The balancing of the equities and the public interest warrant denying injunctive relief.

As to the remaining factors, the balancing of the equities and the analysis of the public interest should be considered together, because these two factors merge when the government is the defendant. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).[17] This Court has recognized that "any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (cleaned up); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012).

---

[17] As the district court recognized, while the Attorney General is the named defendant, the lawsuit is functionally against the State of Maine. Add. 4, n.3.

Here, moreover, enjoining enforcement of the waiting period law is more than just an abstract injury to Maine's interest in enforcing its laws. Lives will likely needlessly be lost to suicides and homicides if the Attorney General cannot enforce the waiting period. As Professor Donohue explains:

> Substantial empirical evidence illustrates that waiting periods prior to the purchase of weapons such as those enacted by Maine will reduce suicides – particularly among young adults – and would be expected to reduce the risk of the type of episodes seen in recent years of enraged individuals buying firearms on the way to commit mass violence and other criminal acts.

Donohue Decl., ¶ 27 (App. 118). One study concluded that waiting period laws reduce firearm suicides by 7.4 percent—the same reduction in Maine's 158 firearm suicides in 2021 would have saved twelve lives that year alone. *Id*., ¶ 40 (App. 124). Professor Donohue's own research found that waiting period laws "are able to disrupt suicidal ideation and thereby significantly decrease firearm suicides," and reduce suicides by 21-34-year olds by 6.1 percent. *Id*., ¶ 41 (App. 124). As he notes, "[i]f a particularly lethal mechanism like a gun is readily available, many despondent individuals with what could be a merely passing moment of despair will end up committing suicide when a lapse of time would be enough to dissuade or divert them from such an irreversible action." *Id*., ¶ 43 (App. 125). Professor Donohue further opines that waiting periods may reduce the risk of at least some mass shootings, citing as an example a 21-year old who shot and killed eight people in Atlanta in 2021. *Id*., ¶ 47 (App. 127). He bought the firearm on the day of the shooting after

his parents had just thrown him out of the home, and a waiting period could have allowed his immediate mental health crisis to pass. *Id*.; *see also Handgun waiting periods reduce gun deaths*, Luca, M., *et al*. (App. 182-85) (study concluding that states adopting waiting periods experienced a seventeen percent decrease in homicides and a six percent decrease in suicides).

In sum, given the undisputed evidence in the record that Maine's waiting period law will save lives, the equities and the public interest warrant denying enjoining enforcement of the law.

## CONCLUSION

For the reasons set forth above, the Attorney General respectfully requests that this Court vacate the district court's preliminary injunction order.

Dated: April 28, 2025                 Respectfully submitted,

<div style="margin-left: 40%;">

AARON M. FREY
Attorney General


/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
Thomas.A.Knowlton@maine.gov
PAUL SUITTER
Assistant Attorney General
Paul.Suitter@maine.gov
Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8880
Fax (207) 287-3145

</div>

## CERTIFICATE OF COMPLIANCE

This brief contains 10,015 words, excluding the items exempted by Federal Rule of Appellate Procedure 27(a)(2)(B), and complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2). For this Certification, I relied on the word count function of the word-processing software used to prepare this brief (Microsoft Word 2007). I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size.

<div align="right">

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Bar No. 65217
Office of the Maine Attorney General
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800

</div>

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 28th day of April, 2025, I filed the above brief electronically via the ECF system. I further certify that on this, 28th day of April, 2025, I served the above brief electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

ERIN E. MURPHY
erin.murphy@clementmurphy.com

JOSHUA A. TARDY
 jtardy@rudmanwinchell.com

KEVIN J. WYNOSKY
kevin.wynosky@clementmurphy.com

MATTHEW ROWEN
matthew.rowen@clementmurphy.com

PAUL D. CLEMENT
paul.clement@clementmurphy.com

<div align="right">

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
Bar No. 65217
Office of the Maine Attorney General
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800

</div>

**<u>ADDENDUM</u>**

Order on Plaintiffs' Motion for Preliminary Injunction ...........................Add. 2

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, AND TLC GUNSMITHING AND ARMORY, | ) ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) No. 1:24-cv-00384-LEW |
| | ) |
| AARON FREY, ATTORNEY GENERAL OF MAINE, | ) ) |
| | ) |
| Defendant | ) |

**ORDER ON PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF**

The Plaintiffs in this action challenge the constitutionality of 25 M.R.S. § 2016 ("Waiting period after sale of firearm"). The matter is before the Court on Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 4), which I now grant.

**BACKGROUND**

Effective August 9, 2024, Maine law outlaws the delivery of firearms from sellers to buyers before 72 hours have passed from the date of the underlying firearm sales transaction. 2024 Me. Legis. Serv. Ch. 678 (S.P. 958) (L.D. 2238) ("An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases")

("the Act").[1]  As worded by the Maine Legislature:  "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement." 25 M.R.S. § 2016(2).  The Act is enforced exclusively against sellers.  Sellers who violate its provisions are subject to a fine of between $200 and $500 for a first violation and $500 and $1000 for each successive violation.  *Id.* § 2016(3).

Plaintiffs are Maine citizens and businesses and include federally-licensed firearm dealers.  Plaintiffs allege that the Act violates the Second Amendment rights of persons who seek to exercise the right to keep and bear arms.[2]  They name as Defendant Aaron Frey, Attorney General of the State of Maine, who is tasked with the enforcement of the Act's penalty provision.  *See* 17-A M.R.S. § 4-B.

The Maine Legislature's passage of the Act occurred in the wake of the October 25, 2023, devastating mass shooting in Lewiston and the Legislature has expressed as cause for the Act concern for persons who may purchase a firearm with the immediate purpose

---

[1] The Act exempts certain sales transactions from its coverage, including sales to law enforcement and corrections officers, sales between dealers, and sales between family members.  25 M.R.S. § 2016(4).

[2] Among the Plaintiffs there is also an individual purchaser of a firearm, who complains of the waiting period she was subjected to, and a business proprietor who offers firearm training and consulting services to victims of domestic violence who fear for their lives.  Although most of the Plaintiffs are sellers, they are entitled to pursue derivative claims based on the Second Amendment rights of their customers.  *Gazzola v. Hochul*, 88 F.4th 186, 194-95 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024) (collecting cases).  *See also*, *e.g.*, *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016); *id.* at 630-32 (Thomas, J., dissenting) (collecting cases).  Furthermore, the 72-hour waiting period is short enough that it would be difficult and impractical for a would-be buyer of a firearm to file a lawsuit and obtain an injunction before the expiration of the waiting period.  In this scenario, it is, unsurprisingly, chiefly sellers rather than buyers who seek to invalidate the Act.  *Miller v. Albright*, 523 U.S. 420, 449 (1998) (O'Connor, J., concurring) ("Where insurmountable procedural obstacles preclude a rightholder's own suit, the Court has also accorded third-party standing.")  In any event, the non-firearm-dealer plaintiffs in this case (all of the individuals) are in part vindicating their own, ongoing, individual right to purchase a firearm without having the purchase subjected to the waiting period.  And not to be overlooked, the seller Plaintiffs also have standing based on the negative impact the Act has on their trade and the threat of civil enforcement proceedings.

of doing harm to themselves or others. The Defendant contends that empirical data and statistics suggest that waiting periods (colloquially coined "cooling-off periods") reduce homicide and suicide rates (by firearm) in the states that enact them. This decision ultimately does not pass judgment on the legislative intent or the efficacy of the Act and, consequently, I do not relate here the evidence offered by the parties concerning legislative intent or anticipated outcomes.

## DISCUSSION

Through this action, the Plaintiffs seek to vindicate the Second Amendment right to keep and bear arms. Through their pending Motion, they seek an order that enjoins enforcement of the Act on a preliminary emergency basis, ahead of the final review of their claim on the merits. As cause, they cite the unconstitutionality of the Act and the general presumption that the deprivation of a constitutional liberty imposes an immediate and irreparable harm that cannot be cured by an after-the-fact remedy such as an award of money damages.[3]

In order to obtain preliminary injunctive relief, Plaintiffs must demonstrate: (1) that they are likely to succeed on the merits of their Second Amendment claim; (2) that they are likely to suffer irreparable harm absent interim relief; (3) that the balance of equities tips in their favor; and (4) that injunctive relief would serve the public interest. *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011). Preliminary

---

[3] Because their civil action against AG Frey is the functional equivalent of an action against the State of Maine, sovereign immunity would prevent Plaintiffs from recovering money damages based on their personal harms, such as harms to their business operations and revenue.

injunctive relief is understood to be an "extraordinary and drastic" form of equitable relief reserved for extraordinary and drastic situations. *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024).

For the following reasons I find that Plaintiffs have carried their burden.

## A.     Likelihood of Success on the Merits

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).  On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs*., *Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16)).

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  The Second Amendment confers an individual right on all members of the political community to keep and bear arms, in case of confrontation, of the kind "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 592 (confrontation), 625 (kind of arms), *passim* (individual right) (2008).

When considering a Second Amendment challenge to a legislative enactment, the first consideration is whether "the Second Amendment's plain text covers" the conduct curtailed by the enactment. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  If it does, then "the Constitution presumptively protects that conduct." *Id.*

4

ADD - 5

In such cases, it is the Government's burden not merely to justify its enactment based on its ability to "promote[] an important interest," but to demonstrate that its curtailment of the right to keep and bear arms "is consistent with this Nation's historical tradition of firearm regulation." *Id.* If the Government cannot demonstrate that the proscribed conduct falls within the parameters of a historical restriction on firearms access, then the enactment will succumb to the "unqualified command of the Second Amendment [that] 'the right of the people to keep and bear Arms shall not be infringed.'" *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961). *See Bruen*, 597 U.S. at 17.

### 1. *The acquisition of firearms is covered by the Second Amendment's plain text.*

Attorney General Frey argues that the act of purchasing or acquiring a firearm was not comprehended by the Founders when they enshrined the right to "keep and bear" arms in the Bill of Rights. Def.'s Opp'n (ECF No. 13) at 5-11. In his view, the Second Amendment only protects one's ability to keep and bear arms already possessed and does not provide "an unfettered right to immediately acquire them free of any regulation." *Id.* at 6. *See also id.* at 7 (collecting cases to that effect). Though Frey concedes that the Constitution makes inviolate a right to keep and bear arms, he asserts that it does not protect the corollary right to acquire arms, which is a curious construction indeed. It is an interpretation that is not only unsupported by the text of the Constitution but one that makes the core right to keep and bear arms illusory if it is relegated to those arms in circulation at the time of the founding or through sales not subject to a background check. In support, Frey cites, among other authorities, the *Heller* Court's construction of "keep and bear" as encompassing having and possessing, which to Frey implies the exclusion of acquiring.

5

ADD - 6

*Id.* at 5 (citing *Heller*, 554 U.S. at 583-84). For their part, Plaintiffs assert that "laws that prevent people from acquiring arms self-evidently restrict the right to 'keep and bear Arms.'" Pls.' Reply (ECF No. 24) at 2.

Though it is certainly correct that to keep and bear encompasses the right to have or possess arms (and to carry arms), the *Heller* Court considered a handgun ban that prohibited possession altogether, subject only to a narrow and discretionary licensing exception. *Heller*, 554 U.S. at 628. The *Heller* Court did not consider a law that temporarily bans taking possession of a firearm through an otherwise lawful sale by dictating when the seller may permit the buyer to carry the firearm away. Here, however, we consider an enactment that temporarily bans keeping, bearing, and carrying activity that would otherwise occur but for its proscription.

If a citizen cannot take possession of a firearm then his or her right to possess a firearm or to carry it away is indeed curtailed, even if, as Frey claims, the curtailment is modest. However, the threshold inquiry is whether the Second Amendment covers the conduct curtailed by the Act, not a qualitative assessment of how modest the imposition on the right happens to be. Citizens wishing to purchase a firearm are dispossessed of one for 72 hours exclusively by operation of the Act's requirement that everyone be subjected to a "cooling off" period, even those who have passed an instant background check at the FFL dealer's counter. That is indiscriminate dispossession, plain and simple. Attorney General Frey impliedly concedes the point by suggesting that the Act merely prohibits "immediate" possession through a "commercial transaction," emphasizing that the infringement is only temporary and presumptively subject to regulation. Def.'s Opp'n at

ADD - 7

7 ("[T]he Second Amendment's plain text does not apply to the purchase of firearms, *or at least not the immediate purchase of firearms*." (emphasis added)).[4]  To the extent those arguments made in mitigation are relevant, they may bear on the second prong of the analysis but do not call into question whether as an initial matter the Act impairs conduct presumptively covered by the Second Amendment.  Acquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm.  Any interpretation to the contrary requires the type of interpretative jui jitsu that would make Kafka blush.

As for the regulatory overlay that attends the commercial sale of firearms, precious few individuals make their own firearms.  Firearms have always been articles of commerce.

---

[4] *See also* Def.'s Opp'n at 9 ("Theoretically, regulations on firearm sales could be so burdensome that they effectively prohibit the acquisition of firearms and interfere with the right to keep and bear arms . . . .").  Attorney General Frey quotes liberally from out-of-circuit opinions and decisions, which apparently represent a surprise revival of the textualist judicial tradition from some rather unexpected quarters.  They are unpersuasive insofar as they express the very same tell of overly qualified reasoning in service of something other than giving ordinary effect to the plain words of the Second Amendment, including *B&L Products*, *Inc*., *v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (holding that the right to keep and bear "says nothing about commerce"); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("'keep and bear' does not include purchase—let alone without a background check"); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, -- F. Supp. 3d ---, 2024 WL 3466482, at *22 (D. Vt. July 18, 2024) ("[T]he 'right of the people to keep and bear Arms,' . . . does not facially include a right to immediately obtain a firearm through a commercial sale."); *Ortega v. Lujan Grisham*, -- F. Supp. 3d --, 2024 WL 3495314, at *26 (D.N.M. July 22, 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees . . . that the Second Amendment's plain text does not cover purchasing firearms." (internal quotation marks omitted)); and *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("[T]he receipt of a paid-for firearm without delay is not covered." (cleaned up)).

For example, in *Bruen*, the Supreme Court instructed courts to ask whether the conduct proscribed by a law falls within the plain text of the Second Amendment, but it did not then draw the obviously silly conclusion that the petitioners must lose because the Second Amendment does not expressly specify home use versus public use or open carry versus concealed carry.  Instead, the Court looked to history to inform the meaning of the language of the Second Amendment, while also considering what the language must naturally mean in order for the Second Amendment to protect the right the keep and bear arms.  *Bruen*, 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms. . . .  [The] definition of 'bear' naturally encompasses public carry. . . .  To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections.").

There is nothing novel or nefarious about that basic reality that would warrant torturing the concepts of keeping, bearing, or carrying to exclude from their meaning the acquisition or purchase of a firearm.[5]  In *Heller*, the Supreme Court observed that nothing in its holding "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27, but it gave no examples of what kind of regulations fall within this particular regulatory safe harbor.  *Id.* n.26.  This might well entail background checks, age restrictions, shop security measures, and the like.  It does not automatically extend to a standardless, temporary disarmament measure.  The question is, simply, whether the purchase of a firearm is a basic component of the right to keep and bear arms.  The *Heller* Court did not answer the question and all indications in the wake of *Heller*, *Bruen* and *Rahimi* suggest the Supreme Court would view with great skepticism the argument Attorney General Frey advances here.

Attorney General Frey otherwise argues that the Act is presumptively lawful because it is no more burdensome than any other "shall-issue" legislative scheme that subjects firearm buyers to a background check, and that like those schemes the Act simply imposes a brief waiting period based on "narrow, objective, and definite standards," citing *Bruen*'s much-discussed ninth footnote.[6]  Def.'s Opp'n at 6 (quoting *Bruen*, 597 U.S. at 38

---

[5] The right to keep and bear arms is one we "inherited from our English ancestors."  *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  Without being presumptuous about the founding generation's access to English language etymologies, in fact the word "keep" was used by our English-speaking forebears to mean taking or acquiring, though the grammar and diction of those forebears would be incomprehensible to a modern English speaker.  *Keep*, Oxford English Dictionary, oed.com/dictionary (entry I.1.: "To seize, lay hold of; to snatch, take. Obsolete.").

[6] *Bruen*'s ninth footnote:

*(continued next page)*

8

n.9, and citing *Heller*, 554 U.S. at 627 n.26, and *McDonald*, 561 U.S. at 786, concerning "conditions and qualifications on the commercial sale of arms"); *see also* Def.'s Opp'n at 9-10 (speaking of the "presumption" of the Act's "lawfulness"). However, as discussed in the following section, the Act applies no standard at all, unless what is meant by the word standard is a prescriptive standard of what the Maine Legislature sees as the ideal behavior of firearm sellers, rather than an evaluative standard to determine whether individual buyers should have their rights suspended.[7]

Because the act of acquiring a firearm, including by purchase, falls within the ambit of what it means to keep and bear arms, it is presumptively protected by the Second Amendment. *See Reese v. Bureau of Alcohol*, *Tobacco*, *Firearms*, *& Explosives*, -- F.4th

---

To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Rather, it appears that these shall issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid*. And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 597 U.S. at 38 n.9 (parallel S.Ct. and L.Ed. citations omitted).

[7] Backgrounds checks once disarmed individuals for comparable lengths of time, or longer, but they at least were designed to implement a standard against which to measure an individual's background. Today, background checks impose only momentary delays. Insisting that a more prolonged waiting period occur because it is no greater in length than early background checks overlooks the fact that background checks impose a standard and waiting periods do not.

9

--, 2025 WL 340799, at *5 (5th Cir. Jan. 30, 2025).[8] Consequently, it is Attorney General Frey's burden to establish not only that the Act "promotes an important interest," but to demonstrate that the Act's curtailment of the right to keep and bear arms "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.[9]

## 2. The Act's cooling-off period is inconsistent with the Nation's historical tradition of firearm regulation.

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Still, the challenge of demonstrating that the curtailment of Second Amendment rights is consistent with our Nation's history and tradition does not boil down to means-ends, costs-benefits, or any

---

[8] In *Reese*, the Fifth Circuit observed:

> Because constitutional rights impliedly protect corollary acts necessary to their exercise, we hold that [the Second Amendment covers the commercial purchase of firearms]. To suggest otherwise proposes a world where citizens' constitutional right to "keep and bear arms" excludes the most prevalent, accessible, and safe market used to exercise the right. The baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether.

-- F.4th --, 2025 WL 340799, at *5.

[9] In the following section, I discuss only the history and tradition inquiry, not whether the Act promotes an important interest. Attorney General Frey and multiple amici have presented evidence that a cooling off period can prevent rash homicidal or suicidal behavior with firearms. *See* Def.'s Opp'n *passim*; Brief of Amici Curiae Maine Gun Safety Coalition, Maine Coalition to End Domestic Violence, Maine Association of Psychiatric Physicians, Brady Center to Prevent Gun Violence, and Giffords Law Center to Prevent Gun Violence in Support of Def.'s Opp'n to Pls.' Mot. to Prelim. Inj. (ECF No. 20) *passim*. Suffice it to say that the objectives of the Act are not arbitrary and capricious such that they would offend the Fourteenth Amendment but for the overlay of Second Amendment jurisprudence that steers my review. Beyond that observation, however, it is emphatically not my assigned role to engage in an analysis that involves a comparative weighing of respective interests. *See Bruen*, 597 U.S. at 22-25; *Heller*, 554 U.S. at 634; *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010).

10

other interests-balancing analysis. *Bruen*, 597 U.S. at 22-25; *Heller*, 554 U.S. at 634; *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010). Instead, Attorney General Frey must identify one or more historical analogues that suggest that the Act has a precedent and that it cuts against the right to keep and bear arms no more stridently than laws that existed in the Colonial or Reconstruction Periods. *Bruen*, 597 U.S. at 27. But to the extent the societal concern addressed by the Act is unprecedented or involves dramatic changes in technology, such that a historical analogue is not readily available for purposes of comparison, Frey may still be able to justify the Act through a "more nuanced approach" to the history and tradition inquiry. *Id.*; *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024). After all, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28.

With this nuanced approach, the question is whether the Act is "consistent with the principles that underpin our regulatory tradition" and/or is "'relevantly similar' to laws that our tradition is understood to permit." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). "Why and how [the Act] burdens the [Second Amendment] right are central to this inquiry." *Id.* Important criteria are whether the Act employs "narrow, objective, and definite standards" to justify the curtailment of the right to keep and bear arms. *Bruen*, 597 U.S. at 38 n.9.

Frey concedes that waiting period laws implicate unprecedented societal concerns or dramatic changes and therefore call for the "more nuanced" approach. Def.'s Opp'n at

11-15.  In fact, there is no readily comparable precedent before the Twentieth Century.[10]

For most persons, the immediate, impulsive purchase of a firearm was not an option given

the lack of access to a seller or even the funds to make a purchase.  Most persons bent on

mayhem or self-harm in earlier times would have to rely on whatever weapons were at

hand or obtain a firearm by means other than a purchase at a local gun shop.  In such

societal conditions, a law imposing a waiting period would lack efficacy and would likely

be unadministrable in any event.  Consequently, the question is not whether Frey can point

to a closely analogous, historical precursor, he cannot, but whether the "how and why" of

the Act measure up to "the principles that underpin our regulatory tradition," *Rahimi*, 602

U.S. at 692, and importantly whether the Act employs "narrow, objective, and definite

standards."  *Bruen*, 597 U.S. at 29, 38 n.9.

Frey argues that the how and why of the Act under review is aligned with delays

associated with background checks and licensing in general, or perhaps with statutes that

have long prohibited persons from publicly carrying firearms while intoxicated.  Def.'s

Opp'n at 15-16.  To this, Plaintiffs reply that at least those kinds of restrictions involve a

"condition or qualification . . . a person can satisfy," not an absolute prohibition uninformed

by any individualized consideration.  Pls.' Reply at 3; *see also id.* at 6.  Plaintiffs have the

better of this argument.

---

[10] The late Twentieth Century at that.  Statutory schemes that impose a waiting period on persons who have already passed a background check, separate and apart from waiting periods associated with processing a license application, started to appear in the 1990s.  Waiting period laws are distinct from laws that produce delay occasioned by bureaucratic procedures in firearm licensing or permitting states, which procedures typically include firearm safety instruction and mental health records checks in addition to background checks, all of which amount to individualized standards for license eligibility.  *See* Def.'s Opp'n at 17 ("Licensing laws impose[] a delay until licensing authorities [can] be certain that the relevant criteria [are] met.").

The hows and whys of background checks and drunken-carry laws do not align with the how and why of the Act presently under review. Background checks are designed to generate cause for denying a sale to a given buyer and include a series of objectively verifiable criteria by which to do so. Background checks represent a suite of narrow and definite conditions that can be met. The national instant background check form inquires about the purchaser's prohibited person status in the form of mental health history, criminal history, and drug use or addiction, among other things. Both the how and the why entail individual inquiries and consequences.

Prohibitions against drunken carry are similar, the how of enforcement is based on an individualized assessment, though the why arises from our common understanding that mixing guns and excessive alcohol is fraught with peril. A near globally-applied waiting period detached from narrow and definite standards departs from these approaches. With a waiting period the how and the why entail generalized assumptions and global consequences. Worse, those assumptions are based on the statistical likelihood of aberrant behavior by a small subset of individuals rather than our understanding of the expected, law-abiding behavior of the many. And the consequences are absolute and universal, not conditional and individual. No one carries away a firearm before the passage of 72 hours from its purchase, regardless of individual circumstance. Such an indiscriminate waiting period law is not characteristic of our Nation's regulatory tradition as that tradition is reflected in background checks and prohibitions against drunken carry.[11]

---

[11] Attorney General Frey also references abjectly prejudicial laws that once banned certain minorities from owning firearms out of a fear of what they might do. Def.'s Opp'n at 17 & n.14. Not unlike the fear that informs the Act, those laws were motivated by a fear that certain persons should not acquire firearms.
*(continued next page)*

13

ADD - 14

Beyond the lack of a suitable regulatory analogue in our Nation's history and tradition, waiting period laws like the one contained in the Act do not employ narrow, objective, or definite standards to justify disarming individuals. This Act does not actually employ any standard at all, objective, narrow, definite or otherwise. Whereas one might pass a background check or avoid prosecution for drunken carry by demonstrating a clean record or sobriety, respectively, law-abiding citizens cannot overcome Maine's 72-hour ban by measuring themselves against and affirmatively satisfying a standard. But assuming for the sake of argument that the requirements of the Act actually involve the application of a standard, how can that standard be characterized as "narrow" or "objective" or "definite"?

The waiting period is not narrow since it applies to very near everyone seeking to purchase a firearm and their entire right to keep and bear any firearm at all through purchase is temporarily banned. Nor is the waiting period objective since it does not permit the evaluation of facts as they pertain to the individual seeking to carry away the firearm. Sellers are not tasked with inquiring whether buyers are intent on harming themselves or

---

Assuming that laws offensive to the Equal Protection Clause are appropriate analogues to consider, they are still distinct from a waiting period because a waiting period applies to most everyone without exception, whereas prejudicial carry laws prohibited keeping and bearing firearms based on an individual's membership in a disfavored group that lawmakers presumed had a predilection or interest in armed insurrection. There was, once again, a standard at work, albeit a bigoted one. Today, in Maine, there is no viable presumption that everyone in the body politic or even the average person who seeks to purchase a firearm is inclined toward self-harm or other mayhem. The Act imposes a Constitutional injury to the entire body politic based on a fear as to the behavior of a few. That does not align with our Nation's history and tradition of firearm regulation, even when one considers former laws disarming disfavored minorities. The Act's burdens are also more onerous than requirements imposed in licensing jurisdictions, such as completion of a firearm safety course. Completion of a firearm safety course as a condition to licensure can be met, and once met it will not stand in the way of future firearm purchases or license renewal. A waiting period demands compliance repeatedly, with every single purchase, and there is no condition that can be met to avoid its future application.

14

others and all buyers are effectively deemed suspect.  Attorney General Frey argues that the waiting period requirement is the most objective standard that could be imposed because there is no individualized inquiry.  But indiscriminate application of a requirement is different from an objective application of a condition.  With indiscriminate application objectivity is entirely beside the point.  For essentially the same reason, the Act does not employ a definite standard.  In fact, the Act is filled with and motivated by doubt—doubt about what someone could conceivably do, but far more likely will not do, upon carrying a firearm away from a seller.  That kind of doubt is timeless, and certainly it was familiar to our forebears in the Colonial and Reconstruction Eras.  Yet we still have a Second Amendment that reads:  "[T]he right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

Viewed dispassionately, the Act employs no standard at all to justify disarming individuals, let alone a standard that can be described as narrow, objective, or definite.  Consequently, I find that Plaintiffs have demonstrated that they are likely to succeed on the merits of their Second Amendment claim.

## B.  IRREPARABLE HARM

The deprivation of a constitutional right does not automatically result in an irreparable injury.  *Vaqueria Tres Monjitas*, *Inc.* v. *Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009).  That treatment has most commonly been reserved for deprivations of rights protected under the First Amendment.  *Id.*  In that context, courts imbue the rights in question with "such qualitative importance as to be irremediable by any subsequent relief."  *Id.* (quoting *Pub. Serv. Co. of New Hampshire v. West Newbury,* 835 F.2d 380, 382 (1st

15

ADD - 16

Cir. 1987)). Though there is not a strong legal tradition of treating the right protected by the Second Amendment the same way in the context of preliminary injunction motions, the Supreme Court has analogized the right protected by the Second Amendment with the rights protected by the First Amendment. *See Bruen*, 597 U.S. at 24 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." (citing *Heller*, 554 U.S. at 582)).

Undoubtedly, deprivation of the right to keep and bear arms, particularly for purposes of self-defense, is of such qualitative importance to be considered irremediable through subsequent relief. Persons most harmed by the waiting period are likely to be seeking to carry for self-defense in case of confrontation. Such an interest is well represented here, by Plaintiff Andrea Beckwith. Furthermore, regardless of whatever degrees of injury one might imagine, statutory disarmament in the absence of individual cause is inimical to our Nation's history and traditions. It is to the Second Amendment what a prior restraint is to the First. I have little trouble finding irreparable injury in this context. As with cases involving the First Amendment, even a temporary deprivation results in irreparable injury. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## C. REMAINING CONSIDERATIONS

The remaining elements of the preliminary injunction standard concern the balance of equities and the public interest. Given that Plaintiffs have established a likelihood of

16

success and the existence of irreparable injury, I find that the balance of equities favors them as well. Similarly, although members of the public undoubtedly feel that they have a genuine interest in laws curtailing the right to keep and bear arms, their interest is not exclusive and not one that can win out in terms of an interest-balancing exercise by a court that is sworn to uphold the Constitution.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 4) is GRANTED.

**SO ORDERED.**

Dated this 13th day of February, 2025.

/S/ Lance E. Walker
Chief U.S. District Judge