No. 25-1160

## UNITED STATES COURT OF APPEALS
### For The First Circuit

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY COSHOW; JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY; A&G SHOOTING,

Plaintiffs-Appellees,

v.

AARON M. FREY, in their personal capacity and in their official capacity as Attorney General of Maine,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE (CASE NO. 1:24-cv-00384-LEW)

APPENDIX

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
PAUL SUITTER
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
(207) 626-8880
Attorneys for Defendant-Appellant

## TABLE OF CONTENTS

Docket Report ..................................................................................................App. 1

Plaintiffs' Complaint.........................................................................................App. 13

Defendant's Notice of Appeal............................................................................App. 68

Declaration of Robert Spitzer (Dec. 23, 2024).....................................................App. 71

Declaration of John J. Donohue (Dec. 27, 2024)................................................App. 113

Declaration of Randolph Roth (Dec. 19, 2024) .................................................. App. 133

Rep. Kristen Cloutier Testimony (March 7, 2024)......................................... App. 167

Rep. Margaret Craven Testimony (March 7, 2024) ........................................ App. 168

Rep. Speaker Rachel Talbot Ross Testimony .................................................... App. 170

Sen. Peggy Rotundo Testimony (March 7, 2024) ............................................ App. 172

Rep. Morgan Rielly Testimony (March 13, 2024) ........................................... App. 175

Sen. Eloise Vitelli Testimony (March 7, 2024)................................................ App. 176

Rep. Sam Zager Testimony (March 7, 2024).................................................... App. 178

*Waiting Periods for Firearms Purchases,*
   American Academy of Pediatrics.................................................................. App. 180

*Handgun waiting periods reduce gun deaths,*
   Luca, M., et al., PNAS, November 14, 2017 ................................................ App. 182

Testimony of Joe Anderson, DO, FAAP, Advocacy Chair,
   Maine Chapter of the American Academy of Pediatrics,
   (March 7, 2024).......................................................................................... App. 186

Testimony of Paul Cain, M.D.,
   Maine Medical Association and The Maine Osteopathic Association,
   (March 7, 2024)................................................................................ App. 188

Testimony of Francine Garland Stark, Executive Director,
   Maine Coalition to End Domestic Violence,
   (March 7, 2024)................................................................................ App. 191

Testimony of David Moltz, M.D., Chair, Clinical Practice Committee,
   Maine Association of Psychiatric Physicians,
   (March 7, 2024)................................................................................ App. 193

Report to the Legislature, Maine Center for Disease Control
   and Prevention, Maine DHHS (February 2023).......................... App. 194

# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: 1:24-cv-00384-LEW

BECKWITH et al v. FREY
Assigned to: JUDGE LANCE E. WALKER
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
Case in other court: First Circuit Court of Appeals, 25-01160
Cause: 42:1983 Civil Rights Act

Date Filed: 11/12/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**ANDREA BECKWITH**                     represented by     **ERIN E. MURPHY**
CLEMENT & MURPHY, PLLC
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: erin.murphy@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
RUDMAN WINCHELL
84 HARLOW STREET
P.O. BOX 1401
BANGOR, ME 04401
207-947-4501
Email: jtardy@rudmanwinchell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
CLEMENT & MURPHY, PLLC
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email:
kevin.wynosky@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
CLEMENT & MURPHY, PLLC
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email:
matthew.rowen@clementmurphy.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
CLEMENT & MURPHY, PLLC
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: paul.clement@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EAST COAST SCHOOL OF SAFETY**          represented by   **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NANCY COSHOW**          represented by   **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

App - 2

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMES WHITE**                    represented by  **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J WHITE GUNSMITHING**           represented by  **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ADAM HENDSBEE**            represented by    **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A&G SHOOTING**                              represented by     **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THOMAS COLE**                              represented by     **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

App - 5

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TLC GUNSMITHING AND ARMORY**          represented by   **ERIN E. MURPHY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA A. TARDY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KEVIN J. WYNOSKY**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MATTHEW ROWEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D. CLEMENT**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**AARON FREY**
*in his personal capacity and in his official capacity as Attorney General of Maine*          represented by   **CHRISTOPHER C. TAUB**
OFFICE OF THE ATTORNEY GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333-0006
207-626-8800
Email: Christopher.C.Taub@maine.gov
*ATTORNEY TO BE NOTICED*

**PAUL E. SUITTER**
OFFICE OF THE MAINE ATTORNEY
GENERAL
6 STATE HOUSE STATION
AUGUSTA, ME 04333

App - 6

207-626-8800
Email: paul.suitter@maine.gov
*ATTORNEY TO BE NOTICED*

**THOMAS A. KNOWLTON**
OFFICE OF THE ATTORNEY GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333-0006
207-626-8832
Email: thomas.a.knowlton@maine.gov
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MAINE GUN SAFETY COALITION**  represented by  **JULIA BRENNAN MACDONALD**
PIERCE ATWOOD LLP
MERRILL'S WHARF
254 COMMERCIAL STREET
PORTLAND, ME 04101
207-791-1100
Email: jmacdonald@pierceatwood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MAINE COALITION TO END**  represented by  **JULIA BRENNAN MACDONALD**
**DOMESTIC VIOLENCE**  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MAINE ASSOCIATION OF**  represented by  **JULIA BRENNAN MACDONALD**
**PSYCHIATRIC PHYSICIANS**  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**BRADY CENTER TO PREVENT GUN**  represented by  **JULIA BRENNAN MACDONALD**
**VIOLENCE**  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**GIFFORDS LAW CENTER TO**  represented by  **JULIA BRENNAN MACDONALD**
**PREVENT GUN VIOLENCE**  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2024 | [1] | COMPLAINT against AARON FREY **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by ADAM |

| | | |
|---|---|---|
| | | HENDSBEE, EAST COAST SCHOOL OF SAFETY, JAMES WHITE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW. (Service of Process Deadline 2/10/2025) Fee due by 11/14/2024. (Attachments: # 1 Exhibit A Declaration of Andrea Beckwith, # 2 Exhibit B Declaration of Nancy Coshow, # 3 Exhibit C Declaration of James White, # 4 Exhibit D Declaration of Adam Hendsbee, # 5 Exhibit E Declaration of Thomas Cole)(cjd) (Entered: 11/13/2024) |
| 11/12/2024 | 2 | CIVIL COVER SHEET. (cjd) (Entered: 11/13/2024) |
| 11/12/2024 | 3 | RULE 7.1 DISCLOSURE STATEMENT by ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE. (cjd) (Entered: 11/13/2024) |
| 11/12/2024 | 4 | MOTION for Preliminary Injunction by ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE (cjd) (Entered: 11/13/2024) |
| 11/13/2024 | | Filing Fee Paid via Credit Card ( Filing fee $ 405 receipt number AMEDC-3028254.), filed by ANDREA BECKWITH.(SINGER, BRENT) (Entered: 11/13/2024) |
| 11/13/2024 | 5 | Summons Issued as to All Defendants.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(Attachments: # 1 Summons to Aaron Frey Personally)(cjd) (Entered: 11/13/2024) |
| 11/13/2024 | | Case Randomly Reassigned to JUDGE LANCE E. WALKER. (mlm) (Entered: 11/13/2024) |
| 11/13/2024 | 6 | CERTIFICATION for Admission Pro Hac Vice of Paul D. Clement filed by JOSHUA A. TARDY on behalf of ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE (Total admission fee $ 200 receipt number AMEDC-3028390.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TARDY, JOSHUA) (Entered: 11/13/2024) |
| 11/13/2024 | 7 | CERTIFICATION for Admission Pro Hac Vice of Kevin Wynosky filed by JOSHUA A. TARDY on behalf of ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE (Total admission fee $ 200 receipt number AMEDC-3028401.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TARDY, JOSHUA) (Entered: 11/13/2024) |
| 11/13/2024 | 8 | CERTIFICATION for Admission Pro Hac Vice of Matthew D. Rowen filed by JOSHUA A. TARDY on behalf of ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE (Total admission fee $ 200 |

| | | receipt number AMEDC-3028403.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TARDY, JOSHUA) Modified on 11/18/2024 to add name of pro hac vice attorney (mlm). (Entered: 11/13/2024) |
|---|---|---|
| 11/13/2024 | 9 | CERTIFICATION for Admission Pro Hac Vice of Erin E. Murphy filed by JOSHUA A. TARDY on behalf of ANDREA BECKWITH, THOMAS COLE, NANCY COSHOW, EAST COAST SCHOOL OF SAFETY, ADAM HENDSBEE, J WHITE GUNSMITHING, TLC GUNSMITHING AND ARMORY, JAMES WHITE (Total admission fee $ 200 receipt number AMEDC-3028409.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TARDY, JOSHUA) (Entered: 11/13/2024) |
| 11/13/2024 | 10 | NOTICE of APPROVAL by Clerk's Office re 8 Certification for Admission Pro Hac Vice,, 7 Certification for Admission Pro Hac Vice,, 9 Certification for Admission Pro Hac Vice,, 6 Certification for Admission Pro Hac Vice,, Attorney PAUL D. CLEMENT,KEVIN WYNOSKY,ERIN E. MURPHY,MATTHEW D. ROWEN added for all plaintiffs to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Clement, Wynosky, Rowen, and Murphy must register for a PACER account and/or request the appropriate e-filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 11/20/2024. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e-filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 11/13/2024) |
| 11/22/2024 | 11 | Consent MOTION to Extend Time to File Answer *to Complaint*, CONSENT MOTION to Set Briefing Schedule by AARON FREY (KNOWLTON, THOMAS). Modified on 11/25/2024 to add motion part and clean up docket text (clp). (Entered: 11/22/2024) |
| 11/25/2024 | 12 | ORDER granting 11 CONSENT Motion to Extend time to File Answer to Complaint, CONSENT MOTION to Set Briefing Schedule By JUDGE LANCE E. WALKER. (clp) (Entered: 11/25/2024) |
| 11/25/2024 | | Set Deadlines per order no. 12: Answer Deadline as to AARON FREY due by 1/31/2025; Deadlines as to 4 MOTION for Preliminary Injunction-Responses due by 1/3/2025, Reply due by 1/17/2025. (clp) (Entered: 11/25/2024) |
| 01/03/2025 | 13 | RESPONSE in Opposition re 4 MOTION for Preliminary Injunction filed by AARON FREY. Reply due by 1/17/2025. (Attachments: # 1 Exhibit 1 - Rep. Cloutier Test (LD 2238, # 2 Exhibit 2 - Rep. Craven Test. (LD 2238), # 3 Exhibit 3 - Rep. Speaker Talbot Ross Test. (LD 2238 & LD 2224), # 4 Exhibit 4 - Sen. Rotundo Test. (LD 2238 & LD 2224), # 5 Exhibit 5 - Rep. Rielly Test. (LD 2238), # 6 Exhibit 6 - Sen. Vitelli Test. (LD 2238), # 7 Exhibit 7 - Rep. Zager Test. (LD 2238), # 8 Exhibit 8 - AAP Report, # 9 Exhibit 9 - Handgun Waiting Periods Reduce Gun Deaths (Luca, M), # 10 Exhibit 10 - Anderson Test. (LD 2238), # 11 Exhibit 11 - Cain Test. (LD 2238 & LD 2224), # 12 Exhibit 12 - Stark Test. (LD 2238), # 13 Exhibit 13 - Moltz Test. (LD 2238), # 14 Exhibit 14 - Maine CDCP Report to the Legislature, Feb 2023)(TAUB, CHRISTOPHER) (Entered: 01/03/2025) |
| 01/03/2025 | 14 | NOTICE of Appearance by PAUL E. SUITTER on behalf of AARON FREY (SUITTER, PAUL) (Entered: 01/03/2025) |

| 01/03/2025 | 15 | AFFIDAVIT of Robert Spitzer re 13 Response in Opposition to Motion,,, filed by AARON FREY. (Attachments: # 1 Exhibit A - vita2024, # 2 Exhibit B - Table Intoxication GunsLaws, # 3 Exhibit C - Intoxication Weapons Laws, # 4 Exhibit D - Table Licensing Laws, # 5 Exhibit E - LicenseLaws)(TAUB, CHRISTOPHER) (Entered: 01/03/2025) |
| 01/03/2025 | 16 | AFFIDAVIT of John Donohue re 13 Response in Opposition to Motion,,, filed by AARON FREY. (Attachments: # 1 Exhibit A - Donohue CV)(TAUB, CHRISTOPHER) (Entered: 01/03/2025) |
| 01/03/2025 | 17 | AFFIDAVIT of Randolph Roth re 13 Response in Opposition to Motion,,, filed by AARON FREY. (Attachments: # 1 Exhibit A - Roth CV)(TAUB, CHRISTOPHER) (Entered: 01/03/2025) |
| 01/10/2025 | 18 | Consent MOTION for Leave to File *Amicus Curiae Brief* BY MAINE GUN SAFETY COALITION, MAINE COALITION TO END DOMESTIC VIOLENCE, MAINE ASSOCIATION OF PSYCHIATRIC PHYSICIANS, BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE Responses due by 1/31/2025. (Attachments: # 1 Exhibit A - Proposed Amicus Curiae Brief)(MACDONALD, JULIA) (Entered: 01/10/2025) |
| 01/10/2025 | 19 | ORDER granting 18 Motion for Leave to File Amicus Curiae Brief By JUDGE LANCE E. WALKER. (clp) (Entered: 01/10/2025) |
| 01/10/2025 | 20 | AMICUS BRIEF re 13 Response in Opposition to Motion by MAINE GUN SAFETY COALITION, MAINE COALITION TO END DOMESTIC VIOLENCE, MAINE ASSOCIATION OF PSYCHIATRIC PHYSICIANS, BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE. (MACDONALD, JULIA) Modified on 1/10/2025 to add Amicus language (clp). (Entered: 01/10/2025) |
| 01/14/2025 | 21 | NOTICE of Hearing on Motion 4 MOTION for Preliminary Injunction: Motion Hearing set for 2/11/2025 at 11:00 AM in **Portland Courtroom 1** before JUDGE LANCE E. WALKER. (clp) (Entered: 01/14/2025) |
| 01/17/2025 | 22 | **FILED IN ERROR* REPLY to Response to Motion re 4 MOTION for Preliminary Injunction *RELIEF* filed by MAINE GUN SAFETY COALITION. (HOCKENBURY, MICHAEL) Modified on 1/17/2025 to add filed in error notation-this was re-filed at ECF No. 24 (clp). (Entered: 01/17/2025) |
| 01/17/2025 | 23 | **FILED IN ERROR** RESPONSE in Opposition re 4 MOTION for Preliminary Injunction *RELIEF* filed by ADAM HENDSBEE, MAINE GUN SAFETY COALITION, MAINE COALITION TO END DOMESTIC VIOLENCE, MAINE ASSOCIATION OF PSYCHIATRIC PHYSICIANS, BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, THOMAS COLE, TLC GUNSMITHING AND ARMORY, AARON FREY, ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING. Reply due by 1/31/2025. (HOCKENBURY, MICHAEL) Modified on 1/17/2025 to add filed in error notation--this was filed at ECF No. 24(clp). (Entered: 01/17/2025) |
| 01/17/2025 | 24 | REPLY to Response to Motion re 4 MOTION for Preliminary Injunction filed by ADAM HENDSBEE, THOMAS COLE, TLC GUNSMITHING AND ARMORY, ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING. (TARDY, JOSHUA) (Entered: 01/17/2025) |

| 01/17/2025 | 25 | NOTICE of Docket Entry Modification regarding 23 Response in Opposition to Motion,, 22 Reply to Response to Motion: Modified on 1/17/2025 by the Clerk's office to add filed in error notation--this was correctly filed at ECF No. 24. (clp) (Entered: 01/17/2025) |
| --- | --- | --- |
| 01/31/2025 | 26 | MOTION to Dismiss *Personal-capacity Claim, with Incorporated Memorandum of Law* by AARON FREY Responses due by 2/21/2025. (KNOWLTON, THOMAS) (Entered: 01/31/2025) |
| 01/31/2025 | 27 | *Defendant Aaron Frey's* ANSWER to 1 Complaint,,, by AARON FREY.(KNOWLTON, THOMAS) (Entered: 01/31/2025) |
| 02/11/2025 | 28 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Oral Argument Hearing held re 4 MOTION for Preliminary Injunction. Matter taken under advisement. (Court Reporter: Michelle Feliccitti) (clp) (Entered: 02/11/2025) |
| 02/12/2025 | 29 | NOTICE/CORRESPONDENCE Re: NOTICE OF SUPPLEMENTAL AUTHORITY by All Plaintiffs (Attachments: # 1 Exhibit A)(TARDY, JOSHUA) Modified on 2/12/2025 to clean up duplicate exhibit text (clp). (Entered: 02/12/2025) |
| 02/13/2025 | 30 | ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF granting 4 Motion for Preliminary Injunction By JUDGE LANCE E. WALKER. (clp) (Entered: 02/13/2025) |
| 02/17/2025 | 31 | NOTICE OF APPEAL as to 30 Order on Motion for Preliminary Injunction by AARON FREY . ( Filing fee $ 605 receipt number AMEDC-3070374.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form <u>MUST</u> be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (SUITTER, PAUL) (Entered: 02/17/2025) |
| 02/17/2025 | 32 | MOTION to Stay *Preliminary Injunction Order Pending Appeal* by AARON FREY Responses due by 3/10/2025. (TAUB, CHRISTOPHER) (Entered: 02/17/2025) |
| 02/18/2025 | | COPIES of Notice of Appeal Sent to Counsel Re: 31 Notice of Appeal, filed by AARON FREY. (jlm) (Entered: 02/18/2025) |
| 02/18/2025 | 33 | APPEAL COVER SHEET Re: 31 Notice of Appeal. (jlm) (Entered: 02/18/2025) |
| 02/18/2025 | 34 | CLERK'S CERTIFICATE Re: 31 Notice of Appeal, Documents sent to the U.S. Court of Appeals. (jlm) (Entered: 02/18/2025) |
| 02/18/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 31 Notice of Appeal. (jlm) (Entered: 02/18/2025) |
| 02/18/2025 | 35 | USCA Case Number 25-1160 for 31 Notice of Appeal, filed by AARON FREY. (jlm) (Entered: 02/18/2025) |
| 02/18/2025 | 36 | Unopposed MOTION to Stay *Further Proceedings Pending Appeal* by AARON FREY Responses due by 3/11/2025. (TAUB, CHRISTOPHER) (Entered: 02/18/2025) |
| 02/19/2025 | 37 | ORDER granting 36 Unopposed Motion to Stay Further Proceedings Pending Appeal By JUDGE LANCE E. WALKER. (clp) (Entered: 02/19/2025) |

| 02/19/2025 | 38 | CLERK'S FIRST SUPPLEMENTAL CERTIFICATE Re: 31 Notice of Appeal. Documents Sent to U.S. Court of Appeals (clp) (Entered: 02/19/2025) |
| --- | --- | --- |
| 02/19/2025 | | Supplemental Record on Appeal transmitted to US Court of Appeals re 31 Notice of Appeal (clp) (Entered: 02/19/2025) |
| 03/03/2025 | 39 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Hearing on Motion for Preliminary Injunction (ECF No. 4) held on February 11, 2025 before Judge Lance E. Walker. Court Reporter/Transcriber: Michelle Feliccitti, Telephone Number: 2074323114. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/2/2025. (FELICCITTI, MICHELLE) (Entered: 03/03/2025) |
| 03/10/2025 | 40 | RESPONSE in Opposition re 32 MOTION to Stay *Preliminary Injunction Order Pending Appeal* filed by ADAM HENDSBEE, THOMAS COLE, TLC GUNSMITHING AND ARMORY, ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING. Reply due by 3/24/2025. (TARDY, JOSHUA) (Entered: 03/10/2025) |
| 03/11/2025 | 41 | REPLY to Response to Motion re 32 MOTION to Stay *Preliminary Injunction Order Pending Appeal* filed by AARON FREY. (SUITTER, PAUL) (Entered: 03/11/2025) |
| 03/12/2025 | 42 | ORDER ON PLAINTIFFS' MOTION TO STAY PRELIMINARY INJUNCTION ORDER PENDING APPEAL denying 32 Motion to Stay Preliminary Injunction Order Pending Appeal By JUDGE LANCE E. WALKER. (clp) (Entered: 03/12/2025) |
| 03/12/2025 | 43 | CLERK'S SECOND SUPPLEMENTAL CERTIFICATE Re: 31 Notice of Appeal, Documents Sent to U.S. Court of Appeals (jlm) (Entered: 03/12/2025) |
| 03/12/2025 | | Supplemental Record on Appeal transmitted to US Court of Appeals re 31 Notice of Appeal. (jlm) (Entered: 03/12/2025) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 04/24/2025 10:21:03 | | |
| **PACER Login:** | cctaub438 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-00384-LEW |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

App - 12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY,

        *Plaintiffs*,

        v.

AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

        *Defendant*.

Civil Action No. _____

## PLAINTIFFS' COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiffs Andrea Beckwith, East Coast School of Safety, Nancy Coshow, James White, J White Gunsmithing, Adam Hendsbee, A&G Shooting, Thomas Cole, and TLC Gunsmithing and Armory bring this civil action against Defendant Aaron Frey, in his personal capacity and in his official capacity as Attorney General of Maine. Plaintiffs allege the following based on personal knowledge as to all facts relating to them, and on information and belief as to all other matters.

## INTRODUCTION

1.    Maine recently enacted a law that forces people to wait 72 hours before they can acquire a firearm. Maine Bill LD 2238 (SP 958), which is now codified at Title 25, Section 2016 of the Maine Revised Statutes ("Section 2016"), does not purport to be tethered to the time it takes

1

to conduct a background check, or to any other investigatory efforts into whether someone is disqualified from exercising Second Amendment rights. To the contrary, it forces law-abiding citizens to wait 72 hours to acquire a firearm even if they pass the requisite background check in a matter of minutes, which most people do. The law is instead just an unadorned effort to delay the exercise of Second Amendment rights, on the theory that people who seek to acquire firearms are likely animated by murderous or suicidal intentions that may subside if they are forced to wait out a three-day "cooling-off period."

2.      That kind of "cooling-off period" measure has no historical pedigree whatsoever— and, indeed, would have been "unimaginable at the founding." *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1142 (D. Colo. 2023). To be sure, a few states adopted waiting periods to acquire a firearm in the early twentieth century to facilitate the advent of then-novel background checks, which at the time were a cumbersome and time-consuming endeavor. But some of those measures were abandoned as background checks became much easier to process, and federal law now takes the opposite approach, imposing a three-day *limit* on how long a background check may delay the acquisition of a firearm. Pure "cooling-off period" laws, by contrast, did not appear until the late twentieth century, and most of the few that are on the books date back only to the twenty-first. That is not because it took two centuries to reach the unremarkable conclusion that some small number of the many people who seek to acquire firearms want to do so for illicit (and immediate) purposes. It is because generations of lawmakers have recognized that delaying the exercise of Second Amendment rights simply because the government is wary of anyone who wants to exercise them is fundamentally incompatible with the fundamental right to keep and bear arms.

3.      One need look no further than the Plaintiffs in this case to see the devastating effect

2

that Section 2016 has had on law-abiding citizens in Maine and will continue to have absent this Court's intervention. Plaintiff Andrea Beckwith is a domestic-abuse survivor who has dedicated her life to helping other women who are trying to escape and recover from abusive situations. She offers self-defense classes to victims and survivors of domestic violence and other tragic experiences all throughout Maine. A certified firearms instructor, Beckwith used to be able to help women promptly secure a firearm to defend themselves after providing them with the training needed to safely operate and store it, giving victims of physical, sexual, and emotional abuse a critical measure of security in a most perilous time. Now, however, she must send them home unarmed for three days—three days in which their abusers will now know that they cannot legally secure the means to defend themselves.

4.      Others, like Plaintiff Nancy Coshow, have been forced to spend hours trekking back and forth between their home and a gun store just to secure the means to exercise their Second Amendment rights—even when they have already lawfully owned firearms for years without incident. And still others have abandoned efforts to purchase firearms entirely, as evidenced by the massive drops in sales that Plaintiffs J White Gunsmithing, A&G Shooting, and TLC Gunsmithing and Armory have all experienced since Section 2016 took effect.

5.      Section 2016's "cooling-off period" is unconstitutional, but also flouts common sense. Many firearm purchasers are repeat customers, buying (at least) their second firearm; if one of them is bent on violence or self-harm, Section 2016 will do little to prevent it. By contrast, the first-time purchasers whose rights Section 2016 impedes are often the very people whose need for a firearm is most acute. Again, consider the problem of domestic abuse. In many cases, the abuser already has a firearm, and even if law enforcement confiscates that firearm pursuant to a court order, the abuser can often acquire one illegally, or dupe a friend or family member into loaning

him one. The victim, meanwhile, is disarmed at the moment when she is most vulnerable. If she remains desperate to defend herself and her children, she may feel compelled to access a firearm through other means, thereby eliminating the possibility that a responsible, federally licensed dealer or firearms instructor can intervene with life-saving safety guidance and suggestions for alternative or additional resources. That result—doing little to stop lawbreakers from getting a gun, while imposing significant roadblocks for law-abiding citizens and driving them into the shadows—has nothing to recommend it.

6. Because Section 2016 burdens law-abiding citizens' right to keep and bear arms in an ahistorical manner for an ahistorical reason that is at odds with the Framers' decision to entrust the people with arms, it violates the Second Amendment. The Court should promptly declare it unconstitutional and enter an order preliminarily and permanently enjoining its enforcement.

## JURISDICTION AND VENUE

7. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that Section 2016 violates the U.S. Constitution and seek relief under 42 U.S.C. §1983.

8. Venue is proper in this District under 28 U.S.C. §1391(b) because the Office of the Maine Attorney General resides here, and because a substantial part of the events or omissions giving rise to the claim occurred here.

9. This case is properly assigned to the Bangor office under Local Rule 3(b) because a substantial part of the events or omissions giving rise to the claim occurred in Piscataquis County (where Plaintiff James White lives and where Plaintiff JW Gunsmithing is located), Somerset County (where Plaintiff Adam Hendsbee lives and where Plaintiff A&G Shooting is located), and Penobscot County (where Plaintiff Thomas Cole lives and where Plaintiff TLC Gunsmithing and Armory is located).

## PARTIES

10.     Andrea Beckwith is a resident of Auburn, Maine, who owns and operates East Coast School of Safety, an organization that specializes in providing firearms classes and self-defense training to victims of domestic violence.

11.     Nancy Coshow is a resident of Bridgton, Maine, who sought to acquire a handgun for self-defense purposes and passed an immediate background check, but was unable to acquire a firearm for 72 hours because of Section 2016.

12.     James White is a resident of Guilford, Maine, who owns J White Gunsmithing, a federally licensed firearms dealer with a storefront at 306 Wharff Road, Guilford, Maine 04443. White is also a current member of the Maine House of Representatives, representing District 30.

13.     Adam Hendsbee is a resident of Fairfield, Maine, who owns A&G Shooting, a federally licensed firearms dealer with a storefront at 214 Center Road, Fairfield, Maine 04937.

14.     Thomas Cole is a resident of Hampden, Maine, who owns TLC Gunsmithing & Armory, a federally licensed firearms dealer specializing in selling firearms at weekend gun shows throughout the state of Maine.

15.     Aaron Frey is Maine's 58th Attorney General.  As the state's chief law-enforcement officer, he enforces all civil violations created by state law.  *See* Me. Stat. tit. 17-A, §4-B(1).  He maintains offices at 111 Sewall Street, Augusta, Maine 04330.  Plaintiffs sue Frey in both his personal capacity and in his official capacity.

## BACKGROUND

## I.     "Cooling-Off Period" Laws Are A Late-Twentieth-Century Regulatory Innovation That Remain Uncommon Even Today.

16.     The Second Amendment provides that "the right of the people to keep and bear Arms[] shall not be infringed."  U.S. Const. amend. II.  From the founding to the present, federal

5

and state authorities have grappled with the best way to respect that right while keeping firearms out of the hands of those who pose a credible threat to the physical safety of others. But in "the early days of the Republic," there was no "open, widespread, and unchallenged" practice, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone could take possession of a firearm. *See, e.g.*, *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014) ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment.").[1] To the contrary, from the very beginning, courts recognized that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises. *Andrews v. State*, 50 Tenn. 165, 177-78 (1871).

17. Waiting-period provisions first came onto the scene in the twentieth century, around the same time that some states started adopting various types of background checks. *See Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring); *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1137 ("[N]o law requiring a waiting period was enacted in the United States until 1923."); David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Leg. 303, 360 (2016) (same). These waiting periods were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then. For example, California—one of the first states to enact such a law back in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide

---

[1] The district court opinion in *Silvester v. Harris* was later reversed on other grounds on appeal, 843 F.3d 816 (9th Cir. 2016); the Supreme Court abrogated the Ninth Circuit decision in *Bruen*, *see Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (recognizing abrogation). Plaintiffs cite the *Silvester* district court and court of appeals opinions for the purposes of their historical analysis.

information identifying the purchaser to the local police or county clerk. *Silvester*, 843 F.3d at 823-24. New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation. *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746. The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to the D.C. police within six hours. *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652. Three years after that, in 1935, South Dakota passed its own 48-hour waiting period with a six-hour notification requirement. *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357. In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance, as additional states sought to facilitate background checks in the pre-Internet era. *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

18. While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens. In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun. Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f. And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase. *See* Kopel, *supra*, at 309-10.

19. With the advent of modern federal background-check requirements and the National Instant Criminal Background Check System ("NICS"), waiting-period laws no longer serve an investigatory purpose, as most background checks are completed in a matter of minutes.

Many states that used to have waiting periods have thus abandoned them over the past few decades. *See, e.g.*, 1995 Or. Laws ch. 729 (S.B. 1096) §13 (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (West) (Indiana; §6 repeals a 7-day waiting period while §8 adds an instant-background check requirement); 2009 S.D. Sess. Laws ch. 122 (SB 70) §1 (South Dakota); 2015-2016 Wis. Legis. Serv. 22 (2015 S.B. 35) (West) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://tinyurl.com/5yx9rc52 (last visited Nov. 12, 2024) (noting that Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").[2]

20. Federal law followed a similar trajectory. Congress initially mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. Although the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law. So the Brady

---

[2] Oregon, Indiana, Tennessee, South Dakota, and Wisconsin are not the only states that appear to have tried and abandoned waiting-period laws since they came on the scene in 1923. While Alabama, Connecticut, Iowa, Massachusetts, Missouri, New York, North Carolina, Pennsylvania, and Virginia had some version of a waiting-period law as of 1990, "during which at least some of the" buyer's eligibility "information … [was] verified," U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats., *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x, that no longer appears to be the case, *see* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?*, https://tinyurl.com/6zpcnpkr (last visited Nov. 12, 2024) (listing the current 13 states with waiting-period laws, which do not include the aforementioned jurisdictions).

Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks. *See Printz v. United States*, 521 U.S. 898, 902-04 (1997). But mindful of the constitutional concerns with that approach, once NICS came online, Congress abandoned the five-day waiting period and replaced it with an affirmative protection to ensure that delays in processing the checks would not impede the lawful exercise of Second Amendment rights: A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed. *See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (June 1999), https://tinyurl.com/2nrdckfs.

21.     While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a background check. California is illustrative. After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*, 843 F.3d at 824. It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling-off" function too. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979). And the California legislature did not expressly embrace a cooling-off approach until 1996. *Silvester*, 41 F.Supp.3d at 946-47. By then, California had switched to an electronic background check system that allowed most checks to be processed far more expeditiously than previously. Although the legislature apparently recognized at that point that it no longer had a good justification to force

9

Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm. (Indeed, at the time, California was not even willing to admit that the Second Amendment protects the right to keep and bear arms *at all*.) So California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check. *Id.* at 947.

22.     The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test that it used to apply in Second Amendment cases. *See Silvester*, 843 F.3d at 828. But *Bruen* subsequently—and emphatically—rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests. 597 U.S. at 22-23. And, to put it mildly, "cooling-off periods" do not sit comfortably with Supreme Court precedent. *Bruen* explicitly cautioned against efforts to impose obstacles for the sole purpose of delaying a law-abiding citizen's ability to carry a firearm. *Id.* at 38 n.9. And *United States v. Rahimi* distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." 144 S.Ct. 1889, 1900-01 (2024).

23.     Unfortunately, those pronouncements have not stopped a few states (including Maine) from breaking with historical tradition and enacting unadorned "cooling-off period" laws for the first time in their histories. For example, Colorado recently passed a three-day cooling-off period that starts when the seller initiates a background check. *See* Colo. Rev. Stat. §18-12-115. Positing that "[d]elaying immediate access to firearms … can help prevent impulsive acts of firearm violence, including homicides and suicides," the legislature effectively subjected all

firearm sales in Colorado to a three-day hold, even if the buyer passes a background-check instantly.  2023 Colo. Legis. Serv. Ch. 125 §1(2)(a) (H.B. 23-1219) (West).  Vermont followed suit, enacting its own three-day "cooling-off" period that starts once a buyer passes a background check, on the theory that doing so will "help to prevent impulsive … violence," H.230, §1(10), https://tinyurl.com/msddz287, despite the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs.  *See* Vt. Stat. Ann. Tit. 13, §4019a.  New Mexico recently joined the bandwagon too, passing a seven-day "cooling-off period" with the "primary purpose" of "preventing impulsive suicides and homicides."  *Ortega v. Lujan Grisham*, --- F.Supp.3d ---, 2024 WL 3495314, at *4 (D.N.M. 2024). In total, accounting for the post-*Bruen* states pursuing unadorned "cooling-off period" laws, 13 states (including Maine) plus the District of Columbia currently have some sort of waiting-period law, although several are subject to a variety of exceptions.

24.    While a few district courts have preliminarily upheld a few of these measures after *Bruen*, they have done so on reasoning that is incredibly difficult to square with Supreme Court— and even pre-*Bruen* circuit court—precedent.  *See Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1142 (positing that the Second Amendment likely does not protect the right to acquire arms *at all*); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710, 2024 WL 3466482, at *25-26 (D. Vt. July 18, 2024) (analogizing "cooling-off period" laws to "historical statutes that restrict[ed] the carry or use of firearms by intoxicated people, as well as the distribution of alcohol in settings 'where firearms were present'"); *Ortega*, 2024 WL 3495314, at *37-38 (analogizing "cooling-off period" laws to historical laws "prohibiting the sale of firearms to" "blacks … Indians; propertyless whites; non-Protestants or potentially unruly Protestants").  *But see, e.g., Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to

11

keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."

(quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011))); *Brown v. ATF*, 704 F.Supp.3d

687, 700-01 (N.D. W. Va. 2023) (collecting cases).

## II.    Maine Enacts A "Cooling-Off Period" Law.

25.    On April 30, 2024, Maine decided to join this group of outliers.  After having gone

more than 200 years of statehood without any waiting period whatsoever, Maine enacted Maine

Bill LD 2238 (SP 958), which passed into law on April 30, 2024, without the Governor's signature,

and took effect by operation of law on August 9, 2024.  The title of the bill is "An Act To Reduce

Suicides and Violent Crimes By Requiring a 72-hour Waiting Period after the Sale of a Firearm."

The bill adds a new Section 2016 to Title 25 of the Maine Revised Statutes.

26.    Under Section 2016, "[a] seller may not knowingly deliver a firearm to a buyer

pursuant to an agreement sooner than 72 hours after the agreement."[3]  25 Me. Rev. Stat. Ann.

§2016(2).  This 72-hour period does not purport to be tied to the time needed to conduct a

background check or perform any other kind of investigation into one's suitability to acquire a

handgun.  Section 2016 instead just requires everyone in the state to wait three days to acquire a

firearm, even if they pass a background check in a matter of minutes (as most people do), and even

if they already lawfully own a firearm and have long done so without incident.  Section 2016 is

thus   an   unadorned   "cooling-off   period"   measure,   as   its   title   and   sponsor   forthrightly

---

[3] "Firearm" is defined as "any weapon, whether loaded or unloaded, which is designed to expel
a projectile by the action of an explosive and includes any such weapon commonly referred to as
a pistol, revolver, rifle, gun, machine gun or shotgun," as well as "[a]ny weapon which can be
made into a firearm by the insertion of a firing pin, or other similar thing, or by repair."  25 Me.
Rev. Stat. Ann. §2016(1)(C); *see* 17-A Me. Rev. Stat. Ann. §2(12-A).  "Buyer" and "seller" are
defined, respectively, as "a person, not including a firearm dealer, who receives possession or
ownership of a firearm through an agreement," and "a person or firearm dealer that owns a firearm
and that is transferring ownership of the firearm to a buyer pursuant to an agreement."  25 Me.
Rev. Stat. Ann. §2016(1)(B), (E); *see also id.* §2016(1)(A) (defining "agreement").

acknowledged.  *See* Cate McCusker, *72-hour gun purchase waiting period now Maine law as of Friday morning*, WMTW8 (Aug. 9, 2024), https://tinyurl.com/3at977wf (interviewing state senator who sponsored Section 2016).

27.     Section 2016 is a civil statute enforceable by the Attorney General, and it carries a fine of between $200-$500 for a first violation and $500-$1,000 for each subsequent one.  25 Me. Rev. Stat. Ann.  §2016(3); *see also* 17-A Me. Rev. Stat. Ann. §4-B(1) ("All civil violations … are enforceable by the Attorney General, the Attorney General's representative or any other appropriate public official in a civil action to recover what may be designated a fine, penalty or other sanction.").

28.     Section 2016 applies to all firearm sales in Maine unless (A) the seller knows the buyer works as a law-enforcement officer, a corrections officer, or a certain type of security guard; (B) the buyer holds a firearms-dealer license; or (C) the seller and buyer are family members; the gun is a curio, relic, or antique; or federal or state law exempts the transaction from background-check requirements.  *Id.* §2016(4); *see also id.* §2016(1)(B).

29.     These features make Section 2016 one of the broadest waiting-period provisions in the country.  For example, several of the other waiting-period states have an exception for buyers who have already secured a concealed handgun license; Section 2016 does not.  *Cf., e.g.*, Fla. Stat. §790.0655(2)(a); N.M. Stat. §30-7-7.3.  Some states have an exception for people certified in hunting-safety seeking to buy a rifle or shotgun; Section 2016 does not.  *Cf., e.g.*, Fla. Stat. §790.0655(2)(c).  Some states have an exception for private gun sales; Section 2016 does not.  *Cf., e.g., id.* §790.0655(1)(a).  Other states allow law enforcement to waive the waiting period upon finding that the buyer is facing a threat to herself or her family; Section 2016 does not.  *Cf.* Minn. Stat. §624.7132, subd. 4.  Still other states at least limit the waiting-period requirement to handgun

sales; Section 2016 does not. *Cf., e.g.*, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1). In short, given that only 13 states (plus the District of Columbia) have any type of waiting period at all, it is fair to say that Section 2016 is an outlier even among outliers.

**III. Section 2016 Is Having Immediate And Devastating Effects On Law-Abiding Residents And Federally Licensed Firearm Dealers All Throughout Maine.**

30. In the brief period that it has been on the books, Section 2016 has already had a devastating impact on both individuals and firearms dealers throughout Maine. Indeed, the dramatic drop-off in sales that several dealers have experienced is a powerful illustration of the significant burdens the three-day waiting period imposes on the fundamental right that the Second Amendment protects.

31. **Plaintiffs Andrea Beckwith & East Coast School of Safety.** Andrea Beckwith is a life-long Maine resident who owns and operates East Coast School of Safety ("East Coast SOS") and is a certified as a firearms instructor by the National Rifle Association and the U.S. Concealed Carry Association. East Coast SOS specializes in private lessons, group courses, seminars, and retreats specifically designed to provide victims of domestic violence with training on first-aid and basic self-defense, including an introduction to safe firearm use and storage, as well as trauma counseling. Through these courses, Beckwith seeks to help victims and survivors of domestic violence take back their lives with confidence; East Coast SOS's motto is "self defense at your comfort level." Ex.A ¶¶1, 9-13.

32. Beckwith's devotion to helping domestic-violence victims is rooted in her own tragic experience with domestic violence. Beckwith acquired her first weapon after her abusive then-husband threatened her with a loaded gun. She credits her pastor with saving her life by convincing her to leave him and providing her with the support and resources—including a key to the church—to get herself on her feet. Although she ultimately obtained a protective order against

her abuser, she recognized that the order alone would not stop him from carrying out his threats of violence: He retained a private investigator to stalk her movements for months, and she knew that he had easy access to firearms. Beckwith decided that the only way to ensure her safety was by obtaining a firearm of her own and taking self-defense classes. On nights when her abuser or his friends would repeatedly pelt the camper in which she was temporarily living with rocks, she would sleep with her gun within reach. Beckwith believes that her abuser's knowledge that she had a gun and firearms training was the primary deterrent preventing him from acting on his threats. Ex.A ¶¶4-7.

33.     Around the time she left her abuser, Beckwith began volunteering with an anti-sex trafficking organization called Thrive New England. She soon realized that the survivors she met were paralyzed by fear, often lacking the confidence even to leave their own home. This experience inspired her to begin teaching self-defense classes, and ultimately led her to found East Coast SOS. In recent years, Beckwith has also founded a 501(c)(3) organization that fundraises to subsidize the cost of training events and to sponsor women who would not otherwise be able to enroll. Through East Coast SOS, Beckwith estimates that she has trained thousands of women across the state who have sought self-defense training after an experience during which they felt threatened and realized that police were too far away to help. Among her former students is a victim of the horrifying 2023 Lewiston shooting; until the victim went through Beckwith's training, she was so traumatized by the shooting that she struggled to leave her home. Ex.A ¶¶8-9, 13-14.

34.     Because Beckwith has become well known throughout the state for working with domestic-violence victims, several times in a typical month she will be connected with a woman who is facing a credible and imminent threat of violence from a former or current intimate partner.

When this happens, Beckwith drops whatever she is doing and meets the woman as soon as possible at the closest gun range. Beckwith is familiar with myriad studies showing that domestic-violence victims face the highest risk of danger in the first few months after leaving their abuser—and, as a domestic-violence survivor herself, she knows first-hand how fraught the first several days can be. Ex.A ¶¶15-16.

35. When Beckwith meets with a woman in crisis, she brings along several models of handguns for her to test. Once the woman decides which model she is most comfortable with, Beckwith provides a few hours of basic instruction so that the woman can safely operate the firearm and competently defend herself—and, often, her children. Beckwith then connects the woman with a nearby gun shop where, pending the instant background check required by federal law, the woman used to be able to purchase the firearm and leave feeling safer that same night. Ex.A ¶17.

36. That is no longer the case, however, under Section 2016. Now, a woman trying to escape an abusive partner who poses a credible and imminent threat to her physical safety must wait three days before she can secure a firearm to defend herself—a fact of which her abuser unfortunately will likely be all too aware. Ex.A ¶¶19, 21.

37. **Plaintiff Nancy Coshow.** Nancy Coshow is a grandmother who lives on a roughly five-acre, heavily wooded property in Bridgton. She is licensed to carry a concealed firearm in Maine and has previously been licensed in two other states. She has been extensively trained on how to safely store and operate her firearms, both for recreation and for self-defense. Ex.B ¶¶1-2.

38. Because their home is visually secluded from the road and neighbors, and because various physical limitations would make it difficult to defend themselves if they were victims of

violent crime, Coshow and her husband are particularly concerned with their safety. To that end, either she or her husband—recently, almost always her husband—routinely carries a handgun for self-defense purposes. Although Coshow and her husband have followed this practice for years, they have become especially vigilant of late in light of several recent crimes in the area that appeared to target senior citizens, as well as another violent crime against a young woman in town. Ex.B ¶¶2-4.

39. Coshow's husband underwent major back surgery on October 16, 2024. As a result of the surgery, his mobility is expected to be significantly reduced for at least three months. And because of that incapacitation, Coshow spent the weeks leading up to his procedure preparing to take over primarily responsibility for all household chores, from grocery shopping, to cleaning, to self-defense. Ex.B ¶5.

40. Coshow suffers from arthritis in her hands, which makes operating her current higher-caliber handguns difficult and painful. She accordingly sought to purchase a smaller handgun which she could comfortably operate. On October 8, 2024, she drove approximately 40 miles (roughly 75 minutes) to Northeastern Firearms in Turner, Maine, where she sought to purchase a Kel-Tec P17. Ex.B ¶¶4-6.

41. Because Northeastern Firearms is a federally licensed firearm dealer, federal law required it to conduct a background check on Coshow to confirm that transferring ownership of the Kel-Tec would not give rise to a violation of certain other laws. 18 U.S.C. §922(t). After informing Coshow of that requirement and collecting the required information from her, the Northeastern Firearms employee contacted NICS to electronically verify that Coshow was eligible to purchase the Kel-Tec. Ex.B ¶6.

42. A few minutes later, the Northeastern Firearms employee informed Coshow that

she had passed the background check.  At that point, Coshow paid in full using her credit card and became the lawful owner of the Kel-Tec.  Nevertheless, the Northeastern Firearms employee informed her that, solely because of Section 2016, Northeastern Firearms could not transfer possession of the Kel-Tec to Coshow for 72 more hours, until October 11, 2024.  Ex.B ¶6.

43.     Unable to take immediate possession of the firearm, Coshow drove the 40 miles and 75 minutes back to her residence.  On October 11, 2024—in the midst of last-minute preparations for her husband's surgery—Coshow drove the 40 miles and 75 minutes back to Northeastern Firearms and finally took possession of the Kel-Tec.  Ex.B ¶7.

44.     **Plaintiffs James White & J White Gunsmithing.**  James White is a Navy veteran, a current member of the Maine House of Representatives, and the owner of J White Gunsmithing, a federally licensed firearm dealer in Guilford.  Because J White Gunsmithing is the only gun shop in town, and one of the last gun shops on the way to remote hunting and camping grounds in northern Maine, it often sells firearms to customers with a time-sensitive need to acquire one.  Ex.C ¶¶1-2.

45.     Sometimes, the time-sensitive need results from a tragedy.  In recent years, J White Gunsmithing sold a firearm to a young woman facing threats from a former intimate partner.  White also personally helped a local doctor and his wife quickly secure firearms after they were threatened by a man addicted to painkillers when the doctor refused to refill the addict's prescription.  Ex.C ¶¶6-7.

46.     Other times, the time-sensitive need is recreational.  During hunting season, J White Gunsmithing frequently sells rifles to hunters who need to obtain or replace a firearm on short notice.  In some instances, a hunter has arrived in northern Maine only to realize that something is wrong with his rifle (or even that he forgot it altogether).  Other times, a hunter needs to buy a new

firearm because the one she brought was damaged in an accident. For example, hunters frequently rest their firearms against pick-up trucks, and it is not uncommon for someone to forget to move one before backing the truck up. During a year's hunting season, White estimates that his store serves four people who need to buy a new firearm in these circumstances. Sometimes, the time-sensitivity is particularly acute: A hunter may have a time-limited permit to hunt moose or bear, or may have a nonrefundable hunting guide booked. Ex.C ¶8.

47.     When a customer selects a firearm for purchase, a J White Gunsmithing employee collects the required identification information from the customer and calls the NICS hotline to initiate the required background check. Most of these calls produce an approved background check and an instant "proceed" determination from NICS. A relatively small number culminate in a failed background check and a "deny" determination. Calls to NICS can also produce a "delay" directive if NICS determines that it needs additional time to process the background check. Ex.C ¶3.

48.     Because Section 2016 forces all transactions into a three-day hold, even when NICS instantly issues a "proceed," it has devastated J White Gunsmithing's sales volume: Handgun sales are down 50% and rifle sales are down 25% from the typical August and September sales figures. Ex.C ¶4.

49.     **Plaintiffs Adam Hendsbee & A&G Shooting.**  Adam Hendsbee owns A&G Shooting, a federally licensed firearm dealer in Fairfield. Hendsbee cares deeply about doing business in an ethical and professional manner. He is eager to get to know his customers and to help them assess their needs, and he always endeavors to sell the right gun to the right person. Among other things, when he knows or suspects that a customer is buying his or her first firearm, Hendsbee has an in-depth conversation with the customer to go over basic firearm safety and

proper use, and always encourages the customer to enroll in a firearms safety course for further instruction and skill development.  During the course of this conversation, Hendsbee evaluates the customer's maturity and state of mind to ensure that the sale will not endanger either the customer or the community.  If Hendsbee is not confident that the customer is going to do the right thing with the firearm, he turns the customer away.  Ex.D ¶¶1-2.

50.    Hendsbee also implements practices to identify potential straw-purchasers, and he routinely turns away customers (irrespective of their NICS check) when he suspects they may be attempting to purchase a firearm for improper or illegal purposes.  He also reports suspected illegal purchase attempts to the Bureau of Alcohol, Tobacco, Firearms and Explosives, which has commended him for effectively blocking illegal purchases and for working collaboratively with law enforcement.  Ex.D ¶3.

51.    A&G Shooting is located near a very busy truck stop along the highway, and a significant portion of its business comes from truck drivers and other interstate travelers who casually stop into the store to browse its inventory.  Section 2016 has unsurprisingly caused A&G to lose a significant number of sales to those customers, because truck drivers and out-of-state residents passing through are now unable to take a purchased firearm with them, even if they pass a background check instantly.  In addition to causing A&G to lose these firearm sales, Section 2016 has decreased attendant sales of firearm accessories.  Ex.D ¶¶5-7.

52.    Like J White Gunsmithing, A&G Shooting also sells firearms to people with a time-sensitive need to acquire a firearm.  A&G has found itself in such a situation twice since Section 2016 took effect.  In the first instance, a single woman from a nearby town came to the store on a Thursday because her local police officer recommended that she purchase a firearm for home defense.  The woman had just learned that she had a stalker looking through the windows and

harassing her on her property. Although the police issued a restraining order against the accused individual, they also recommended that the woman obtain a firearm for self-defense. Hendsbee worked with her for over an hour to pick out a firearm that she would be comfortable with and encouraged her to sign up for training to learn additional skills and safety practices. After Hendsbee collected the woman's identifying information, NICS issued a "proceed" determination, and she paid for the firearm in full. But because of Section 2016, she could not take possession of the firearm for 72 more hours. And because A&G is closed on Sundays and Mondays, the next available day for her to pick up the firearm was the following Tuesday. The woman was visibly shaken to learn that she would have to wait four more days to obtain the means for effective self-defense. Ex.D ¶9.

53.     The following Friday, a married couple whose home had been burgled the previous night came into the store seeking to purchase a gun for home-defense. Once again, A&G was faced with a customer with a time-sensitive need to acquire a firearm, but once again, Section 2016 forced the couple to wait until the following Tuesday to obtain the means for effective home-defense. Ex.D ¶9.

54.     **Plaintiffs Thomas Cole & TLC Gunsmithing & Armory.**   Thomas Cole is a retired Marine who lives in Hampden, Maine. Cole owns and operates TLC Gunsmithing & Armory, a federally licensed firearm dealer, and employs his adult daughter to help with the business. TLC Gunsmithing does not have a storefront, and although it does have a website, it sells firearms almost exclusively at weekend gun shows throughout Maine. Although that low-overhead business model can be profitable, it requires a significant investment to accumulate and store inventory in advance of a show, as well as significant costs for Cole and his daughter to travel to the show, pay the vendor registration fee, and secure lodging. For example, TLC Gunsmithing

incurred roughly $2,000 in travel and incidental expenses for Cole and his daughter to travel to a annual gun show at the Augusta Armory from August 24-25, 2024.  Last year, TLC Gunsmithing sold approximately 20 firearms at the Augusta Armory gun show.  This year, however, TLC Gunsmithing sold *none*—meaning that the show was a $2,000 loss.  Ex.E ¶¶1-3, 5.

55.     Section 2016 has caused TLC Gunsmithing's sales to plummet.  Because gun shows are two-day weekend affairs, Section 2016 makes it impossible to transfer possession of any firearm sold during the show, even if the purchaser instantly passes a background check.  And after each show, Cole and his daughter return to their home, which may be hours away.  So if a customer buys a firearm from TLC Gunsmithing during a gun show, to take possession, either the customer will need to travel to Hampden, or Cole and the customer will need to make alternate arrangements.  Any alternate arrangements will necessarily involve additional expense:  Cole or his daughter will have to extend their stay near the gun show, meet the customer at a mutually agreeable location after the gun show ends, or ship the firearm to another federal firearm licensee closer to the customer, so the other licensee can consummate the sale (typically at an additional cost).  Ex.E ¶4.

56.     A few weeks after losing roughly $2,000 in Augusta, TLC Gunsmithing participated in a gun show in Bangor, where it managed to sell five guns—an improvement reflecting the fact that Cole lives in the greater Bangor area, so he could arrange to meet up and transfer the gun after the show with minimal inconvenience or expense.  Even still, the costs of participating in the show were still significant enough that TLC Gunsmithing barely broke even.  Because of the failure to recoup costs incurred as a result of the Augusta and Bangor gun shows, TLC Gunsmithing canceled plans to sell at any gun show where overnight travel would be required.  Ex.E ¶5.

57.     On September 21 and 22, TLC Gunsmithing participated in another gun show in

nearby Lincoln, once again failing to sell a single gun.  Given this continued inability to turn a profit, Cole made the difficult decision to pause TLC Gunsmithing's operations.  Simply put, the business is unable to sustain additional financial losses.  Ex.E ¶6.

58.     If this Court does not enjoin Section 2016, Cole will be forced to liquidate TLC Gunsmithing's substantial firearms inventory, and he has already reached out to auction houses to discuss potential arrangements to do so.  However, if the law is amended by the legislature or enjoined by this Court, Cole intends to resume TLC Gunsmithing's operations.  Ex.E ¶6.

**CLAIM FOR RELIEF**
**Second Amendment Violation**
**42 U.S.C. §1983**

59.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set out herein.

60.     The Second Amendment secures "the right of the people to keep and bear Arms." U.S. Const. amend. II.  Because "the Constitution presumptively protects" arms-bearing "conduct," the state must "justify" any law that regulates that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  To do so, it must identify an appropriate and well-established "'historical analogue'" that "burden[ed]" a citizen's Second Amendment rights in a "similar" manner and for a "similar reason[]." *Rahimi*, 144 S.Ct. at 1898, 1903 (quoting *Bruen*, 597 U.S. at 30).

61.     Section 2016's "cooling-off period" prevents law-abiding citizens from taking possession of the firearms they wish to keep and bear for at least 72 hours.  It therefore restricts arms-bearing conduct covered by the plain text of—and "presumptively protect[ed]" by—the Second Amendment.  *Bruen*, 597 U.S. at 17.

62.     Section 2016's "cooling-off period" is not "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 24.  When a state restricts arms-bearing conduct, it bears

the burden to identify "well-established and representative historical analogue[s]"—in other words, not "outliers"—that are "relevantly similar" in how and why they burden the rights that the Second Amendment protects.  *Id.* at 29-30, 34.  Put differently, a state must demonstrate that historical analogues burdened the right to keep and bear arms "for similar reasons" as the modern regulation, i.e., "to address [the] particular" public policy "problem[]." *Rahimi*, 144 S.Ct. at 1898. And "[e]ven when" a historical analogue "regulate[d] arms-bearing for a" similar "reason" as a modern regulation, the modern regulation will not "be compatible with the right if [the modern regulation] does so to an extent beyond what was done at the founding." *Id.*

63.     There is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms.  While some states adopted waiting-period laws in the early- and mid-twentieth-century, those laws were imposed to facilitate background checks or other investigatory efforts to determine whether someone is prohibited from possessing a firearm.  "Cooling-off period" laws, by contrast, are not tethered to any such efforts; they simply delay the exercise of Second Amendment rights for the sake of delay, on the theory that even law-abiding citizens who have passed a background check cannot be trusted with a firearm.  So even assuming twentieth-century waiting-period laws could be justified as a response to the introduction of background check requirements, the handful of "cooling-off period" laws which did not come about for nearly another half century address a fundamentally different "why"—and one that is fundamentally incompatible with the Second Amendment.

64.     Because Section 2016 "is [not] consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it violates the Second Amendment.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1.      issue an order and judgment declaring that Section 2016 violates the Second Amendment both on its face and as applied to law-abiding citizens purchasing a handgun for self-defense who pass a background check in less than 72 hours;

2.      preliminarily and permanently enjoin enforcement of Section 2016;

3.      award Nancy Coshow nominal damages against Aaron Frey in his personal capacity;

4.      award costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

5.      provide any other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Paul D. Clement, VA Bar #37915
  (pro hac vice forthcoming)
Erin E. Murphy, VA Bar #73254
  (pro hac vice forthcoming)
Matthew D. Rowen, VA Bar #100113
  (pro hac vice forthcoming)
Kevin Wynosky, PA Bar #326087
  (pro hac vice forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

/s/Joshua A. Tardy
Joshua A. Tardy
Brent A. Singer
RUDMAN WINCHELL
84 Harlow Street
PO Box 1401
Bangor, Maine 04402
(207) 947-4501
jtardy@rudmanwinchell.com
bsinger@rudmanwinchell.com

*Counsel for Plaintiffs*

November 12, 2024

26

**EXHIBIT A**

**Declaration of Andrea Beckwith**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

ANDREA BECKWITH, EAST COAST SCHOOL
OF SAFETY, NANCY COSHOW, JAMES
WHITE, J WHITE GUNSMITHING, ADAM
HENDSBEE, A&G SHOOTING, THOMAS
COLE, and TLC GUNSMITHING AND
ARMORY,

      *Plaintiffs*,

      v.

AARON FREY, in his personal capacity and
in his official capacity as Attorney General
of Maine,

      *Defendant*.

Civil Action No. _____

**DECLARATION OF ANDREA BECKWITH**

I, Andrea Beckwith, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a life-long Maine resident and the owner-operator of East Coast School of Safety ("East Coast SOS"), which I founded in 2012. Additional information on East Coast SOS can be found online at https://eastcoastsos.com/. I currently live and raise my three children in Auburn, Maine. I make this declaration based on my personal knowledge.

2.      I have regularly carried a gun for self-defense for over a decade. I have previously been registered to carry a concealed weapon in the State of Maine and am currently in the process of renewing my concealed-carry registration. I intend to purchase another handgun for self-defense purposes soon but will be unable to promptly acquire it owing to Section 2016.

1

3.      I vividly remember the first time I considered buying a gun:  late one night, while traveling with my children, I had an unnerving encounter with an unknown man in an empty parking lot.  In that moment, I realized that I would have been unable to effectively defend my family if the man attempted to take one of my children.  And although that was the first time I wished I had a gun, it would not be the last.

4.      Several months later, my marriage deteriorated into domestic violence.  My then-husband was always very possessive and controlling, limiting my access to a car, to money, and even to my family and friends.  But over the course of several months, his conduct escalated from emotional abuse into both physical and sexual assault.  On multiple occasions during this period, he threw things at me, brandished a loaded gun, and made concrete threats of violence if I attempted to leave him.

5.      I am extremely fortunate that, when my pastor found out about this abuse, he intervened and encouraged me to leave my husband for the safety of myself and my children.  He gave me a key to the church and critical support in the aftermath of our separation as I struggled to get on my feet.  During this period, I lived in a camper on property owned by my parents.  I credit my pastor's support during this period with saving my life.

6.      Even after leaving my accuser, I remained unsafe and anxious, well aware of my acute vulnerabilities and constantly looking over my shoulder.  For instance, although I had obtained a protective order against my abuser, I knew that the order alone could not guarantee my safety.  And although the protective order allowed law enforcement to confiscate his guns, I actually asked the police executing the order *not* to confiscate his guns, out of fear that doing so would only enrage him and make him more likely to carry out his threats of violence against me. I also knew that, even if the police were able to secure all his guns, he could still easily obtain

2

another from a friend or family member.  Since I was unable to rely solely on the protective order for my safety, I bought a firearm and began taking as many classes as I could to gain proficiency in self-defense.

7.    During this period, my abuser frequently stalked my movements around town, and enlisted his friends, siblings, and a private investigator to do the same.  Occasionally, I would be woken up in the middle of the night by the sound of my abuser or his friends throwing rocks at my camper to scare me.  On these nights, I would sleep with my gun within reach.  Ultimately, I believe that my abuser's knowledge that I had a gun and had been trained in self-defense was the primary deterrent preventing him from harming me.

8.    My experience as a domestic-violence victim led me to devote my life to protecting and empowering women, with the goal of preventing other women from going through what I went through and helping them take back their lives when they do.  As I was planning to leave my abuser, I began volunteering with an anti–sex-trafficking organization called Thrive New England.  I quickly came to realize that the survivors I worked with were paralyzed by fear, often lacking the confidence even to leave their own home.  But I also realized that just a modicum of self-defense training would go a long way towards giving them the confidence to take their lives back.  That insight is ultimately what inspired me to begin teaching self-defense classes, leading directly to the founding of East Coast SOS.

9.    Today, I am certified as a firearms instructor by both the National Rifle Association and the U.S. Concealed Carry Association.  Through East Coast SOS, I have trained thousands of women across the state of Maine seeking instruction on firearms self-defense.  Many women come to me on the recommendation of local law enforcement.  Other women come after an experience in which they felt threatened and realized that they could not fight off an attacker themselves, and

that the police were too far away to guarantee their safety.

10.     In addition to firearms-training classes, I offer classes and seminars on first aid and nonlethal self-defense strategies.  I offer these courses both in group settings and in one-on-one settings.  Although most of my classes are designed for adult women, I also teach classes geared specifically towards children and, occasionally, co-ed groups.  That said, I have found that women—and particularly those who are suffering or have suffered domestic violence—show greater willingness to participate and ask questions in a woman-only setting.

11.     In the past, I have hosted most of my classes and seminars at an indoor gun range in Windham, Maine, though the range is currently for sale and I am unsure whether I will be able to continue teaching at that location in the future.  I also frequently travel throughout the state to host courses at local gun clubs and at other locations by request.  In the past year, I have been contacted by various women's associations—including motorcycle groups and even a book club—asking me to put on a self-defense training course.  My long-term goal is to open a facility of my own where I can host these classes without incurring facility rental expenses.

12.     I also host annual retreats for alumni of my classes, primarily designed to empower and support domestic-violence victims and survivors.  These retreats offer opportunities for victims, survivors, and allies to network, form support groups, refresh their self-defense skills, and meet with trauma counselors in both group and individual settings.

13.     My classes, seminars, and retreats are all organized around the goal of helping victims and survivors of domestic violence to take back their lives with confidence.  East Coast SOS' motto is "self-defense at your comfort level," which conveys my goal of meeting women where they are and providing them with whatever skills and knowledge they need to feel safer and more comfortable in their communities.  One of my students in recent years was a victim of the

horrific 2023 Lewiston shooting who watched her friend get shot and suffer severe injuries on that tragic day.  After the shooting, the victim was so paralyzed by fear that she was nearly unable to leave her home.  After going through my training, she regained a sense of security, enabling her to feel more comfortable going about her day-to-day life.

14.     Because my classes, seminars, and retreats are expensive to put on, I charge my clients modest tuition fees.  However, many domestic-violence victims and survivors face financial hardship, making it difficult for them to enroll.  It is an unfortunate phenomenon that abusive partners often control household finances and limit victims' access to bank accounts.  And women are often forced to exhaust whatever meager savings they may have been able to accumulate to support themselves and their families after leaving their abuser.  To avoid having to turn away women in financial need, I founded a non-profit 501(c)(3) organization known as AWE (an acronym for "Academy of Women Empowerment") that raises funds to subsidize the cost of classes and retreats.  Through this fundraising, I estimate that I have been able to provide free firearms self-defense training to hundreds of women and children over the past 10 years.

15.     The nature of my work and my reputation for working with domestic-violence victims frequently brings me into direct contact with women facing credible, imminent threats of physical violence from a current or former intimate partner.  Although I wish that this scenario were less common, in an average month, I expect to be introduced to between three and five women facing a credible, imminent threat of physical violence.  These connections generally occur because the victim directly reaches out, or because someone in my network passes on the victim's contact information.  Although each of these instances is heartbreaking, I take pride in doing whatever I can to help these women feel safer in their time of crisis.

16.     When I am connected with a woman facing a credible, imminent threat of physical

App - 44

violence, my practice is to ask her to meet me at the closest gun range at her earliest opportunity. I will frequently change or rearrange my schedule to accommodate a victim's availability, as helping these women in their time of crisis is my utmost priority. Many studies show that domestic-violence victims face the highest risk of death in their first 3 months after leaving their abuser. And I know from my own experiences how fraught and anxiety-ridden the first several days can be.

17.     As soon as I can meet with a woman facing a credible, imminent threat of physical violence, my practice is to bring along several models of handguns suitable for self-defense for her to test. Once the woman decides which model she is most comfortable with, I provide a few hours of basic instruction so that she can safely operate the firearm and competently defend herself (and, if she is a mother, her children too). Then I connect her with a local gun shop where, at least before Section 2016 took effect, she could purchase the gun and, pending the instant background check required by federal law, leave feeling safer that same night. As part of that process, I call the gun shop so it knows to look out for the woman and to help her with exactly what she needs to buy.

18.     After that initial encounter with a woman facing a credible, imminent threat of physical violence, I stay in close contact with her to ensure her continued safety. I also encourage her to take other classes with me or another instructor to gain additional self-defense skills. And I frequently accompany the woman to any court hearings as a source of moral support if she elects to bring divorce, custody, or protection-from-abuse proceedings.

19.     Maine's new waiting-period law makes it impossible for people to legally acquire a gun for self-defense purposes without waiting-out a 72-hour "cooling-off" period. There are countless problems with this law, not least that it deprives law-abiding women facing a credible,

App - 45

imminent threat of violence of any meaningful opportunity to defend themselves. It also directly affects and interferes with one of my core business activities: helping women in acute crisis lawfully obtain a firearm so that they are immediately in a position to defend themselves and their families.

20. It is hard for me to imagine a clearer infringement of the Second Amendment. Yet for obvious reasons, women facing credible, imminent threats of violence encounter significant hindrances and barriers to challenging the lawsuit in court themselves. For one thing, retaining a lawyer and filing a lawsuit is expensive, and domestic-violence victims are often severely limited in their ability to access funds. As my own experience shows, abusers routinely control victims' finances, and leaving an abuser often requires a woman to exhaust all available savings to secure housing and food for herself and her children. Besides this financial burden, hiring a lawyer and filing a complaint takes time, and it is simply unrealistic to expect a woman to do so in the three days during which she faces so many other necessary expenses, and during which her primary focus is keeping herself and her children alive. Moreover, coming forward as a plaintiff forces a woman facing a credible, imminent threat of violence to put herself at additional risk, by raising her profile and publicly accusing her abuser at a time when further escalation could prove deadly. And if that all were not enough, feelings of shame and embarrassment associated with the stigma of domestic abuse will often deter women harmed by Section 2016 from coming forward.

21. As a practical matter, the waiting-period law makes no sense. A domestic abuser plainly does not respect the law and will always be able to acquire a firearm—including through illegal means if necessary. So the waiting-period law will do nothing to prevent him from impulsive violence or self-harm. By contrast, the waiting-period law makes it impossible for a victim of domestic abuse to lawfully obtain a gun and effectively defend herself and her children.

The State of Maine should encourage women in these circumstances to come forward, acquire a gun, and be trained on safe and effective self-defense techniques. Yet instead, the waiting-period law pushes victims even further into the shadows and empowers their abusers, who now know that their victim will be unarmed for at least 72 hours. Indeed, the fact that abusers know that their victims will not be able to obtain a gun for 72 hours makes that initial period after leaving an abuser even more fraught, as it may serve to incentivize abusers bent on violence to act quickly during the period in which they have a perceived advantage.

\*  \*  \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on November 12, 2024

_Andrea Beckwith_

Andrea Beckwith

**EXHIBIT B**

**Declaration of Nancy Coshow**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY,

      *Plaintiffs*,

      v.

AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

      *Defendant*.

Civil Action No. _____

## DECLARATION OF NANCY COSHOW

I, Nancy Coshow, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am licensed to carry a concealed weapon in Maine and have previously been licensed in two other states. I have been extensively trained on how to safely store and operate firearms, both for recreation and for self-defense. Among other things, I took an advanced safety training course to obtain my Range Safety Officer designation. I have also taken significant First Aid training. I make this declaration based on my personal knowledge.

2.      I live alone with my husband on a roughly five-acre, heavily wooded property in Bridgton, Maine. I am in my late 60s, and my husband is 70. We have no family in the area; our two adult children and their children live out of state. As we age, we have become increasingly

1

aware of our safety, and sensitive to physical limitations that would make it difficult for us to defend ourselves if we were the victims of violent crime. For instance, I suffer from arthritis in my hands, knees, and back that limits my mobility to such an extent that the state of Maine has issued me a handicapped-parking permit. My husband also has a handicapped parking permit.

3.  Our awareness of our safety has heightened in recent years because of several violent crimes in the surrounding area that have appeared to specifically target senior citizens as well as another particularly vicious attack in town against a young woman. Our concerns are compounded further still given that our house is visually secluded from the road and neighbors. Because of these concerns, it has been our practice for many years that one of us always carries a handgun for self-defense purposes.

4.  My husband and I used to share this self-defense duty, but for the past several years, arthritis in my hands has made it difficult and painful for me to operate the higher-caliber handguns that we currently own. Once my arthritis progressed to the point where it became difficult and painful to operate the higher-caliber handguns, my husband became solely responsible for carrying a gun for self-defense.

5.  My husband underwent major back surgery on October 16, 2024. In advance of the surgery, his doctors informed him that his mobility will be significantly reduced for at least three months following the surgery. As a result of his expected incapacitation, in advance of his procedure, I took steps to prepare to take over primary responsibility for all household chores, from grocery shopping, to cleaning, and including self-defense. As part of that process, I sought to purchase a smaller handgun that I could carry and use more comfortably.

6.  On October 8, 2024, I traveled to Northeastern Firearms, a federally licensed firearms dealer approximately 40 miles (roughly 75 minutes) away in Turner, Maine. I intended

to purchase a Kel-Tec P17, an affordable small-caliber pistol. After I arrived at the store, I entered into an agreement to purchase the Kel-Tec. The store employee collected various pieces of identifying information and informed me that federal law required the store to conduct a background check to confirm that I was eligible to purchase the Kel-Tec. He then contacted the National Instant Criminal Background Check center to electronically verify my eligibility. Three to four minutes later, he informed me that I had passed the background check. At that point, I paid in full using my credit card. Nevertheless, the store employee informed me that, solely because of Maine's new 72-hour waiting period law, he could not transfer possession of the Kel-Tec for nearly 72 more hours, until October 11, 2024.

7. Unable to take immediate possession of the firearm, I drove the 40 miles (75 minutes) back to my residence. On October 11, 2024 I drove the 40 miles (75 minutes) back to the store and took possession of the Kel-Tec, and then drove the 40 miles (75 minutes) back to my residence.

*   *   *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 12, 2024

Nancy Coshow

3

**EXHIBIT C**

**Declaration of James White**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY,

*Plaintiffs*,

v.

AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

*Defendant*.

Civil Action No. _____

## DECLARATION OF JAMES WHITE

I, James White, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Navy veteran and the owner of J White Gunsmithing, a federally licensed firearm dealer with a storefront at 306 Wharff Road, Guilford, Maine 04443.  I founded the business in 2001 as a way to use my skills and passion for gunsmithing to build custom, one-of-a-kind guns for customers.  Since then, I hired my wife to manage the paperwork and my son Jake to oversee the growing portion of the business devoted to firearm sales.  In 2022, I was elected to the Maine House of Representatives, representing District 30.  Because of my duties in Augusta, my son has taken over as the primary manager of the business, which now focuses primarily on gun sales.  I make this declaration based on my personal knowledge and on information reported

1

to me in my capacity as the owner of J White Gunsmithing.

2.     Because of its location—it is the only gun shop in town, and one of the last gun shops on the way to remote hunting and camping grounds in northern Maine—J White Gunsmithing often sells guns to customers with a time-sensitive need to acquire a firearm.

3.     When a customer comes in to buy a firearm, we work with the customer to assess his or her needs and to offer recommendations on the appropriate firearm and any accessories to purchase. After a customer selects a firearm for purchase, one of my employees collects the required identification information from the customer and calls the National Instant Criminal Background Check System ("NICS") hotline to initiate the required background check. Most of these phone calls culminate with an approved background check and an instant "proceed" determination from NICS. By contrast, a relatively small number of calls to NICS culminate with a failed background check and a "deny" determination. Besides "proceed" and "deny," calls to NICS can also culminate with a "delay" directive, when NICS needs additional time to process the background check. In many cases, NICS calls back in less than hour with a "proceed" determination. If the "delay" directive remains pending after three days, federal law allows the store to proceed with the sale if the buyer is 21 years of age or older. (Buyers aged 18-20 are delayed ten days under federal law.)

4.     Given the types of customers we often serve, Section 2016 has had a disastrous effect on the business. Because Section 2016 forces all transactions into a three-day hold, even when NICS instantly issues a "proceed," we can no longer promptly sell a firearm to a customer with a time-sensitive need to acquire one. As a result, since Section 2016 went into effect, our handgun sales are down 50% and rifle sales down 25% from the typical sales volume in prior years for August and September.

2

5.      While that is devastating for my business, I am also extremely sensitive to Section 2016's effect on my customers, because it makes it impossible for a customer with a legitimate, time-sensitive need to lawfully acquire a gun.  Two experiences that customers have shared with me over the years have weighed particularly heavily on my mind.  Although J White Gunsmithing sold guns to these customers long before Section 2016 took effect, I cannot help but think how differently their stories might have turned out under the new law.

6.      The first involves a young woman who grew up in town.  Her boyfriend was an older man, well known around town for physical aggression.  One day, she came into the store, confided in my son that she had been physically abused, that she had left her abuser, and that she had obtained a restraining order against him to protect herself and her child.  After consulting with law enforcement, she was quite aware that response times to her then-residence could be close to an hour.  The young lady had been raised around firearms and was quite competent with the use and storage of them.  She purchased a handgun from my store and left with an improved peace of mind, knowing that she could protect herself and her child if necessary.

7.      I also think back on the experience of a local physician who I am friends with through church.  One day, the doctor called me in a state of concern after he had refused to refill a prescription for a man who had been abusing opioids.  The doctor had left his practice for the day, but before he had reached his home, the man returned to the clinic with a firearm threatening to kill the doctor.  Claiming to know where the doctor lived, the man left the office and drove out of the parking lot.  The doctor feared for his family's safety, as they lived at the end of a dirt road where emergency response times would have been roughly an hour.  He was also worried about the safety of the church congregation, as it was public knowledge that he and his wife were very involved in the church.  He asked me to if I would be armed and vigilant at that night's prayer

3

App - 55

meeting, which I was happy to do. I also lent the doctor two of my personal firearms until the police apprehended and charged the man who made the threats. Shortly thereafter, the doctor purchased a firearm to defend his wife and daughter in case such an occurrence ever happened again.

8.    J White Gunsmithing also frequently sells firearms to outdoorsmen who, for one reason or another, need to acquire or replace one on short notice. Sometimes, a hunter has made it all the way to northern Maine for a hunting trip only to realize that he has forgotten his hunting rifle at home. Other times, a hunter needs a new gun after something happens to his original gun at the hunting camp. For example, roughly four times a year, a hunting-season customer needs a new rifle because his was run over after it was leaning up against the side of a pick-up truck and someone backed-up the truck without moving the rifle. If a hunter in that scenario is in the middle of a seven-day hunting permit for moose or bear, Section 2016 now means that his hunt is effectively over. And if a hunter in that scenario has an upcoming, nonrefundable reservation for a hunting guide, Section 2016 effectively requires him to eat the cost of the hunt.

9.    Section 2016 has many problems, but one of its most illogical features is the refusal to make any exceptions for people who already own guns or who already have a state-issued hunting permit and are seeking to buy a hunting rifle.

10.    If a customer who has been carrying a firearm legally in the state of Maine decides it is time to upgrade even though he currently owns a firearm, Section 2016 nonetheless prohibits him from purchasing a new firearm and taking it home that day. This prohibits a customer from trading his old gun in for a new gun in a single transaction. But when law-enforcement agencies around the state upgrade their side arms, their duty pistols are traded in and their new duty pistols are transferred at the same time, allowing the taxpayers to realize the trade-in value immediately.

4

trade-in value immediately. Why shouldn't law-abiding citizens have the same opportunity?

*    *    *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2024

James White

5

**EXHIBIT D**

**Declaration of Adam Hendsbee**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY,

*Plaintiffs*,

v.

AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

*Defendant*.

Civil Action No. _____

## DECLARATION OF ADAM HENDSBEE

I, Adam Hendsbee, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the owner of A&G Shooting, a federally licensed firearm dealer. A&G has been in business since 2011. Since 2020, we have had a storefront at 214 Center Road, Fairfield, Maine 04937. I make this declaration based on my personal knowledge.

2. I care deeply about doing business in an ethical and professional manner. I always endeavor to get to know my customers and to ensure that I am selling the right guns to the right people. This is especially important when I know or suspect that a customer is buying his or her first firearm. I have in-depth conversations with them to make sure they are getting the right firearm for their needs and that they are getting a firearm for the right reasons. I take the time to go over basic firearm safety and proper use of the firearm, like proper loading and

1

unloading, as well as disassembly and cleaning. I always recommend that they take a firearms safety course for further safety instruction and skill development. During these conversations I am not only getting to know my customers, but also evaluating their maturity and state of mind. I must be comfortable that the sale will not endanger the customer or the community. In other words, just because a customer passes a background check does not mean they will be able to buy a firearm from my store. If I am not confident that they are going to do the right thing with a firearm, I deny the sale.

3.      On an annual basis, for as many times as the FBI's National Instant Criminal Background Check System (NICS) denies a sale, I generally deny a far greater amount on my own judgment, because I believe the customer to be unfit or unsafe. For my store, the NICS system denies around 5 to 10 attempted purchases a year. Usually half of these denials get overturned with an appeal from the customer based off of an error with the NICS system. In contrast, my store averages 4 to 6 denials per month based on customer/employee interactions. None of these denials are overturned. Many of these purchases I deny because I believe them to be potential straw purchases. I report many of the suspected straw purchase attempts directly to ATF investigators. The ATF has commended me for effectively blocking illegal purchases and for working collaboratively with local, state, and federal law enforcement agencies.

4.      Because of Section 2016's negative impact on my in-person customer base, I anticipate an increase in online sales, where the customer only has to come to my store once (to pick the gun up) instead of twice (first to buy the gun, and then to pick it up). Although this pivot to online sales may be necessary for A&G's continued success, it is unfortunate that a law designed to promote public safety will in fact leave me with less opportunity to interact with customers, to vet them in person, and eliminate the line of defense only available through in-

2

person interactions.

5.      My business is located right off the highway next to a very busy truck stop in Fairfield.  A significant portion of my overall sales come from interstate travelers and truck drivers.  These customers are generally traveling through, and stop to casually browse our inventory.  Many, if not most, of these customers we will probably never see again.  When one of them selects a firearm for purchase, I or one of my employees will collect the required identification information from the customer and call the NICS hotline to initiate the required background check. Most of these phone calls culminate with an approved background check and an instant "proceed" directive from NICS.  By contrast, less than 1% of calls to NICS culminate with a failed background check and a "deny" directive.  Besides "proceed" and "deny," calls to NICS can also culminate with a "delay" directive, in circumstances where NICS needs additional time to process the background check.  In many cases, NICS calls back in less than hour with a "proceed" directive.  If the "delay" directive remains pending after three days, federal law allows me to proceed with the sale.

6.      But Section 2016 subjects every one of these customers to a three day "hold," regardless of the customer getting a "proceed" directive on a NICS background check.  This three-day hold has negatively impacted sales to this portion of my business.  Most are not able or willing to travel back to our location to complete the sale.  We offer to ship firearms to a location more convenient for the customer to pick up, but this comes with another set of inconveniences, as well as additional expenses in the form of shipping and transfer fees.  After accounting for these additional inconveniences and fees, a casual customer is often not interested in buying the firearm.

7.      Section 2016 has caused compounding harm to my business because, when I sell

a firearm, I typically sell numerous accessories to go along with it. So for every firearm sale I lose because of Section 2016, I also lose corresponding sales of accessories.

8.      Section 2016 makes particularly little sense for my regular customers who already currently own other firearms. Over 95% of the customers that I deal with on a yearly basis are already current firearm owners. Many of these customers like to trade in firearms that they currently own towards something new. It makes no sense to me that these customers will walk into my store with a firearm in hand, find a firearm that they would like to trade towards, complete and pass a NICS background check, only to leave with the firearm that they came in with and return sometime after the 72 hours has passed with that firearm again to make the trade and complete the sale. Many of these customers are well trained and hold valid concealed carry permits, yet everyone has to wait 72 hours to make a legal purchase.

9.      Since Section 2016 has been in effect, it not only has caused a financial burden for my store and a major inconvenience for my customers, but also a safety hazard for Maine citizens. I have witnessed this hazard first-hand. On the first Thursday after Section 2016 took effect, I had a single woman from a nearby town come into the store because her town police officer had recommended that she purchase a firearm for home defense. She had just learned that she had a stalker looking through her windows and harassing her on her own property. The local police issued a restraining order against the accused individual and suggested to the victim that she should consider a firearm for self-defense. I worked with her for over an hour picking out the right firearm that she would be comfortable with as well as getting her signed up for some training. She completed the NICS background check successfully and paid for the firearm. I let her know that since Section 2016 was now in effect and we are closed on Sunday and Mondays, the soonest she would be able to take possession of the firearm would be the following

4

Tuesday. She was visibly shaken when she realized that she would have to wait four more days to protect herself. I dealt with a similar incident on the following Friday from a married couple that had just had their house broken into in the middle of the night. They too had to wait until Tuesday to be able to properly protect themselves. With Section 2016 in effect this is going to become an all too common problem that will, in my opinion, without a doubt cause harm to innocent, law-abiding citizens.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 12, 2024

Adam Hendsbee

5

**EXHIBIT E**

**Declaration of Thomas Cole**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL
OF SAFETY, NANCY COSHOW, JAMES
WHITE, J WHITE GUNSMITHING, ADAM
HENDSBEE, A&G SHOOTING, THOMAS
COLE, and TLC GUNSMITHING AND
ARMORY,

        *Plaintiffs*,

        v.

AARON FREY, in his personal capacity and
in his official capacity as Attorney General
of Maine,

        *Defendant*.

Civil Action No. _____

## DECLARATION OF THOMAS COLE

I, Thomas Cole, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am a retired Marine living in Hampden, Maine. I own and operate TLC Gunsmithing, a federally licensed firearm dealer, and employ my adult daughter to help with the business. I make this declaration based on my personal knowledge.

2.     TLC Gunsmithing does not have a storefront, and although it does have a website, we sell guns almost exclusively at weekend gun shows throughout Maine. Because TLC Gunsmithing is federally licensed, federal law requires it to conduct a background check for all sales at gun shows. *See* 18 U.S.C. §922(t). And even for non-federally licensed firearms dealers, Maine law would still require background-checks for all firearm sales at gun shows. *See* 25 Me.

1

Rev. Stat. §2013(2).

3.      Although a business model focused on gun shows offers relatively low overhead cost, it does require a significant investment to accumulate and store inventory in advance of a show, as well as significant travel and incidental costs associated with traveling to the gun show, securing lodging and meals, and paying the fees that gun shows assess on participating vendors. For example, TLC Gunsmithing incurred roughly $2000 in travel and incidental expenses for me and my daughter to travel to an annual gun show at the Augusta Armory from August 24-25, 2024. At the 2023 iteration of this gun show, we sold approximately 20 guns.  This year, however, TLC Gunsmithing sold *zero*.

4.      Section 2016 is directly responsible for TLC Gunsmithing's plummeting sales figures.  Because gun shows are Saturday-Sunday affairs, Section 2016 makes it impossible to transfer possession of any firearm sold during the show.  And after each show, my daughter and I return to Hampden, which may be hours away from the gun show.  If a customer buys a firearm from TLC Gunsmithing during a gun show, to take possession of it, either the customer would need to travel to Hampden, or we would need to make alternate arrangements involving additional expense:  I or my daughter would have to extend our stay near the gun show or meet the customer at a mutually agreeable location after the gun show ends, or we would have to ship the firearm to another federal firearm licensee closer to the customer, so the other licensee can consummate the transfer (which licensees often charge a fee to do).

5.      A few weeks after losing roughly $2000 in Augusta, I participated in a gun show in Bangor, where I managed to sell five guns—an improvement I attribute to the fact that I live in the greater Bangor area, so I could arrange to meet up and transfer the gun after the show with minimal inconvenience.  Although I live close enough to Bangor to avoid incurring significant

2

travel costs, the costs were still high enough that the business operated at a loss. After the Bangor gun show, I canceled plans to sell at any gun show where overnight travel would be required.

3.      On September 21 and 22, I participated in another gun show in Lincoln, once again selling *zero* guns. Given my continued failure to turn a profit, I made the difficult decision to pause TLC Gunsmithing's operations. Simply put, the business is unable to sustain additional financial losses. If this Court does not enjoin Section 2016, I will be forced to liquidate my substantial inventory at auction, and I have already reached out to auction houses to discuss potential arrangements to do so. However, if the law is amended by the legislature or enjoined by this Court, I intend to resume TLC Gunsmithing's operations.

\*      \*      \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 12, 2024,

Thomas Cole

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ANDREA BECKWITH, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-00384-LEW |
| ) | |
| AARON M. FREY, in his personal capacity ) | |
| and in his official capacity as Attorney ) | |
| General of Maine, ) | |
| ) | |
| Defendant. ) | |

## <u>DEFENDANT'S NOTICE OF APPEAL</u>

Please take notice that Defendant Aaron M. Frey, in his official as the Attorney General of

the State of Maine, hereby appeals to the United States Court of Appeals for the First Circuit from

the "Order on Plaintiffs' Motion for Preliminary Injunctive Relief" (ECF No. 30), dated February

13, 2025.

Dated: February 17, 2025          Respectfully submitted,

                                AARON M. FREY
                                Attorney General

                                */s/ Paul E. Suitter*
                                CHRISTOPHER C. TAUB
                                Chief Deputy Attorney General
                                Christopher.C.Taub@maine.gov

                                THOMAS A. KNOWLTON
                                Deputy Attorney General
                                Chief, Litigation Division
                                Thomas.A.Knowlton@maine.gov

PAUL E. SUITTER
Assistant Attorney General
Paul.Suitter@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

*Counsel for Defendant Aaron M. Frey, in his
personal capacity and his official capacity as
Attorney General of the State of Maine*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2025, I electronically filed this document and any attachments with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter.

Dated: February 17, 2025                    Respectfully submitted,

                                      AARON M. FREY
                                      Attorney General

                                      */s/ Paul. E. Suitter*_____

                                      PAUL E. SUITTER
                                      Assistant Attorney General
                                      Paul.Suitter@maine.gov

                                      Office of the Maine Attorney General
                                      6 State House Station
                                      Augusta ME  04333-0006
                                      Tel.  (207) 626-8800
                                      Fax (207) 287-3145

                                      *Counsel for Defendant Aaron M. Frey, in his personal capacity and his official capacity as Attorney General of the State of Maine*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDREA BECKWITH, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-00384-LEW |
| | ) | |
| AARON FREY, in his personal capacity | ) | |
| and in his official capacity as Attorney | ) | |
| General of Maine, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DECLARATION OF ROBERT SPITZER

---

I, Dr. Robert Spitzer, declare under the penalty of perjury that the following is true and correct:

The Office of the Maine Attorney General has asked me to provide an expert opinion pertaining to firearms waiting periods and related restrictions in the United States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

### BACKGROUND AND QUALIFICATIONS

1. I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William & Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia.

2.      I am the author of 16 books on many American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was recently published by Routledge Publishers (2024). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws, a subject I have been studying and writing on for over ten years.  I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

3.      I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, No. 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, No. 17-cv-00746 (C.D. Cal.); *Gates v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Twp.*, No. 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *Nat'l Ass'n for Gun Rights, Inc.*

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

2

*v. City of Highland Park*, No. 22-cv-4774 (N.D. Ill.); *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott v. Connor*, No. 20-00360 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, No. 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety and Homeland Sec.*, No. 1:22-cv-00951 (D. Del.); *Fitz v. Rosenblum*, No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 3:23-cv-00141 (S.D. Ill.); *Mitchell v. Atkins*, No. 19-cv-5106 (W.D. Wash.); *Keneally v. Raoul*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners v. The Town of Superior*, No. 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Fed. Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364 (W.D. Wash.); *Koppel v. Bonta*, No. 8:23-cv-00813 (C.D. Cal.); *Doe v. Bonta*, No. 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, No. 1:21-cv-08208-ER (S.D.N.Y.); *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, No. 1:23-cv-344 (AMN-DJS) (N.D.N.Y.); *Commonwealth of Pennsylvania v. Tomlinson*, No. CP-31-CR-217-2023 (Pa. Court of Common Pleas); *Nat'l Ass'n for Gun Rights v. Polis*, No. 1:2024-cv-00001 (D. Colo.); *O'Neil v. Neronha*, No. 1:23-cv-00070 (D. RI); *State of Washington v. Gator's Custom Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC,*

3

*et al. v. State of WA, et al.*, No.: 23-2-01761-34; *Virginia Citizens Defense League et al. v. City of Roanoke et al.*, CL-2474; *Garcia v. Polis*, No. 1:23-cv-02563-JLK (D. Colo.); *Rocky Mountain Gun Owners v. Polis*, No.: 1:23-cv-1077-PAB-NRN (D. Colo.); *Ortega v. Lujan Grisham*, No. 1:24-cv-00471-JB-SCY (D. N.M.); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-00710-WKS (D. Vt.); *Yzaguirre v. District of Columbia*, 24-cv-01828 (D.D.C.); *Clemendor v. District of Columbia*, 24-cv-01955 (D.D.C); *State of New Jersey v. Fox*, Docket No. FO-14-123-20, FO-14-141-21; *State of New Jersey v. Ricciardi*, Docket No. FO-14-54-21, FO-14-149-22, DOL Nos. 24-01899, 24-01900; *Birney et al., v. Delaware Department of Safety and Homeland Security, et al.* (C.A. No. K23C-07-019 RLG).

4.      I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003); *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

5.      I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

6.      A true and correct copy of my current curriculum vitae is attached as Exhibit A to this Declaration.

## RETENTION AND COMPENSATION

7.      I have been retained by the Office of the Attorney General of Maine to render expert opinions in this case. I am being compensated at a rate of $500 per hour for record review and consultation, document preparation, and other non-testimony services, and $750 per hour for deposition and trial testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## OPINIONS

### I.      GUN PURCHASE WAITING PERIODS

8.      Gun purchase waiting periods and related background checks as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

9.      First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[2] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. In the eighteenth century and before, the vast majority of firearms available in American were European imports. Among American gunsmiths, according to early American historian Brian DeLay, most American gunsmith work consisted of repair work, not the construction of firearms from scratch.

---

[2] As of 2022, there were nearly 78,000 licensed gun dealers. "Gun Dealers in the United States," Everytown for Gun Safety, https://everytownresearch.org/wp-content/uploads/sites/4/2021/05/Inside-the-Gun-Shop-One-Pager.pdf

5

Moreover, for the few that did manufacture firearms from start to finish, "it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch."[3] According to DeLay, "repairs consumed the vast majority of [their] work. . . ."[4]

10.     Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[5] The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[6] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and other restrictions in the late 1800s and early 1900s.[7]

11.     Second, no organized system of gun waiting periods and background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993. The waiting period was phased out in 1998 and replaced with

---

[3] Brian DeLay, "The Myth of Continuity in American Gun Culture," *California Law Review* 113(forthcoming 2025): 71; available at SSRN: https://ssrn.com/abstract=4546050 or http://dx.doi.org/10.2139/ssrn.4546050. The lengthy and painstaking process of producing a long gun from start to finish utilizing eighteenth century materials and methods is carefully chronicled in the hour-long film, "Gunsmith of Williamsburg," produced by Colonial Williamsburg, narrated by NBC reporter David Brinkley, 1969; https://www.youtube.com/watch?v=X_O1-chxAdk The film reports that the process to construct one long gun took 300 hours.
[4] DeLay, "The Myth of Continuity in American Gun Culture," 72.
[5] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.
[6] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)
[7] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.

6

an instant background check system. No such system was operational when the law was passed, but bill supporters accepted the waiting period phase-out as part of the compromise to win passage of the bill.[8] As of this writing, 13 states plus D.C. have waiting period laws for at least some firearm purchases ranging in length from three to 30 days.[9] By its nature, a gun waiting period simply delays an otherwise lawful purchase for two sound reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[10]

12. Third, as historian Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[11]

---

[8] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.

[9] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/. In 2023 Minnesota enacted a law that provides for a 30 day waiting period for the purchase of handguns and assault weapon purchases from dealers.

[10] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114.

[11] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and

13.     Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the logical absence of historical twins to modern waiting periods in earlier American history, were there similar, analogous historical gun laws? A close examination of historical laws, ordinances, and regulations shows a long history in this country of (1) temporarily restricting or regulating weapons access based on assumptions about risks posed by an individual's perceived mental condition with respect to alcohol intoxication, and (2) enacting and enforcing licensing/permitting laws, which by their nature incorporated the passage of time between the attempt by individuals to acquire or use weapons and the granting of permission by the government to then do so. The Plaintiffs' Complaint in this case asserts that "[t]here is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms."[12] The account below will demonstrate that this assertion is incorrect.

## II.    GUNS AND INTOXICATION

14.     An instructive and analogous historical parallel to modern waiting period laws is the intersection of historic gun laws pertaining to alcohol use and intoxication with weapons possession and use. Just as those considered mentally ill are similarly understood to reflect a kind of "diminished capacity" such that they also may be deprived of access to weapons, alcohol intoxication was a basis for preventing gun acquisition or use because it diminished capacity,

---

Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

[12] Plaintiffs' Complaint, *Beckwith et al. v. Frey,* U.S. District Court for the District of Maine, Case 1:24-cv-00384-LEW, Filed 11/12/24, 24.

8

judgment, and reason. The effects of alcohol consumption in reducing and degrading an individual's judgment, reasoning, coordination, and skill were well understood in early America.

15.     For example, the foremost American physician of the eighteenth century, Dr. Benjamin Rush, published a highly influential and widely read tract in 1785 titled, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind*. (The phrase "ardent spirits" referred to strong distilled liquors.) In addition to his pioneering work in medicine, Rush was a signer of the Declaration of Independence, advisor to public officials including Thomas Jefferson, and a social activist. After first noting in his tract the physiological effects of inebriation and alcoholism, Rush then turned to its mental effects. "Not less destructive are the effects of ardent spirits upon the human mind. They impair the memory, debilitate the understanding, and pervert the moral faculties. . . . But the demoralizing effects of distilled spirits do not stop here. They produce not only falsehood, but fraud, theft, uncleanliness and murder."[13]

16.     It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

---

[13] Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind*, 6th ed. (NY: Cornelius Davis, 1811; first pub. 1785), 7, https://digirepo.nlm.nih.gov/ext/mhl/2569025R/PDF/2569025R.pdf

9

17.     That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), incorporating "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drunk-driving countermeasures, modifying the drinking context, and treatment and early intervention."[14]

18.     In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[15] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[16] Reliance on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a significant problem to be "condemned and punished"[17] partly for the reasons described by Benjamin Rush. Early weapons laws (see below) reflected this understanding. During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, encouraged "responsible oversight"[18] by tavern owners.

---

[14] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.

[15] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/

[16] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131.

[17] Aaron and Musto, "Temperance and Prohibition in America," 132.

[18] Aaron and Musto, "Temperance and Prohibition in America," 133.

10

19.     The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[19] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[20] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, which was then repealed by the Twenty-first Amendment in 1933.

20.     Even though attitudes about alcohol use evolved over time, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations in America. From the 1600s through the early 1900s, laws were enacted in at least 30 states that regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included laws enacted in at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states had laws that regulated the commercial sale or distribution of alcohol when firearms were also present; at least two states barred gun sales to those who were intoxicated; at least six states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred providing guns to Native Americans if intoxicated (see Exhibits B and C).

---

[19] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[20] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

11

21.     To parse the data chronologically, in the 1600s, at least seven intoxication laws were enacted in at least three states (which at the time were colonies); in the 1700s at least nine laws were enacted in seven colonies/states; in the 1800s at least 28 laws were enacted in 19 states ; and in the 1900s at least 32 laws were enacted in 15 states (note that some states enacted laws across more than one century). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

22.     In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[21] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred specifically when "drinking" was involved. In a 1655 Virginia law, alcohol-fueled revelry was subject to fines for any who would "shoot any guns at drinking," although the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[22] While this admittedly amusing law was prompted by concern over whether colonists would hear an alarm warning of a Native American attack, the law's enactment was necessitated by rowdy "frequent shooting of guns at drinking" which the law dubbed "beastly vice spending much powder in vaine" that could otherwise be used in fending off an attack or for other purposes. Thus, the law applied only to the intersection of shooting and drinking, not all shooting, recognizing yet again

---

[21] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.
[22] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

12

the early understanding that alcohol-fueled firearms use led to undesirable (and therefore prohibitory) behavior.

23.     In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[23] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[24] In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[25]

24.     Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[26] In 1868, Kansas enacted a law to punish anyone found to carry a deadly weapon while "under the influence of intoxicating drink."[27] Nevada enacted measures in 1881 and 1885 that

---

[23] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.

[24] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.

[25] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

[26] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.

[27] *The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed* 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

13

punished anyone who discharged firearms in various public spaces while "under the influence of liquor."[28] An 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."[29] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon[30] (minors and those intoxicated were more than occasionally treated together within these laws, a clear indication of their inferior legal status[31]). In 1907, Arizona enacted a law making it "unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[32]

25.     In 1879 and again in 1883, Missouri enacted a law to fine or imprison anyone who carried concealed or brandished "any kind of fire arms" or other listed weapons "when

---

[28] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, *The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto* 1076, Image 1084 (1885) available at *The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places*, § 1.

[29] 1883 Wis. Sess. Laws 290.

[30] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A. Patterson Campbell, *The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes* 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[31] E.g. William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix* 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[32] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1. Arizona became a state in 1912.

14

intoxicated or under the influence of intoxicating drinks."[33] At least 20 similar laws were also

enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see

Exhibits B and C).

    26.    A Maryland state law from 1884 pertaining to Baltimore stated that anyone found

to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was

subject to confiscation of the weapon and a fine.[34] Rhode Island enacted a similar law—fine plus

weapon confiscation—in 1893.[35] An 1899 South Carolina law said that "any person who shall

engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a

firearm of any kind near a road would be subject to a fine and jail.[36] A 1909 Idaho law

criminalized anyone who "shall have or carry any such weapon upon or about his person when

intoxicated, or under the influence of intoxicating drinks."[37]

    27.    While the focus of these laws was on regulating persons who had weapons while

drinking or drunk, another category of laws in early America restricted the sale or distribution of

alcohol in the proximity of persons with firearms. A 1679 Massachusetts law prohibited bringing

or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a

---

[33] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[34] John Prentiss Poe, *The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein* 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[35] *General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State* Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[36] 1899 S.C. Acts 97, An Act to Prevent Drunkeness and Shooting Upon The Highway, No. 67, § 1.

[37] 1909 Id. Sess. Laws 6, § 1.

penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[38] In 1746, New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[39] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[40] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[41] Pennsylvania enacted the same type of measure in 1780.[42] Such measures extended into the nineteenth century.[43] These laws make abundantly clear that diminished capacity caused by

---

[38] "Order p[ro]hibbiting retayling strong drinckes at traynings," Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.

[39] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.

[40] An Act for Establishing a Militia in this Government (Delaware, 1756).

[41] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

[42] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[43] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, In The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

16

alcohol consumption when gun carrying and use was also occurring was serious enough to proscribe the intersection of the two by law.

28.     Aside from these laws restricting the civilian commercial sale of alcohol, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[44] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[45] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[46] during the Revolutionary War, but like any good commander, he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[47]

29.     States and localities enacted similar laws in the nineteenth and twentieth centuries.  A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating

---

[44] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[45] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[46] Burns, *The Spirits of America*, 16.

[47] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces per day.

17

liquors or to any intemperate person."[48] St. Paul, Minnesota enacted a similar measure in 1858.[49] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[50]

30.     The whole point of these laws—to keep firearms from the hands of the intoxicated while they were in a state of intoxication—provides a remarkable parallel to the "cooling off" purpose of modern waiting period laws. The intoxicated could generally acquire or reacquire guns after they sobered up, just as in the modern era gun license applicants can acquire their guns after the "cooling off" period.

31.     Thus, "sobering up" might be thought of as the historical equivalent of "cooling off."

### III.   HISTORICAL WEAPONS LICENSING LAWS

32.     Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[51] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

33.     While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on

---

[48] George Manierre, *The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois* 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.

[49] *The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City* 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[50] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

[51] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

18

a process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods, in that they are a more nuanced and sophisticated policy tool to winnow out those who might pose a threat with possession of a firearm. In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand.

34. Colonial, state, and local laws encompassing the licensing or permitting of dangerous weapons and substances date to the 1600s and 1700s, but became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons and substances that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers and gunpowder to nitroglycerine after its invention). This is consistent with what became the widespread use of licensing by the nineteenth century, which was employed "to regulate and control a host of economic activities, trades, callings, and professions" though "the overall justification for licensing was the same as the police power generally—the public good and the people's welfare."[52]

---

[52] William J. Novak, *People's Welfare: Law and Regulation in Nineteenth Century America* (Chapel, Hill, NC: University of North Carolina Press, 1996)*,* 90. For example, Bangor, Maine

35.     At least 89 licensing requirement laws were enacted in at least 34 states for

individuals as a pre-requisite for their weapons carrying or ownership during this time (including

Maine[53]); laws in 18 states did so in the 1800s and 29 did so in the 1900s (some states enacted

laws in multiple centuries; see Exhibits D and E). Laws in at least 27 states regulated firearms

discharging through licensing, with 13 of those states doing so from the 1700s up to the start of

the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some

states enacted laws in both periods). Laws in at least 12 states licensed hunting with firearms

from the 1800s through the early 1900s. At least 20 states had laws that licensed the commercial

sale, transport, or firing of weapons at locations like shooting galleries from the 1600s through

the early 1900s. Laws in at least 22 states licensed the possession, handling, or transport of

gunpowder and other explosives from the 1600s through the early 1900s. Laws in at least 17

states required those selling or otherwise providing weapons to individuals to record and keep

information pertaining to the buyers of weapons in the late 1800s and the early 1900s as the sales

process matured and became regulated.

36.     In addition, at least 15 states imposed licensing requirements on specified

marginalized groups (variously including Native Americans, non-citizens, non-state residents, or

minors). In the pre-Civil War period, at least 13 states allowed for licensing of enslaved persons

or free Blacks. And nine states enacted regulatory taxes on firearms.

---

enacted an ordinance in 1878 to license a variety of private activities with public consequences, including making or repairing any drains or aqueducts, the sale of various goods, the parking of commercial vehicles, activities that might block streets, and the use of explosives. Injurious Practices, §§ 27 & 28, BANGOR, CHARTER AND ORDINANCES OF THE CITY (Burr & Robinson 1878), https://firearmslaw.duke.edu/assets/1878,-me,-bangor,-injurious-practices,--27-&-28.pdf

[53] An Ordinance Relating to Concealed Weapons, §§ 1-5, reprinted in City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland [Maine] for the Financial Year of 1909, 152-53 (1910).

20

37.     A great many laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were first enacted in or for municipalities (populated areas), since the misuse of weapons posed a far greater and more identifiable risk to public safety in areas where larger numbers of people lived in close proximity to each other, and because observing, monitoring, and enforcing these measures by local governments was more feasible in jurisdictions where larger numbers of people lived in more geographically defined and confined areas. Municipal laws are no less significant than state laws for three reasons: first, social and public safety problems arising from weapons typically appeared first in places where large numbers of people congregated and lived—i.e., cities and towns. These problems multiplied in the nineteenth century as the U.S. began to transition from an overwhelmingly rural nation to a majority urban one. Second, given that municipalities are legal creatures of state governments, localities' ability to enact these or other laws presumes that they did so as allowable public policy under state law. Third, the initial enactment of municipal regulations often led to subsequent enactment of similar state-wide regulations.

38.     These licensing categories were generally instances where the prevailing legal standard had been to criminalize the activity or practice outright—criminalizing concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question.

21

39.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s every state in the country restricted or criminalized such carrying.[54] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

40.     Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[55] The hunting related laws listed here are all instances where hunting was allowed through permitting by a governing entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is examined in more detail below.

A.     **Licensing of Weapons Carrying or Possession**

---

[54] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67; Robert J. Spitzer, "Understanding Gun Law History after *Bruen:* Moving Forward By Looking Back," *Fordham Urban Law Journal* 51(October 2023): 99-100, 105-15.
[55] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

41.     This analysis identified 89 concealed weapons carry license laws enacted by 34 states from the post-Civil War period through the early 1900s: 35 of these laws were enacted by 18 states between the end of the Civil War and 1900, and 53 were enacted by 29 states in the early 1900s (some states enacted laws in both centuries). Generally speaking, these laws criminalized the concealed carrying of various weapons, but all of the laws examined here carved out exceptions for those who applied for, and received, a carry license. In addition, most permit laws imposed a time limit on permit duration, generally ranging from a month to a year, regardless of other criteria.

42.     Broadly speaking, these laws fell into two categories: those that specified criteria for granting a license, and those that did not: 54 of the 89 laws included discretionary criteria for the issuing of licenses, whereas the other 35 did not. Thus, about 60% of these licensing laws included discretionary criteria. Of the latter (no discretionary criteria listed) category, it is possible that criteria were specified in other laws, documents, oaths, or the like, but that were not specified in the laws enacting a weapons licensing scheme.

43.     In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[56] St. Louis enacted its own municipal version of this law in 1892.[57] A similar measure was enacted for

---

[56] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).
[57] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

23

Kansas City, Missouri, in 1880.[58] Jersey City, New Jersey enacted a licensing scheme in 1871

for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as

"any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[59] As this wording makes

clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting

small animals[60]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for

granting licenses, described below (as determined by the city's municipal court), that bears great

similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons
> named in the first section to such persons as should, from the nature of their
> profession, business or occupation, or from peculiar circumstances, be allowed so
> to do; and may, in granting such permits, impose such conditions and restrictions
> in each case as to the court shall seem proper.[61]

44.     The Jersey City ordinance added that carry permits would not be granted "to any

person until the court is satisfied that such person is temperate, of adult age, and capable of

exercising self-control."[62]

45.     Hyde Park, Illinois enacted a similar licensing law for concealed weapons

carrying, including handguns, in 1876. In this instance, the licenses were granted "by written

---

[58] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[59] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[60] https://www.thefreedictionary.com/fowling+piece.

[61] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[62] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

24

permission of the Captain of Police."[63] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[64]

46. New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[65]

47. This provision also allowed for non-residents who had occasional business in the city to apply for permits as well. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so. Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[66] A year later, the law was extended to

---

[63] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[64] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[65] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

[66] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

25

all cities in the state and included "any pistol or other firearms of any kind."[67] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[68]

48.    Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[69] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[70]

49.    An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[71] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[72] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up

---

[67] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[68] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[69] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[70] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[71] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[72] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

26

to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[73] The California cities of Stockton (1891)[74] and Fresno (1896)[75] did the same.

50.    A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[76] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[77]

51.    Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of

---

[73] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.
[74] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.
[75] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
[76] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.
[77] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

27

men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[78]

52.      A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "to so many and such persons as he may think proper" in 1895, adding that the mayor "may revoke any and all of such licenses at his pleasure."[79] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[80] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[81]

53.      In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[82] Licensing was extended to long guns—

---

[78] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[79] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[80] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[81] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[82] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

28

machine guns and automatic rifles—in New Jersey in 1927[83] and 1934.[84] (A number of the 36 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[85] It extended licensing to a variety of guns in 1927.[86] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[87] It extended the permitting process in 1926.[88]

54.    In 1909, Portland, Maine enacted a discretionary weapons concealed carry law applying to the carrying of any "fire arm, slung shot, knuckles, bowie knife, dirk, stiletto, or other dangerous or deadly weapon" unless licensed to do so by the local police. It could issue licenses

> to any person of good moral character, whose business or occupation requires the carrying of such weapons for protection, a certificate setting forth that such person has complied with the requirements of this ordinance, and that he has been duly licensed to carry such weapon or weapons for protection. Such license shall continue in effect until revoked by the Chief of Police.[89]

---

[83] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[84] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[85] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[86] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[87] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[88] 1926 Va. Acts. 285-87, CHAP. 158.

[89] An Ordinance Relating to Concealed Weapons, §§ 1-5, reprinted in City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland [Maine] for the Financial Year of 1909, 152-53 (1910). ORDINANCE RELATING TO CONCEALED WEAPONS. As early as 1840, Maine criminalized the carrying of weapons (not limited to

29

55.     Georgia enacted a detailed handgun permitting system in 1910.[90] Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[91] Indiana,[92] Michigan,[93] New Hampshire,[94] North  Carolina,[95] North Dakota,[96] Ohio,[97] Oregon,[98] Pennsylvania,[99] Rhode Island,[100] and South Carolina.[101] As of 1938, "the carrying of concealed

---

concealed carrying) including "any dirk, dagger, sword, pistol, or other offensive and dangerous weapon. . . ." Maine Rev. Stat. ch. 169,  sec. 16 (1841), available at https://lldc.mainelegislature.org/Open/RS/RS1840/RS1840_c169.pdf.

[90] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[91] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[92] 1925 Ind. Acts 495, 495-98.

[93] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[94] 1923 N.H. Laws 138.

[95] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[96] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[97] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[98] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[99] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[100] 1927 (January Session) R.I. Pub. Laws 256.

[101] 1934 S.C. Acts 1288.

30

pistols [was] either prohibited absolutely or permitted only with a license in every state but two."[102]

56.    The existence and functioning of old licensing laws make clear that the government could take whatever time was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand. Moreover, no license law examined here imposed any time limit by which a license application had to be approved or denied by the relevant governing authority. And often, these laws gave the individual or body that granted the license to also withdraw or cancel it at his or its pleasure. If one trait of these laws emerges, it is that those granting licenses had wide-ranging discretion to issue or not issue as they saw fit, and to do so according to any time frame they saw fit.

### B.    Permits for Firearms Discharge or Use of Explosives

57.    As noted above, laws in at least 27 states established licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms and discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, laws in at least 13 colonies/states assigned discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[103] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's

---

[102] Sam B. Warner, *The Uniform Pistol Act*, 29 J. CRIM. L. & CRIMINOLOGY 529, 530 (1938).
[103] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

31

special license."[104] Another Philadelphia ordinance to prevent "mischief [that] may happen by

shooting of guns" or setting off fireworks, criminalized such activities unless individuals first

obtained a "governor's special license."[105] A 1750 law did the same for the District of

Southwark,[106] as did a colony-wide law also in 1750.[107] In 1824, permission from the president

of the board of commissioners was required for anyone seeking to test through firing any gun,

cannon, or similar weapons in certain sections of Philadelphia.[108]

     58.      Charleston, South Carolina enacted an ordinance in 1802 similar to those of

Philadelphia where Commissioners of the Streets would grant a license for gun firing and

fireworks "at times of public rejoicing" and at specified locations.[109] New Hampshire enacted a

discharge permit system for Portsmouth in 1823.[110] New York State enacted a law in 1824 that

allowed the Schenectady mayor or other city officials to grant permission for discharge of any

---

[104] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[105] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[106] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[107] 1750 Pa. Laws 208.

[108] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[109] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[110] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

gun or various fireworks.[111] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[112] New London, Connecticut singled out "some public day of review" in an 1835 law as a permissible reason for issuing a discharge permit,[113] and New Haven enacted a similar law in 1845.[114] The same was enacted for Quincy, Illinois in 1841,[115] Jeffersonville, Indiana in 1855,[116] and Richmond, Virginia in 1859.[117] Such laws were enacted in another 21 states from the end of the Civil War up to the end of the 1800s (not including laws in states enacted both before and after the Civil War: dealers in firearms, Arkansas, California, Colorado, Louisiana, Maine, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states.

## C.    Hunting Licensing Laws

---

[111] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[112] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[113] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[114] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[115] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[116] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[117] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

33

59.     Many early laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[118] The states with hunting-related laws listed here all allowed hunting as permitted or authorized by or through a government entity or policy, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season, or hunting certain types of game). Hunting licensing or permission laws were enacted in at least 12 states from the 1700s through the early 1900s. Two colonies, New Jersey and New York, enacted laws in the 1700s. The rest spanned the 1800s to the early 1900s.

### D.     Commercial Licensing Laws

60.     As noted, commercial licensing laws were enacted in a total of at least 20 states, enacted with 15 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (laws were enacted in some states in both centuries).

61.     A remarkably early, if limited, commercial licensing law was enacted by the Connecticut colony in 1642. The law barred the sale or barter of weapons to Indigenous people as well as "to any person inhabiting out of this Jurisdiction" but excepted people who first obtained a license to engage in such transactions from "the particular Court" or "two magistrates"[119] to do so. Strictly speaking, this statute was aimed at any individual who might contemplate such trade, but the focus was on regulating commercial activity, to the extent feasible, in the mid-seventeenth century. (The law did not specify the conditions or circumstances under which such a license might be granted.)

---

[118] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.
[119] Act of Dec. 1, 1642, CONN. GEN. STAT. (Brown & Parsons 1850) (Law Passed 1642).

34

62. An 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans for guns, knives, tomahawks, or other items, unless they first obtained a license from the governor.[120] A century later a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[121] An 1854 law for San Francisco, California licensed commercial shooting galleries.[122] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements, such as an ordinance for Martinsburg, West Virginia in 1876 that required a license issued by the mayor for the opening and maintenance of a pistol gallery.[123] This historical category of law is consistent with the notion that the government could and can regulate the commercial activity of selling and commercially using weapons.

### E. Licensing Restrictions on Gunpowder

63. Gunpowder was widely and extensively regulated in the colonies and states. In fact, every state in the country but one enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[124] One element of this regulation

---

[120] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[121] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[122] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[123] J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876.

[124] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher and

35

was gunpowder licensing; with such licensing laws enacted in at least 22 states from the 1700s through the early 1900s. This pertained directly to the operation of firearms, as gunpowder was indispensable to firearm discharge for most guns through the post-Civil War period.

### F. Weapons Sellers Recording Purchases

64.     Aside from direct licensing of weapons purchasers by a government official or entity, at least 17 states had laws that required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[125]

---

Darrell Miller, eds. (NY: Oxford University Press, 2023), 206 (the one state with no gunpowder regulation to be found was Arizona); Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510; Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 116-17, 286.

[125] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

36

65.     With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[126]

66.     A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[127] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.  Regulations being placed on the sellers of weapons are a historic normality.

## G.     Licensing Pertaining to Named Groups

67.     The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also

---

[126] 1911 Colo. Sess. Laws 408, Section 3.
[127] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

traded arms with Natives throughout this entire period, as they sought profitability, access to highly desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[128] At least seven states imposed nine licensing laws pertaining to Indigenous people.

68. As for licensing related to enslaved persons and free persons of color (listed as "Pre-Civil War Blacks" in Exhibit D), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons, most specifically because "the South was perpetually terrified of slave revolts."[129] The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

69. Despite assertions that the only pre-twentieth century weapons licensing laws that existed in America pertained to African Americans and Indigenous people,[130] the data presented here demonstrate that, of the many weapons permitting laws enacted during this time, only a very small percent pertained to African Americans: of the 316 permitting laws listed in Exhibit D, 20 (6.3%) enacted in 13 states pertained to African Americans. The nine laws pertaining to Native Americans accounted for fewer than 3% of all licensing laws.

---

[128] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

[129] Carl T. Bogus, *Madison's Militia* (NY: Oxford University Press, 2023), 159. See also 98-107.

[130] David B. Kopel, "Background Checks for Firearms Sales and Loans: Law, History, And Policy," *Harvard Journal on Legislation* 53(Winter 2016), 336.

70.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## H.     Regulatory Taxes

71.     Regulatory taxes on weapons, which are defined as "fees imposed by governments on specific activities or behaviors, primarily aimed at discouraging undesirable practices or encouraging compliance with regulations," were enacted in at least nine states.[131] In this category, individual weapons owners were assessed a money tax on various types of weapons they owned with the dual goals of raising revenue but also, in effect, monitoring and regulating the ownership or use of weapons. Failure to pay the tax could result in forfeiture of the weapons in question, or other penalties. For example, an 1867 Alabama law imposed a tax on "all pistols or revolvers in the possession of private persons not regular dealers holding them" of two dollars each, and a three dollar tax on all privately owned "bowie knives, or knives of the like description. . . ." Failure to pay the tax resulted in seizure of the weapons to then be "sold at

---

[131] "Regulatory Taxes," https://library.fiveable.me/key-terms/ap-macro/regulatory-taxes. Political scientist Theodore J. Lowi identifies regulatory taxes as a governmental technique of control designed not simply to raise revenue but to act as a regulatory mechanism to shape behavior. *The End of the Republican Era* (Norman, OK: University of Oklahoma Press, 1995), 46-47. For example, so-called "sin taxes"—taxes on products like cigarettes, alcohol, or gambling—are designed both to raise revenue but also to discourage or minimize the legal behavior being taxed. "Are Sin Taxes Healthy for State Budgets?" *Pew Trusts*, July 19, 2018, https://www.pewtrusts.org/en/research-and-analysis/reports/2018/07/19/are-sin-taxes-healthy-for-state-budgets. Regulatory taxes (also considered a type of excise tax) can also be understood as mechanisms "to offset the costs associated with regulating public safety." "What are Excise Taxes and How Do They Affect the Federal Budget?" *Peter G. Peterson Foundation,* July 15, 2024, https://www.pgpf.org/article/what-are-excise-taxes-and-how-do-they-affect-the-federal-budget/

public outcry before the court house door. . . ."[132] An 1872 ordinance for the city of Galveston, Texas assessed a tax on the owner of any "pistol or rifle gallery."[133] Note that this law is not listed in the category of the licensing of commercial shooting galleries in Exhibit E because in this instance the regulatory mechanism is the tax rather than a license. Failure to pay the tax would presumably result, sooner or later, in the closure of the establishment. To take a different example, a 1909 Delaware state law assessed a special "license fee" of ten dollars on non-state resident "gunners" that was an increase in the earlier fee. The fee was increased because "our neighboring States charge non-resident gunners a license fee of more than Five Dollars."[134] While this law calls it a license fee, the purpose is to increase the financial burden on non-resident gunners, making it a regulatory tax.

### IV.    CONCLUSION

72.    Gun purchase waiting periods are an artifact of the modern era, but with deep roots in American history and tradition. While the idea of waiting periods as a public policy tool was both beyond contemplation and beyond the reach of the immature and undeveloped American nation-state earlier in history, American society did respond to the intersection of weapons acquisition and problematic behavior similar to the modern policy remedy of waiting periods. And as Jacob Charles has persuasively noted, "the absence of positive law. . . . tells us nothing about what our ancestors thought their elected representatives *could* do."[135] There is no

---

[132] The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867.
[133] Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax, Art. 418, § 26.
[134] 1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.
[135] Jacob D. Charles, "The Dead Hand of a Silent Past: *Bruen*, Gun Rights, and the Shackles of History," 73 *Duke Law Journal* 73(October 2023), 111.

reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option now. Far from it, especially considering the inherently modest nature of waiting periods.

73.     The examples of old weapons laws pertaining to intoxication and weapons, and old licensing/permitting laws, provide remarkably similar analogs to modern waiting period laws.

74.     For historic guns and intoxication laws, "sobering up" might be thought of as the historic equivalent of the modern waiting period "cooling off" period. Intoxication laws and licensing laws both utilized the passage of time.

75.     Historic weapons licensing laws contemplated an evaluation process to improve the likelihood that individuals who sought access to firearms did not obtain that access until they were approved to receive a license. No licensing law examined here imposed a time limit for the issuance of a license, and many of these laws gave the license issuer discretion to withdraw said license if, in the judgment of the issuer, the recipient failed to abide by the terms under which the license was issued.

76.     When our ancestors in the colonial, post-colonial, and developmental periods of the seventeenth, eighteen, and nineteenth centuries encountered social, behavioral, and other problems with respect to firearms, they responded with public policy techniques appropriate to their time, place, and circumstances. The examples pertaining to alcohol consumption and weapons licensing are all appropriate examples that are analogous to modern waiting period laws.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed on December 23, 2024, at Williamsburg, VA.

*Robert J. Spitzer*

Dr. Robert Spitzer

42

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, *et al*.,      )
             )
      Plaintiffs,      )
             )
      v.          )     Civil Action No. 1:24-cv-00384-LEW
             )
AARON FREY, in his personal capacity    )
and in his official capacity as Attorney    )
General of Maine,        )
             )
      Defendant.      )

---

## DECLARATION OF JOHN J. DONOHUE

---

I, John J. Donohue, being duly sworn, hereby declare under the penalty of perjury as follows, based on my personal knowledge:

1. I am a citizen of the United States and a resident of California.

2. I am over 21 years of age.

### BACKGROUND AND QUALIFICATIONS

3. I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. (A copy of my complete cv is attached as Exhibit A.) After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), Tel Aviv University, and Renmin University (Beijing).

4.     For many years, I have taught a course at Stanford on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, St. Gallen University School of Law in Switzerland, and the Universidad del Rosario in Bogota, Colombia. Since gun crime is such an important aspect of American criminal justice, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime, which is an important part of my research, about which I have published extensively (as reflected in my c.v.).  I have also consistently taught courses on law and statistics for three decades.

5.     I am a Research Associate of the National Bureau of Economic Research, a Senior Fellow in the Stanford Institute for Economic Policy Research (SIEPR), and an elected member of the American Academy of Arts and Sciences.  I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years.  I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

6.     From October 2011 – December 2018, I served on the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups."  (See http://www7.national-academies.org/claj/ online for more information about the NRC.)

7.     I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity

App - 114

magazines: *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

8.   I also filed an expert declaration in a case involving an NRA challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

9.   I filed (June 1, 2017) an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS.

10.   I filed expert declarations on June 4, 2017, and June 16, 2017, in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB and *Wiese v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN.  I filed a supplemental declaration in *Duncan* (now *Duncan v. Bonta*) on November 8, 2022.

11.   I filed an expert declaration, and provided expert testimony, in a case involving a challenge to New Jersey's restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.), August 2018.  In October 2018, I also filed an affidavit in a case involving a challenge to Vermont's restrictions on large-capacity magazines.  *Vermont Federation of Sportsmen's Clubs v. Birmingham*, Superior Court, Washington Unit, Docket No. 224-4-18 Wncv.

12.   In August 2019, I testified at trial in a case challenging the University of Missouri's ban of guns on campus: *State ex rel. Schmitt v. Choi*, No. 16BA-CV03144, Circuit Court of Boone County, State of Missouri.

13.    I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

14.    At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).  On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division. I was deposed in this case on December 16, 2020.

15.    I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

16.    I filed expert reports in *Jones v. Bonta*, Case No. 3:19-cv-01226-L-AHG, United States District Court (S.D. Cal.), on June 2, 2021, and March 16, 2023.  This case involved a challenge to California's restriction of purchasing long-guns to those who were 21 years of age.

17.    On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington*, a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20.  I was deposed in this case on March 28, 2022.

18.     On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

19.     On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

20.     On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates assault weapons.  This report supplemented my earlier work in that case which involved submission of an expert declaration on January 23, 2020, followed by testimony on October 23, 2020 during an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction.

21.     On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

22.     On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr, in a case challenging magazine-size restrictions for handguns and long guns.

23.     On January 26, 2023, I submitted two expert declarations: 1) in *NAGR v. Lamont*, Case No. 3:22-cv-01118, a case challenging Connecticut's restrictions on assault weapons and limits on magazine size, and 2) in *NAGR v. Campbell*, Civil Action No. 1:22-cv-11431-FDS, U.S. District Court for the District of Massachusetts, a similar case involving the comparable restrictions in Massachusetts.

24.     On February 27, 2023, I submitted an expert report in *Herrera v. Kwame Raoul, et al.*, 23 CV 0532, in the U.S. District Court for the Northern District of Illinois, Eastern Division. This case also involved a challenge to the restrictions in Illinois on assault weapons and magazine size.

25.   In February 2024, I submitted an expert report in *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 2:23- CV-710, in the U.S. District Court for the District of Vermont in a case challenging the state's restrictions on high-capacity magazines and its waiting period law.

26.     On May 14, 2024, I submitted an expert report in *Virginia Citizens Defense League v. City of Roanoke*, Case No. CL 24-0074 in the Circuit Court of the City of Roanoke, Virginia, which involved a challenge to an ordinance that restricted the possession and carrying of guns in city parks.

### SUMMARY OF CONCLUSIONS

27.     It is a sound, evidence-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the purchase of firearms. Maine's modest 72-hour purchase-delay law sits comfortably in this appropriate regulatory approach and can be expected to reduce firearm deaths and injuries. Substantial empirical evidence illustrates that waiting periods prior to the purchase of weapons such as those enacted by Maine will reduce suicides – particularly among young adults – and would be expected to reduce the risk of the type of episodes seen in recent years of enraged individuals buying firearms on the way to commit mass violence and other criminal acts.

28.     The limited purchase-delay restriction imposed by the state of Maine that is challenged in this litigation is well-tailored to protect the citizens of the state from impulsive misconduct with a weapon, whether directed at the firearm purchaser or others. Given the very brief duration of the restriction and the evidence that gaining access to a firearm *increases* the

risk of homicide and suicide, the law in question is likely to have little or no negative impact to offset its clear social benefits. Indeed, these factors establish that Maine's law is one of those "wise restraints that make men free."[1]

29. It should be emphasized that the empirical evidence indicates that increased gun carrying by the untrained public rarely generates any benefit in thwarting crime and is indeed self-defeating since it generates substantial increases in violent crime.[2]

30. The empirical evidence on laws requiring waiting periods for transfers of firearms indicates that waiting periods substantially reduce suicides – particularly for those under the age of 35. This is a noteworthy finding given the increasing rates of suicide over the last twenty years, particularly among the young.

---

[1] Harvard Law Professor John MacArthur Maguire composed this declaration, which has been used by Harvard Presidents when conferring degrees at Commencement since the late 1930s: "You are ready to aid in the shaping and application of those wise restraints that make men free." https://asklib.law.harvard.edu/faq/115309.

[2] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219. The amicus brief submitted to the United States Supreme Court on behalf of "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, September 21, 2021, further discusses the evidence that right-to-carry laws increase violent crime, citing 14 studies that had so found in the five previous years.

Since that brief was submitted, five additional empirical studies have confirmed the conclusion that increased gun carrying *increases* violent crime: Van Der Wal, W. M. (2022). Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime. *Statistics and Public Policy*, 9(1):163–174.; Doucette, M. L., Ward, J. A., McCourt, A. D., Webster, D., and Crifasi, C. K. (2022). "Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020." *Journal of Urban Health*, pages 1–12.; Donohue, J. J., Cai, S. V., Bondy, M. V., and Cook, P. J. (2022). "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities." Working paper no. 30190, National Bureau of Economic Research; Doucette, M. L., McCourt, A. D., Crifasi, C. K., & Webster, D. W. (2023). Impact of Changes to Concealed Carry Weapons Laws on Fatal and Non-Fatal Violent Crime, 1980-2019. *American Journal of Epidemiology*, 192(3):342–355 ("Shall-Issue CCW law adoption was associated with a 9.5% increase in rates of assaults with firearms during the first 10-years post-law adoption"). Stansfield, R., Semenza, D. & Silver, I., (2023) The Relationship between Concealed Carry Licenses and Firearm Homicide in the US: A Reciprocal County-Level Analysis. *Journal of Urban Health* ("increases in the number of CCWs in 2010–2017 were statistically associated with increases in total gun homicide in 2011–2018…. Far from concealed carry making people safer, our model finds acute safety risks associated with expansion of legal firearm carrying.")

Surveying the entire body of research, the RAND Corporation has concluded – at its highest level of evidentiary support – that RTC laws increase "total homicides, firearm homicides, and violent crime." RAND Corporation, Effects of Concealed-Carry Laws on Violent Crime, updated July 16, 2024, https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html.

7

**DISCUSSION**

31.    By a wide margin, most Americans do not own guns. According to recent survey data, 70 percent of all American adults do not own any firearm, consistent with the widespread understanding that such weaponry is not essential to their safety or important for their self-defense.[3]

32.    For decades, evidence has been building that firearm accessibility in the home *increases* rather than decreases the risk of homicide victimization and suicide (Anglemyer, Horvath, and Rutherford 2014).[4]

33.    A recent, meticulous study with extraordinarily detailed individual data from 2004–2016 has powerfully confirmed this conclusion.[5]  In this study, David Studdert and his coauthors were able to assess how the risk of homicide was influenced by having guns in the home by observing almost 600,000 California residents who transitioned from being without a gun in the home to being with someone who did.  This transition led to a considerably higher risk of dying by homicide.

34.    Studdert et al. (2022) used extended Cox proportional hazard models adjusted for cohort members' gender, age, racial and ethnic group, and, partially, the presence of a long gun in the home to examine the impact of gun possession. The models allowed the baseline hazard to vary by census tract, ensuring that people who resided with handgun owners (exposed) were compared only with people living in gun-free homes (unexposed) in the same small

---

[3] This is the finding of a June 2021 survey of 10,606 adults by the Pew Research Center. https://www.pewresearch.org/fact-tank/2021/08/04/wide-differences-on-most-gun-policies-between-gun-owners-and-non-owners-but-also-some-agreement/.

[4] Anglemyer A, T . Horvath, and G. Rutherford. 2014. The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. Annuals of Internal Medicine, 160:101–110.

[5] Studdert, David M., Yifan Zhang, Erin E. Holsinger, and Lea Prince. 2022. Homicide deaths among adult cohabitants of handgun owners in California, 2004 to 2016. Annals of Internal Medicine, June. doi:10.7326/M21-3762.

neighborhood. In this way, the study adjusted for local factors, such as crime rates and economic conditions, that might otherwise have confounded the relationship of interest. In other words, bringing a gun in the home elevates the risk of death, thereby undermining the view that private gun purchases on balance protect household members from homicidal victimization.

35.    Cook and Ludwig (2006) sort out the causal link between gun prevalence and homicide in a county-level panel data analysis for the period 1980–1999.[6] They summarize their primary finding as follows:

> In sum, gun prevalence is positively associated with overall homicide rates but not systematically related to assault or other types of crime. Together, these results suggest that an increase in gun prevalence causes an intensification of criminal violence—a shift toward greater lethality, and hence greater harm to the community. (387).[7]

### **Waiting Period Laws Clearly Save Lives**

36.    Strong empirical evidence shows that Maine's 72-hour waiting period for acquiring firearms is a reasonable measure that will reduce the number of suicides.  There can be no doubt that suicide is a serious and growing problem. About a quarter of the American adult population in 2022 struggles with mental illness -- a rate that has grown by nearly 25% since 2012.[8] At the same time, the number of Americans who died at the hands of a firearm[9] also increased a staggering 44% between 2012 and 2022, up to 48,222 people. Importantly, firearm suicide remains the leading cause of firearm deaths in the US. Of the 48,222 firearm deaths in 2022, nearly 60% were suicides. Of the 49,513[10] Americans who died by suicide in 2022, 27,040 used

---

[6] Cook, Philip J., and Jens Ludwig. 2006. The social costs of gun ownership. *Journal of Public Economics*, 90 (1–2): 379–391. https://doi.org/10.1016/j.jpubeco.2005.02.003.

[7] Cook and Ludwig provide further affirmation of the strength of this relationship. Cook, Philip J., and Jens Ludwig. 2019. The social costs of gun ownership: A reply to Hayo, Neumeier, and Westphal. *Empirical Economics* 56 (1): 13–22. https://doi.org/10.1007/s00181-018-1497-5.

[8] https://www.samhsa.gov/data/report/behavioral-health-trends-united-states-results-2014-national-survey-drug-use-and-health.

[9] https://wonder.cdc.gov/mcd.html.

[10] https://wonder.cdc.gov/mcd.html.

9

a firearm. The tragic pattern of increasing overall suicide rates – adjusted for the age of the population – is well illustrated in this graphic from the CDC.[11]

Figure 1. Age-adjusted suicide rates, by sex: United States, 2001–2021



[1]No statistically significant trend from 2001 through 2006; significant increasing trend from 2006 to 2018; no statistically significant trend from 2018 through 2021, $p < 0.05$. The rate in 2021 was significantly higher than the rate in 2020, $p < 0.05$.
[2]No statistically significant trend from 2001 through 2006; significant increasing trend from 2006 to 2018, with different rates of change over time; no statistically significant trend from 2018 through 2021, $p < 0.05$. The rate in 2021 was significantly higher than the rate in 2020, $p < 0.05$.
[3]Significant increasing trend from 2001 to 2017; significant decreasing trend from 2017 through 2021, $p < 0.05$. The rate in 2021 was significantly higher than the rate in 2020, $p < 0.05$.
NOTES: Suicide deaths are identified using *International Classification of Diseases, 10th Revision* underlying cause-of-death codes U03, X60–X84, and Y87.0. Age-adjusted death rates are calculated using the direct method and the 2000 U.S. standard population. Access data table for Figure 1 at: https://www.cdc.gov/nchs/data/databriefs/db464-tables.pdf#1.
SOURCE: National Center for Health Statistics, National Vital Statistics System, Mortality.

---

[11] https://www.cdc.gov/NCHS/IMAGES/DATABRIEFS/451-500/DB464-FIG1.PNG.

37.    This ominous trend is naturally a subject of substantial public policy concern and a significant justification for state action to try to reduce the alarming and rising death toll from suicide.  In evaluating a purchase-delay law, it is important to note that a major 1999 study found that, "[i]n the first week after the purchase of a handgun, the rate of suicide by means of firearms among purchasers (644 per 100,000 person-years) was 57 times as high as the adjusted rate in the general population."[12]

38.    A second important study by Studdert et al. (2020) articulates the crucial elements that make firearm access such an important risk factor for suicide:

> Suicide attempts are often impulsive acts, driven by transient life crises.  Most attempts are not fatal, and most people who attempt suicide do not go on to die in a future suicide. Whether a suicide attempt is fatal depends heavily on the lethality of the method used, and firearms are extremely lethal.[13]

Of critical importance is the fact that if one can divert a despondent individual from access to a firearm during a transient life crisis, the chance that the individual will survive and avoid future suicide is highly elevated.

39.    Studdert et al. (2020) meticulously examined data on all California adults to see how gun acquisition would influence their likelihood of dying by suicide.  The authors summarize their findings as follows:

> In this study of firearm ownership and mortality in a cohort of 26.3 million adult residents of California, we found an elevated risk of suicide among a large sample of first-time handgun owners. This risk was driven by a much higher rate of suicide by firearm -- not by higher rates of suicide by other methods. Handgun owners' risk of

---

[12] Garen J. Wintemute et al., *Mortality Among Recent Purchasers of Handguns*, 341 N.E. J. of Medicine 1583, 1583 (1999), *available at* https://bit.ly/3kEMaEo.

[13] David Studdert et al., "Handgun Ownership and Suicide in California," *New England J Med* (2020); 382:2220-9, at 2221, DOI: 10.1056/NEJMsa1916744.  Specifically, firearm suicide attempts are fatal about 85% of cases, while the fatality rates for other methods of attempted suicide are only 9%. Miller, M., Azrael, D. and Barber, C. (2012). "Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide," *Annual Review of Public Health*, vol. 33(April), pp. 393–408. Importantly, the vast majority of survivors of an attempted suicide, do not later die from suicide. Owens, D., Horrocks, J. and House, A., "Fatal and non-fatal repetition of self-harm: systematic review," *British Journal of Psychiatry*, vol. 181(3), pp. 193–9 (2002).

suicide by firearm peaked in the period immediately after their first handgun acquisition.…[14]

40.    Examining data from 1977-2014, a 2017 study concluded that waiting period laws reduced firearm suicides by 7.4 percent and had no impact on non-gun suicide.[15] The same reduction in the 158 firearm suicides in Maine in 2021 would have saved 12 lives in one year.[16] Nationally, reducing the 27,040 gun suicides in 2022 by 7.4 percent would save 2001 lives. In other words, a waiting period alone would save dramatically more lives by a very wide margin than any plausible estimate of the impact of all defensive gun use across the nation.[17]

41.    My own recent research (with my coauthors) has examined the impact of firearm waiting period (or "purchase delay") laws on suicide by adults (those over 21) for the period from 1987-2019.[18] Our analysis considered the full range of state waiting period laws as well as a federal waiting period law that went into effect in 1994 when the Brady Act[19] established a 5-day waiting period on some firearm transactions in certain states and then ended in 1998. We find that these laws – even when they delay gun purchases for as little as 48 hours – are able to disrupt suicidal ideation and thereby significantly decrease firearm suicides. Specifically, we estimate that waiting period laws reduce suicides by 21–34-year-olds by 6.1 percent.

---

[14] *Id*. at 2226.

[15] *See* Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017. "Handgun waiting periods reduce gun deaths." *PNAS*, 114(46): 12162–12165, Table 1, column 3.

[16] Maine Center for Disease Control and Prevention, "Report to the Legislature," February 2023, https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=181957.

[17] Another study that examines the link between waiting periods and suicide is Edwards, Griffin, Erik Nesson, Joshua Robinson, and Frederick Vars. 2017, "Down the Barrel of a Loaded Gun: The Effect of Mandatory Handgun Purchase Delays on Homicide and Suicide." *The Economic Journal*, 128(616): 3117–3140.  This study is based on a slightly shorter data period than Luca, Malhotra, and Poliquin, supra n. 15, using 1990-2013, and it again finds that waiting period laws lead to a statistically significant 2-5 percent reduction in the rate of firearm suicide.

[18] John J. Donohue, Samuel V. Cai & Arjun Ravi, "Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws," NBER Working Paper 31917 (2023), https://www.nber.org/papers/w31917.

[19] https://www.atf.gov/rules-and-regulations/brady-law.

42.     The particular vulnerability of young individuals to suicide is underscored by the fact that in 2021 over half of 18-25-year-olds suffered from mental illness, engaged in illicit substance abuse, binge drinking or heavy alcohol use, or had serious thoughts of suicide.[20]

43.     Moreover, a study[21] of suicides in Illinois between 2005 and 2010 revealed that the circumstances surrounding and risk factors contributing to suicide differ substantially by age group.[22] School problems are a major contributor to youth suicide. Employment problems and alcohol dependence are most common among middle aged people who die by suicide. Indeed, our study shows that waiting period laws are particularly impactful at preventing suicide among younger adults because suicidality is often more impulsive for this group.  If a particularly lethal mechanism like a gun is readily available, many despondent individuals with what could be a merely passing moment of despair will end up committing suicide when a lapse of time would be enough to dissuade or divert them from such an irreversible action.

44.     This fact was underscored when a simple policy shift in the behavior of members of the Israeli military led to a 40 percent reduction in suicides by young members of the military. Prior to the shift, Israeli soldiers would carry the weapons when they went home for weekend leave.  Momentary stressors on these weekend leaves, often when the soldiers had been drinking, led to a substantial number of suicides using their service weapons. When the policy shifted in 2006 and soldiers were instructed to leave their weapons at their bases when headed home for

---

[20] SAMHSA (Substance Abuse and Mental Health Services Administration). 2021. Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health. Rockville, MD: SAMHSA; https://www.samhsa.gov/data/sites/default/files/reports/rpt39443/2021NSDUHNNR122322/2021NSDUHNNR12322.htm#execsumm.

[21] https://journals.lww.com/jtrauma/fulltext/2016/10001/suicide_in_illinois,_2005_2010__a_reflection_of.7.aspx.

[22] McLone, Suzanne G.; Loharikar, Anagha; Sheehan, Karen,; Mason, Maryann, "Suicide in Illinois, 2005–2010: A reflection of patterns and risks by age groups and opportunities for targeted prevention," *Journal of Trauma and Acute Care Surgery* 81(4):p S30-S35, October 2016. | *DOI:* 10.1097/TA.0000000000001141.

weekend leave, there was a highly statistically significant 40 percent drop in suicides among soldiers aged 18-21. Suicides in this age group had averaged 28 per year in the three years prior to the policy shift and fell to an average of 16.5 per year after the change.[23] This brief delay in access to weapons at a vulnerable moment reduced weekend suicides, and yet led to no offsetting increase in suicides when the soldiers were back on base with access to guns. This experience underscores the benefit from stopping someone from impulsively attempting suicide with the most lethal modality.

45. Given the array of benefits that flow from firearm waiting period laws, it is not surprising that Americans consistently and overwhelmingly support the adoption of these laws. The latest Gallup Poll inquiring into this support found that 77 percent of American adults favor "Enacting a 30-day waiting period for all gun sales."[24] This support evokes the famous statement by former U.S. Supreme Court Chief Justice Warren Burger who was asked on the 200th Anniversary of the Bill of Rights if he supported a proposed five-day federal waiting period for gun purchases. Burger replied that "I am very much against it. It should be 30 days waiting period…."[25]

46. Burger emphasized that additional time to evaluate gun purchasers could be effective in reducing the risk of substantial firearm violence. Indeed, in the horrific Charleston, South Carolina church shooting of June 17, 2015, we saw how prescient Burger was. On that date, Dylann Roof, who had patiently waited until his 21st birthday to buy a gun, fired a total of

---

[23] Gad Lubin et al., "Decrease in Suicide Rates After a Change of Policy Reducing Access to Firearms in Adolescents: A Naturalistic Epidemiological Study," *Suicide and Life-Threatening Behavior*, 2010, 40(5):421-24, https://www.academia.edu/96400821/Decrease_in_suicide_rates_after_a_change_of_policy_reducing_access_to_firearms_in_adolescents_a_naturalistic_epidemiological_study.

[24] This Gallup Poll result from a survey conducted over the period June 1-20, 2022, mimicked previous Gallup Poll results. https://news.gallup.com/poll/1645/guns.aspx.

[25] Warren Burger discussing the Second Amendment on its 200th Anniversary on the MacNeil/Lehrer News Hour, December 16, 1991, at minute 1:12. https://www.youtube.com/watch?v=hKfQpGk7KKw.

14

approximately 77 rounds at the Emanuel African Methodist Episcopal Church in Charleston, killing nine people during a Bible study session.[26] Had federal law allowed a full investigation of Roof's background they would have realized he was a prohibited purchaser, and his ability to purchase a gun would have been curtailed. Unfortunately, federal law did not mandate the completion of the background check, which enabled Roof to buy the weapon he used for the mass killing.

47. The wisdom of Burger's remarks is also underscored by the events of March 16, 2021, when an unhinged 21-year-old killed eight in Atlanta. The shooter had legally bought a 9-millimeter handgun in a gun shop on the very day of the shooting — so that he could commit mass murder. Thankfully, when police released a picture of the assailant from video footage, his parents contacted authorities, leading to his capture before he achieved his intended goal of killing more in Florida.[27] How much better for all involved if he had not been able to take possession of a gun when he was in a distressed and vulnerable state? A waiting period would have provided an opportunity for the shooter's immediate mental health crisis — he had just been thrown out of his home by his parents — to pass, potentially saving many lives.

### Comments on Some of The Plaintiffs' Allegations

48. In the face of the clear contrary evidence from the United States and around the world, Plaintiffs' motion for preliminary injunction overstates the potential benefit of firearms as a means of self-defense. First, it is worth noting that in the vast majority of cases, when an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense. Specifically, over the period 2007-2011, when roughly 6 million violent crimes

---

[27] Kate Brumback, *Atlanta-Area Shootings Leave 8 Dead, Many of Asian Descent*, WHYY (Mar. 16, 2021), https://whyy.org/articles/georgia-massage-parlor-shootings-leave-8-dead-man-captured.

occurred each year, data from the National Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents – this in a country with 350 million or more guns in civilian hands. In other words, a gun is used in self-defense about 0.8 percent of the time when someone is attacked in the United States.

49.     In my view, some of the comments in the Plaintiffs' Complaint and Motion for Preliminary Injunction badly misrepresent the relationship between guns, crime, and citizen safety. For example, the statement in ¶ 3 of the Complaint that "One need look no further than the Plaintiffs in this case to see the devastating effect that Section 2016 has had on law-abiding citizens in Maine." The alleged "devastating impact" is that Plaintiff Andrea Beckwith is unable to send women home with a gun as soon as she meets them. If it took a few days to provide "the training needed to safely operate and store" a weapon, the waiting period would have no impact. Giving stressed women and men who have little or no training in firearm use immediate access to a weapon is unlikely to advance their safety or the safety of their family and community as the discussion of the overall effects of gun ownership discussed above makes clear.

50.     ¶ 5 of the Complaint then asserts abused women will not be able to secure weapons while their abusers will already have them, but federal law already prohibits possession of firearms by or transfer of firearms to persons subject to certain protection from abuse orders and persons convicted or under indictment for certain crimes of domestic violence. Given the unequivocal research findings described above, the thought that providing untrained, stressed individuals with guns will lead to socially beneficial outcomes has no empirical support.

51.     ¶ 1 of the Complaint asserts that a 72-hour waiting period law would have been "unimaginable at the founding." Indeed, the thought of imposing a waiting period to purchase guns likely was unimaginable at the founding because it was completely unnecessary. There was

16

a built-in waiting period for everyone who purchased a gun in 1791 because of issues of travel time, scarcity of gun parts, and the time it took to make a gun. The world today allows almost unlimited access to weaponry within minutes because there are far more licensed gun sellers than the combined number of McDonald's and Starbuck's stores. It is this capacity to turn a momentary suicidal impulse or fleeting homicidal ideation into a horrible tragedy that leads prudent legislatures to enact waiting period laws designed to limit these avoidable harms.

52. The Complaint goes on to state:

> While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens. In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun. Greg Adomaitis, N.J. gun association calls Berlin woman's death an 'absolute outrage', NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f. And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase. See Kopel, supra, at 309-10.

These highly contentious claims need to be addressed.

53. Beginning with the final sentence about a Wisconsin woman killed by her stalker, it is important to note that the claim that she was "attempting to purchase" a gun has been widely discredited, specifically by the brother of the deceased Wisconsin woman. The case dates back to 1991, when a husband killed his wife, and two children, and a gun rights activist claimed that the woman had contacted him about getting a gun the day before she was killed at a time when Wisconsin had a 48-hour waiting period. The gun rights activist had no proof that the victim had ever contacted him, and the woman's brother said she would never have contacted such a person, nor would she have ever sought to buy a gun. Nonetheless, the improbable tale is repeated by gun advocates without any mention of the strong grounds for disbelief.[28]

---

[28] Michael Daly, "Scott Walker's Gun Bill Is Based on a Lie," Daily Beast, June 26, 2015, https://www.thedailybeast.com/scott-walkers-gun-bill-is-based-on-a-lie/. Another implausible claim concerns a

54.     The other case that the Complaint alludes to is a case where a New Jersey woman was killed in June 2015 after starting the process to procure a state handgun application in April. The type of 72-hour waiting period that Maine has adopted would have made no difference in the New Jersey case since the woman would have readily gotten the gun in mid-April, long before she was killed. Equally importantly, it should be emphasized that it is highly speculative that the New Jersey woman would have avoided death had she gotten her gun more promptly. This woman (Carol Bowne) had just returned home when was "ambushed" as she walked from her vehicle toward the house and stabbed to death by an attacker who "came out of nowhere." Most homicidal attackers surprise their victims, which is part of the reason why armed self-defense in response to a violent attack is so rare in a country with 350 million guns.

55.     Even highly trained army veterans have been victimized by sudden attacks despite being full armed. For example, on February, 2013 in Texas, Chris Kyle (the *American Sniper)*[29] and Chad Littlefield, who were aware their killer was a threat, were shot 6 and 7 times each by the 25 year old killer, and they never got their guns out of their holsters. Similarly, when Philadelphia permit holder Louis Mockewich shot and killed a popular youth football coach over a dispute concerning snow shoveling in January 2000, the coach was also a permit holder carrying his gun, which he never got out of his holster.[30]

56.     In other words, against the empirical evidence showing that waiting period laws could save thousands of lives nationally each year, the plaintiffs only offer two unconvincing

---

survey that John Lott claimed to have conducted about defensive gun use. The esteemed sociologist Otis Dudley Duncan and Northwestern Law Professor James Lindgren were skeptical that the survey was actually conducted, and when they wrote of their concerns, a former NRA board member supported Lott by saying he (the board member) had been surveyed. The chance that an NRA board member would be captured in a nationally representative random sample is highly remote. Mike Spies, "The Right's Favorite Gun Researcher," *The Trace*, Nov. 3, 2022, https://www.thetrace.org/2022/11/john-lott-gun-crime-research-criticism/.

[29] https://en.wikipedia.org/wiki/American_Sniper_(book).

[30] Gibbons, Thomas, & Robert Moran (2000) "Man Shot, Killed in Snow Dispute," *Philadelphia Inquirer*. https://www.newspapers.com/article/the-philadelphia-inquirer-m-kirkpatrick/58685890/.

anecdotes drawn from across the nation over the last 33 years. The plaintiffs have provided no evidence of any "substantial cost" associated with Maine's waiting period.

57.     As I explained in a chapter in *The Oxford Handbook of Evidence-Based Crime and Justice Policy*,

> The best evidence on the percentage of crimes in which a victim does use a gun defensively is less than 0.9% of the time that victims are confronted by criminals. Interestingly, … the NCVS data revealed an identical but extremely low percentage of defensive gun uses for both 1992-2001 as well as for 2007-2011. This constant and low percentage is telling because it shows that as RTC [right-to-carry gun] laws expanded greatly across the nation, there was absolutely no increase in the likelihood that a potential victim would defend against crime with a gun. Specifically, in the first period from 1992 to 2001, 41% of the population lived in states with RTC (or permitless carry) laws. By the second period, this percentage had jumped to 67%—a 63% increase in the proportion of the country living in RTC states. And yet this massive increase in gun carrying did nothing to elevate the overall likelihood of defensive gun use, which was at exactly the same low rate it had been in the earlier period.[31]

58.     As one of the greatest historians of Colonial America – Jack Rakove, Pulitzer-Prize Winning Historian, and Coe Professor of History and American Studies, Stanford University – indicated in discussing this issue:

> [O]ur modern assumptions about the protective value of firearms presuppose facts that the adopters of the Second Amendment would not have shared. As Randolph Roth, the leading historian of American homicide, has demonstrated, firearms were not the weapon of choice for anyone needing to protect himself or his family from some imminent danger. The primitive guns of the founding era were unreliable and hard to use. Only in the late 19th and early 20th century would revolvers and then semi-automatic weapons acquire their terrifying effectiveness.[32]

**Conclusion**

59.     The problem of firearm homicide in the United States is socially damaging and growing worse. No one measure is adequate to address this scourge, but a combination of sound

---

[31] Donohue, "Applying What We Know and Building an Evidence Base: Reducing Gun Violence," 2023, in Brandon C. Welsh, Steven N. Zane, and Daniel P. Mears, eds., *The Oxford Handbook of Evidence-Based Crime and Justice Policy*.

[32] Jack Rakove, "The Justices Are Bad Gun Historians," *The Wall Street Journal*, November 4 - 5, 2023.

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**

I declare that the foregoing is true and correct under penalty of perjury under the laws of

the United States.

Executed on December 27, 2024

John J. Donohue
_____
John J. Donohue

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, *et al*.,     )
          )
     Plaintiffs,     )
          )
     v.     )     Civil Action No. 1:24-cv-00384-LEW
          )
AARON FREY, in his personal capacity     )
and in his official capacity as Attorney     )
General of Maine,     )
          )
     Defendant.     )

## DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.     I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.     I have been retained by the Office of the Attorney General of Maine to render expert opinions in this case. I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

3.     I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history. I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

1

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2] *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present.  I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

5.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present.  The pilot project on Ohio has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.
[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

2

mortality statistics of the Ohio Department of Health, the confidential compressed mortality files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

6.      I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States), and e) "Government Legitimacy, Social Solidarity, and American Homicide in Historical Perspective" (New York: Harry Frank Guggenheim Foundation, 2024) (https://www.hfg.org/hfg_reports/government-legitimacy-social-solidarity-and-american-homicide-in-historical-perspective/).

7.      I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary

/hvd.  The historical data on which this declaration draws are available through the Historical

Violence Database.  The Historical Violence Database is a collaborative project by scholars in

the United States, Canada, and Europe to gather data on the history of violent crimes and violent

deaths (homicides, attempted murders, suicides, sexual assaults, accidents, and casualties of war)

from medieval times to the present.  The project is described in Randolph Roth et al., "The

Historical Violence Database: A Collaborative Research Project on the History of Violent Crime

and Violent Death." *Historical Methods* (2008) 41: 81-98

(https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=

PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-

X29CkEdqIe8bMoZjBNdk7yNh_aAU).  The only way to obtain reliable historical estimates of

the incidence of homicides and suicides is to review every scrap of paper on criminal matters in

every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll

and coroner's report, every diary and memoir, every article in every issue of a number of local

newspapers, every entry in the vital records, and every local history based on lost sources, local

tradition, or oral testimony. That is why it takes months to study a single rural county, and years

to study a single city.[3]

---

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides or suicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides or suicides that appear in the surviving records by looking at the degree to which homicides or suicides reported in the surviving legal sources overlap with homicides or suicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147

(continued…)

8. My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and suicide, and on the role that technology has played in changing the nature and incidence of homicide and suicide. I hasten to add that the insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism. Our goal is to gather accurate data on the character and incidence of violent crimes and deaths and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis that we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right. That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

9. I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Steven Rupp et al. and California Rifle and Pistol Association v. Bonta*, 8:17-cv-00746-JLS-JDE (CA. Central District Western Division); *Jones v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.); ); *Richards v. Bonta* 3:23-cv-00793-LAB-AHG (S.D.Calif: *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.C.); *State of Vermont v. Max B.*

---

(https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

5

*Misch*, Docket No. 173-2-19 Bnrc (Superior Court, Criminal Division, Bennington Unit, VT.);

*National Association for Gun Rights and Capen v. Campbell*, No. 22-cv-11431-FDS (D.MA.);

*National Association for Gun Rights, and Susan Karen Goldman v. City of Highland Park, Illinois*, No. 1:22-cv-04774 (N.D. Ill. Eastern Division); *Association Of New Jersey Rifle and Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7-:22-cv-04360 (D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Federation, et al. v. Brown and Roseblum*, No. 2:22-cv-01815-IM (D.OR.); *National Association for Gun Rights v. Brown*, No 22-cv-00404-DKW-RT (D.HI.); *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D.CT.); *Barnett v. Raoul*, 3:23-cv-209-SPM (S.D. Ill.); *Rocky Mountain Gun Owners et al. v. Polis*, No. 23-cv-01076-PAB (D.CO); *Ortega and Scott v. Grisham*, No. 1:24-cv-00471-JB-SCY (D. NM); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 2:23-cv-00710 (D. Vt.); *State of New Jersey v. Robert Fox*, FO-14-123-20, FO-14-141-21; and *State of New Jersey v. Michael J. Ricciardi*, FO-14-54-21, FO-14-149-22.

## OPINIONS

**I.   SUMMARY OF OPINIONS**

10.    I have been asked by the State of Maine to provide opinions on the history of homicides and suicides in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and suicides over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and suicides. Since 1791, local, state, and federal governments have responded in measured ways

whenever new weapons, including certain classes of firearms, or new uses of deadly weapons have posed a threat to the safety of law enforcement, government officials, or the public.

11.     For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.     Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217, (https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=99e1b9b2cccce19ceeb33808f90f75b7c8e835d0), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building. My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present. In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

7

of modern breech-loading firearms in the mid-nineteenth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

13.    I have also gathered data on suicides from coroner's inquests, newspapers, vital records, and local histories, to understand the changing character and incidence of suicides. That effort has enabled me to determine that the incidence of suicide in northern New England during the early republic was low compared to today, and that suicides were rarely committed with firearms.

14.    My opinion will address in turn:

a.    firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur;

b.    the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives;

c.    the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century;

8

App - 140

d. and the advent of waiting period laws in response to the rise since the mid-nineteenth century in impulsive homicides and suicides committed with firearms.

## II. GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A. Homicide and Firearms in the Colonial Era (1688-1763)

15.    In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5] But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6] By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7] Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year. See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

9

16.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.  Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8]  Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.  In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution.  The rates in the Chesapeake were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[10] And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

17.     Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12]

---

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

[12] Ibid., 117.

10

They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying

---

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

11

clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

18.      The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

19.      When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave

---

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid. Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

12

App - 144

catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were

killed in Virginia were shot.[28]  Otherwise, however, colonists seldom went about with loaded

guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a

modest impact on homicide rates among colonists.

### B. The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)

20.      The Founding Generation was zealous in its defense of the people's rights, and so

enshrined them in the Constitution.  At the same time, they recognized that some citizens could

be irresponsible or motivated by evil intent and could thus threaten the security of the

government and the safety of citizens.[30]  The threats that such citizens posed to public safety

could be checked in most instances by ordinary criminal statutes, drawn largely from British

common law.  But at times those threats could be checked only by statutes that placed limits on

basic rights.[31]

---

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[29] Ibid., 118-119.

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul

(continued…)

13

21.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33]  But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and

---

Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/ cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[34] And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low— between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[35]

22.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[36]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were

---

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf). On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

optimistic, after slavery was abolished in the North, about earning their own living and forming

their own churches and voluntary organizations.[38]

23.     That is why there was little interest among public officials in the North in

restricting the use of firearms during the Early National period, except in duels.  They took a

strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the

practice posed for the nation's democratic polity and the lives of public men: editors, attorneys,

military officers, and politicians.[39]

24.     Laws restricting the everyday use of firearms did appear, however, in the early

national period in a number of slave states,[40] where violence among citizens increased after the

Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the

status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults

per year.[41]  Poor and middle-class whites were increasingly frustrated by their inability to rise in

a society that remained class-bound and hierarchical.[42]  Prominent whites were subjected to the

rough and tumble of partisan politics and their position in society was threatened by people from

---

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

16

lower social positions.[43]  African Americans despaired over the failure of the abolition

movement in the South, and whites were more fearful than ever of African American rebellion.[44]

As a result, impatience with restraint and sensitivity to insult were more intense in the slave

South, and during this period the region saw a dramatic increase in the number of deadly

quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier

Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in

the early national period.[46]  During the Early National period, the proportion of homicides

committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed

themselves in anticipation of trouble, or set out to cause trouble.[47]

25.     Citizens and public officials in these states recognized that concealable

weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming

proportion of the era's murders and serious assaults.[48]  They were used to ambush both ordinary

citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the

advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the

state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the
> aged to arm themselves with Pistols, dirks knives sticks & spears under the
> specious pretence of protecting themselves against insult, when in fact being so
> armed they frequently insult others with impunity, or if resistance is made the pistol

---

[43] Ibid.

[44] Ibid.

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[48] Roth, *American Homicide*, 218.

dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[50] These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

26. The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber. Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51] The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

27. The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable

---

[49] Ibid., 218-219. See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

18

weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[53]

28.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

_____

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw. duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*

(continued…)

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

29.     By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that

_____

(Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22. These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per 100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today— by far the most murderous affluent society in the world.[57]

30.    The increase occurred because America's heretofore largely successful effort at nation-building failed at mid-century.[58] As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[59] Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[60] They were losing the sense that they were

---

[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385. See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

[60] Roth, *American Homicide*, 300.

participating in a great adventure with their fellow Americans.[61]  Instead, they were competing in

a cutthroat economy and a combative political system against millions of strangers whose

interests and values were antithetical to their own.[62]  And most ominously, law and order broke

down in the wake of the hostile military occupation of the Southwest, the political crisis of the

1850s, the Civil War, and Reconstruction.[63]

31.     The proportion of homicides committed with firearms increased as well from the

Mexican War through Reconstruction, as it had during previous increases in nondomestic

homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64]

Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of

the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder

weapons, the proportion of homicides committed with guns stayed in the range of a third to two-

fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable

percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies

added to the toll in lives, because of their lethality and the new ways in which they could be

used.

32.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in

the early years of the homicide crisis, but they gained popularity quickly because of their

association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican

War.[66]  They retained some of the limitations of earlier firearms, because their rotating

---

[61] Ibid.

[62] Ibid.

[63] Ibid., 299-302, 332, 337, 354.

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

cylinders—two of which came with each revolver—had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever. Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

33.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway. But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68] And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69] As Smith and Wesson noted in its advertisements,

Some of the advantages of an arm constructed on this plan are:

- The convenience and safety with which both the arm and ammunition may be carried;
- The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
- Certainty of fire in damp weather;

---

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[69] Ibid., 38-57.

- That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

34.    Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

35.    These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War

---

[70] Ibid., 39.
[71] Ibid., 38-57.
[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.
[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).
[74] Ibid., 124-125.

24

App - 156

I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction. By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico. Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75] Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[76] That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[77] And that is why every state in the Union restricted the right to carrying certain concealable weapons.

36. It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent. In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the

---

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

[76] Ibid., 125.

[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192, (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed

carry of a wide range of weapons, including firearms, on social occasions;[79] and it followed in

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[80]  These laws

---

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the

(continued…)

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

    37.    Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil War interpersonal violence. In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried

---

State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3." The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law did not apply to all guns or firearms but just pistols. The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'" See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository.tcu.edu/handle/116099117/26778).

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620. The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication. See also Rivas, "Deadly Weapon Laws of Texas," 164-195.

by members of the military, which could be carried openly, but not concealed.[82]  Arkansas

followed suit in 1881.[83]  Tennessee's law withstood a court challenge, and Arkansas's was never

challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary

revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the

State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or

revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar

prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well:

"Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner

furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal

knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the

United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person

who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

---

[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

28

38.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

39.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[89]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's

---

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

40.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

41.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

### III.     THE HISTORICAL CONTEXT FOR MAINE'S 2024 WAITING PERIOD LAW: THE PROBLEM OF FIREARMS SUICIDES

42.     Scholars have long understood that most suicides are impulsive rather than premeditated. While many suicide victims suffer from underlying conditions that place them at a higher risk for suicide, such as severe depression, the decision to commit suicide comes in the

---

[91] Ibid., 11-13.

[92] Ibid., 13-15. Note that the title of the Cramer and Olson essay is misleading. It does not refer to the origins of the laws discussed here or to the ways in which they were enforced. It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[93] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

great majority of cases less than a day before the attempt and can pass just as quickly.[94] That is why access to a firearm—the deadliest means for attempting suicides—can have such dire consequences when a citizen experiences a sudden burst of anger or despair.[95] Scholars have found a strong correlation between firearms regulations and lower rates of suicides with firearms and suicides as a whole.[96]

43.     At the time of the nation's founding, suicides—and especially gun suicides—were rare, which is why today's gun suicide problem did not come to the attention of citizens or legislators in the early national period. I completed a historical analysis of suicides in Vermont and New Hampshire, 1783-1824, with evidence drawn from newspapers, coroner's inquests, and town histories. Using estimation techniques, I determined with 95 percent confidence that the suicide rate over those years was remarkably low by today's standards: between 3.1 and 5.7 per

---

[94] See, for example, Harvard T. H. Chan School of Public Health Duration of Suicidal Crises, https://www.hsph.harvard.edu/means-matter/means-matter/duration/; Yari Gvion, Yossi Levi-Belz, Gergö Hadlaczky, and Alan Apter, "On the Role of Impulsivity and Decision-Making in Suicidal Behavior. World Journal of Psychiatry 5:3 (2015): 255–259, https://www.wjgnet.com/2220-3206/full/v5/i3/255.htm; O. R. Simon, A. C. Swann, K. E. Powell, L. B. Potter, M. Kresnow, and P. W. O'Carroll, "Characteristics of Impulsive Suicide Attempts and Attempters" Suicide Life Threat Behavior 32 (2001): supplement, 49-59, https://pubmed.ncbi.nlm.nih.gov/11924695/; and Eberhard A. Deisenhammer, Chy-Meng Ing, Robert Strauss, et al.. "The Duration of the Suicidal Process: How Much Time Is Left for Intervention between Consideration and Accomplishment of a Suicide attempt? Journal of Clinical Psychiatry 70:1 (2009):19-24.

[95] See for example L. G. Peterson, M. Peterson, G. J. O'Shanick, and A. Swann, "Self-Inflicted Gunshot Wounds: Lethality of Method versus Intent. American Journal of Psychiatry" 142 (1985): 228-231, https://pubmed.ncbi.nlm.nih.gov/3970248/; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis," Journal of Affective Disorders 300 (2022): 121-129, https://pubmed.ncbi.nlm.nih.gov/34953923/.

[96] Patrick Sharkey and Megan Kang, "The Era of Progress on Gun Mortality: State Gun Regulations and Gun Deaths from 1991 to 2016." Epidemiology 34 (2023): 786-792, https://journals.lww.com/epidem/abstract/2023/11000/the_era_of_progress_on_gun_mortality__state_gun.3.aspx; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis." Journal of Affective Disorders 300 (2022): 121-129, https://pubmed.ncbi.nlm.nih.gov/34953923/.

100,000 persons ages 16 and older per year for all suicides, and 0.19 and 0.35 per 100,000 per year for suicides by firearm, because only 6 percent of suicides were committed with firearms. That is remarkable, because 50 to 60 percent of households in northern New England owned a working muzzle-loading firearm.[97] Fifty-two percent of suicide victims in New Hampshire and Vermont hanged themselves, while another 35 percent drowned or cut themselves with knives or razors. Muzzle loading firearms were not the preferred means for committing impulsive suicides, just as they were not for committing homicides.[98]

44.     As breech loading firearms replaced muzzle loading firearms, however, the proportion of suicides committed with firearms rose, as did the suicide rate, because they could be kept loaded all the time and used readily on impulse. By the late 1920s and early 1930s, when the transition to breech loaders was complete, the suicide rate in New Hampshire had risen to 22 per 100,000 persons ages fifteen and older per year and the rate with firearms to 9 per 100,000, because 41 percent of suicides were committed with guns. The suicide rate in Vermont had risen to 24 per 100,000 persons ages 15 and older per year and the rate with firearms had risen to 11 per 100,000, because 47 percent of suicides were committed with guns. And the suicide rate in Maine was 22 per 100,000 persons ages 15 and older per year and the rate with firearms was 9 per 100,000, because 40 percent of suicides were committed with firearms.[99]

---

[97] Roth, "Guns, Gun Culture, and Homicide," 232-234; and James Lindgren and Justin L. Heather, "Counting Guns in Early America." *William & Mary Law Review* 43:1 (2002): 1777-1824. Of the 244 suicides for which the means is known, 15 were committed with a firearm.

[98] Red flag laws that required domestic abusers to surrender their firearms for a specified period were absent in the early national period for a similar reason. Domestic homicides were rare by today's standards, and few of those that occurred were committed with firearms, because muzzle-loading firearms were difficult to use on impulse. Roth, *American Homicide*, 115-116; Roth, "Why Guns Are and Aren't the Problem," 113, 117; and Roth's contribution to "Brief for Amici Curiae Professors of History and Law in Support of Petitioner," *United States of America v. Zachary Rahimi*, Supreme Court of the United States, No. 22-915, 23-24.

[99] Bureau of the Census, "Mortality Statistics," 1929-1933. Washington, D. C.: Government Printing Office, 1931-1935.

Figure 3



45.     In recent years, 2018-2022, the suicide rate in Maine has been 23 per 100,000 persons ages 15 and older, 56 percent of which were committed with firearms.[100] When Maine passed its 2024 statute (P.L. 2023, ch. 678 (eff. Aug. 9, 2024), codified at 25 M.R.S. § 2016 ) to establish a 72-hour waiting period for the purchase of a firearm, it addressed a new and pressing problem—a problem that the nation's Founding Generation had not faced.

**VI.     CONCLUSION**

46.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require new government-imposed restrictions.  That is why every state passed and enforced laws against the carrying of concealable weapons by the end of

---

[100] CDC Wonder, Underlying Cause of Death by Single-Race Categories, 2018-2023, Centers for Disease Control and Prevention, https://wonder.cdc.gov/Deaths-by-Underlying-Cause.html, accessed June 3, 2024.

33

the nineteenth century, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why some states passed and enforced laws during and after Reconstruction against both open and concealed carrying of firearms.  Public officials are not required to pass such laws, of course, but historically, they have always had the ability to do so, beginning with the generation that authored, ratified, and first interpreted the Second Amendment and continuing through the generation that authored, ratified, and first interpreted the Fourteenth Amendment.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations.

47.     The prevalence of impulsive firearms suicides and homicides is a recent phenomenon, caused by changes in technology that emerged from the mid-nineteenth century through the late twentieth century.  Those changes prompted citizens and their elected representatives to support waiting period laws for the purchase of firearms. Public officials today are confronting criminological and sociological problems that did not exist in the Founding Era.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 19, 2024, in Franklin County, Ohio.

*Randolph Roth*

Randolph Roth

**HOUSE OF REPRESENTATIVES**

2 STATE HOUSE STATION
AUGUSTA, MAINE  04333-0002
(207) 287-1400
TTY: MAINE RELAY 711

EXHIBIT 1

**Kristen Cloutier**
**Assistant Majority Leader**
33 Charles St.
Lewiston, ME 04240
Phone: (207) 807-1637
Kristen.Cloutier@legislature.maine.gov

March 7, 2024

*Testimony of Rep. Kristen Cloutier in support of*
**LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain**
**Firearm Purchases**
*Before the Joint Standing Committee on Judiciary*

Good morning Senator Carney, Representative Moonen and distinguished members of the Judiciary Committee. My name is Kristen Cloutier and I represent House District 94, which includes part of my hometown of Lewiston. I am writing to you as a cosponsor and supporter of **LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**.

The goal of LD 2238, a sensible piece of legislation, is to save lives through the establishment of a 72-hour waiting period.

Waiting periods are designed to prevent individuals who pose an immediate threat to themselves or others from the impulsive purchase and use of a firearm.

Specifically, this bill would require a 72-hour waiting period between an agreement for the purchase and sale of a firearm and the delivery of that firearm to the purchaser. The measure includes certain exemptions for sales to law enforcement officers, to individuals who need a firearm for employment in security and to federally licensed firearms dealers.

While Maine's suicide death rate dropped from 19.5 per 100,000 in 2021 to 17.7 per 100,000 in 2022, it remains the second-highest rate in New England. Similarly, violent crimes including assault and robbery were down in 2021, but Maine's 2022 murder rate is the highest it has been since 2008 at 2.2 per 100,000 residents. Research shows that proposals such as this one work, and it's one that has support among non-gun owners and gun-owners alike.

A 2019 study found that Americans routinely underestimate public support for gun safety measures including waiting periods. Nationally, 85% of non-gun owners and 72% of gun owners support mandatory waiting periods for firearms purchases.

By requiring a 72-hour waiting period before the purchase of a firearm, we have the opportunity to significantly reduce both suicides and homicides. Thank you for your time and consideration.

Sincerely,

Kristen Cloutier

District 94: Part of Lewiston



# HOUSE OF REPRESENTATIVES

2 STATE HOUSE STATION     **EXHIBIT 2**
AUGUSTA, MAINE  04333-0002
(207) 287-1400
TTY:  Maine Relay 711

**Margaret Craven**
8 Manning Ave
Lewiston, ME 04240
(207) 240-4822
Margaret.Craven@legislature.maine.gov

March 7, 2024

*Testimony of Representative Margaret Craven in support of*
**LD 2238, an Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**
*Before the Judiciary Committee*

Good afternoon, Senator Carney, Representative Moonen and honorable members of the Judiciary Committee. My name is Margaret Craven, and I represent House District 93, which is part of Lewiston. I am here today to speak in strong support of **LD 2238, an Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**.

In the 129th Legislature, we passed a bill that requires the Maine CDC to keep track of the incidences of injury and deaths from firearms in the state. In 2021, there were 178 deaths from firearms in Maine, two of which were accidental, 17 were homicides and 158 were suicides. One death was deemed, "undetermined." These numbers come from the 2021 CDC report, which is attached, and the 2023 report should be published soon. Suicide is the second-leading cause of death for ages 10 to 34 and the third-leading death for Mainers 35 to 44.

If these deaths were caused by just about anything besides gun violence, people would be quick to do something to rectify it. The gun lobby seems to have some kind of magic to be able to convince people that access to guns is not the problem, but I say access to guns is the problem.

According to the Pew Research Center, and the US CDC, there were more deaths from firearms in the US in 2021 than in any other year on record.

Gun violence is an epidemic. Gun violence is a public health threat. According to the American Psychiatric Association, an overwhelming 87% of Americans think gun violence is a public health threat[1]. In 2016, the American Medical Association, our country's largest physicians' group, adopted a formal policy calling gun violence a public health crisis.[2]

We all know that the human brain does not mature until well into a person's 20s. Young people, especially when experiencing despair or hopelessness, are impetuous and can lack the maturity to make good decisions.

Behaviorally-informed gun policy has the potential to reduce violence without imposing new restrictions on anyone's right to own a gun. Waiting periods are effective, and they are also

supported by a majority of Americans and roughly 50% of gun owners[3]. Waiting periods do not restrict gun ownership, they create a window of time in which someone in crisis could get the help they need. It's been proven in states that enacted waiting periods that it reduces the incidents of suicide.

Eleven states have some form of a waiting period to purchase a firearm. They are VT, RI, NJ, MD, IL, MN, WA, CO, CA, HI, FL and the District of Columbia.

Thank you for your time. I am happy to answer any questions you have for me.

1. https://www.psychiatry.org/newsroom/news-releases/americans-overwhelmingly-see-gun-violence-as-a-public-health-issue-they-want-congress-to-act-and-cdc-to-conduct-research
2. https://www.ama-assn.org/press-center/press-releases/ama-calls-gun-violence-public-health-crisis
3. https://behavioralscientist.org/the-case-for-handgun-waiting-periods/

STATE OF MAINE
HOUSE OF REPRESENTATIVES
SPEAKER'S OFFICE
AUGUSTA, MAINE 04333-0002
(207) 287-1300

**EXHIBIT 3**

RACHEL TALBOT ROSS
SPEAKER OF THE HOUSE

*Testimony of Speaker Rachel Talbot Ross supporting*

## LD 2224, An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and Mental Health System

*and*

## LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases

*Before the Joint Standing Committee on Judiciary*

Good morning Senator Carney, Representative Moonen and esteemed members of the Joint Standing Committee on Judiciary. I am Representative Rachel Talbot Ross of Portland. I represent House District 118 which is the Portland peninsula and I have the distinct honor of serving as the Speaker of the House. I stand before you today to offering my steadfast support of both LD 2224, An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and Mental Health System and LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases.

Without a doubt, you will be hearing from a diverse and varied group of Mainers today. The issue of common-sense gun safety reforms, especially in light of the Lewiston tragedy, has elevated the urgency of this conversation. You will hear today and in the coming weeks from constituents, elected officials, first responders, the local and federal government, gun safety advocates, gun owners, sportsmen, hunters, and public health experts.

To use your time most judiciously, I will leave the policy overview and the technical details to the sponsor, Sen. Rotundo and share my own personal experience with these long overdue reforms.

In 1977, my father, the Honorable Gerald Talbot, proposed legislation to enact a three-day waiting period for handgun purchases in Maine. At that time, the weapon causing the most harm was the "Saturday Night Special" - one of the small, easily concealed weapons that were believed to be at the root of many street crimes in the 1970s.

The amount of damage those guns could do in a short amount of time pales in comparison to the damage inflicted by the weapons readily available today. Increases in caliber, ammunition capacity, firing rate and range have made deadly weapons of war immediately accessible with lethal consequences both in Maine and across the country.

In the following years, gun violence in all its forms has become a significant public health crisis. It poses a serious threat to the well-being and safety of individuals and communities, and its impact, often felt for generations, extends beyond just physical injuries. Gun violence can result in loss of life and permanent disability, as well as long-lasting psychological and emotional trauma for survivors, families, witnesses, and the healthcare providers who care for the victims.

In addition to supporting the bills before you today, I also provided testimony on LD 2086 An Act to Amend the Law Governing the Disposition of Forfeited Firearms. Combined with my proposal, LD 2237, An Act to Strengthen Public Safety, Health and Well-being by Expanding Services and Coordinating Violence Prevention Resources, we have the opportunity to pass a suite of legislation to protect Mainers and reduce the risk of gun-related incidents.

47 years later, one of the initiatives in this comprehensive package is the very same answer that my father proposed. A 72-hour waiting period. And we have the same reasons for supporting this common-sense legislation. This reform could help prevent so many people from making a terrible, tragic, life-changing decision. Give them time to cool off. To get the help they need.

The goal is to save lives, and research shows that these policies work. The American Academy of Pediatrics found that states with waiting periods experienced 51 percent fewer firearm suicides than states without these policies. Another study found that states that adopted waiting period laws experienced a 17 percent decrease in homicides and a six percent decrease in suicide.

According to the Maine CDC, suicide is the fourth leading cause of death for Mainers between the ages of 15-54. In 2021, 277 Mainers died by suicide – more than half involved a firearm.

Governor Mills' legislation creates another layer of protection by extending the National Instant Criminal Background Check System (NICS) to advertised, private sales and



EXHIBIT 4

Peggy Rotundo
Senator, District 21

**THE MAINE SENATE**
131st Legislature

3 State House Station
Augusta, Maine 04333

**Testimony introducing**
**LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases"**

**And**

**LD 2224, "An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and Mental Health System"**

**Senator Peggy Rotundo**
**March 7, 2024**

Senator Carney, Representative Moonen and friends and colleagues on the Committee on Judiciary, my name is Peggy Rotundo and I represent Senate District 21, the City of Lewiston. I am here today to introduce two bills: LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases" and LD 2224, "An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and Mental Health System."

First I would like to talk about LD 2238, which, as its title suggests, will require a 72-hour waiting period between an agreement for the purchase and sale of a firearm and the delivery of that firearm to the purchaser. The bill does not apply to sales to law enforcement officers, people employed as corrections officers or guards whose jobs require carrying a firearm, or other firearm dealers. Violating this waiting period would be a civil offense, with the punishment being a fine between $200 and $500; the penalty following a second violation would result in a fine of between $500 and $1,000.

The purpose of requiring a waiting period is to provide the purchaser with a "cooling off" period. It is to help protect the purchaser from acting on a short-lived impulse — suicide or homicide — that may have inspired the purchase in the first place. Nine states have similar laws on the books and three more employ waiting periods for certain types of firearms.

The goal is to save lives, and research shows that these policies work. The American Academy of Pediatrics found that states with waiting periods experienced 51 percent fewer firearm suicides than states without these policies. Another study, published in the publication *Proceedings of the National Academy of Sciences,* found that states that adopted waiting period laws experienced a 17 percent decrease in homicides and a 7 to 11 percent decrease in suicide.

*Chair, Appropriations and Financial Affairs Committee*
*State House: (207) 287-1515 * Fax: (207) 287-1585 * Toll Free: 1-800-423-6900 * TTY: 711*
*Peggy.Rotundo@legislature.maine.gov * legislature.maine.gov/senate*

App - 172

According to the Centers for Disease Control (CDC), suicide is the fourth leading cause of death for Mainers between the ages of 15 to 54. In 2021, 277 Maine people died by suicide in Maine. More than half involved a firearm. Enacting waiting periods in Maine could make a meaningful difference in suicide rates and could save lives.

This bill can't and won't prevent all homicides and suicides. No piece of legislation can. It can, however, lessen gun violence in general in the state and help to save lives and create safer and healthier communities.

The same can be said for LD 2224, the Governor's bill. It is a thoughtful approach to addressing gun violence and mental health care. I am honored to sponsor this bill and am happy to provide details to you on what it does.

The Governor's bill creates an Injury and Violence Prevention Program within the CDC. The program will be a clearinghouse for information and data from all over Maine to help us understand and prevent future incidents of violence. The more we know about the causes of these kinds of violence, the better we can adapt and prevent them in the future.

As Chair of the Appropriations Committee, I am pleased to note that the Governor's proposed Supplemental Budget includes $1 million to fund this initiative.

The bill also establishes a network of crisis receiving centers throughout Maine. These centers provide care for people suffering a mental health crisis. They are proven alternatives to the hospital emergency room or jail, which are common destinations for people who are experiencing these crises. The first of these centers opened in Portland just over two years ago. In the last year, over 170 people have visited the center in order to help resolve a mental health crisis.

The bill contains plans for a center to be created in Lewiston and I am pleased that there is $1.4 million in the Supplemental Budget to fund its construction and staffing. This bill also directs the Department of Health and Human Services to develop a statewide plan to build centers throughout Maine in the future.

LD 2224 would also strengthen Maine's extreme risk protection law. As we learned after the mass shooting in Lewiston, law enforcement officers had been unable to take the assailant, Robert Card, into custody and initiate our extreme risk protection law to confiscate his weapons. This bill addresses gaps in that law by allowing law enforcement to get a judge's approval, in unusual circumstances, to take a person into protective custody for a mental health assessment. If a law enforcement officer has made reasonable efforts to take the person into custody but has been unable to do so, and the officer can establish probable cause that the person has a mental illness and presents a likelihood of serious harm due to access to weapons, the court will issue a protective custody warrant.

LD 2224 also expedites a judge's weapons restriction order, making sure the order is sent quickly from the courts to the State Bureau of Identification. This way the state database which is utilized by the National Instant Criminal Background Check System (NICS) can be updated as soon as possible, helping to ensure that a prohibited person will not be able to purchase a weapon. The bill will also extend statutory deadlines for court processes in order to provide District Attorneys additional time to prepare for hearings.

Under current law, a person may not purchase a weapon from a federally licensed firearm dealer when that person's name is entered into NICS. They may, however, be able to purchase a weapon in a private sale. The bill address this issue by requiring *any* sale of a firearm that is advertised to be checked against NICS.

Additionally, this bill makes it easier to successfully prosecute anyone who sells a gun to someone who is not allowed to have one via private and unadvertised sales. The current crime of knowingly selling a firearm to someone who is a prohibited person – a misdemeanor – would be expanded by adding the term "recklessly" to intentionally or knowingly, making it a stronger standard and making it easier to successfully prosecute these sellers. It also makes that type of illegal sale a felony – not just a misdemeanor.

The bill does not change the tradition of transferring a firearm to a relative or a friend who they know is allowed to own one. But it would mean that anyone selling a firearm to a stranger should have to visit a licensed firearm dealer to check the NICS system, and make sure they are not a prohibited person.

Please know that Department of Public Safety Commissioner Mike Sauschuck is on hand to answer questions about this bill.

I come from a community with broken hearts and shattered lives, a community where many people are still afraid to go out in public, a community where there are families that worry when their children go off to school, and wonder if those children will come home safely at night. As a legislator, I cannot do anything to bring back the lives of the grandparents, parents, children, friends and neighbors who lost their lives on October 25, nor can I miraculously heal those people that were terribly injured in the mass shooting, or take away the grief and pain that the families of the victims and survivors live with daily. What I can do is to do everything in my power as a legislator to put laws in place that help reduce the level of gun violence in our state and that make our communities safer places to live and work. That is why I am here today presenting these two bills to you and why I thank you for the serious consideration I know you will give these bills.

I appreciate the Governor's leadership on this issue and look forward to working with her and others to find smart, effective solutions to protect the people of Maine. I am confident we can keep people safe while respecting the rights of responsible gun owners. I am confident we can get there by working hard and by working with respect, sensitivity, patience and compassion. We owe this to our children so they can go to school without fear. We owe this to Maine families so they can go out to a movie or to a restaurant without fear. We owe this to the memories of those people we lost on October 25th in Lewiston and to the loved ones they left behind. Thank you.

I am happy to answer questions and I will note again that Commissioner Sauschuck is also here to answer questions about the Governor's bill.

EXHIBIT 5



# HOUSE OF REPRESENTATIVES

2 STATE HOUSE STATION
AUGUSTA, MAINE 04333-0002
(207) 287-1400
TTY: MAINE RELAY 711

**Morgan Rielly**
16 Blue Spruce Farm Road, Apt #6
Westbrook, ME 04092
Phone: (207) 228-5767
Morgan.Rielly@legislature.maine.gov

March 13, 2024

*Testimony of Rep. Morgan Rielly in support of*
**LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**
*Before the Joint Standing Committee on Judiciary*

Dear Senator Carney, Representative Moonen and distinguished members of the Joint Standing Committee on Judiciary:

My name is Morgan Rielly, and I represent House District 127, which includes part of my hometown of Westbrook. I am pleased to cosponsor and write in support of **LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**.

Waiting periods are designed to prevent individuals who pose an immediate threat to themselves or others from the impulsive purchase and use of a firearm, and currently, in our state, we need to support the passage of LD 2238. According to the CDC, suicide is the fourth leading cause of death for Mainers between the ages of 15-54. Most gun deaths in Maine are by suicide.

The American Academy of Pediatrics found that states with waiting periods experienced 51 percent fewer firearm suicides than states without these policies. Another study found that states that adopted waiting period laws experienced a 17 percent decrease in homicides and a six percent decrease in suicide.

We need to stop and ask ourselves why people need access to firearms quickly. If we have the ability to allow our law enforcement more time to run thorough background checks on those purchasing firearms, and in that process, have the ability to save the lives of community members who are second guessing taking their own life or the lives of others, we must support LD 2238.

Thank you for your time and consideration of this bill.

District 127: Westbrook

EXHIBIT 6

*131st Legislature*

# Senate of Maine

*Senate District 24*

*Senator Eloise Vitelli*
*Senate Majority Leader*
*3 State House Station*
*Augusta, ME 04333-0003*
*Office (207) 287-1515*

*Testimony of Senator Eloise Vitelli supporting*
**LD 2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases**
*Before the Joint Standing Committee on Judiciary*
**March 7, 2024**

Senator Carney, Representative Moonen, and Esteemed Members of the Joint Standing Committee on Judiciary, my name is Eloise Vitelli, and I proudly represent Senate District 24, which includes all of Sagadahoc County and Dresden. Today I offer testimony in support of LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases."

As the Senator who represents Bowdoin, I have joined our community in grieving a quadruple homicide. There have been instances, such as these, where our gun laws have not protected Mainers. That's why it's clear we need to examine our state laws, find the gaps in our safety nets, and do all we can to help keep people safe.

This is a crucial moment in our state's history, and we are here to meet that moment. It will take all of us working together and listening compassionately to chart a path forward. This bill represents the first step.

LD 2238 would require a 72-hour waiting period between an agreement for the purchase and sale of a firearm and the delivery of that firearm to the purchaser. The measure includes certain exemptions for sales to law enforcement officers, to individuals who need a firearm for employment in security and to federally licensed firearm dealers.

Waiting periods are designed to prevent individuals who pose an immediate threat to themselves or others from the impulsive purchase and use of a firearm. The goal is to save lives, and research shows that these policies work.

<u>The American Academy of Pediatrics</u> found that states with waiting periods experienced 51 percent fewer firearm suicides than states without these policies. <u>Another study</u> found that states that adopted waiting period laws experienced a 17 percent decrease in homicides and a six percent decrease in suicide.

1

<u>According to the Maine CDC</u>, suicide is the fourth leading cause of death for Mainers between the ages of 15-54. In 2021, 277 Mainers died by suicide – more than half involved a firearm.

Thank you for your consideration and time. At this time, I will do my best to answer any questions you may have.

**Eloise Vitelli**
Senate Majority Leader, Senate District 24
*Sagadahoc County and Dresden*

2

EXHIBIT 7



## HOUSE OF REPRESENTATIVES
2 STATE HOUSE STATION
AUGUSTA, MAINE  04333-0002
(207) 287-1400
TTY: MAINE RELAY 711

**Sam Zager**
90 Prospect Street
Portland, ME 04103
Residence: (207) 400 - 6846
Sam.Zager@legislature.maine.gov

*Testimony in support of*

### LD  2238, An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases

*March 7, 2024*

Senator Carney, Representative Moonen, and esteemed Judiciary committee members, thank you for hearing this bill.  My name is Representative Sam Zager, and I represent District 116, Part of Portland, where I also practice family medicine.

As this committee is well aware, this 3-day waiting period bill  is one of severe proposals under consideration this session regarding firearm violence. No right under the US or Maine Constitution is absolute, and the Supreme Court of the United States in the *Heller* and *Bruen* decisions allows for tailored approaches to regulating firearms. There has to be a compelling public interest.

To consider the public interest, we should first examine the scope and type of problem we have: more American children die each year involved with a firearm than a motor vehicle. See Figure 1 of this article published in the medical journal *Pediatrics* by Dr. Bailey Roberts and co-authors two months before the Lewiston tragedy.[1] **In addition to showing that firearms being the #1 killer of American children, they also pointed out the problem is worsening:** "From 2018 to 2021, there was a 41.6% increase in the firearm death rate [among children]." We ought to be able to reduce the number of children dying in this manner. These numbers and trends constitute a public health crisis.

In the face of public health crises, public policy and collective solutions have a remarkably good track record. Consider a public health crisis of the 20th century: annual US deaths due to motor vehicles had nearly tripled in the 25 years from 1943 to 1968. Then, the federal government mandated the installation of seatbelts.[2] Motor vehicle deaths in this country reached 56,000 per year in 1972, approximately the same number of deaths in the entire Vietnam War. It took another 25 years for actual seatbelt usage to reach a majority (54% in 1994). There were also

---

[1] https://publications.aap.org/pediatrics/article/152/3/e2023061296/193711/Trends-and-Disparities-in-Firearm-Deaths-Among?autologincheck=redirected
[2] https://www.ghsa.org/issues/seat-belts

other government steps (e.g. speed limits and drunk driving enforcement), and citizen campaigns to change people's behaviors (e.g. Mothers Against Drunk Driving, MADD). The net effect was more than a 50% reduction in per capita motor vehicle fatalities (roughly 20,000 fewer Americans dying each year). **Americans realized that we could make driving safer without taking away driving. Similarly, we can reduce deaths from firearms, while still respecting the Second Amendment right to well-regulated firearm possession and usage. As with motor vehicle accidents, we just have to decide we want to do something to save lives.**

When it comes to the 72-hour waiting period in this bill, there actually is good evidence that it would save lives. Michael Luca et al published a study in the Proceedings of the National Academies of Science in 2017. They found in a natural experiment, caused by the temporary implementation of the Brady Bill, that waiting periods reduce gun suicides by 6% and homicides by 17%.[3]

This bill addresses an important issue of firearm fatalities, a large and growing problem, in a way that has been demonstrated to reduce both suicides and homicides. I urge the committee to support it.

Thank you for your service and attention.

---

[3] https://www.pnas.org/doi/epdf/10.1073/pnas.1619896114

District 116: Portland (part)

American Academy
of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN®

## Waiting Periods for Firearms Purchases

# Overview

Under current federal law, there is no waiting period requirement for the purchase of guns. Waiting period laws give law enforcement additional time to perform an accurate background check and create a "cooling off" period to prevent acts of violence or suicide attempts. If sold from a federally licensed dealer, a gun can be transferred to a purchaser before a proper background check is performed. However, the laws do not apply to private dealers in states that do not require universal background checks.

Waiting periods can reduce the number of prohibited people from purchasing guns, along with those who purchase a firearm with the intent of suicide. Waiting periods are an under-utilized, evidence-based strategy for reducing death and injuries.

# AAP Position

- The AAP is committed to protecting children from firearm-related injury and violence.

- The absence of guns in home and communities is the most reliable and effective measure to prevent firearm-related injuries in children and adolescents.

- The AAP supports a number of specific measures to reduce the destructive effects of guns in the lives of children and adolescents, including the manufacture, sale, purchase, ownership, storage, and use of firearms.

- Other measures aimed at regulating the access of guns should include mandatory waiting periods, closure of the gun show loophole, and mental health restrictions for gun purchasers.

# Facts

Death from firearms remains the most lethal form of suicide with an approximate 90% mortality rate.

- According to several studies, suicide survivors contemplated their actions in a very brief window of time. Waiting periods could help address this period of impulsive behaviors.

- Waiting period laws have proven to lower the rates of suicide. States with such laws had 51% fewer firearm suicides than states without. Another study showed that these states also experienced a 17% decrease in gun homicides. Over 900 firearm homicides could be prevented each year if every state implemented waiting periods.

- Over 70% of Americans without a firearm in the home support longer waiting periods for gun purchases.

## Progress

- **6 states and DC** – impose waiting periods for purchases of all firearms

- **1 state** – imposes waiting periods for purchases of handguns & assault weapons

- **4 states** – impose waiting periods for handguns only



For information on current law or pending legislation in your state, please contact AAP State Advocacy at **stgov@aap.org**.

# More

# Handgun waiting periods reduce gun deaths     EXHIBIT 9

Michael Luca[a,1], Deepak Malhotra[a], and Christopher Poliquin[a]

[a]Harvard Business School, Boston, MA 02163

Edited by Philip J. Cook, Duke University, Durham, NC, and accepted by Editorial Board Member Kenneth W. Wachter September 21, 2017 (received for review December 3, 2016)

Handgun waiting periods are laws that impose a delay between the initiation of a purchase and final acquisition of a firearm. We show that waiting periods, which create a "cooling off" period among buyers, significantly reduce the incidence of gun violence. We estimate the impact of waiting periods on gun deaths, exploiting all changes to state-level policies in the Unites States since 1970. We find that waiting periods reduce gun homicides by roughly 17%. We provide further support for the causal impact of waiting periods on homicides by exploiting a natural experiment resulting from a federal law in 1994 that imposed a temporary waiting period on a subset of states.

gun policy | gun violence | waiting period | injury prevention

More than 33,000 people die in gun-related incidents each year in the United States, accounting for as many deaths as motor vehicle accidents (1). This is concerning both in absolute terms and in comparison to other developed countries, all of which have lower rates of gun violence (2). For example, if the United States could lower its firearm death rate to that of Finland (the high-income country with the second highest rate), roughly 20,000 fewer people would die from guns every year. However, there has been no meaningful reduction in the US firearm-related death rate for more than a decade. Moreover, evidence about which policies would be effective at reducing violence remains limited (3), and the types of bills that are enacted depend on the political party in power (4).

One avenue for reducing gun deaths is to draw on insights from behavioral economics and psychology, which suggest that delaying gun purchases, even for a short time, might be an effective policy tool. Visceral factors, such as anger or suicidal impulses, can spur people to inflict harm on others or themselves, but tend to be transitory states (5, 6). For example, Card and Dahl (7) find that there is a 10% increase in domestic violence following an upset loss of the local National Football League team. Moreover, behaviors triggered by such visceral states can be contrary to longer term self-interest (5, 6).

Delaying a gun purchase could create a "cooling off" period that reduces violence by postponing firearm acquisitions until after a visceral state has passed. Increasing the time it takes to acquire a gun might also close the window of opportunity for would-be perpetrators of violence to use their weapons. Finally, a mandatory delay has the potential to deter purchases among people who have malevolent, but temporary, motivations for owning a firearm.

This article explores the impact of "waiting period" laws on firearm-related homicides and suicides using 45 y of data on law changes and mortality at the state level in the United States. A waiting period is a mandatory delay between the purchase and delivery of a gun; it requires purchasers to wait, typically between 2 and 7 d, before receiving their weapons. We exploit plausibly exogenous temporal and geographic variation in waiting period laws to implement a difference-in-differences approach that identifies the causal impact of waiting periods on homicides and suicides.

We find that waiting periods cause large and statistically significant reductions in homicides. Point estimates using our full 45-y data and all waiting period changes imply a 17% reduction in gun homicides. We provide further evidence of a causal relationship between waiting periods and lower homicide rates based on a natural experiment in which federal law imposed waiting periods on a subset of states. Estimates from this analysis

also suggest that waiting periods reduce gun homicides by 17%. The results of both analyses confirm a large and robust effect of waiting periods on homicides. We also find a negative effect of waiting periods on suicides, but the magnitude and statistical significance of the suicide effect vary across model specification.

## Data and Research Design

We construct a panel of every change to waiting period laws in the United States between 1970 and 2014, which we obtained from state statutes and session laws. We combine these changes with annual data on firearm-related deaths from the Centers for Disease Control and Prevention. Fig. 1 shows the number of states with waiting periods over time. Overall, 44 states (including the District of Columbia) have had a waiting period for at least some time between 1970 and 2014. Exploiting the significant geographic and temporal variation in the adoption of waiting periods, we implement a difference-in-differences framework to estimate the causal impact of waiting periods on gun deaths. Essentially, we compare changes in firearm-related deaths within states that adopted waiting periods with changes in firearm-related deaths in other states. We control for changing economic and demographic factors that may be correlated with higher levels of gun violence or with the decision of lawmakers to adopt policies that delay gun purchases.

To support our causal interpretation, we then restrict the analysis to the period from 1990 to 1998, during which federal policy forced many states to implement waiting periods. The Brady Handgun Violence Prevention Act (hereinafter "Brady Act"), which went into effect in February 1994, required background checks on handgun purchases from licensed firearm dealers and created a 5-d waiting period to allow sufficient time for the check. Although it was a federal policy, the Brady Act only created new waiting periods for 19 states, since some states already required a background check and waiting period, and some implemented an "instant check" system that allowed for nearly immediate background checks (thereby obviating the need for a waiting period). We provide further details regarding the Brady Act and affected states in *Identifying Policy Changes* and *Materials and Methods*.

## Significance

Waiting period laws that delay the purchase of firearms by a few days reduce gun homicides by roughly 17%. Our results imply that the 17 states (including the District of Columbia) with waiting periods avoid roughly 750 gun homicides per year as a result of this policy. Expanding the waiting period policy to all other US states would prevent an additional 910 gun homicides per year without imposing any restrictions on who can own a gun.

Author contributions: M.L., D.M., and C.P. designed research, performed research, analyzed data, and wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission. P.J.C. is a guest editor invited by the Editorial Board.

This is an open access article distributed under the PNAS license.

See Commentary on page 12097.

[1]To whom correspondence should be addressed. Email: mluca@hbs.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1619896114/-/DCSupplemental.

Downloaded from https://www.pnas.org by 72.12.82.97 on March 7, 2024 from IP address 72.12.82.97.

App - 182

Case: 1:24-cv-00384-DEW Doc #: 82-12 Page 186 of Date 04/03/25 Page 254 PageID#6717150
136

PNAS

SEE COMMENTARY

ECONOMIC SCIENCES

Downloaded from https://www.pnas.org by 72.12.82.97 on March 7, 2024 from IP address 72.12.82.97.



**Fig. 1.** States with handgun waiting periods and background checks on dealer sales from 1970 to 2015. Many states were required to implement these policies during the Brady interim period between February 1994 and November 1998 (shaded gray). Following prior research (8), Alabama and Ohio are coded as not requiring background checks after the Supreme Court's decision in *Printz v. United States*. Not all states had waiting periods during the Brady interim period because they implemented or already had an instant background check system that obviated the need for a waiting period to investigate gun buyers.

## Results

We begin by examining the effect of waiting periods across the full sample period from 1970 to 2014. The results of Table 1 show that waiting periods are associated with a 17% reduction in gun homicides. This effect is equivalent to ~36 fewer gun homicides per year for a state with an average number of gun deaths. Waiting periods also lead to a 7–11% reduction in gun suicides (depending on the control variables used in the specification), which is equivalent to 22–35 fewer gun suicides per year for the average state. The results in Table 1 use a log-linear specification; we

**Table 1.  Effects of handgun waiting periods and background checks on violence, 1970–2014**

| Type of violence | 1970–2014 | | 1977–2014 |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.127 (0.059)** | −0.137 (0.059)** | −0.132 (0.050)** |
| Background check | | 0.049 (0.082) | 0.025 (0.081) |
| **Gun homicide** | | | |
| Waiting period | −0.188 (0.077)** | −0.187 (0.086)** | −0.186 (0.071)** |
| Background check | | −0.004 (0.103) | 0.022 (0.107) |
| **Non-gun homicide** | | | |
| Waiting period | −0.016 (0.051) | −0.048 (0.060) | −0.035 (0.037) |
| Background check | | 0.153 (0.076)** | 0.036 (0.057) |
| **All suicide** | | | |
| Waiting period | −0.047 (0.021)** | −0.070 (0.023)*** | −0.024 (0.011)** |
| Background check | | 0.113 (0.061)* | 0.023 (0.020) |
| **Gun suicide** | | | |
| Waiting period | −0.097 (0.034)*** | −0.120 (0.031)*** | −0.074 (0.017)*** |
| Background check | | 0.111 (0.073) | 0.029 (0.028) |
| **Non-gun suicide** | | | |
| Waiting period | −0.017 (0.038) | −0.058 (0.059) | −0.006 (0.033) |
| Background check | | 0.199 (0.072)*** | 0.084 (0.031)** |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Model 3 uses fewer years of data due to missing control variables in earlier years. Summary statistics for all variables are included in Table S1. The 1970–2014 period includes 2,295 state-year observations; the model for gun homicides omits three state-years, and the model for non-gun homicides omits two state years because the death count was zero and the model is specified with a logged dependent variable. Similarly, the 1977–2014 period includes 1,938 state-years, but omits two state-years for gun homicides and one state-year for non-gun homicides. SEs, shown in parentheses, are clustered by state. Alternative model specifications presented in Tables S7 and S8 are not logged and include all state-years. *P < 0.10; **P < 0.05; ***P < 0.01.

Downloaded from https://www.pnas.org by 72.12.82.97 on March 7, 2024 from IP address 72.12.82.97.

present models with state-specific trends, models linear in the rate of violence, and Poisson models as part of Tables S3 and S5. The conclusion that waiting periods reduce gun homicides is robust across all specifications. The conclusion regarding suicides is robust to all specifications except those that include state-specific, linear trends (Table S3). Both conclusions are robust across models with and without controls for state-level economic and demographic changes. We also investigate the robustness of the results to the exclusion of individual states in Fig. S1.

To further support the hypothesis that waiting periods lead to a reduction in gun homicides, we then focus on a natural experiment created by the Brady Act, a federal law that forced some states to adopt new waiting period and background check policies between 1994 and 1998. Ludwig and Cook (8) also use the Brady Act to study whether background checks and waiting periods affect violence. They compare "Brady states" that were subject to the Brady Act with "Brady-exempt states" that were not. However, some states that were classified as Brady states already had waiting periods and background checks before the Brady Act, and other states chose to implement an "instant" background check system instead of requiring a waiting period. As a result, the coding of Brady states in the study by Ludwig and Cook (8) fails to capture all states that had preexisting waiting periods. In contrast, we precisely code which states had waiting periods (before 1994) and which implemented waiting periods only because of the Brady Act. In total, our coding differs from theirs for 16 states. This additional accuracy allows us to assess the causal impact of waiting periods resulting from the Brady Act. The full list of differences between our coding and prior research, along with supporting citations, can be found in Table S4.

We find that waiting periods led to large and statistically significant reductions in gun violence (Table 2) during the Brady interim period. Specifically, the results of column 3 of Table 2 show that waiting periods implemented during the Brady interim years resulted in a 17% reduction in gun homicides. This is equivalent to roughly 39 fewer homicides per year for the average state. There was also a 6% reduction in gun suicides (i.e.,

17 fewer suicides per year for the average state). Both results are robust across models with and without controls for state-level economic and demographic changes. Notably, exploiting the Brady Act as a natural experiment produces similar estimates as the longer sample period from 1970 to 2014.

Tables 1 and 2 also show that waiting periods have no significant effect on non-gun homicides, suggesting that people subject to waiting period laws do not substitute other means of committing homicide. This is consistent with other research (9) finding no increase in non-gun homicides in response to policies restricting access to firearms. Results for non-gun suicides, however, are less clear; some specifications suggest partial substitution toward non-gun methods of suicide in response to handgun waiting periods.

## Discussion

Our results show that waiting periods reduce gun homicides. Waiting periods for gun purchases are supported not only by the American Medical Association but also by a majority of Americans and a majority of gun owners (10, 11). Our point estimates, based on 45 y of data, suggest that the 17 states (including the District of Columbia) with waiting periods as of 2014 avoid ~750 gun homicides. Expanding the waiting period policy to states that do not currently have it would prevent an additional 910 gun homicides per year. Waiting periods would therefore reduce gun violence without imposing any restrictions on who can own a gun.

## Materials and Methods

Our main specifications are of the form:

$$r_{it} = \alpha_i + \lambda_t + \beta W_{it} + \gamma B_{it} + \delta' X_{it} + \epsilon_{it},$$

where $r_{it}$ is the natural logarithm of the rate of violence (homicides or suicides) per 100,000 adult residents, $W_{it}$ is an indicator for handgun waiting periods and $B_{it}$ is an indicator for whether background checks are required for dealer handgun sales. We include an indicator variable for background checks on handgun purchases from licensed firearm dealers because a major source of policy variation in our dataset (the Brady Act) also affected

**Table 2. Effects of handgun waiting periods and background checks on violence, 1990–1998**

| Type of violence | Brady period, 1990–1998 | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.073 (0.084) | −0.130 (0.077)* | −0.145 (0.060)** |
| Background check | 0.091 (0.064) | 0.010 (0.053) | |
| **Gun homicide** | | | |
| Waiting period | −0.103 (0.093) | −0.179 (0.087)** | −0.181 (0.068)** |
| Background check | 0.120 (0.080) | 0.033 (0.065) | |
| **Non-gun homicide** | | | |
| Waiting period | −0.019 (0.068) | −0.035 (0.064) | −0.072 (0.050) |
| Background check | 0.025 (0.044) | −0.043 (0.039) | |
| **All suicide** | | | |
| Waiting period | −0.016 (0.021) | −0.022 (0.023) | −0.036 (0.020)* |
| Background check | 0.009 (0.022) | −0.007 (0.019) | |
| **Gun suicide** | | | |
| Waiting period | −0.039 (0.024) | −0.053 (0.028)* | −0.066 (0.021)*** |
| Background check | 0.023 (0.028) | −0.003 (0.024) | |
| **Non-gun suicide** | | | |
| Waiting period | 0.050 (0.021)** | 0.035 (0.022) | 0.018 (0.022) |
| Background check | 0.024 (0.023) | 0.009 (0.018) | |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for all variables are included in Table S2. The sample includes 459 state-year observations for all models. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

App - 184

SEE COMMENTARY

PNAS

background check policies. As seen in Tables 1 and 2, the estimated impact of background checks depends on model specification. We also incorporate time-varying state-level control variables that may influence rates of gun violence (8), $X_{it}$, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for these variables are included in Tables S1 and S2. The $\alpha_i$ and $\lambda_t$ parameters represent state and year fixed effects. These fixed effects control for stable, state-specific factors affecting violence and time-varying factors that affect all states identically. It is impossible to control for all time-varying, state-specific factors that affect gun violence. For example, policing tactics, drug use, and environmental factors such as lead exposure might not have changed uniformly across states over time and may also affect violence. However, the consistency between our estimates during the short (Brady interim) period and the longer period (including all waiting period changes since 1970) supports our interpretation of the results. The model parameters are estimated via least squares weighted by state population. We then calculate the percentage effect of waiting periods on violence using the estimator described by Kennedy (12).

We code a state as having a waiting period if it imposes any mandatory delay on the purchase of a handgun or has a permitting system for dealer and private sales. (In Table S5, we estimate models with a separate control variable for handgun permit systems and show that the effect of waiting periods is not limited to states with permitting systems.) Currently, 10 states and the District of Columbia impose an explicit waiting period on handgun

sales, and an additional five states have permitting systems for private and dealer sales that result in a delay of firearm purchases. Forty-four states have had a handgun waiting period at some point since 1970, although 19 implemented the policy only due to the Brady Act's interim provisions, in effect from February 1994 to November 1998. These provisions required local law enforcement agencies to conduct background checks on handgun purchases from licensed firearm dealers and required a 5-d waiting period to conduct the check. Some states already required background checks and/or waiting periods before the Brady Act, and were therefore not affected by the new law, but other states were forced to adopt a new waiting period due to the federal policy change. When the permanent provisions of the Brady Act took effect on November 30, 1998, the federal waiting period requirement was replaced with an instant background check system [the National Instant Criminal Background Check System (NICS)]. As a result, many states discarded their waiting periods after 1998 because the NICS eliminated the need for a waiting period to investigate purchasers' backgrounds. We use the subset of waiting period changes that resulted from the Brady Act as a natural experiment to provide further support for our analysis of the full sample period from 1970 to 2014.

Although nine states have also had a waiting period on long-guns (i.e., rifles and shotguns) sometime since 1970, we focus on handgun waiting periods because handguns account for 70–80% of firearm homicides (13) and because a major source of variation in our data, the Brady Act's interim period, only affected handgun sales.

1. National Center for Health Statistics, Centers for Disease Control and Prevention (2015) About Compressed Mortality, 1999-2014. CDC WONDER Online Database. Available at wonder.cdc.gov/cmf-icd10.html. Accessed August 5, 2016.
2. Grinshteyn E, Hemenway D (2016) Violent death rates: The US compared with other high-income OECD countries, 2010. *Am J Med* 129:266–273.
3. Sacks CA (2015) In memory of Daniel–Reviving research to prevent gun violence. *N Engl J Med* 372:800–801.
4. Luca M, Malhotra D, Poliquin C (2017) The impact of mass shootings on gun policy. Harvard Business School NOM Unit Working Paper No. 16-126. Available at dx.doi.org/10.2139/ssrn.2776657. Accessed October 1, 2016.
5. Loewenstein G (1996) Out of control: Visceral influences on behavior. *Organ Behav Hum Decis Process* 65:272–292.
6. Loewenstein G, Lerner JS (2002) The role of affect in decision making. *Handbook of Affective Sciences*, eds Davidson RJ, Scherer KR, Goldsmith HH (Oxford Univ Press, Oxford), pp 619–642.
7. Card D, Dahl GB (2011) Family violence and football: The effect of unexpected emotional cues on violent behavior. *Q J Econ* 126:103–143.
8. Ludwig J, Cook PJ (2000) Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–591.
9. Raissian KM (2016) Hold your fire: Did the 1996 Federal Gun Control Act expansion reduce domestic homicides? *J Policy Anal Manage* 35:67–93.
10. American Medical Association (2016) AMA Expands Policy on Background Checks, Waiting Periods for Gun Buyers. Available at https://perma.cc/CNE4-FEQ9. Accessed October 28, 2016.
11. Sides J (December 23, 2012) Gun owners vs. the NRA: What the polling shows. Washington Post, Wonkblog. Available at https://perma.cc/HCC9-4DY5. Accessed October 28, 2016.
12. Kennedy P (1981) Estimation with correctly interpreted dummy variables in semilogarithmic equations. *Am Econ Rev* 71:801.
13. Planty M, Truman J (2013) Firearm Violence, 1993-2011 (US Department of Justice, Washington, DC), NCJ 241730. Available at https://www.bjs.gov/index.cfm?iid=4616&ty=pbdetail. Accessed October 18, 2016.

14. Wolfers J (2006) Did unilateral divorce laws raise divorce rates? A reconciliation and new results. *Am Econ Rev* 96:1802–1820.
15. Webster D, Crifasi CK, Vernick JS (2014) Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health* 91:293–302.
16. Rudolph KE, Stuart EA, Vernick JS, Webster DW (2015) Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health* 105: e49–e54.
17. Lott JR, Jr, Mustard DB (1997) Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud* 26:1–68.
18. Ludwig J (1998) Concealed-gun-carrying laws and violent crime: Evidence from state panel data. *Int Rev Law Econ* 18:239–254.
19. Ayres I, Donohue JJ, III (2002) Shooting down the 'more guns, less crime' hypothesis. *Stanford Law Rev* 55:1193–1312.
20. Manski CF, Pepper JV (2017) How do right-to-carry laws affect crime rates? Coping with ambiguity using bounded-variation assumptions. *Rev Econ Stat*, 10.1162/REST_a_00689.
21. Solon G, Haider SJ, Wooldridge JM (2015) What are we weighting for? *J Hum Resour* 50:301–316.
22. Federal Register 59 (1994). Available at https://www.gpo.gov/fdsys/pkg/FR-1994-07-22/html/94-17819.htm. Accessed June 29, 2016.
23. Manson DA, Gilliard DK, Lauver G (1999) Presale Handgun Checks, the Brady Interim Period, 1994-98 (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 175034. Available at https://www.bjs.gov/content/pub/pdf/phc98.pdf. Accessed June 29, 2016.
24. Vernick J, Hepburn L (2003) State and federal gun laws. *Evaluating Gun Policy: Effects on Crime and Violence*, eds Ludwig J, Cook PJ (The Brookings Institution, Washington, DC), pp 345–402.
25. U.S. Department of Justice Bureau of Justice Statistics (1996) Survey of State Procedures Related to Firearm Sales (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC). Available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=1067. Accessed August 2, 2014.
26. Carroll CA, Jr (January 27, 1994) South Carolina Executive order no. 94-03. Available at hdl.handle.net/10827/1350. Accessed June 14, 2017.

ECONOMIC SCIENCES

Downloaded from https://www.pnas.org by 72.12.82.97 on March 7, 2024 from IP address 72.12.82.97.



**Maine Chapter**
American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

EXHIBIT 10

**Executive Committee**

President
Laura Blaisdell, MD, MPH, FAAP

Vice President
Brian Youth, MD, FAAP

Treasurer
Christopher Motyl, DO, FAAP

Secretary
Genevieve Whiting, MD, FAAP

Immediate Past President
Deborah Q. Hagler, MD, MPH, FAAP

**Board of Directors**

Mahmuda Ahmed, MD, FAAP
Joseph Anderson, DO, FAAP
Amy Buczkowski, MD, FAAP
Melissa Burch, MD, FAAP
Adrienne Carmack, MD, FAAP
Gabriel Civiello, MD, FAAP
Anne Coates, MD, FAAP
Alyssa Goodwin, MD, FAAP
Dan Hale, MD, FAAP
Jessica Iyer, MD*
Jennifer Jewell, MD, MS, FAAP
Stephanie Joy, MD, FAAP
Emily Keller, MD, FAAP
Alton Kremer, MD, PhD, FAAP
Michele LaBotz, MD, FAAP
Maria Libertin, MD*
Lawrence Losey, MD, FAAP
Valerie O'Hara, DO, FAAP
Gita Rao, MD, FAAP
Sydney Sewall MD, MPH, FAAP
Austin Steward**
Jeffrey Stone, DO, FAAP
Mary Tedesco-Schneck, PhD, NP
Andrea Tracy, MD, FAAP
Jyotika Vallurupalli**

*Resident Board Representatives
**Medical Student Representatives

**Staff**

Dee Kerry, BSEd
Executive Director

Emily Belanger, RN, BSN
Project Coordinator

Tiffany Harrington, MBA
Development Director

30 Association Drive, Box 190
Manchester, ME  04351
office: 207-622-3374

www.maineaap.org

March 7, 2024

**Subject: Testimony in Support of LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases"**

Senator Carney, Representative Moonen, and distinguished members of the Committee on Judiciary, my name is Joe Anderson.  I am a resident of Portland, a pediatric hospitalist in Lewiston, and I serve on the board of the Maine Chapter of the American Academy of Pediatrics.  I am here to express our support for LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases."

The Maine Chapter of the AAP is a professional organization representing over 275 pediatricians and pediatric subspecialists working together to further our mission *to improve the lives of children and adolescents in Maine*.  Waiting periods are a prevention method for any impulsive act involving a firearm, including both firearm suicide as well as intentional gun violence.  We know that in Maine, most gun deaths (upwards of 90%) are suicides, not homicides.  Some may wonder why pediatricians feel the need to implement a waiting period for firearm purchases as a suicide prevention tool, when in Maine, you must be 18 years old to purchase a firearm.

Often, we think of suicide in terms of the singular life lost – and certainly that is the most identifiable and significant consequence.  However, the impact of suicide on our pediatric community, especially the suicide of trusted adults in their lives, is significant.  Experiencing suicide in the family and exposure to firearm violence are both independent adverse childhood experiences, which are correlated with long-term negative health consequences.

Suicide deaths by firearm are on the rise in Maine, as highlighted in the chart below.  In 2021, 56% of those deaths involved a firearm.



Suicide Deaths by Firearm in Maine
2001 - 2020[1]



Waiting periods are an under-utilized, evidence-based strategy for reducing death and injuries by firearms. Waiting periods give law enforcement sufficient time to perform an accurate background check, and additionally create a "cooling off" period to prevent acts of violence or suicide attempts. States with such laws had 51% fewer firearm suicides than those without. Over 70% of Americans without a firearm in the home support longer waiting periods for gun purchases.[2]

Although a similar proposal was considered in 2023 and was ultimately unsuccessful, we believe that recent events have been a turning point – for our citizens and our elected representatives – to reconsider means of reducing suicides and gun violence in our state. This waiting period is not intended to infringe upon the rights of responsible gun owners, but rather to *encourage* responsibility and ensure that the decision to purchase a firearm is made with careful consideration and full awareness of the potential risks. We hope you will vote ought to pass on this important piece of legislation which introduces a temporary delay in firearm acquisition in order to prevent a permanent loss of life via suicide or an act of gun violence.

Sincerely,

Joe Anderson DO

Joe Anderson, DO, FAAP
Advocacy Chair, Maine Chapter of the American Academy of Pediatrics

[1] Maine CDC Report to the Legislature pursuant to 22 MRS, Ch. 256-A § 1425

 

EXHIBIT 11

## TESTIMONY OF THE MAINE MEDICAL ASSOCIATION
## AND
## THE MAINE OSTEOPATHIC ASSOCIATION

### IN SUPPORT OF

<u>LD 2224</u> - An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and
Mental Health System
and
<u>LD 2238</u> - An Act to Address Gun Violence in Maine by Requiring a Waiting Period for
Certain Firearm Purchase

Joint Standing Committee on Judiciary
Room 438, State House, Augusta, Maine
Thursday, March 7, 2024

Good afternoon Senator Carney, Representative Moonen, and Members of the Joint Standing Committee on Judiciary. My name is Paul Cain, M.D., and I am a retired orthopedic surgeon and the President of the Maine Medical Association. I am submitting this testimony in support of <u>LD 2224</u> - An Act to Strengthen Public Safety by Improving Maine's Firearm Laws and Mental Health System and <u>LD 2238</u> - An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchase on behalf of the Maine Medical Association and the Maine Osteopathic Association.

The Maine Medical Association (MMA) is a professional organization representing more than 4,000 physicians, residents, and medical students in Maine. MMA's mission is to support Maine physicians, advance the quality of medicine in Maine, and promote the health of all Maine people. The Maine Osteopathic Association (MOA) is a professional organization representing more than 1,200 osteopathic physicians, residents, and medical students in Maine whose mission is to serve the Osteopathic profession of the State of Maine through a coordinated effort of professional education, advocacy, and member services in order to ensure the availability of quality osteopathic health care to the people of this State.

MMA and MOA have chosen gun safety reform as a priority issue for our Associations because we cannot continue to ignore one of America's most serious public health crises. Deaths by firearms have increased significantly in the last few years including homicide, suicide, and accidents. In 2020, firearms became the leading cause of death among our children from 1 to 19 years of age—eclipsing motor vehicle accidents, cancer, drug

1

overdoses, suffocation, and drownings. 77% of homicides and more than 50% of suicides are the result of a firearm. One half of the murders of women are committed by a current or former intimate partner or spouse. Surely this is not what our forefathers imagined when they codified the right to bear arms in our Constitution.

We, the physician caregivers for more than a million Mainers, stand up to end this mayhem through the passage of sensible firearm safety laws in Maine. The physicians of Maine are dedicated to the health and well-being of our communities. We take our role in advancing public health measures seriously. We have no choice: because we are on the front lines of caring for patients affected by gun-related injuries every day.

Before I end, I wanted to note a few specific items about the two bills in front of you today.

As to LD 2238, we support a waiting period because the medical community frequently participates in difficult conversations with patients about how a life event might cause them to be at a heightened risk of harm, both to themselves and others. Suicide is the 4th leading cause of death among 15-54 year old people in Maine, one of the highest rates in the country. LD 2238 would put a buffer between that person's emotions and impulses and an action that would not just hurt themselves but cause a ripple of loss throughout the entire person's community. We know this works because it can reduce firearm suicide rates by 7-11%.[1] Saving just one life is worth the temporary inconvenience of needing to wait to purchase a firearm.

As to LD 2224, we support the majority of the bill including strengthening background checks. However, we just have a couple of suggestions and ultimately believe we should be implementing a red flag law.

We would suggest amending section three of the bill to add §395 (3) (C) - "For the purpose of preventing imminent death or serious physical injury, and the provision lasts only as long as is necessary to prevent the death or serious physical injury." This is based on language out of Oregon and recognizes that there might be a situation where someone acknowledges that they need a pause from firearms in their home and this would allow them to give those firearms to a trusted individual for a temporary period of time. We should be encouraging and creating space in the law for that self recognition.

We would also suggest amending section seven because the current law and this amendment would only allow firearms to be removed after taken into protective custody and a medical professional has identified foreseeable harm. This is problematic for a number of reasons including

- The standard for taking someone into protective custody is high and it is a severe loss of liberty for the individual. Although an extreme risk protection order/ red flag law sounds more intense, it would actually provide a path to a less severe

---

[1] https://www.pnas.org/doi/10.1073/pnas.1619896114

2

intervention that can be responsive to less severe situations where a person poses a risk but it's not as certain as to what their next steps might be.

- The current law and amendment would only allow law enforcement officers to make the determinations that someone ought to be taken into protective custody. Family members, community members, coworkers should be able to make a petition to a court for extreme risk protection and not rely on law enforcement.

We wanted to note our concern with continuing to rely on the yellow flag law as the one tool to protect the community from harm. At its core, physicians and other healthcare professionals' job is to build relationships with our patients so we can get them the best possible care. Putting health care professionals in the position of determining our patients' Second Amendment rights puts them at odds with building relationships with their patients. This should only be done in special circumstances like in the scope of a forensic psychiatric evaluation and not somewhere like the emergency department room by an ER doctor. If the State does want to place this responsibility on health care professionals then they should provide immunity to the clinician.

Ultimately, we believe many of these points can be resolved by passing an extreme risk protection order/red flag law. We would be happy to discuss this more with the committee members but we would recommend reviewing Gifford's Law Center resources around these types of laws.[2]

I practiced orthopedic surgery in Lewiston-Auburn for over 30 years and raised our family there. I know many of the victims of the mass shooting that took place there. This tragedy has shook our community and shattered our feeling of safety. How many people now avoid public gatherings or feel uncomfortable sending their children to schools? We need to do better. I am also a gun owner and responsible hunter, but I believe in limits to my Second Amendment Rights.

Thank you for considering the support of Maine's physician community about L.D. 2224 and LD 2238. Sensible gun safety reform needs to happen. We cannot wait for another one of our patients to die. We urge an "ought to pass" vote on both of these bills. I would be happy to respond to any questions you may have.

Thank you,
Paul Cain, M.D.

Please contact Anne Sedlack, Director of Advocacy at the Maine Medical Association and Maine Osteopathic Association if you need to get in touch with me for any further questions

---

[2] https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/extreme-risk-protection-orders/.

3



**MCEDV.**

The Maine Coalition
to End Domestic Violence

EXHIBIT 12

101 Western Ave.
P.O. Box 5188
Augusta, ME 04332-5188
207.430.8334

**Testimony of Francine Garland Stark**
**In Support of LD 2238: "An Act to Address Gun Violence in Maine**
**by Requiring a Waiting Period for Certain Firearms Purchases"**
**Before the Joint Standing Committee on Judiciary**
**Thursday, March 7, 2024**

Senator Carney, Representative Moonen, and members of the Joint Standing Committee on Judiciary, I am writing on behalf of the Maine Coalition to End Domestic Violence (MCEDV)[1] in support of LD 2238, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearms Purchases." What MCEDV and our network of services providers would like Maine policymakers to understand on this issue is that **the codification of a waiting period in connection to firearms in Maine will not cause domestic violence victims to be less safe.**

An abusive partner's access to firearms makes it five times more likely that a victim of domestic abuse will be killed.[2] Domestic violence assaults involving a gun are twelve times more likely to result in death than those assaults involving other weapons or bodily force.[3] Abusers who possess guns tend to inflict the most severe abuse on their partner.[4] These things are true without regard to who the actual owner of the firearm is.

In Maine, firearms are the primary method abusers use to kill their current or former intimate partners; accounting for 62% of all of intimate partner violence homicides between 2000 and 2019.[5] In the cases reviewed for its 2020 report, Maine's Domestic Abuse Homicide Review Panel noted that approximately half (5 of 12) of the perpetrators who killed their intimate partner went on to commit suicide.

---

[1] MCEDV serves a membership that includes Maine's eight regional domestic violence resource centers (DVRCs) across the state, as two culturally specific service providers. Last year, these programs together served more than 12,000 Maine survivors of domestic abuse and violence and their children.
[2] JC Campbell, et al., "Risk Factors for Femicide in Abusive Relationships: Results from a Multistate Case Control Study, American Journal of Public Health 93, no. 7 (2003).
[3] Saltzman, L. E., Mercy, J. A., O'Carroll, P. W., Rosenberg, M. L., & Rhodes, P. H. (1992). Weapon involvement and injury outcomes in family and intimate assaults. JAMA, 267(22), 3043-3047.
[4] JC Campbell, et al., "Risk Factors for Femicide in Abusive Relationships: Results from a Multistate Case Control Study, American Journal of Public Health 93, no. 7 (2003).
[5] 2020 Domestic Abuse Homicide Review Panel Report.

---

*Connecting people, creating frameworks for change.*
mcedv.org

Maine's Homicide Review Panel has recommended that bystanders who become aware that victims have acquired firearms understand that the presence of firearms may lead to increased danger for victims and that these bystanders take immediate steps to connect that person with Maine's domestic violence resource centers to explore high risk safety planning. The US Supreme Court has even noted the connection between access to guns and femicide. In US v. Castleman (2014), the Court observed, "This country witnesses more than a million acts of domestic violence, and hundreds of deaths from domestic violence, each year. Domestic violence often escalates in severity over time, and **the presence of a firearm increases the likelihood that it will escalate to homicide**... '[A]ll too often... the only difference between a battered woman and a dead woman is the presence of a gun.'"

Advocates from the domestic violence resource centers in Maine do not advise victims to obtain a firearm as part of their safety plan. This is because, as noted above, statistically, the victim is more likely to have it used against them than to find it helpful in defending themselves from the person abusing them. Of course, if a victim has a firearm or wants to have a firearm as part of their safety plan, our resource centers will support that, including making sure the survivor is aware of the heightened risk that comes with that choice. **A waiting period would not impede efforts of survivors who see acquisition of a firearm as integral to their safety, as there are services in place that can help survivors be safe during that waiting period.** For example, if a victim tells an advocate that they don't feel safe in their house without a firearm, and it turns out that they need to wait 3 days to get that firearm, our centers can either directly shelter, or arrange for temporary lodging in a hotel (in their community or in another community) until that person has what they have determined they need to be safe in their home.

Implementation of a 72-hour waiting period on the purchasing of a firearm would reduce the likelihood of impulsive acts of lethal violence. Domestic violence homicide has devastating impact on surviving family members and on whole communities. MCEDV urges you to take this important step towards decreasing impulsive acts of gun violence by enacting this reasonable waiting period on gun purchase. Thank you for the opportunity to share our knowledge and perspective on this important issue. Please do not hesitate to let me know if we can be of assistance as this conversation continues.

**Contact Information:**
Francine Garland Stark, Executive Director
Maine Coalition to End Domestic Violence (MCEDV)
Email: francine@mcedv.org

EXHIBIT 13

# Maine Association of Psychiatric Physicians

Testimony of David Moltz, MD
To the Joint Standing Committee on Judiciary
129th Maine State Legislature
March 7, 2024

Senator Carney, Representative Mooney, and Distinguished Members of the Judiciary Committee,

My name is David Moltz, MD, and I live in Portland, Maine. I am here today representing the Maine Association of Psychiatric Physicians, in support of LD 2238.

As a psychiatrist I am far too familiar with the problem of preventing suicide. A fact that is frequently overlooked in discussions of gun violence is that 89% of deaths by gun in Maine are suicides.  More than half of suicide deaths in Maine are by gun. And this is because suicide attempts by gun are lethal 85% of the time, compared, for instance, with drug overdose, which is lethal only 3-5% of the time.

Impulsiveness plays a part in many suicide attempts. In one study, 70% of people who survived serious suicide attempts said that the time between when they thought of suicide and when they attempted it was less than one hour, and 24% said it was less than 5 minutes. In that brief time, if a gun is available it will be used, and when you use a gun, there is no chance for second thoughts.

This impulsivity is why it is vital to legislate a waiting period, such as 72 hours, before a gun can be purchased. It allows a cooling-off period, time to have second thoughts and to change your mind before acting. And it doesn't interfere with second amendment rights.  You still get to have your gun; you just have to wait a few days to get it. But those few days may mean the difference between life and death.

On behalf of the Maine Association of Psychiatric Physicians I urge you to save lives by voting "ought to pass" for LD 2238. Thank you.

David Moltz, MD
Chair, Clinical Practice Committee
Maine Association of Psychiatric Physicians
207-650-1017
dmoltz2@gmail.com

EXHIBIT 14



Janet T. Mills
Governor

Jeanne M. Lambrew, Ph.D.
Commissioner

Maine Department of Health and Human Services
Maine Center for Disease Control and Prevention
286 Water Street
Augusta, Maine 04333-0011
Tel; (207) 287-8016; Fax (207) 287-9058
TTY: Dial 711 (Maine Relay)

## REPORT TO THE LEGISLATURE

**TO:**      Joint Standing Committee on Health and Human Services
**FROM:**    Maine Center for Disease Control and Prevention, Maine DHHS
**DATE:**    February 2023
**RE:**      Report pursuant to 22 MRS, Ch. 256-A §1425

## INTRODUCTION AND BACKGROUND

Pursuant to 22 MRS §1425, the Maine Center for Disease Control and Prevention (Maine CDC) at the Maine Department of Health and Human Services (DHHS) submits this second annual report representing the available data for firearm-related deaths and hospitalizations occurring in Maine from January 2021 through December 2021 as provided to Maine CDC by its partners, including Maine Health Data Organization (MHDO), the Office of the Medical Examiner and the Maine Department of Public Safety (DPS). Additional sources of data specific to incidents involving the use of a firearm and information beyond the scope of this legislative report mandate have been identified and these include, but are not limited to: Maine's Violent Death Reporting System, Maine's Domestic Violence and Homicide Review Panel and National Electronic Injury Surveillance System-All Injury Program (NEISS-AIP).

## FIREARM FATALITIES: OVERALL

In Maine in 2021, there were 178 deaths by firearms. Of these deaths, 2 were unintentional, 17 were homicides, 158 were suicides. There was one death where the manner could not be determined.

### Firearm Fatalities 2021



| Firearm Fatalities by Category | | | | |
|---|---|---|---|---|
| | **2020** | | **2021** | |
| Suicide | 132 | 85.7% | 158 | 88.7% |
| Homicide | 19 | 12.3% | 17 | 9.6% |
| Unintentional | 3 | 1.9% | 2 | 1.1% |
| Undetermined | 0 | 0% | 1 | .6% |
| **Total** | **154** | | **178** | |

*Categories are determined by the Office of the Chief Medical Examiner.*

■ Suicide  ■ Homicide
▨ Unintentional  ▪ Undetermined

## UNINTENTIONAL FIREARM FATALITIES

Unintentional firearm fatality is a case of a person's death caused by a firearm discharging unintentionally.

| Unintentional Deaths by Firearm by Age Group | | |
|---|---|---|
| Age Group | 2020 | 2021 |
| <15 | 0 | 2 |
| 15-24 | 1 | 0 |
| 25-34 | 1 | 0 |
| 35-44 | 0 | 0 |
| 45-54 | 0 | 0 |
| 55-64 | 1 | 0 |
| 65+ | 0 | 0 |
| Total | 3 | 2 |

*Source: Maine Center for Disease Control and Prevention,*
*Maine Office of Data, Research and Vital Statistics, Death certificate data*

## HOMICIDE

In 2021, there were 17 firearm-related homicides in Maine. Of these deaths, more than 1 in 3 were domestic violence (DV) homicides. According to Maine's Domestic Violence Homicide Review Panel, about 40% of domestic violence homicide perpetrators use a firearm to kill their victim.

| Homicides by Firearm by Age Group | | | | |
|---|---|---|---|---|
| | 2020 | | 2021 | |
| Age Group | Total | DV (subset) | Total | DV (subset) |
| <15 | 0 | 0 | 0 | 2 |
| 15-24 | 4 | 1 | 1 | 0 |
| 25-34 | 5 | 1 | 7 | 0 |
| 35-44 | 3 | 1 | 2 | 0 |
| 45-54 | 1 | 0 | 6 | 0 |
| 55-64 | 5 | 3 | 1 | 0 |
| 65+ | 1 | 1 | 0 | 0 |
| Total | 19 | 7 | 17 | 6 |

Notes: Firearm homicide data were run from the death records filed and registered with Data, Research, and Vital Statistics, and compared with the Maine State Police Report on homicides, found on their website 2021 Annual Homicides | Maine State Police). The Office of Chief Medical Examiner provided input on records not found on the State Police website.

The following ICD 10 codes were used to identify firearm deaths: W32, W33, W34, X72, X73, X74, X94, X95, Y22, Y23, Y24, Y35, and U014

*Source: Maine Vital Records, Maine CDC, Department of Health and Human Services,*
*Maine State Police, Department of Public Safety, and the Office of Chief Medical Examiner,*
*Maine Attorney General's Office.*

Beginning January 2022, DPS will implement a revised data collection form to require law enforcement agencies to submit additional data elements for firearm-related incidents occurring January 1, 2022 and after.

## SUICIDE

Suicide is the fourth leading cause of death among those ages 15-54 years old in Maine[1]. In 2021, 277 Mainers died by suicide. Of these deaths, 56% (n=158) used a firearm. Men are more likely to die by suicide using a firearm than women. Most suicide deaths that involved a firearm occurred among individuals older than 25 years of age.

| Number of Suicides by Firearm | | |
|---|---|---|
| Age Group | 2020 | 2021 |
| <25 | 13 | 14 |
| 25-44 | 33 | 56 |
| 45-64 | 44 | 52 |
| 65+ | 42 | 36 |
| 2021 Total | 132 | 158 |

Notes: Suicide related deaths are defined as deaths of Maine residents for which the underlying cause of death was coded as ICD-10 U03 X60-X84 or Y87.0.

*Data Source: Maine death certificates, Maine CDC Data, Research and Vital Statistics*

## FIREARM-RELATED HOSPITALIZATIONS

In 2021, there were 54 firearm-related injuries that resulted in hospitalization in Maine, an increase from 39 in 2020. Of these, 48 (89%) were among men; 17 (31%) were among those aged 25-34 years. Most firearm-related injury hospitalizations were due to accidental discharge of a firearm, followed by assault by firearm.

| Non-fatal Firearm-related Hospital Discharges by Firearm-related Cause | | |
|---|---|---|
| Cause of Injury | 2020 | 2021 |
| Accidental discharge or malfunction of firearm | 15 | 24 |
| Intentional self-harm by firearm | 8 | 10 |
| Assault by firearm | 14 | 17 |
| Terrorism involving firearms | 0 | 0 |
| Firearm discharge of undetermined intent | 1 | 0 |
| Legal intervention involving firearm discharge | 1 | 3 |
| Total | 39 | 54 |

Notes: Data include Maine Non-Federal/Non Psychiatric Acute Care Hospital Discharges with Principal Diagnosis of injury and firearm-related secondary diagnosis or injury cause code

*Data Source: Maine Health Data Organization Hospital Inpatient Database 2021*

## RELATED RESOURCES

The U.S. Center for Disease Control and Prevention publishes data on causes of nonfatal injury via Web-based Injury Statistics Query and Reporting System (WISQARS) Nonfatal, providing data from the National Electronic Injury Surveillance System-All Injury Program (NEISS-AIP)[2]. The NEISS-AIP data provides information about types of nonfatal injuries in U.S. hospital emergency departments, how common they are, who they affect, and what causes them.

---

[1] Centers for Disease Control and Prevention, National Centers for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) (2021). Available at: www.cdc.gov/injury/wisqars
[2] https://wisqars.cdc.gov/data/non-fatal/home

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 28th day of April, 2025, I filed the above Appendix electronically via the ECF system. I further certify that on this, 28th day of April, 2025, I served the above Appendix electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

ERIN E. MURPHY
erin.murphy@clementmurphy.com

JOSHUA A. TARDY
 jtardy@rudmanwinchell.com

KEVIN J. WYNOSKY
kevin.wynosky@clementmurphy.com

MATTHEW ROWEN
matthew.rowen@clementmurphy.com

PAUL D. CLEMENT
paul.clement@clementmurphy.com

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
Bar No. 65217
Office of the Maine Attorney General
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800