No. 25-1160

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY COSHOW;
JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE;
TLC GUNSMITHING AND ARMORY; A&G SHOOTING,

*Plaintiffs-Appellees*,

*v.*

AARON M. FREY, in their personal capacity and in their official capacity
as Attorney General of Maine,

*Defendant-Appellant.*

On appeal from the United States District Court
for the District of Maine

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-
## APPELLANT AND REVERSAL

Janet Carter
William J. Taylor, Jr.
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue,
P.O. Box 4184
New York, NY 10163
efredericksen@everytown.org
(646) 324-8198

May 5, 2025

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................... 1

ARGUMENT ......................................................................................... 4

    I.   Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis ................................................ 4

        A.   Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus ... 5

        B.   If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era .......................................... 11

    II.  *Rahimi* Clarifies That Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases .............................................................................................. 20

    III.  This Court Should Consider Historical Context in Conducting a "More Nuanced" Analysis ............................................................ 25

CONCLUSION ..................................................................................... 32

# TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024), *cert. denied,* --- S. Ct. ----, 2025 WL
    1020368 ...................................................................................... *passim*

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub*
    *nom. Snope v. Brown,* No. 24-203 (U.S. Aug. 23, 2024) ........... 7, 27, 30

*Capen v. Campbell,*
    --- F.4th ----, 2025 WL 1135269 (1st Cir. Apr. 17, 2025) ............. *passim*

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... 5, 8, 11

*Duncan v. Bonta,*
    133 F.4th 852 (9th Cir. 2025) (en banc) ........................................ 30, 31

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ................................................................ 13

*Gould v. Morgan,*
    907 F.3d 659 (1st Cir. 2018) ................................................................ 12

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ............................................................. 8

*Kipke v. Moore,*
    No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024), *appeal*
    *docketed,* No. 24-1799 (4th Cir. Aug. 22, 2024) ................................. 19

*LaFave v. County of Fairfax,*
    No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024), *appeal*
    *docketed,* No. 24-1886 (4th Cir. Sept. 16, 2024) ........................... 13, 31

*Lara v. Commissioner Pennsylvania State Police,*
    125 F.4th 428 (3d Cir. 2025) .......................................................... 18, 19

*Mahanoy Area Sch. Dist. v. B. L.*,
594 U.S. 180 (2021) ............................................................... 16

*McCullen v. Coakley*,
573 U.S. 464 (2014) ............................................................... 30

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ............................................................... 12

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ............................................................... 16

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) .......................................................... 14

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) (en banc) ............................ 14, 15, 23

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) ............................................ 14, 15

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ............................................................... 10

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ....................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024), *petition for cert. filed*, No. 24-131 (U.S. Aug. 2, 2024) ............................................................. *passim*

*Pinales v. Lopez*,
--- F. Supp. 3d ----, 2025 WL 653980 (D. Haw. Feb. 7, 2025) .............. 19

*Pitsilides v. Barr*,
128 F.4th 203 (3d Cir. 2025) ................................................. 23

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
127 F.4th 583 (5th Cir. 2025) ........................................... 18, 19

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ............................................................ 10

*Rocky Mountain Gun Owners v. Polis*,
    701 F. Supp. 3d 1121 (D. Colo. 2023), *appeal dismissed*, No. 23-1380,
    2024 WL 5010820 (10th Cir. Aug. 23, 2024) ................................ 26, 27

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583
    (9th Cir. Apr. 24, 2024) ................................................... 14, 20

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ................................................ 8

*United States v. Diaz*,
    116 F.4th 458 (5th Cir. 2024), *petition for cert. filed*, No. 24-6625 (U.S.
    Feb. 18, 2025) ............................................................. 23

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ................................................ 13

*United States v. Langston*,
    110 F.4th 408 (1st Cir. 2024) ............................................. 21, 22

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ............................................... 24

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................... *passim*

*United States v. Rowson*,
    652 F. Supp. 3d 436 (S.D.N.Y. 2023) ........................................ 31

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
    741 F. Supp. 3d 172 (D. Vt. 2024) .......................................... 27

*We the Patriots, Inc. v. Lujan Grisham*,
    697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*, 119 F.4th
    1253 (10th Cir. 2024) ...................................................... 14

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024), *petition for cert. filed*, No. 24-1046 (U.S. Apr. 3, 2025) ........................................................................... 8

*Worth v. Jacobson,*
108 F.4th 677 (8th Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL 1151242 (U.S. Apr. 21, 2025) ....................................................... 18

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .................................................................................................... 17

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen* (No. 20-843) (July 20, 2021) ........................... 6

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ......................................................... 6

Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. 3121 (2024) ............. 28, 29

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ..................................................................................... 15

Kurt L. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439) ............................................................. 17

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ... 15

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ........................... 16

*Suicide Data and Statistics, Data Table: Suicide Methods*, Centers for Disease Control and Prevention (2025), https://perma.cc/WEA9-WT3M ................................................................................................. 28

Transcript of Oral Argument, *New York State Pistol & Rifle Ass'n v. Bruen* (No. 20-843) ............................................................................ 15

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Maine's law establishing a 72-hour waiting period for certain commercial firearm sales is constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v.*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

*Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons set out in the State's brief, Dkt. 00118278112 ("State Br."). As Maine has explained, this Court should uphold the law at the initial, textual step of the *Bruen-Rahimi* test. *See* State Br. 14-23. If, however, the Court proceeds to the second, historical step of that test, Everytown submits this amicus brief to expand on three methodological points relevant to that inquiry.[2]

 *First*, *Bruen*, *Rahimi*, and the recent decisions in *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024), *petition for cert. filed*, No. 24-131 (U.S. Aug. 2, 2024), and *Capen v. Campbell*, --- F.4th ----, 2025 WL 1135269 (1st Cir. Apr. 17, 2025), make clear that this Court should give significant weight to Reconstruction-era and later evidence. This is so regardless of which time period is the central focus of the historical inquiry—the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the states through the Fourteenth Amendment. Thus, as in *Ocean State Tactical* and *Capen*, the Court need not resolve the

---

 [2] This brief addresses only Plaintiffs' likelihood of success on the merits. Everytown agrees with Maine that the other preliminary injunction factors also favor the State. *See* State Br. 35-40.

question of which of those periods is the central focus of the Second Amendment historical analysis to decide this appeal and uphold Maine's law. If, however, it chooses to do so, originalist principles establish that the historical analysis properly centers on the Reconstruction era and 1868.

*Second, Rahimi* clarifies that the Second Amendment analysis requires a flexible, principles-based approach to history. Rather than picking apart Maine's historical evidence analogue by analogue, as the district court did, this Court should consider the historical evidence "[t]aken together," *Rahimi*, 602 U.S. at 698, and then derive principles from that historical tradition viewed as a whole.

*Third*, in analogizing Maine's law to historical tradition, this Court's analysis should be even more flexible because Maine's law "implicat[es] unprecedented societal concerns [and] dramatic technological changes," thus requiring "a more nuanced approach" to history. *Bruen*, 597 U.S. at 27. Until recently, guns were simply not available for widespread, immediate purchase, and they were not historically suitable for or prevalently used in impulsive homicides and suicides. Moreover, earlier generations' flawed understandings of

suicide meant that they did not comprehend it as susceptible to a regulatory solution like Maine's law. These circumstances easily explain why waiting-period laws like Maine's did not arise until recently and support the conclusion that Maine's law is a constitutional response to novel concerns.

## ARGUMENT

## I. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

If the Court proceeds to the second step of the *Bruen-Rahimi* framework, it may confront the question of whether the most relevant time period for its historical inquiry is the founding era, when the Second Amendment was ratified, or the Reconstruction era, when the Fourteenth Amendment made it applicable to the states. To be clear, this Court need not resolve that question to uphold Maine's law. Even though the Supreme Court and this Court have not yet resolved that question, both have made clear that evidence from Reconstruction and beyond is an important part of the analysis. Just as this Court did in *Ocean State Tactical* and *Capen*, it should consider the consistent arc of regulatory tradition that Maine has identified stretching from the founding through Reconstruction and into the 20th century. If, however,

the Court wishes to answer the question of which time period is the central focus, the correct originalist answer is to focus on the Reconstruction era and 1868.

### A. Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus

*Heller*, *Bruen*, and *Rahimi* all make clear that Reconstruction-era and later history is crucial to the Second Amendment analysis. *Heller* announced that post-ratification history "is a critical tool of constitutional interpretation" and examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008). In doing so, it relied on "19th-century cases that interpreted the Second Amendment," "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "how post-Civil War commentators understood the right." *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen*, similarly, relied on mid-19th-century cases and statutes, *see id.* at 51-57, and surveyed "public discourse surrounding

Reconstruction," *id.* at 60. And in discussing sensitive places, *Bruen* indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added). In fact, *Bruen* cited to sources in which all the 19th-century laws restricting guns in those locations were from the *late* 19th century.[3]

*Rahimi* then put the relevance of 19th-century evidence even further beyond doubt. It rested its decision *upholding* a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 696 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23, citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

---

[3] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

This Court and other circuits have likewise recognized that 19th-century and later evidence is critical to the historical inquiry. In *Ocean State Tactical*, this Court relied on historical laws restricting sawed-off shotguns and machine guns that first appeared in the twentieth century as well as restrictions on Bowie knives "[f]rom the beginning of the 1830s through the early twentieth century." 95 F.4th at 46-48. In so doing, it expressly rejected the argument that these laws were too late to inform the historical analysis, noting that *Heller* and *Bruen* also acknowledged the value of post-ratification evidence. *Id.* at 51-52. And just weeks ago, in *Capen*, this Court relied again on these same 19th- and 20th-century laws in rejecting challenges to Massachusetts's assault-weapon and large-capacity-magazine restrictions. *See Capen*, 2025 WL 1135269, at *8-9, 13.

Other courts, including the Fourth, Ninth, and D.C. Circuits, have also adopted this "long view ... of history," considering historical sources from the 19th and 20th centuries. *Bianchi v. Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 23, 2024); *see id.* at 465-71 (considering 19th- and 20th-century evidence in rejecting Second Amendment

challenge); *Hanson v. District of Columbia*, 120 F.4th 223, 237-40, 238 n.7 (D.C. Cir. 2024) (same), *petition for cert. filed*, No. 24-936 (U.S. Feb. 26, 2025); *United States v. Alaniz*, 69 F.4th 1124, 1129 & n.2 (9th Cir. 2023) (relying on tradition persisting through Reconstruction to reject Second Amendment challenge). And the Second Circuit has similarly explained that "evidence from the Reconstruction Era regarding the scope of the right to bear arms ... is at least as relevant as evidence from the Founding Era." *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL 1020368 (U.S. Apr. 7, 2025); *see also Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) (agreeing with earlier opinion in *Antonyuk* and looking to both 1791 and 1868 in sensitive-places context), *petition for cert. filed*, No. 24-1046 (U.S. Apr. 3, 2025).

This focus on Reconstruction-era and later evidence follows the Supreme Court's instruction, noted above, that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As Justice

Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. 602 U.S. at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Appreciating the relevance of postenactment history accords not only with Supreme Court caselaw, but also with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public

understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era tradition also reflects the founding-era understanding. Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 37.

Moreover, 1868 is not a cutoff. As in *Ocean State Tactical* and *Capen*, history postdating the Fourteenth Amendment's ratification is also an important part of the analysis. Indeed, it is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another." *Antonyuk*, 120 F.4th at 973. After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)). Moreover, considering later history is particularly warranted where, as here, the challenged law addresses "unprecedented societal concerns." *Bruen*, 597 U.S. at 27; *see infra* pp. 25-32.

In sum, under the precedents of the Supreme Court and this Court, Reconstruction-era and later history plays a crucial role in the *Bruen-Rahimi* historical analysis.

## B.   If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era

The Supreme Court has expressly left open which time period to privilege in the Second Amendment analysis, because in both *Bruen* and *Rahimi* it found the public understanding of the right to have remained consistent throughout our nation's history. *See Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 37-38. The same is true here and so this Court, too, does not need to resolve this question. *See* State Br. 27-28. But if the Court chooses to address the issue, it should conclude that the proper focus of the inquiry is on the Reconstruction era and 1868, when the Fourteenth Amendment was ratified.

In a case involving a state law, that conclusion follows directly from the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to

keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 37. Accordingly, focusing on 1868 in a case challenging a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption?

The Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reinforces this conclusion. *McDonald* analyzed at length the public understanding around 1868 before holding that the Second Amendment constrains the states. *See id.* at 770-78. That approach is hard to square with a belief that only the 1791 understanding informs the content of the right: "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

Courts—including this one—recognized even before *Bruen* that the Reconstruction era should be the primary focus for evaluating state and local gun laws. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *see also United States v. Greeno*, 679 F.3d

510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).[4]

After *Bruen*, this Court has not yet revisited *Gould*'s focus on 1868.[5] However, several well-reasoned, persuasive decisions from other courts have continued to "recogniz[e] the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024); *see Nat'l Rifle Ass'n v.*

---

[4] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

[5] In *Ocean State Tactical*, this Court noted that *Bruen* "indicated" that founding-era evidence was "of primary importance." 95 F.4th at 51. But this remark certainly did not purport to settle the question that *Bruen* and *Rahimi* emphasize as unresolved—much less to repudiate the Court's earlier reasoning in *Gould*.  Indeed, this Court further noted that the Supreme Court "has also relied upon" later 19th-century evidence, and "left open" reliance on consistent evidence into the 20th century. *Id*. And, as discussed, in both *Ocean State Tactical* and *Capen*, this Court relied heavily on historical laws from the 19th and 20th centuries. In any case, because this Court need not resolve the time-period question in this case, it also need not decide whether *Gould*'s focus on 1868 remains binding law of the circuit.

*Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("*Bondi I*") ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[6] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi I*), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi I* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). And, as noted, still more courts have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See supra* p.

---

[6] Despite being vacated for rehearing en banc, *Bondi I*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (finding *Bondi I* persuasive on this point after vacatur). The en banc Eleventh Circuit subsequently reached the same decision as the panel in *Bondi I*, but declined to resolve this time-period question. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1116-17 (11th Cir. 2025) (en banc) ("*Bondi II*") ("[W]e need not and do not decide in this appeal how to address a conflict between the Founding-era and Reconstruction-era understandings of the right because the law of both eras restricted the purchase of firearms by minors.").

8; *see also Capen*, 2025 WL 1135269, at \*7-9 (considering evidence from both eras, as well as later evidence); *Ocean State Tactical*, 95 F.4th at 46-49 (same).

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[7] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi I*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see Bondi II*, 133 F.4th at 1154 (same) (Rosenbaum, J., concurring).[8] Both Justice

---

[7] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding."). Mr. Clement and his firm, Clement & Murphy, represent Plaintiffs in this case.

[8] *See also, e.g.*, Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist

Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

This conclusion raises the additional question, not directly presented in this case, as to the correct temporal focus in challenges to *federal* laws. The originalist answer to that question is more complex, because the Second Amendment has bound the federal government

---

argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

since 1791, and yet *Bruen* stated that individual rights applicable against the states and against the federal government "have the same scope." 597 U.S. at 37.

But *Bruen* itself charted the path through this complexity. After identifying the issue, it cited scholars Akhil Amar and Kurt Lash, who have explained that the 1868 understanding should apply to both levels of government. *See id.* at 37-38 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)). As Professor Lash wrote (and as quoted in *Bruen*), adoption of the Fourteenth Amendment "'invested those original 1791 texts [of the Bill of Rights] with new 1868 meanings.'" *Id.* at 38 (citation omitted). The Court's choice to highlight only these two scholars is compelling evidence that it considered them to be correct,

and thus that Reconstruction should be the central focus of the historical inquiry in challenges to both state and federal laws.[9]

This Court should follow the path *Bruen* marked in citing Professors Amar and Lash, and not the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428, 438-41 (3d Cir. 2025), or the Eighth Circuit's and Fifth Circuit's similar approaches in *Worth v. Jacobson*, 108 F.4th 677, 692-93 (8th Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL 1151242 (U.S. Apr. 21, 2025), and *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 599-600 (5th Cir. 2025). Instead of engaging with originalist principles, *Lara* based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. *Lara*, 125 F.4th at 440 (citing *Bruen*, 597 U.S. at 37). *Worth* pointed to this same assumption to conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." 108 F.4th at 692-93, 697. And *Reese* also relied on this assumption to discount Reconstruction-era laws, without even

_____

[9] *Bruen* identified no scholarship or other authority explaining how an originalist could accept the contrary position—inflicting upon the states an understanding of the Second Amendment different from the one the Reconstruction generation believed it was extending to them.

acknowledging it was only an assumption. *See* 127 F.4th at 600. But the

Supreme Court has made clear that this general assumption did not

resolve the time-period issue—otherwise, it would have simply said so

in *Bruen* and *Rahimi*.

Moreover, the cases *Bruen* cited in describing that assumption did

not address the significance of the Fourteenth Amendment's ratification

for this issue. They cannot have resolved the question that *Bruen* and

*Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602

U.S. at 692 n.1. Thus, *Lara*, *Worth*, and *Reese* are not persuasive.[10] *See,*

*e.g.*, *Antonyuk*, 120 F.4th at 974 (rejecting similar reasoning in earlier

opinion in *Lara*); *Pinales v. Lopez*, --- F. Supp. 3d ----, 2025 WL 653980,

at *11-13 (D. Haw. Feb. 7, 2025) (disagreeing with *Lara*, *Worth*, and

*Reese*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at *5 (D.

Md. Aug. 2, 2024) (finding earlier opinion in *Lara* "unconvinc[ing]"),

*appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *Rupp*, 723 F.

---

[10] Regardless, even *Lara* acknowledged that "laws 'through the end of the nineteenth century' … can be 'a "critical tool of constitutional interpretation"' because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood," *Lara*, 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 35)—so long as those laws do not "contradict[] earlier evidence," *id.* (quoting *Bruen*, 597 U.S. at 66).

Supp. 3d at 877-78 (declining to follow earlier opinion in *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles").

*     *     *

In sum, this Court should follow Supreme Court caselaw and its own methodology in *Ocean State Tactical* and *Capen* in considering evidence from the Reconstruction era and beyond as part of this nation's historical tradition of firearm regulation—regardless of which time period is central to the Second Amendment inquiry. But if it chooses to settle the time-period issue, it should hold that 1868 is the focus.

## II. *Rahimi* Clarifies That Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases

*Rahimi* involved a Second Amendment challenge to the federal law that prohibits individuals subject to certain domestic violence restraining orders from possessing firearms. *See* 602 U.S. at 688. The Supreme Court upheld the law, relying on two regulatory traditions from the 18th and 19th centuries that "specifically addressed firearms violence," *id.* at 695: affray laws (which prohibited "arming oneself to the Terror of the People," *id.* at 697-98 (cleaned up)), and surety laws

(which "targeted the misuse of firearms" by requiring "individuals suspected of future misbehavior" to post a bond or else be incarcerated, *id.* at 695-97). Although neither of those traditions closely mirrored the modern domestic violence prohibitor, together they established a principle of disarming "individual[s] [who] pose[] a clear threat of physical violence to another," a principle also reflected in the modern law. *Id.* at 698-99.

*Rahimi* "clarified the scope of the history and tradition test under the Second Amendment." *United States v. Langston*, 110 F.4th 408, 418 (1st Cir. 2024). The Supreme Court emphasized that "some courts have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a challenged statute. *Rahimi*, 602 U.S. at 691. The Court stressed that the Second Amendment "was never thought to sweep indiscriminately," and that its precedents "were not meant to suggest a law trapped in amber." *Id.* To the contrary, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. "Holding otherwise," the Court explained, "would be as mistaken as

applying the protections of the right only to muskets and sabers." *Id.* at 692.

Against that backdrop, the Supreme Court clarified in *Rahimi* that "the appropriate analysis" in Second Amendment cases is not to look for a "dead ringer" or "historical twin," *id.*, as the Fifth Circuit had erroneously done in finding the challenged law unconstitutional, *see id.* at 701. Rather, courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added); *see also id.* at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." (citing *Bruen*, 597 U.S. at 28-31)); *Langston*, 110 F.4th at 418 (emphasizing *Rahimi*'s focus on general principles).

Moreover, *Rahimi* confirms that different strands of historical laws may be "[t]aken together" to identify the principles against which modern laws should be judged. *See* 602 U.S. at 698 (majority opinion). The majority did not discount surety laws for differing from the challenged modern law in some ways, and then discount affray laws for differing in other ways. Rather, the majority evaluated the modern law

against "the tradition the surety and going armed laws represent." *Id.*[11]
And that is how this Court has correctly applied the *Bruen-Rahimi*
historical test in *Ocean State Tactical* and *Capen*, relying on a "broader
analogy" to historical tradition based on several strands of historical
laws considered together. *See Capen*, 2025 WL 1135269, at *10 & n.7;
*Ocean State Tactical*, 95 F.4th at 49.

The district court erred by picking apart Maine's historical
analogues individually, rather than extrapolating principles from the
historical evidence taken together, as *Rahimi* instructs. The district

---

[11] In other words, *Rahimi*'s principles-based approach means that
the "how" and the "why" of a modern law may each separately find
support in history. *See United States v. Diaz*, 116 F.4th 458, 471 n.5
(5th Cir. 2024) ("We focus on these [going armed] laws to address the
'how' of colonial-era firearm regulation, rather than the 'why,' which is
supported by other evidence."), *petition for cert. filed*, No. 24-6625 (U.S.
Feb. 18, 2025); *Bondi II*, 133 F.4th at 1133 (Rosenbaum, J., concurring)
(emphasizing this aspect of the analysis in *Diaz*); *see also Capen*, 2025
WL 1135269, at *7-11 (first comparing modern regulation's burden to
historical tradition, then separately comparing its justification); *Ocean
State Tactical*, 95 F.4th at 45-50 (same); *Pitsilides v. Barr*, 128 F.4th
203, 210 (3d Cir. 2025) ("We must consider … principles embodied in
different strands of historical firearm regulations, 'taken together,'"
rather than "reduce historical analogizing to an exercise in matching
elements of modern laws to those of their historical predecessors."
(citation omitted)). Notably, only Justice Thomas, the sole dissenter in
*Rahimi,* rejected the majority's "piecemeal approach" in "combining
aspects of surety and affray laws" to support the modern law. *Rahimi*,
602 U.S. at 767 (Thomas, J., dissenting).

court first analyzed licensing laws, concluding that they did not match Maine's law because they were designed to evaluate whether individuals met certain criteria. Addendum to State Br. ("State Add.") 14. It then analyzed intoxication laws, concluding that they did not match Maine's law because they imposed individualized restrictions rather than delaying firearms access for all. *Id.* The court failed to apply the "wider lens" that *Rahimi* requires, evaluating Maine's law against the tradition of which intoxication and licensing laws each form a part. The district court's "divide-and-conquer approach to the historical evidence" misapplies *Bruen* and *Rahimi* and "misses the forest for the trees." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). It makes the very mistake for which the Supreme Court corrected the Fifth Circuit in *Rahimi*. And it is contrary to how this Court has correctly applied the *Bruen-Rahimi* historical inquiry. *See supra* p. 23.

Properly applying *Rahimi*'s flexible, principles-based approach to history, Maine's law is constitutional. Taken together, historical intoxication laws and historical licensing regimes demonstrate that the government may temporarily delay access to new firearms in order to

prevent their impulsive misuse. *See* State Br. 28-35. The law is

therefore "consistent with the principles that underpin our regulatory

tradition." *Rahimi*, 602 U.S. at 692.

## III. This Court Should Consider Historical Context in Conducting a "More Nuanced" Analysis

In conducting its historical analysis, this Court should recognize

the importance of historical context. "The regulatory challenges posed

by firearms today are not always the same as those that preoccupied

the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*,

597 U.S. at 27. And yet, "the Constitution can, and must, apply to

circumstances beyond those the Founders specifically anticipated." *Id.*

at 28. To that end, *Bruen* counsels that "cases implicating

unprecedented societal concerns or dramatic technological changes may

require a more nuanced approach" to history. *Id.* at 27; *see Ocean State

Tactical*, 95 F.4th at 44 (applying "more nuanced" approach); *Capen*,

2025 WL 1135269, at *6 (same). That approach is required in this case

and reinforces the conclusion that Maine's law is constitutional.

Specifically, historical context supplies several reasons why waiting-

period laws like Maine's arose only recently, in order to address novel needs and concerns.

*First*, as Maine's historical experts have explained, waiting periods already existed in practice in early America because firearms were not readily available for immediate purchase in the 17th, 18th, or most of the 19th century. *See* State Br. 26-27; A75 ¶¶ 9-10 (Spitzer Decl.). Even as firearms purchasing became easier, when "ordering firearms via postal mail became possible in the 1870s and 1880s, purchasers still had to wait several days before receiving them." *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1139 (D. Colo. 2023), *appeal dismissed*, No. 23-1380, 2024 WL 5010820 (10th Cir. Aug. 23, 2024). And in more recent years, as the district court itself noted, background checks were time-consuming processes that necessarily delayed acquisition "for comparable lengths of time, or longer" than Maine's waiting period. State Add. 10 n.7. It can easily be inferred that earlier legislatures did not impose waiting periods not because anyone thought they lacked the authority to do so, but simply because there

was no need. Until very recently, waiting periods were already an inherent part of purchasing firearms.

*Second*, 18th- and 19th-century legislatures had much less reason to regulate for the impulsive, heat-of-the-moment firearm homicides and suicides that waiting periods address. *See* State Br. 24-26. As Professor Roth has explained, technical limitations made early firearms impractical for those uses. *See* A142-44 ¶¶ 16-18 (Roth Decl.); *see also Bianchi*, 111 F.4th at 464 (relying on book chapter from Professor Roth for this point); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 213 (D. Vt. 2024) (relying on expert report from Professor Roth for this point), *appeal docketed*, No. 24-2026 (2d Cir. July 31, 2024); *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1139 (same). Thus, unlike today, firearms were neither "the weapons of choice in homicides that grew out of the tensions of daily life," A144 ¶ 18 (Roth

Decl.), nor "the preferred means" for suicide, *id.* at 164 ¶ 43 (Roth Decl.).[12]

*Third*, understandings of suicide and the possible means of suicide prevention have evolved dramatically. Early Americans did not conceive of suicide as resulting from psychological conditions that could be addressed by delaying access to lethal means. Instead, they often attributed suicide to the devil, and responded to it with religious rituals—such as driving stakes through the hearts of those who died by suicide, to prevent the escape of evil spirits. *See* Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. 3121, 3130, 3160-61 (2024). Alongside these practices, American law responded to suicide with criminalization and incarceration, imprisoning individuals in jails or asylums. *Id.* at 3130, 3161-63.

---

[12] Today, guns are the most common means of suicide in the United States, accounting for just over 55 percent of suicides. *Suicide Data and Statistics, Data Table: Suicide Methods*, Centers for Disease Control and Prevention (2025), https://perma.cc/WEA9-WT3M; *see* A121 ¶ 36 (Donohue Decl.). Professor Roth has estimated that firearms were used in only 6 percent of suicides in Vermont and New Hampshire from 1783 to 1824. A163-64 ¶ 43 (Roth Decl.).

Even when suicide was approached through a medical frame, doctors treated it as a blood-related disorder that could be addressed through bloodletting, "purges" (induced diarrhea or vomiting), and the ingestion of toxic substances including mercury. *See id.* at 3130, 3168-72. It was not until the late 1800s and early 1900s that researchers like Sigmund Freud "beg[a]n to acknowledge the *psychological* determinants of suicidal behavior." *Id.* at 3173 (emphasis added). And it was not until the mid- to late-20th century that researchers arrived at the modern understanding of means restriction—the idea that restricting the immediate availability of highly lethal means can effectively prevent, not merely delay, suicide. *See id.* at 3139-44.

We now know that "[s]uicide attempts are often impulsive acts, driven by transient life crises," and that limiting access to lethal arms during such crises reduces deaths by suicide. A123-24 ¶¶ 38-41 (Donohue Decl.); *see also* Ruben, *supra* at 3142-44 (cataloguing empirical studies and emphasizing that "the risk of suicide is more than four times greater for those living in homes with guns"). Without the benefit of these scientific advances, the founding and Reconstruction

generations had no reason to think that a waiting period would be effective at preventing suicide.

In short, it makes no sense to expect a society that attributed suicide to demonic influence or responded to it with bloodletting, at a time when firearms were not a prevalent means of suicide, to have addressed suicide through a firearms waiting-period law. "States adopt laws to address the problems that confront them." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992)). Earlier generations did not confront today's problems of impulsive gun homicides and suicides. And even if they did, they would not have understood suicide as a problem that could be addressed through a solution as simple and minimally burdensome as a short waiting period on firearms purchases.

Under these circumstances, a "more nuanced approach" to history is fully warranted. *Bruen*, 597 U.S. at 27; *see Bianchi*, 111 F.4th at 463 (applying more nuanced approach to public safety crisis unknown at the founding).[13] That is "an even more flexible approach than the Court

_____

[13] The district court nominally accepted that this case calls for the more nuanced approach but failed to apply it in practice. It strangely stated that Maine "concede[d]" that the more nuanced approach should

applied in *Rahimi*." *Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025) (en banc). And under it, the "lack of directly on-point tradition does not end [the] historical inquiry." *Ocean State Tactical*, 95 F.4th at 44. As courts have explained, this "more nuanced" approach allows for "a broader search for historical analogies," *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023), and perhaps "more recent analogies," *Duncan*, 133 F.4th at 874; *see also, e.g., LaFave*, 2024 WL 3928883, at *7 (noting that "firearms prohibitions about societal conditions that did not exist at the founding … demand a more expansive approach to historical analogy").

To be clear, Maine's law is consistent with the principles underpinning our tradition of firearms regulation even without applying the more nuanced approach. *See supra* pp. 20-25. But that conclusion is further "buttressed by the Supreme Court's reservation of a more flexible analogical approach for 'unprecedented societal concerns or dramatic technological changes.'" *Duncan*, 133 F.4th at 874 (quoting

---

apply, and seemed to believe that this meant only that the court should analogize to historical principles rather than seek a historical twin— which *Rahimi* makes clear is true of any Second Amendment historical analysis. *See* State Add. 12-13.

*Bruen*, 597 U.S. at 27). Historical context—regarding the changing availability of firearms, the dramatically increased prevalence of firearms in impulsive homicides and suicides, and evolving understandings of suicide and suicide prevention—explains why that approach applies here. The more nuanced approach only strengthens the conclusion that Maine's law is constitutional.

## CONCLUSION

The Court should reverse the district court's order granting a preliminary injunction.

Dated: May 5, 2025

Respectfully submitted,

/s/ Erik P. Fredericksen
Janet Carter
William J. Taylor, Jr.
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8198
efredericksen@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6383 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Erik P. Fredericksen
Erik P. Fredericksen
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2025, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Erik P. Fredericksen
Erik P. Fredericksen
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*