No. 25-1160

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY; NANCY COSHOW;
JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE;
TLC GUNSMITHING AND ARMORY; A&G SHOOTING,
PLAINTIFFS-APPELLEES,

V.

AARON M. FREY, in his personal capacity and in
his official capacity as Attorney General of Maine,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
No. 1:24-CV-00384-LEW

**BRIEF FOR THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY,
NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND
WASHINGTON AS AMICI CURIAE IN SUPPORT OF
DEFENDANT-APPELLANT AND REVERSAL**

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

**TABLE OF CONTENTS**

INTRODUCTION AND INTEREST OF AMICI CURIAE ..................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ........................................................................................................ 4

I.     States May Implement Reasonable Firearm Regulations To Protect The Health And Safety Of Their Residents ............................................................. 4

II.    Waiting Periods Are Commonly Used Firearm Regulations That Save Lives ..................................................................................................................... 8

       A.     Waiting periods ensure only that law-abiding, responsible individuals keep or bear arms and do not infringe any Second Amendment right ................................................................................. 8

       B.     At least 13 other jurisdictions enforce explicit waiting periods, and even more require prospective gun buyers to wait to pass a background check or acquire a purchase permit ................................. 12

       C.     Waiting periods reduce gun deaths ..................................................... 15

CONCLUSION .................................................................................................... 18

## TABLE OF AUTHORITIES

### *Cases*

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ..................................................... 6

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................... 1, 2, 5, 6, 7, 9, 11

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................... 5, 6

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) ............................................... 11

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ......................................................... 4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ............................................................... 1, 5, 6, 7, 9, 10, 11, 12

*New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310 (S.D.N.Y. 2024) .................. 10

*United States v. Morrison*, 529 U.S. 598 (2000) ..................................................... 4

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................................................ 5

### *Constitutions and Statutes*

U.S. Const. amend. II ............................................................................................. 10

18 Pa. Cons. Stat. Ann. § 6111 ............................................................................... 15

18 U.S.C. § 922 ...................................................................................................... 14

25 M.R.S. § 2016 ..................................................................................................... 2

720 Ill. Comp. Stat. 5/24-3 .................................................................................... 13

Cal. Penal Code § 26815 ........................................................................................ 13

Colo. Rev. Stat. § 18-12-115 ................................................................................. 13

Conn. Gen. Stat. § 29-33 .................................................................................. 15, 17

D.C. Code § 22-4508 ............................................................................................. 13

Del. Code tit. 11, § 1448A ................................................................. 15

Fla. Const. art. I, § 8 ......................................................................... 14

Haw. Rev. Stat. § 134-2 .................................................................... 14

Md. Code Ann., Pub. Safety § 5-123 ................................................ 14

Mich. Comp. Laws § 28.422 ............................................................. 15

Minn. Stat. § 624.7132 ...................................................................... 14

N.J. Rev. Stat. § 2C:58-2 .................................................................. 14

N.M. Stat. Ann. § 30-7-7.3 ............................................................... 13

Neb. Rev. Stat. § 69-2403 ................................................................. 15

Neb. Rev. Stat. § 69-2407 ................................................................. 15

Nev. Rev. Stat. § 202.2547 ............................................................... 15

Ore. Rev. Stat. § 166.505 .................................................................. 15

R.I. Gen. Laws § 11-47-35 ............................................................... 14

Vt. Stat. Ann. tit. 13, § 4019a .......................................................... 13

Wash. Rev. Code § 9.41.092 ............................................................. 14

## Other

Michael Luca et al., Handgun Waiting Periods Reduce Gun Deaths, 114 Proc. of the Nat'l Acad. Scis. of the U.S. 12162 (2017) ............................ 13

Crim. Just. Info. Servs. Div., FBI, 2022 NICS Operations Report 14 (2023) ......... 14

Lindsay Whitehurst, 8 Dead in Atlanta Spa Shootings, With Fears of Anti-Asian Bias, N.Y. Times (Mar. 26, 2021) .................................. 16

Edward Helmore, Walmart Shooter Purchased Handgun Legally the Same Day, Authorities Say, Guardian (Nov. 25, 2022) ............................... 16

Gene Johnson, *Tulsa Shooting Renews Debate on Waiting Periods for Gun Buyers*, PBS (Jun. 4, 2022)................................................................16

Catherine W. Barber & Matthew J. Miller, *Reducing A Suicidal Person's Access to Lethal Means of Suicide: A Research Agenda*, 47 Am. J. Prev. Med. S264 (2014) ..............................................................17

Michael D. Anestis et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, 107 Am. J. Pub. Health 579 (2017) ...............................17

Stephen D. Oliphant, *Effects of Wisconsin's Handgun Waiting Period Repeal on Suicide Rates*, 28 Inj. Prevention 580 (2022)................................................18

iv

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici the District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington (collectively, "Amici States") submit this brief in support of defendant-appellant Aaron M. Frey pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, like waiting periods and background checks that ensure guns are used in a "law-abiding, responsible" manner. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 39 n.9 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," leaving states with the flexibility they need to protect their communities. *Id.* at 21 (quoting *Heller*, 554 U.S. at 626-27).

1

Indeed, the Second Amendment "leaves [jurisdictions with] a variety of tools for combating [the] problem" of gun violence. *Heller*, 554 U.S. at 636. This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In April 2024, Maine enacted a law imposing a 72-hour waiting period for all commercial firearm sales for which a background check is required, which became effective on August 9, 2024 (the "Waiting-Period Act" or "the Act"). Maine Bill LD 2238 (SP 958); Add. 2. Specifically, the Act makes it illegal for any firearm dealer to "knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement," 25 M.R.S. § 2016(2), if that sale required a background check under federal or state law, *id.* § 2016(4)(C)(3). Plaintiffs challenged the law under the Second Amendment and requested a preliminary injunction against its enforcement. The district court granted it. Add. 2.

Amici States agree with Maine that the Second Amendment's plain text does not cover the purchase and immediate acquisition of firearms, and that the Waiting-Period Act is a presumptively valid regulation of the commercial sale of firearms. *See* Appellant Br. 14-23. This brief, however, focuses on one of Maine's alternative arguments for reversing the district court's grant of preliminary injunction—states' historical and present practice of ensuring that only law-abiding, responsible individuals possess firearms to prevent impulsive and criminal gun violence.

The Supreme Court's Second Amendment precedents leave ample room for states to implement measures that restrict arms-bearing to law-abiding, responsible adults. Reasonable waiting periods fall squarely in this category. In addition to allowing states to conduct adequate background checks, they impose a prophylactic "cooling off" period between firearm purchase and acquisition that can—like background checks—help to ensure that guns will not be used for unlawful or irresponsible purposes. For that reason, at least 13 other jurisdictions impose explicit waiting periods for firearm acquisition, and even more jurisdictions impose implicit waiting periods by requiring prospective gun buyers to wait to pass a background check or acquire a purchase permit. And the available evidence shows that such delays can save lives. Because waiting periods sit well within the boundaries of constitutional firearm regulation, and because saving lives advances the public

interest, this Court should reverse the district court's grant of the preliminary injunction.

## ARGUMENT

## I.    States May Implement Reasonable Firearm Regulations To Protect The Health And Safety Of Their Residents.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety that are tailored to local circumstances falls squarely within the reasonable exercise of states' police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed the states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, *McDonald*, *Bruen*, and *Rahimi*—the Court expressly acknowledged the important role that states play in setting their own local policies to minimize the risk of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Supreme Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although government

4

entities may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, states still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" the states' "ability to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010); *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute.").

*Bruen* confirmed these principles. There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 39 n.9 (quoting *Heller*, 554 U.S. at 635). And most recently, in *Rahimi*, the Court again explained that "the right secured by the Second Amendment is not unlimited" and should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 626-27).

In short, although the Supreme Court has defined the outer bounds of permissible regulations, the Court has not "disabled the ability of representative

democracy to respond to an urgent public safety crisis." *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc). States retain not only the freedom, but the fundamental responsibility, to implement "solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785; *see also Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

In particular, using their police powers, local jurisdictions may limit who can possess or carry guns to ensure their lawful use and protect their residents from the harms of gun violence. That is because, as *Bruen* itself makes clear, the "people whom the Second Amendment protects" are "ordinary, law-abiding, adult citizens," 597 U.S. at 31 (internal quotation marks omitted)—and not, for instance, felons or the mentally ill, *see Heller*, 554 U.S. at 626, or those who might otherwise engage in violent or irresponsible acts.

For example, the *Bruen* majority cited with approval the "shall-issue" licensing regimes of 43 states in effect at the time of the decision. *Bruen*, 597 U.S. at 39 n.9. According to the majority, these licensing regimes may include requirements "to undergo a background check or pass a firearms safety course" because such guardrails "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635); *see id.* at 2162 (Kavanaugh, J., concurring) (approving of

"fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"). As long as these measures permit ordinary citizens to exercise "their Second Amendment right to public carry," the Court explained, they are presumptively constitutional. *Id.* at 2138 n.9 (majority opinion).

The Supreme Court in *Bruen* thus endorsed the proposition that states may deploy measures with "narrow, objective, and definite standards" to ensure that individuals bearing arms "are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Licensing is one permissible way to achieve that goal. But other measures that accomplish the same ends, while respecting the rights of ordinary citizens to acquire and carry firearms in case of confrontation are likewise constitutional. That is especially true of regulations that do not rely on either the demonstration of some "special need" for a gun, the exercise of "open-ended" discretion by state authorities, or other features that may deny law-abiding, responsible citizens the right to acquire or carry firearms for self-defense. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). Maine's waiting period is one such "objective" and "definite" measure that helps ensure firearms will be used lawfully and responsibly by encouraging purchasers who might otherwise be a danger to themselves or others to "cool off" before taking possession of a firearm.

II.     **Waiting Periods Are Commonly Used Firearm Regulations That Save Lives.**

Like background checks and firearms-training requirements, waiting periods are tools designed to ensure that firearms are not acquired by dangerous or prohibited persons. They thus do not "infringe" any Second Amendment rights, and they sit well within the constitutional boundaries that *Bruen* drew. Indeed, it is common to require prospective gun purchasers to wait some period of time before receiving a firearm so that authorities can ensure the firearm will not be used unlawfully or irresponsibly. Multiple jurisdictions, like Maine, currently enforce explicit waiting periods, and still more build in de facto waiting periods for state authorities to conduct background checks or issue purchase permits. Moreover, waiting periods have been shown to save lives by reducing the rate of gun homicides and suicides. The district court's decision to enjoin this crucial public-safety measure should therefore be reversed.

A.     **Waiting periods ensure only that law-abiding, responsible individuals keep or bear arms and do not infringe any Second Amendment right.**

Waiting periods delay the acquisition of a firearm to ensure that individuals are not prohibited persons or have dangerous propensities when they take possession of the weapon. Specifically, waiting periods afford adequate time to complete background checks and help to reduce the possibility that the gun will be used in a crime of passion or suicide—*i.e.*, unlawfully or irresponsibly. *See infra* Part II.C.

And they do not impose more than a de minimis burden on the right of law-abiding, responsible individuals to acquire and carry firearms for self-defense.

That is precisely the sort of "narrow, objective, and definite" standard that the Supreme Court has accepted as legitimate. *Bruen*, 597 U.S. at 39 n.9. Indeed, it has been long established that states and the federal government may restrict arms-bearing by violent felons or the mentally ill, *see Heller*, 554 U.S. at 626, and institute requirements like training in firearms or the use of force, *see Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring), in order to ensure that firearms are not possessed by prohibited or dangerous persons. Background checks accomplish this goal by verifying that the license applicant or gun purchaser does not have a history that predicts unlawful or irresponsible use of firearms. Firearms training likewise reduces irresponsible use by guaranteeing that all arms-bearers have a baseline level of knowledge about the safe operation of firearms. Both requirements can delay firearm acquisition. Waiting periods serve the same ends through the delay itself— by ensuring that individuals seeking a gun when enraged or suicidal have time to reconsider, *see infra* Part II.C, and by giving governments breathing room to conduct adequate background checks on purchasers.

That is why the district court's analogy to the First Amendment, Add. 17, misses the mark. The function of a waiting period in the Second Amendment context is to ensure that guns are used lawfully and responsibly, not simply to delay

arbitrarily the exercise of constitutional rights. Because only law-abiding and responsible adult citizens have Second Amendment rights, measures that limit arms-bearing to that population—as long as those measures are not overly burdensome for law-abiding and responsible citizens—are acceptable. *See Bruen*, 597 U.S. at 39 n.9.

Moreover, a brief delay between the desire to acquire a handgun and taking physical possession of it does not "infringe" any Second Amendment right. The requirement that the right to keep and bear arms "shall not be infringed," which is clearly stated in the Second Amendment's text, serves to filter out minimal burdens from judicial second-guessing. U.S. Const. amend. II. Laws that do not actually *infringe* the right to bear arms "do not trigger Second Amendment scrutiny." *New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 334 (S.D.N.Y. 2024). Thus, the *Bruen* Court invalidated New York's "broad[] prohibit[ion] [on] the public carry of commonly used firearms for personal defense," 597 U.S. at 70, but left most licensing regimes across the country undisturbed, *see id.* at 39 n.9. And the *Heller* Court acknowledged that the Second Amendment permits a "variety" of firearm regulations, even though it forbids an "*absolute prohibition* of handguns held and used for self-defense in the home." 554 U.S. at 636 (emphasis added).

Said differently, while the Supreme Court in *Bruen* acknowledged that excessively long or "abusive" wait times may pose a constitutional issue, it accepted

that delays of some length would be permissible as states impose measures with "narrow, objective, and definite standards" to ensure the safe and lawful use of firearms. 597 U.S. at 39 n.9; *see McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) ("Our law is plain as can be that some amount of time for background checks is permissible."). And appellees have come nowhere close to demonstrating that Maine's 72-hour waiting period—the equivalent of a holiday weekend—qualifies as "abusive" under this standard.

The district court also missed the mark in reasoning that the Waiting-Period Act causes particular constitutional concern because "it applies to very near everyone seeking to purchase a firearm." Add. 15. Indeed, the Supreme Court itself has already rejected the requirement of individualized treatment for making gun-suitability determinations. For instance, licensing regimes that require background checks and firearms-training courses as prerequisites to carrying firearms are prophylactic violence-prevention measures applicable to *every* adult citizen seeking to carry arms in public. Much like waiting periods, they prohibit "near[ly] everyone," Add. 15, from carrying or possessing weapons until they have met certain requirements. Yet the Court went out of its way to approve of such generally applicable regulations. *See Bruen*, 597 U.S. at 39 n.9; *id.* at 2162 (Kavanaugh, J., concurring). Moreover—contrary to the district court's conclusion that background checks are different because they "include a series of objectively

11

verifiable criteria" that checks for "prohibited person status," Add. 14—waiting periods mirror these measures by ensuring for *every* adult purchasing firearms that they do not possess traits that pose a specific danger, such as an immediate propensity to harm others. *See infra* Part II.C. The relevant inquiry is not whether a firearm regulation requires individualized treatment, but whether the regulation uses "narrow, objective, and definite" standards to "ensure . . . that those bearing arms in the jurisdiction are, in fact, law abiding and responsible citizens." *Bruen*, 597 U.S. at 39 n.9 (internal quotation marks omitted). Waiting periods do just that.

In short, a robust historical tradition supports such laws. *See* Appellant Br. 23-35. That tradition includes both more individualized tools, like laws against firearm possession while intoxicated, *see* Appellant Br. 27, 33, and more uniform ones, like licensing laws, *see* Appellant Br. 27-28, 32. Because the Waiting-Period Act is "relevantly similar" to these historical regulations both in "how and why" it burdens "a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, it passes constitutional muster.

### B.    At least 13 other jurisdictions enforce explicit waiting periods, and even more require prospective gun buyers to wait to pass a background check or acquire a purchase permit.

The Waiting-Period Act is no outlier. Explicit waiting periods have been a common regulatory tool for the past several decades. For instance, the Brady Handgun Violence Prevention Act of 1994 initially imposed a five-day waiting

period for handguns purchased from licensed gun dealers in states without robust background-check procedures. Pub. L. No. 103-159, § 102(a), 107 Stat. 1536, 1537-38. In part because of this interim measure—which expired in 1998, when the National Instant Criminal Background Check System became available, *see id.* § 103, 107 Stat. at 1541—at least 44 states and the District "had a waiting period for at least some time between 1970 and 2014," Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. of the Nat'l Acad. Scis. of the U.S. 12162, 12162 (2017), https://tinyurl.com/4b2fnx72.

Currently, at least 12 other states and the District have instituted explicit waiting periods. In some states, the waiting period applies to any firearm purchase or purchase-permit application (with certain exceptions, *e.g.*, for concealed-carry licensees or law-enforcement officers). These waiting periods range in duration from 3 to 14 days. *See* 720 Ill. Comp. Stat. 5/24-3(A)(g) (72 hours); Colo. Rev. Stat. § 18-12-115(1)(a)(I) (3 days); Vt. Stat. Ann. tit. 13, § 4019a(a) (3 to 7 days); N.M. Stat. Ann. § 30-7-7.3 (7 days); D.C. Code § 22-4508 (10 days); Cal. Penal Code § 26815(a) (10 days); Wash. Rev. Code § 9.41.092(2) (10 days); Haw. Rev. Stat. § 134-2(e) (14 days from date of application for a purchase permit; handgun permits last 30 days, while shotgun and rifle permits last a year). In other states, the waiting period applies only to certain firearms like handguns or assault weapons. These periods range in duration from 3 to 30 days. *See* Fla. Const. art. I, § 8(b) (3 days,

13

handguns); Md. Code Ann., Pub. Safety § 5-123(a) (7 days, handguns and assault weapons); N.J. Rev. Stat. § 2C:58-2(a)(5)(a) (7 days, handguns); R.I. Gen. Laws § 11-47-35(a)(1) (7 days, pistols and revolvers); Minn. Stat. § 624.7132, subdiv. 4 (30 days, pistols and assault weapons).

Moreover, many prospective gun buyers outside of these jurisdictions are required to wait *some* period of time in order to pass a background check or receive a permit to purchase a handgun—de facto "waiting periods" that the district court appeared to accept. *See* Add. 10 n.7. For instance, federal law currently requires a background check, which may take up to 3 days, for purchases of firearms from licensed gun sellers. *See* 18 U.S.C. § 922(t). Although most checks are completed instantaneously, approximately 10% take longer than that. *See* Crim. Just. Info. Servs. Div., FBI, *2022 NICS Operations Report* 14 (2023), https://tinyurl.com/mpd3v259. That minor delay is not a constitutional issue.

Many other states independently require background checks or separate purchase permits in order to acquire certain firearms, which can also have the effect of building in de facto waiting periods. *See, e.g.*, Neb. Rev. Stat. §§ 69-2403 to 69-2407 (with some exceptions, individuals must apply for a permit to purchase a handgun; chief of police has up to 3 days to complete background check; certificates last 3 years); Ore. Rev. Stat. § 166.505 (individuals must apply for a permit to purchase a firearm; permit agent has up to 30 days to issue the permit, following a

background check and firearms-safety training; permits last 5 years); Mich. Comp. Laws § 28.422 (with some exceptions, individuals must apply for a permit to purchase a handgun; licensing authority must act "with due speed and diligence"; permits expire after 30 days). Other states augment the federal background check conducted at the point of sale with additional, sometimes lengthier, state background-check requirements. *See, e.g.*, Nev. Rev. Stat. § 202.2547 (all gun sales must go through federal background check, not just sales from federally licensed dealers); 18 Pa. Cons. Stat. Ann. § 6111 (up to 10 days); Del. Code tit. 11, § 1448A (up to 25 days); Conn. Gen. Stat. § 29-33(c) (no time limit indicated).

In short, states employ a variety of limited, targeted regulations on the transfer of firearms to purchasers—all of which can delay the delivery of firearms—in order to fulfill their duty of ensuring possession only by law-abiding, responsible citizens. The Waiting-Period Act falls squarely within this range of common practices.

### C.     Waiting periods reduce gun deaths.

The Waiting-Period Act furthers the public interest because delaying the acquisition of a firearm can be a crucial tool in reducing gun violence and deaths. A cooling-off period may prevent a disturbed individual from carrying out his plans to harm others. For instance, the gunman who targeted Asian-American businesses around Atlanta in 2021 acquired his gun the day before he went on his rampage. *See* Lindsay Whitehurst, *8 Dead in Atlanta Spa Shootings, With Fears of Anti-Asian*

15

*Bias*, N.Y. Times (Mar. 26, 2021), https://tinyurl.com/nw4se653.  The disgruntled employee who murdered his coworkers in a Walmart in Chesapeake, Virginia purchased his gun the same day.  *See* Edward Helmore, *Walmart Shooter Purchased Handgun Legally the Same Day, Authorities Say*, Guardian (Nov. 25, 2022), https://tinyurl.com/46cu5y2j.  And before 19-year-old Allen Ivanov opened fire on his ex-girlfriend and others at a house party, he "sat in his car outside the party and studied the owner's manual" because the gun had been purchased so recently.  Gene Johnson, *Tulsa Shooting Renews Debate on Waiting Periods for Gun Buyers*, PBS (Jun. 4, 2022), https://tinyurl.com/32ybfsw4.  In all of these tragic shootings, a waiting period could have delayed the acquisition of the firearm long enough for the danger of violence to subside.

Wait times can also prevent suicides.  When individuals contemplating suicide "cannot readily obtain a highly lethal method," they "either attempt with a method less likely to prove fatal or do not attempt at all."  Catherine W. Barber & Matthew J. Miller, *Reducing A Suicidal Person's Access to Lethal Means of Suicide: A Research Agenda*, 47 Am. J. Prev. Med. S264, S264 (2014), https://tinyurl.com/mrypu665.  Suicidal crises are often short-lived, and the method used depends on its ready availability.  *See id.*  Among the common methods of attempting suicide, firearms are the most lethal.  *See id.*  Briefly delaying access to a firearm can thus mean the difference between life and death.  That is particularly

16

true because 90% of those who survive a nonfatal suicide attempt will not go on to die by suicide thereafter. *See id.* at S265. And focusing on firearms in particular makes good sense for another reason: in the United States, "more suicides are completed with a firearm than by all other methods combined." *Id.* at S266.

Empirical evidence demonstrates the effectiveness of waiting periods. One study has found that waiting periods were associated with a 17% reduction in gun homicides and a 7 to 11% decrease in gun suicides. Luca et al., *supra*, at 12163. Another study found "significant" reductions in the suicide rate in states with mandatory waiting periods "relative to states without such laws." Michael D. Anestis et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, 107 Am. J. Pub. Health 579, 579-80 (2017), https://tinyurl.com/bdctjahk. And a third study has found that, after Wisconsin in 2015 repealed its 48-hour waiting period for handgun purchases, its suicide rate increased by 1.14 deaths per 100,000, "which translates to 66 additional handgun suicides per year." Stephen D. Oliphant, *Effects of Wisconsin's Handgun Waiting Period Repeal on Suicide Rates*, 28 Inj. Prevention 580, 581 (2022), https://tinyurl.com/4ff7n9n5. In addition, suicides in the state were "more likely to involve handguns" after the waiting-period repeal than before. *Id.* at 582. That study concludes: "Consistent with prior research examining waiting periods, the estimated 7% increase in firearm suicides following the repeal of a handgun waiting period suggests that firearm purchase delays are an effective

17

form of temporary lethal means restriction to reduce suicide." *Id.* at 582 (footnote omitted).

Waiting periods can be a critical tool to reduce gun deaths while still preserving the rights of law-abiding, responsible citizens to carry firearms for self-defense. Nothing in the Constitution requires depriving states of this life-saving measure. And this public-safety measure promotes the public interest, further underlining the inappropriateness of the lower court's injunction of Maine's law.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

May 2025

ROB BONTA
*Attorney General*
State of California

WILLIAM TONG
*Attorney General*
State of Connecticut

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

ANTHONY G. BROWN
*Attorney General*
State of Maryland

DANA NESSEL
*Attorney General*
State of Michigan

AARON D. FORD
*Attorney General*
State of Nevada

RAÚL TORREZ
*Attorney General*
State of New Mexico

DAN RAYFIELD
*Attorney General*
State of Oregon

CHARITY R. CLARK
*Attorney General*
State of Vermont

PHILIP WEISER
*Attorney General*
State of Colorado

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

KWAME RAOUL
*Attorney General*
State of Illinois

ANDREA J. CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

KEITH ELLISON
*Attorney General*
State of Minnesota

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

LETITIA JAMES
*Attorney General*
State of New York

PETER F. NERONHA
*Attorney General*
State of Rhode Island

NICHOLAS W. BROWN
*Attorney General*
State of Washington

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. of App. P. 29(a)(4)(G), I certify that this amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,127 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
Caroline S. Van Zile

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 5, 2024, I electronically filed the foregoing Brief of Amici Curiae the District of Columbia et al. with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Caroline S. Van Zile
Caroline S. Van Zile