No. 25-1160

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY COSHOW;
JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; A&G SHOOTING;
THOMAS COLE; and TLC GUNSMITHING AND ARMORY;

*Plaintiffs-Appellees*,

v.

AARON M. FREY, Attorney General of Maine,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-384-LEW

_____

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

_____

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

May 28, 2025

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees hereby certify that:

- Plaintiff-Appellee East Coast School of Safety does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock;

- Plaintiff-Appellee J White Gunsmithing does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock;

- Plaintiff-Appellee A&G Shooting does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock; and

- Plaintiff-Appellee TLC Gunsmithing and Armory does not have a parent corporation and no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE ISSUE .............................................................................. 4

STATEMENT OF THE CASE ............................................................................... 4

    A.    Legal Background .............................................................................. 4

    B.    Factual Background ........................................................................... 9

    C.    Procedural Background ................................................................... 15

SUMMARY OF ARGUMENT ............................................................................ 19

STANDARD OF REVIEW ................................................................................. 22

ARGUMENT ...................................................................................................... 22

I.    The District Court Did Not Abuse Its Discretion In Concluding That Plaintiffs Are Likely To Succeed On The Merits ......................................... 22

    A.    Section 2016 Regulates Conduct Covered by the Plain Text ............ 23

    B.    Section 2016 Is Not Presumptively Lawful—and Even If It Were, Any Such Presumption Would Be Rebutted Multiple Times Over ..................................................................................... 30

    C.    Section 2016 Is Inconsistent With This Nation's Historical Tradition of Firearm Regulation ....................................................... 41

II.    The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors Favor Injunctive Relief. ....................................... 48

CONCLUSION ................................................................................................... 52

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................... 29, 43

*B & L Products, Inc. v. Newsom,*
   104 F.4th 108 (9th Cir. 2024) ............................................................29

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) ............................................................48

*Capen v. Campbell,*
   134 F.4th 660 (1st Cir. 2025) ............................................................23

*Coquico, Inc. v. Rodríguez-Miranda,*
   562 F.3d 62 (1st Cir. 2009) ...............................................................22

*Covidien LP v. Esch,*
   229 F.Supp.3d 94 (D. Mass. 2017) ....................................................50

*Craig v. Boren,*
   429 U.S. 190 (1976) ...........................................................................50

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................. *passim*

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...........................................................................48

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ............................................................48

*Free the Nipple-Fort Collins v. City of Fort Collins,*
   916 F.3d 792 (10th Cir. 2019) ..........................................................51

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ...........................................................................27

*McRorey v. Garland,*
   99 F.4th 831 (5th Cir. 2024) .............................................................29

*Minneapolis Star & Trib. Co. v. Minnesota Commissioner*,
    460 U.S. 575 (1983)........................................................................................27

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022).................................................................... *passim*

*New Jersey v. Trump*,
    131 F.4th 27 (1st Cir. 2025) ............................................................22

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)........................................................................43

*Ortega v. Lujan Grisham*,
    741 F.Supp.3d 1027 (D.N.M. 2024) .....................................................9

*People v. Bickston*,
    154 Cal.Rptr. 409 (Cal. App. Dep't Super. Ct. 1979).........................7

*PhRMA v. Concannon*,
    249 F.3d 66 (1st Cir. 2001) ........................................................ 50, 51

*Planned Parenthood League of Mass. v. Bellotti*,
    641 F.2d 1006 (1st Cir. 1981) ................................................. 3, 45, 48

*Printz v. United States*,
    521 U.S. 898 (1997)........................................................................7

*Reese v. ATF*,
    127 F.4th 583 (5th Cir. 2025).................................................... 29, 39

*Rocky Mountain Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024)................................................ 38, 39, 40

*Rocky Mountain Gun Owners v. Polis*,
    701 F.Supp.3d 1121 (D. Colo. 2023) ...................................... 4, 43, 44

*Silvester v. Harris*,
    41 F.Supp.3d 927 (E.D. Cal. 2014)........................................... 7, 8, 43

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016)................................................. 5, 7, 8, 43

*United States v. Daniels*,
101 F.4th 770 (10th Cir. 2024)................................................................ 20, 41, 46

*United States v. Knipp*,
--- F.4th ---, 2025 WL 1431395 (6th Cir. May 19, 2025) ...................................29

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024)................................................................ 24, 30, 36

*United States v. Rahimi*,
602 U.S. 680 (2024)................................................................ *passim*

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024)................................................................46

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) ................................................................48

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005) ................................................................22

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) ................................................................48

*Yukutake v. Lopez*,
130 F.4th 1077 (9th Cir. 2025)................................................................29

## Constitutional Provision

U.S. Const. amend. II ................................................................ 4, 23

## Statutes

18 U.S.C. §922(d) ................................................................34

18 U.S.C. §922(t)(1) ................................................................7

17-A Me. Rev. Stat. §4-B(1) ................................................................ 10

25 Me. Rev. Stat. §2016................................................................ 9, 10, 23

2023 Colo. Legis. Serv. ch.125 ................................................................9

Fla. Stat. §790.0655 ................................................................10, 11

Md. Code Ann., Pub. Safety §5-101 ....................................................10

Md. Code Ann., Pub. Safety §5-123 ....................................................10

Md. Code Ann., Pub. Safety §5-124 ....................................................10

Minn. Stat. §624.7132 .........................................................................10

N.M. Stat §30-7-7.3 .............................................................................10

Act of July 8, 1932, ch.465, 47 Stat. 650 ............................................. 5

Law of Mar. 14, 1935, ch.208, 1935 S.D. Laws 355 .............................5

Law of Mar. 30, 1927, ch.321, 1927 N.J. Laws 742 ..............................5

**Other Authorities**

Greg Adomaitis, *N.J. gun association calls Berlin woman's death an
     'absolute outrage'*, NJ.com (June 5, 2015),
     https://tinyurl.com/mn32h8f ..........................................................5

*Black's Law Dictionary* (12th ed. 2024) ........................................ 33, 35

DOJ, *Identifying Persons, Other Than Felons, Ineligible to Purchase
     Firearms* (May 1990), https://tinyurl.com/2s3tpz8x ......................6

DOJ, *NICS 2023 Operational Report*, https://tinyurl.com/587ke5h9 ......6

DOJ, *Presale Handgun Checks, the Brady Interim Period, 1994-98*
     (June 1999), https://tinyurl.com/2nrdckfs ......................................7

Everytown for Gun Safety, *Which states require a waiting period
     before gun purchases?*, https://tinyurl.com/6zpcnpkr .....................6

David B. Kopel, *Background Checks for Firearms Sales and Loans:
     Law, History, and Policy*, 53 Harv. J. Legis. 303 (2016) ...................6

Maine Bill LD 1099 (SP 331) ............................................................. 10

Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun
     Waiting Period*, Reuters (June 24, 2015),
     https://tinyurl.com/228uby2t...........................................................6

1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976),
    https://tinyurl.com/3f8xr6uy ................................................................ 5

Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs ........................... 9

# INTRODUCTION

In most of the country, once a law-abiding citizen passes a background check and confirms that she may lawfully possess a firearm, she can take possession and begin exercising her fundamental constitutional right to keep and bear arms without delay. That is no small matter. When it comes to defending oneself and one's loved ones, time is often of the essence. Yet Section 2016 of Title 25 of the Maine Revised Statutes mandates a 72-hour "cooling-off period" on nearly all firearm sales. It makes no difference why a Mainer seeks to buy a firearm or if she has a concealed-carry permit or a hunting license. It does not even matter if she faces an imminent threat and needs a firearm for self-defense. Everyone must wait at least three days—even after passing a background check—before they can take possession of a new firearm, on the theory that even people who have proven themselves law-abiding are likely to be inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental constitutional right.

Nothing in our Nation's tradition supports that kind of "cooling-off" measure, which is at odds with the very premise of the Second Amendment: that the people *can* be trusted to keep and bear arms unless and until there is a reason to think otherwise for a particular individual. To be sure, "our Nation's tradition of firearm regulation" recognizes that the government may keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of

others." *United States v. Rahimi*, 602 U.S. 680, 700 (2024). That is why laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" typically will pass muster. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). But our Nation's tradition has never endorsed efforts to "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698. And Section 2016 falls decidedly in that latter camp. Making nearly everyone "cool off" before they can use firearms is a classic "broad[] restrict[ion] [on] arms use by the public generally," *id.*, without analogue in our Nation's tradition. A law that requires nearly everyone to "cool off" for days, even after they have passed a background check, before they can keep or carry a firearm, is instead the very model of an unconstitutional effort to "deny ordinary citizens" the fundamental right the Second Amendment secures. *Bruen*, 597 U.S. at 38 n.9.

The district court correctly understood all this and entered a preliminary injunction. Maine's efforts to disturb that decision fail at every turn. Section 2016 self-evidently regulates conduct covered by the Second Amendment's plain text: The state does not (and could not) deny that Section 2016 "temporarily bans keeping, bearing, and carrying activity that would otherwise occur but for its proscription." Add.7. And the state's meager historical evidence confirms that Section 2016 is far out of step with the tradition *Rahimi* recognized but Maine pointedly ignores.

Section 2016 also has little to recommend it. For individuals facing credible threats, Section 2016 eliminates any real possibility of defending themselves and their loved ones. Maine's response to that reality is to deny it. In its view, Mainers living in fear of imminent violence not only do not need a firearm, but fail to realize that they are actually better off without one. That response harkens back to the bad-old days when states deployed interest-balancing to deny the people their fundamental rights. It is also contrary to the record evidence, which shows that the first few days are the most critical for someone facing a credible threat of violence from an intimate partner. Allowing Section 2016 to take effect would deny victims facing imminent threats a critical measure of safety precisely when they need it most.

If Maine enacted a 72-hour "cooling-off period" on inflammatory speech, this Court would doubtless affirm a preliminary injunction on First Amendment grounds. Indeed, in the era before *Dobbs*, the Court preliminarily enjoined a law imposing a *24-hour* "cooling-off period" before a woman could obtain an abortion. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981). There is simply no reason to tolerate a 72-hour "cooling-off period" in the Second Amendment context—and, as the record illustrates, there is every reason not to.

In short, as this Court recognized in denying Maine's request for a stay pending appeal, the district court did not remotely abuse its discretion in enjoining Section 2016. Nothing has changed since. The Court should affirm.

## STATEMENT OF THE ISSUE

Whether the district court acted within its discretion in enjoining Section 2016 pending final resolution of Plaintiffs' Second Amendment claim.

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** Since the invention of the firearm, it has been an unfortunate reality that some people want firearms for illicit purposes.  Yet the Founders nevertheless saw fit to "enshrine" in the Constitution "'the right of the people to keep and bear Arms.'" *Bruen*, 597 U.S. at 20, 26, 50 (quoting U.S. Const. amend. II).  Consistent with that "unqualified command," *id.* at 17, states have experimented over the centuries with measures to combat illicit firearm use, *e.g.*, prohibitions on using firearms for improper purposes, background checks to identify individuals who have proven themselves likely to do so, and licenses to carry firearms outside the home.  But no government imposed any "waiting period" on firearms purchases "until 1923." *Rocky Mountain Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1137 (D. Colo. 2023).

A handful of waiting-period laws were enacted over the following decade.  But these early-twentieth-century laws were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then.  For example, California—one of the first states to enact such a law, in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or

county clerk.  *Silvester v. Harris*, 843 F.3d 816, 823-24 (9th Cir. 2016).  New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation.  Law of Mar. 30, 1927, ch.321, §6(4)(b), 1927 N.J. Laws 742, 746.  The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to the D.C. police within six hours.  Act of July 8, 1932, ch.465, §8, 47 Stat. 650, 652.  South Dakota passed its own 48-hour waiting period, with a six-hour notification requirement, in 1935.  Law of Mar. 14, 1935, ch.208, §9, 1935 S.D. Laws 355, 357.

Waiting-period laws enjoyed a brief renaissance from the 1970s to the early 1990s as additional states sought to facilitate background checks in the pre-Internet era.  *Silvester*, 843 F.3d at 824; *see also, e.g.*, 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy.  But while these waiting periods facilitated investigations into the purchaser, they came at a significant cost to law-abiding citizens.  In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun.  Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f.  And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase.

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303, 309 (2016).

With the advent of modern federal background-check requirements and the National Instant Criminal Background Check System ("NICS"), fixed waiting-period laws no longer serve an investigatory purpose, as over 90% of background checks are resolved within minutes. *See* DOJ, *NICS 2023 Operational Report* 6, https://tinyurl.com/587ke5h9. At least 14 states that used to have waiting periods have thus abandoned them since NICS came online. *Compare* DOJ, *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x, *with* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?*, https://tinyurl.com/6zpcnpkr; *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "[NICS] makes the waiting period law obsolete").

Federal law followed a similar trajectory. Congress mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. But although the Brady Act contemplated a nationwide instant-background-check system, the technology did not yet exist. Congress thus gave the FBI five years to create what ultimately became NICS, and, in the meantime, embraced a five-day waiting period to facilitate more cumbersome background checks. *See*

*Printz v. United States*, 521 U.S. 898, 902-04 (1997). Mindful of the constitutional concerns with that approach, however, Congress not only eliminated the five-day waiting period once NICS came online, but replaced it with an affirmative *protection* to ensure that processing delays do not impede the exercise of Second Amendment rights: A licensed retailer now may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed. 18 U.S.C. §922(t)(1)(B)(ii); *see also* DOJ, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (June 1999), https://tinyurl.com/2nrdckfs.

**2.** While Congress and several states responded to NICS and related improvements to background-check processes by abandoning obsolete waiting-period laws, a handful of other states responded by trying to come up with a new justification for them.

Again, California led the pack. After adopting a one-day waiting period in 1923, California extended the period to five days in 1965, and then to 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*, 843 F.3d at 823-24. It was not until 1979 that the state even hinted (as a litigating position) that its law might serve a "cooling-off" function. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979). And the California legislature did not expressly embrace a cooling-off approach until 1996. *Silvester v. Harris*, 41 F.Supp.3d 927, 946-47 (E.D. Cal. 2014). By that time

the state had adopted an electronic system that processed background checks expeditiously. But while the legislature recognized at that point that it no longer had a good reason to force Californians to wait 15 days to acquire a firearm, it was not willing to trust even law-abiding citizens who have passed a background check with a firearm. So California reduced its waiting period, but only to ten days, contending that all citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check. *Id.* at 947.

The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test that it used to apply in Second Amendment cases. *See Silvester*, 843 F.3d at 828. But *Bruen* subsequently—and emphatically—rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests. 597 U.S. at 22-23.

**3.** "Cooling-off period" laws do not sit comfortably with *Bruen* or *Rahimi*. *Bruen* explicitly cautioned against efforts to impose obstacles solely to delay the lawful exercise of Second Amendment rights. *Id.* at 38 n.9. And *Rahimi* distinguished between permissible efforts to keep firearms away from "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." 602 U.S. at 698-700.

Unfortunately, those pronouncements have not stopped some states from enacting unadorned "cooling-off period" laws over the past few years for the first time in their histories. Colorado recently subjected nearly all firearm sales to a three-day hold, even if the buyer passes a background check instantly. 2023 Colo. Legis. Serv. ch.125 §§1(2)(a), 2. Vermont followed suit, enacting its own three-day "cooling-off period" that starts once a buyer passes a background check, notwithstanding the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs. And New Mexico recently imposed a seven-day "cooling-off period." *Ortega v. Lujan Grisham*, 741 F.Supp.3d 1027, 1038 (D.N.M. 2024). In total, 13 states plus D.C. currently have some sort of waiting-period law. But no court of appeals has accepted the constitutionality of any of them since *Bruen*.

### B. Factual Background

**1.** Last year, Maine joined this late-breaking party, imposing a 72-hour delay between when someone agrees to purchase a firearm and when she can keep and bear it. 25 Me. Rev. Stat. §2016(2). Section 2016 does not purport to facilitate any inquiry into whether someone is a law-abiding citizen; even if the purchaser passes a background check instantly (as most do), she still must wait three days. Nor does it require, or even call for, any additional investigation during that 72-hour period. The wait is instead an unadorned "cooling-off" period, justified on the theory that it

may curb impulsive violence or self-harm. That is evident from the title of the underlying bill: "An Act To Reduce Suicides and Violent Crimes by Requiring a 72-hour Waiting Period after the Sale of a Firearm." Maine Bill LD 1099 (SP 331).

Section 2016's broad restriction applies to any firearm sale in Maine unless (A) the seller knows the buyer works as a law-enforcement officer, corrections officer, or certain type of security guard; (B) the buyer holds a firearms-dealer license; or (C) the seller and buyer are family members; the gun is a curio, relic, or antique; or federal or state law exempts the transaction from background-check requirements. 25 Me. Rev. Stat. §2016(4); *see also id.* §2016(1)(D). Section 2016 carries a fine of between $200-$500 for a first violation and $500-$1,000 for each subsequent violation. *Id.* §2016(3); *see also* 17-A Me. Rev. Stat. §4-B(1).

Even among the handful of states with "cooling-off" laws, Section 2016 is an outlier. Some states allow law enforcement to waive the waiting period upon finding that the buyer faces threats. Minn. Stat. §624.7132, subd.4. Others make exceptions for buyers who have a concealed handgun license, Fla. Stat. §790.0655(2)(a); N.M. Stat §30-7-7.3(H)(2), or are certified in hunting safety and seeking to buy a rifle or shotgun, Fla. Stat. §790.0655(2)(c). And some states at least leave open some avenue to acquire a firearm by limiting the "cooling-off" period to only certain types of firearms, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1), or

allowing certain private sales, *cf.* Fla. Stat. §790.0655(1)(a). Maine, however, does none of these things.

**2.** Plaintiffs are law-abiding citizens and businesses harmed by Section 2016. James White is a Navy veteran and the owner of J White Gunsmithing, a federally licensed firearm dealer in Guilford. JWG's sales plummeted after Section 2016 took effect, with handgun sales dropping 50% and rifle sales falling 25% from the typical volume in prior years. Appx.53-54. And those direct losses were not the only harms Section 2016 occasioned before it was enjoined. JWG is the only gun store in a county nearly three times larger than Rhode Island. Since it often takes police upwards of an hour to arrive in an emergency, people must be prepared to defend themselves against imminent threats. White and his business have helped multiple people secure firearms under those circumstances in recent years, including a young woman facing threats from a former intimate partner. Before Section 2016 was enjoined, however, the new law stymied JWG's ability to help customers with a time-sensitive need for a firearm. Appx.54-56.

Adam Hendsbee, the owner of A&G Shooting in Fairfield, has seen a similar effect on his business—and his customers. In the weeks following Section 2016's enactment, A&G Shooting served multiple customers facing a time-sensitive need to acquire a firearm. For instance, a single woman from a nearby town came to the store on a Thursday because a local police officer recommended that she purchase a

firearm after a stalker began harassing her on her property. Hendsbee worked with the woman for over an hour to pick out a firearm that she would be comfortable with and encouraged her to sign up for training to learn additional skills and safety practices. The woman then passed the background check and paid for the firearm. But because of Section 2016, she could not take possession for 72 more hours. And because A&G Shooting is closed on Sundays and Mondays, she could not pick it up until the following Tuesday. The woman was visibly shaken to learn that she would have to wait four more days to obtain the means for effective self-defense. The following Friday, a married couple whose home had been burgled the previous night came into the store seeking to purchase a gun for home-defense. Once again, A&G was faced with customers with a time-sensitive need to acquire a firearm, and once again, Section 2016 forced the couple to wait until the following Tuesday to obtain their chosen means for self-defense. Section 2016 impedes A&G Shooting's ability to serve these urgent needs. Appx.59, 61-63.

Section 2016's effect on Thomas Cole, a retired Marine living in Hampden who owns TLC Gunsmithing and Armory, a federally licensed firearm dealer specializing in selling firearms at weekend gun shows, has been even more pronounced. Because these shows are Saturday-Sunday affairs, Section 2016 makes it impossible to legally transfer a firearm sold during a show. Appx.65-66. TLC Gunsmithing's experience bears this out: At two post-Section 2016 shows, it sold

no guns at all. That precipitous decline left the business hemorrhaging money, repeatedly failing to recoup the costs incurred traveling from show to show. So, before the district court enjoined Section 2016, TLC Gunsmithing had made the difficult decision to suspend operations. Appx.66-67.

Others, like Plaintiff Nancy Coshow, have been forced to spend hours trekking back and forth between their home and a gun store just to secure the means to exercise their Second Amendment rights—even when they have already lawfully owned firearms for years without incident (but now need a smaller, replacement firearm in light of a physical restriction), even though they passed a background check instantly, and despite their obligations to their loved ones. *See* Appx.28-30, 49-51.

Last but certainly not least is Andrea Beckwith, a life-long Mainer who owns and operates East Coast School of Safety, which specializes in private lessons, group courses, seminars, and retreats designed to provide domestic-violence victims with training on first aid and self-defense, including an introduction to safe firearm use and storage, as well as trauma counseling. Beckwith's devotion to helping domestic-violence victims stems from her own tragic experiences. She acquired her first firearm after her abusive then-husband threatened her with a loaded gun. Although she obtained a protective order against her abuser, she recognized that the order alone would not stop him: He retained a private investigator to stalk her for months, and

she knew that he could easily obtain a firearm from family or friends even if his were taken away.  Beckwith accordingly concluded that she could ensure her safety only by obtaining her own firearm and taking self-defense classes.  On nights when her abuser or his friends repeatedly pelted with rocks the camper in which she was temporarily living, Beckwith would sleep with her gun within reach.  Today, she believes that her abuser's knowledge that she had a firearm and the training to use it was the primary deterrent stopping him from acting on his threats.  Appx.40-44.

Around the time she left her abuser, Beckwith began volunteering with an anti-sex-trafficking organization called Thrive New England.  She soon realized that fear and trauma paralyzed the survivors she met, destroying their confidence even to leave their own homes.  This experience inspired her to begin teaching self-defense classes and to found East Coast SOS.  More recently, Beckwith founded a 501(c)(3) organization that fundraises to subsidize training costs and sponsor women facing financial need.  She has trained thousands of women across the state who have sought self-defense training after feeling threatened and realizing that police were too far away to help.  Her former students include a victim of the horrifying 2023 Lewiston shooting; until she went through Beckwith's training, the experience had so traumatized her that she struggled to leave her home.  Appx.42-44.

Because Beckwith has become well known throughout the state for working with domestic-violence victims, she is often connected with women facing an

imminent threat of violence from a former or current intimate partner. When this happens, Beckwith drops what she is doing and meets the victim as soon as possible at the closest gun range. As a survivor herself, she knows first-hand how fraught the first few days can be. When Beckwith meets with a woman in crisis, she brings several handguns for her to test. And once the woman decides which model she is most comfortable with, Beckwith teaches her how to safely operate the firearm and competently defend herself (and often her children too). Beckwith then connects her with a local gun shop where, pending a background check, the victim used to be able to purchase the firearm and leave feeling safer that same night. Appx.44-45.

Before the district court enjoined it, Section 2016 had devastated Beckwith's ability to help her clients obtain this immediate security. Instead of leaving a gun shop empowered, a domestic-violence victim left having been told at her most vulnerable moment that she could not exercise a basic constitutional right—or access her preferred means to protect herself and her family—for 72 more hours. Appx.44-47.

### C. Procedural Background

Plaintiffs filed this suit challenging Section 2016 shortly after its effects on their lives, their clients, and their businesses became too grave to ignore. Appx.13-38 (complaint); Appx.39-67 (declarations). They moved for a preliminary injunction as soon as the complaint hit the docket. Appx.7-8. After briefing and

argument, the district court granted the motion, finding that Plaintiffs are likely to succeed on their claim that Section 2016 violates the Second Amendment and that the remaining factors favor injunctive relief.  Add.1-18.

The court began with the merits.  "[T]he first consideration" here "is whether 'the Second Amendment's plain text covers' the conduct" Section 2016 "curtail[s]." Add.5 (quoting *Bruen*, 597 U.S. at 17).  As the court explained, answering that question does not call for "a qualitative assessment of how modest the imposition on the right happens to be."  Add.7.  The focus of the "threshold inquiry" is instead on whether "the Act impairs conduct presumptively covered by the Second Amendment," i.e., "keeping and bearing a firearm."  Add.7-8.  Here, the court concluded, it does:  Because Section 2016 prevents law-abiding citizens from taking possession of a firearm for 72 hours, it curtails conduct covered by the plain text. "Any interpretation to the contrary requires the type of interpretative jui jitsu that would make Kafka blush."  Add.8.

The court next rejected the state's argument that Section 2016 "fall[s] within" the category of longstanding "laws imposing conditions and qualifications on the commercial sale of arms" that *Heller* noted it did not intend "to cast doubt on." Add.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).  While the court acknowledged that this category "might well [include] background checks,

age restrictions, shop security measures, and the like," it concluded that it could not be understood to cover "a standardless, temporary disarmament measure." Add.9.

The state thus bore the burden to show that Section 2016's "curtailment of Second Amendment rights is consistent with our Nation's history and tradition." Add.11. That inquiry, the court made clear, "does not boil down to means-ends, costs-benefits, or any other interests-balancing analysis." Add.11-12. It instead turns on "whether the 'how and why' of the Act measure up to 'the principles that underpin our regulatory tradition.'" Add.13 (quoting *Rahimi*, 602 U.S. at 692).

The court found that the state is unlikely to carry that burden. Whereas "[b]ackground checks are designed to generate cause for denying a sale to a given buyer" based on individualized "criteria," Section 2016 calls for no "individualized assessment" at all; it applies the same to everyone. Add.14. As for historical "[p]rohibitions against drunken carry," those laws temporarily disarmed only people who had proven, on an "individualized" basis, to be temporarily irresponsible. Add.14. Finally, the state "reference[d] abjectly prejudicial laws that once banned certain minorities from owning firearms out of a fear of what they might do." Add.14 n.11. But even "[a]ssuming that laws offensive to the Equal Protection Clause are appropriate analogues," those odious laws—which "prohibited keeping and bearing firearms based on an individual's membership in a disfavored group that lawmakers presumed had a predilection or interest in armed insurrection"—would

not support a law that, like Section 2016, "applies to most everyone without exception." *Id.*[1]  "Consequently," the court concluded, "Plaintiffs have demonstrated that they are likely to succeed on the merits of their Second Amendment claim." Add.16.

Turning to the remaining factors, the court had "little trouble finding irreparable injury." Add.17.  And although the court acknowledged that "members of the public undoubtedly feel that they have a genuine interest in laws curtailing the right to keep and bear arms," it concluded that "their interest is … not one that can win out in terms of an interest-balancing exercise by a court that is sworn to uphold the Constitution." Add.18.  The court thus "GRANTED" an injunction.  Add.18.

Maine sought a stay pending appeal, Dkt.32, which the district court denied essentially "for the reasons set forth in the [PI] Order," Dkt.42.at.4.  The state then asked this Court for a stay but got the same answer.  The Court was "not persuaded that the Attorney General has made a 'strong showing' that he is likely to succeed in demonstrating that the district court abused its discretion in granting preliminary injunctive relief."  Order of Court 2, Doc.#00118270772 (Apr. 10, 2025).  And while Maine argued that "allowing the injunction to remain in effect pending appeal … may result in loss of life that could be avoided if the law were enforced," *id.* at 1, the

---

[1] Maine no longer argues that such odious laws can justify Section 2016.

Court concluded that this case "does not present unusual circumstances involving a 'particularly severe and disproportionate' harm to one side," *id.* at 2. "Moreover, the Attorney General's failure to seek expedited review of the stay motion or the appeal undercuts any claim that immediate relief from the injunction is required to prevent irreparable harm." *Id.* The Court therefore denied "the request for a stay." *Id.*

## SUMMARY OF ARGUMENT

The core question in this case is whether the Second Amendment allows a state to force law-abiding citizens to wait out a "cooling-off period" before taking possession of a firearm, even if the purchaser passes a background check instantly and satisfies any other criteria to obtain a firearm. The district court did not abuse its discretion in concluding that the answer is no. Because Maine has restricted citizens' ability to keep and bear arms, it must "demonstrate" that its law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. It cannot do so. While our Nation's tradition leaves room for regulatory measures "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635), it does not tolerate efforts to "broadly restrict arms use by the public generally"—i.e., by those the government has already assured itself *are* law-abiding, responsible citizens, *Rahimi*, 602 U.S. at 698. And while a brief, state-mandated delay for purposes of conducting a background check may fall into the former

category, delaying the exercise of Second Amendment rights just for the sake of delaying their exercise falls decidedly into the latter.

That distinction dooms Section 2016. By imposing a "cooling-off" period that forces citizens to wait to take possession of a firearm even *after* they have passed a background check, Section 2016 unabashedly strays far beyond trying to ensure that someone is entitled to exercise Second Amendment rights. It instead just "look[s] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024). No historical tradition supports anything like that rights-impeding approach.

Maine cannot evade historical scrutiny by likening Section 2016 to "shall-issue" licensing regimes or conditions and qualifications on the commercial sale of arms. Again, Section 2016 does not delay the exercise of Second Amendment rights in service of facilitating the processing of licenses; no individualized investigation happens during the 72 hours. Nor does Section 2016 impose a condition that must be satisfied for a transaction to proceed. No one can satisfy a waiting period; all one can do is wait it out. In all events, treating certain types of laws as presumptively constitutional makes little sense after *Bruen* and *Rahimi*, which make clear beyond cavil that when the government regulates arms-bearing conduct, it must justify that restriction. At absolute most, the dictum on which Maine relies simply flips who bears the historical-tradition burden; it does not eliminate it entirely.

Section 2016 thus can survive only if it is consistent with historical tradition. The district court did not abuse its discretion in finding no reason to think that it is. While *Bruen* is not "a regulatory straightjacket" that demands "a historical *twin*," 597 U.S. at 30, it still requires "a well-established and representative historical *analogue*," *id.*, that "impos[es] similar restrictions" on acquiring a firearm "for similar reasons"—in other words, an analogue with a similar "how" and "why." *Rahimi*, 602 U.S. at 692. But no law imposed an unadorned "cooling-off period," grounded in the notion that even citizens who have demonstrated their law-abidingness still cannot be trusted with firearms, until the late twentieth century. And while some historical laws delayed the exercise of Second Amendment rights in service of a *different* purpose, to uphold Section 2016 simply because it uses a similar "how" would eliminate the "why" component entirely. More fundamentally, it would deny the reality that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at 700. Section 2016, by contrast, just impermissibly "broadly restrict[s] arms use by the public generally." *Id.* at 699-700.

Finally, the district court plainly did not abuse its discretion in finding that the remaining factors favor injunctive relief. Maine does not cite a single case in which a court has declined to issue an injunction despite holding that the plaintiff is likely

to succeed on the merits of a claim that a law violates the Constitution, and Plaintiffs are aware of none.  That makes sense:  A state has no interest in enforcing an unconstitutional law, and the public interest is harmed by the enforcement of laws repugnant to the Constitution.  And in all events, the record here amply supports the conclusion that the equities favor preserving the ability of Mainers to timely exercise the right the Second Amendment guarantees.

## STANDARD OF REVIEW

"A grant of a preliminary injunction is reviewed for abuse of discretion." *New Jersey v. Trump*, 131 F.4th 27, 34 (1st Cir. 2025).  This Court "afford[s] substantial deference" to the district court's assessment of the preliminary-injunction factors, *Coquico, Inc. v. Rodríguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009), and will reverse "only if the [district] court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion," *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005).

## ARGUMENT

**I.    The District Court Did Not Abuse Its Discretion In Concluding That Plaintiffs Are Likely To Succeed On The Merits.**

The threshold question in a Second Amendment case is "whether the plain text of the Second Amendment protects [the plaintiff's] proposed course of conduct." *Bruen*, 597 U.S. at 32.  If the answer is yes—i.e., if the state has "regulate[d] arms-bearing conduct," *Rahimi*, 602 U.S. at 691—then "a presumption of protection"

arises, *Capen v. Campbell*, 134 F.4th 660, 668 (1st Cir. 2025), and the state "bears the burden to 'justify its regulation,'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24).  To do so, the state must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.  "Only if" the state proves that "a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17.  The district court did not abuse its discretion in concluding that Maine has not met that burden here.

### A.    Section 2016 Regulates Conduct Covered by the Plain Text.

**1.** The threshold inquiry here is simple, as it will be in most cases.  The Second Amendment secures "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  Maine does not dispute that Section 2016 applies to "the people" the Amendment protects.  *See Heller*, 554 U.S. at 579-81.  Nor does Maine deny that Section 2016 applies to "Arms" the Second Amendment protects.  *See* 25 Me. Rev. Stat. §2016(1)(C); p.10, *supra*.  The only question is whether Section 2016 restricts Plaintiffs' ability to "keep" and "bear" those arms.  It plainly does.

As *Heller* explained, "the most natural reading of 'keep Arms' … is to 'have weapons,'" and "the natural meaning of 'bear arms' … implies [] the carrying of [a] weapon [] for the purpose of 'offensive or defensive action.'"  554 U.S. at 582-83.

Plaintiffs include people who would like to take possession of firearms ("Arms") to have ("keep") and carry ("bear"), and Section 2016 precludes them from doing so for three days. It also precludes Plaintiffs who would sell firearms to those who want to keep and bear them from doing so for three days. That suffices to satisfy the threshold inquiry. A law that "restricts [the] ability to bear or keep [a] firearm … unquestionably implicates … Second Amendment rights," especially when, as here, it does nothing else. *United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024).

**2.** The state's principal response "border[s] on the frivolous." *Heller*, 554 U.S. at 582. In Maine's view, because the Second Amendment does not explicitly say "purchase" alongside "keep" and "bear," "the plain language of the Second Amendment does not apply to the purchase of firearms." Br.14-15. That fundamentally misunderstands the inquiry and makes a mockery of the Framers' decision to enshrine the right to keep and bear arms in the Constitution.

The conduct in which Plaintiffs seek to engage is keeping and bearing firearms. Section 2016 prevents people from doing so for at least 72 hours; indeed, that is its *raison d'être*. That it accomplishes that end by prohibiting the transfer of an arm rather than prohibiting its possession or carrying makes no difference. The threshold inquiry focuses on Plaintiffs' "proposed course of conduct," *Bruen*, 597 U.S. at 32, not the means by which the state has frustrated it. If Maine enacted a law

that said, "Mainers cannot keep or bear a firearm sooner than 72 hours after agreeing to purchase it," no one would seriously dispute that the law restricted conduct covered by the plain text of the Second Amendment. From the perspective of the citizen whose ability to keep and bear arms is restricted, there is no difference between that law and Section 2016. That is why the threshold inquiry focuses on the citizen's conduct—and why the conduct is framed at its most essential level, without overlaying the challenged restriction on it. The threshold question is not whether the Second Amendment explicitly confers a right to "the immediate purchase of firearms." Br.16. It is whether the challenged restriction frustrates the ability to keep or bear arms.

*Bruen* makes that clear. The Court described the "proposed course of conduct" of the two individual plaintiffs there (Koch and Nash) as "carrying handguns publicly for self-defense." 597 U.S. at 32. That framing is notable for two reasons. First, the law they challenged barred them from obtaining concealed-carry permits, not from carrying handguns altogether. Yet the Court focused on whether the *ultimate* conduct in which they wanted to engage (carrying firearms in public) fell within the plain text, not whether the specific thing the state would not let them do (obtain a concealed-carry permit) did. Second, Koch and Nash were not entirely prohibited from carrying handguns publicly for self-defense. Nash had a "license [that] permitted him 'to carry concealed for purposes of off road back

country, outdoor activities similar to hunting,' such as 'fishing, hiking & camping etc.'" *Id.* at 15-16. And Koch had an even broader "restricted license permitting him to carry a handgun outside the home" not only "for hunting and target shooting," but "to and from work" as well. *Id.* at 16. What Koch and Nash wanted was to be able to carry outside the home—i.e., to bear arms—"in ANY LOCATION typically open to and frequented by the general public" without having "to demonstrate a unique need for self-defense." *Id.*

If Maine were right about how the threshold inquiry operates, then the Court would have asked whether the plain text covers *that* conduct, i.e., "carrying a handgun in any location typically open to the general public, without having to demonstrate a unique need for self-defense." But that is not what the Court asked, because that is not what the inquiry entails. *Bruen* asked simply "whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32. How New York had restricted that conduct made no difference to the threshold inquiry. So too here. The plain text covers Plaintiffs' proposed course of conduct: keeping and bearing firearms for self-defense. *How* Maine has restricted that conduct makes no difference to the threshold inquiry. All that matters is that it has.

To be sure, "how [a law] burdens the Second Amendment right" certainly matters—at the historical-tradition stage. *See Rahimi*, 602 U.S. at 698; *Bruen*, 597

U.S. at 29. But as Judge Walker explained, "the threshold inquiry is whether the Second Amendment covers the conduct curtailed by the Act, not a qualitative assessment of how modest the imposition on the right happens to be." Add.7. And just as a law restricting people to distributing one pamphlet a month, or restricting their access to ink and paper, would plainly restrict the ability to speak, *see, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r*, 460 U.S. 575, 592-93 (1983), a restriction on acquiring an arm plainly restricts the ability to keep and bear that arm. Indeed, the notion that a law explicitly designed to prevent people from keeping or bearing arms does not even *implicate* the right to keep and bear arms is impossible to square with the Supreme Court's repeated admonitions that the Second Amendment is not "a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality).

Adopting Maine's contrary view would leave the threshold inquiry covering virtually nothing, as nearly all laws restricting arms-bearing conduct (save a blanket prohibition on keeping or bearing arms) will regulate something more specific than keeping and bearing arms simpliciter. Indeed, that appears to be what Maine envisions, as it insists that Section 2016 should escape scrutiny so long as it is not "so burdensome that [it] effectively prohibit[s] the acquisition of firearms" entirely. Br.21. While that is not true for the 72 hours Section 2016 prevents someone from taking possession of a firearm, it is also not a plausible reading of precedent. Not

one word in *Heller*, *McDonald*, *Bruen*, or *Rahimi* so much as hints of some secret sliding scale under which the degree of burden is relevant to the plaintiff's threshold showing, let alone suggests that laws do not even "implicate the right to keep and bear arms," Br.15, unless they effectively foreclose the exercise of the right entirely.

**3.** Trying another tack, the state argues that *taking* possession and *maintaining* possession are two different things, and only the latter is covered by the plain text. Br.14-15. But the argument that the Framers meant to protect the rights only of those who were fortunate enough to already have arms when the Second Amendment was ratified finds zero support in historical tradition, and it finds no support in a proper reading of the Second Amendment's text either. As the Supreme Court has made clear, "the original meaning of the constitutional text" is what controls. *Bruen*, 597 U.S. at 36; *see also Heller*, 554 U.S. at 581-83 (using Founding-era sources to define the Second Amendment's terms). And as Judge Walker explained, "the word 'keep' was used by our English-speaking forebears to mean taking or acquiring, though the grammar and diction of those forebears would be incomprehensible to a modern English speaker." Add.9 n.5. Indeed, *Heller* itself not only noted that the phrase "'Keep arms' was simply a common way of referring to possessing arms" at the Founding, 554 U.S. at 583, but invoked Founding-era sources demonstrating that it was understood to embrace *taking* possession as well as maintaining it, *see id.* at 583 n.7 (citing Founding-era treatise stating that a man is "deprived by [the law] of

keeping arms for his own defence" if the "law forbids … the purchase of it"). *Accord, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("th[e] right of keeping arms" "necessarily involve[s] the right to purchase and use them").

It is little wonder, then, that courts have coalesced around the conclusion that "the Second Amendment's text presumptively protects the act of selling or transferring a firearm." *United States v. Knipp*, --- F.4th ---, 2025 WL 1431395, at *4 (6th Cir. May 19, 2025); *see also, e.g.*, *Yukutake v. Lopez*, 130 F.4th 1077, 1090 (9th Cir. 2025); *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025). The state invokes various decisions that it claims "recognized that the Second Amendment's plain text does not apply to the purchase of firearms." Br.16; *see* Br.16-18. But it buries the fine print in footnotes. *See* Br.16-17 nn.11-12. For instance, the state continues to rely on dictum in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), but the Fifth Circuit has now squarely held that "the Second Amendment 'covers' the conduct [of] []commercial purchases[]." *Reese*, 127 F.4th at 590. And it continues to rely on dictum from *B & L Products, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), that the Ninth Circuit has since rejected in a square holding. *See Yukutake*, 130 F.4th at 1090-91. Those courts have reached that commonsense conclusion because restrictions on acquiring arms necessarily restrict the right to keep and bear them. "[A]lthough the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right." *Knipp*, 2025 WL 1431395, at *3.

In the end, the threshold inquiry here is straightforward no matter how this Court frames the question. Section 2016 "temporarily bans keeping, bearing, and carrying activity." Add.7. It therefore restricts conduct covered by the text and "unquestionably implicates [Plaintiffs'] Second Amendment rights." *Perez-Garcia*, 96 F.4th at 1181.[2]

## B.  Section 2016 Is Not Presumptively Lawful—and Even If It Were, Any Such Presumption Would Be Rebutted Multiple Times Over.

With no serious textual argument, Maine insists that "the Supreme Court" has already resolved the issue in its favor by (supposedly) "recogni[zing] that laws causing delays in taking possession of firearms do not, absent unusual circumstances, implicate the right to keep and bear arms." Br.15; *see also* Br.18-22. That would be news to the Supreme Court.

**1.** Maine first invokes a footnote in *Bruen* "clarif[ying] that it was not calling into question 'shall-issue' licensing regimes that require applicants to undergo a background check or pass a firearms safety course before being allowed to carry a handgun in public." Br.15; *see Bruen*, 597 U.S. at 38 n.9. In Maine's view, because

---

[2] Maine obliquely argues that if Section 2016 implicates the right, then any generally applicable regulation that reaches firearms would be subject to historical scrutiny. But this case does not involve a generally applicable regulation that incidentally impacts Second Amendment rights. Section 2016 applies only to firearms transactions, and its sole purpose is to delay them. Whatever may be said for laws of general applicability, it should come as no surprise that a law that singles out firearms acquisitions for special restrictions implicates the constitutional amendment that specifically protects the right to keep and bear arms.

*Bruen* said shall-issue regimes likely pass muster even though they (in the state's estimation) "necessarily impose a delay" on the exercise of Second Amendment rights, it must follow that Section 2016 is likely constitutional too.  Br.15.

There are any number of problems with that convoluted argument, the first being that it rests on a logical fallacy:  The mere fact that *one* type of law that entails some delay likely passes constitutional muster hardly means that *all other* laws that impose some sort of delay likely do too.  After all, a court must look at *both* the "how" *and* the "[w]hy" of a law.  *Rahimi*, 602 U.S. at 692.  And the very footnote on which Maine relies affirmatively refutes any claim that *all* laws imposing delay should be treated as one and the same, as it explains that shall-issue licensing regimes are likely (but not definitively) constitutional because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9.  The Court then went on to explain that such regimes may *not* pass muster if they entail "lengthy wait times in processing license applications or exorbitant fees." *Id.*  And rightly so:  Because burdens untethered from the time or cost of ensuring that citizens are law-abiding and responsible cannot be justified on that "why," regimes that impose them are likely instead being "put toward abusive ends." *Id.*

All of that suffices to defeat Maine's reliance on footnote 9 for two reasons.  First, it forecloses the state's argument that laws that delay the exercise of the right—

or even shall-issue regimes in particular—"do not, absent unusual circumstances, implicate the right to keep and bear arms" at all. Br.15. If shall-issue licensing regimes did not implicate the Second Amendment, then there would have been no need for *Bruen* to discuss them, let alone to go out of its way to explain that they can *violate* the Second Amendment if "put toward abusive ends." 597 U.S. at 38 n.9. Whether laws implicate a constitutional right turns on *whether* they restrict conduct the right covers, not on *how much* they restrict it. To say that a particular type of law does not implicate a constitutional right absent the unusual circumstance in which it violates that right is incoherent.

Second, Section 2016 is not "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *Id.* The state does not do anything during the three-day "cooling-off" period to assess whether there is some reason an individual should not be able to possess a firearm; for that, it instead continues to rely entirely on the background check, which is typically conducted at the beginning, not the end, of the three-day period. So if someone who wants to buy a firearm passed a background check on day one then committed a crime or exhibited signs of acute mental distress on day two, nothing in Section 2016 would preclude that person from acquiring the firearm once 72 hours passed. That is not an effort to determine which would-be purchasers "pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. It is an effort to "broadly restrict arms use by

the public generally." *Id*. at 698. *Bruen*'s footnote about shall-issue licensing regimes governing who can carry a firearm in public—which Section 2016 obviously is not—is thus of no help to the state here.

**2.** Neither is *Heller*'s dictum clarifying that the decision should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27. That dictum does not cover Section 2016 either—and even if it did, it would not immunize Section 2016 from Second Amendment or historical-tradition scrutiny.

First of all, Section 2016 is not a law imposing conditions or qualifications on the commercial sale of arms. Conditions and qualifications are things people can satisfy. *See* Condition, *Black's Law Dictionary* (12th ed. 2024) ("an uncertain act or event that," if satisfied, "triggers or negates a duty to render a promised performance"); Qualification, *id.* ("qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible for a position or office, or to perform a public duty or function <voter qualification requires one to meet residency, age, and registration requirements>"). So, for instance, the requirement to secure a background check is a condition on the sale of a firearm (or, perhaps more precisely, a condition precedent to the transfer of a firearm) because a seller

33

can satisfy it by procuring a background check.  To be sure, if the purchaser does not pass the background check, then the seller may be *independently* prohibited from transferring the firearm, because it is unlawful to transfer a firearm to persons falling within certain categories.  18 U.S.C. §922(d).  But the obligation to secure a background check before selling a firearm is a classic condition on commercial sale.  Likewise, the obligation to secure a Federal Firearms License to *sell* firearms is a classic qualification:  One cannot lawfully sell firearms without obtaining that license demonstrating that one satisfies the requirements to do so.

A "cooling-off" period does not remotely fit either bill, as it is not something one can satisfy or secure; all one can do is wait it out.  Consider a law-abiding citizen who owns no firearms.  Imagine that, after a bad breakup and a violent encounter with her now-ex, she decides—perhaps after consulting with, and receiving training from, Plaintiff Beckwith—that she wants to buy a handgun, the "quintessential self-defense weapon," for personal protection.  *See Heller*, 554 U.S. at 629.  Section 2016 prohibits her from keeping or bearing a handgun *right now* and *for three days hence*, no matter how many background checks she passes or how many hoops she jumps through, and no matter how acute her need to be armed and ready *today*.  There is no prerequisite either she or the person who is ready and willing to lawfully sell her a firearm can satisfy to proceed.  All they can do is wait.  Laws that simply prohibit the transfer of a firearm for a fixed period of time thus do not impose a condition or

qualification on the sale of arms. In point of fact, *Black's Law Dictionary* explicitly defines "condition precedent" (under the umbrella term "condition") *to exclude* "a lapse of time." Condition, *Black's Law Dictionary* (12th ed. 2024) ("An act or event, *other than a lapse of time*, that must exist or occur before a duty to perform something promised arises." (emphasis added)).

Second, even if Section 2016 could be understood as a condition or qualification on commercial sale, it still would not fall within *Heller*'s dictum because it is plainly not a "longstanding" one. *See Heller*, 554 U.S. at 626. Maine does not dispute that the first state law imposing an unadorned "cooling-off" period—under which people must wait a set period of time to acquire a firearm even after passing a background check demonstrating that they are eligible to keep and bear arms—was not enacted until the 1990s. *See* Add.13 & n.10. Nor does it deny that the (few) waiting-period laws enacted in the early-twentieth century were designed to give licensing authorities time to conduct background checks, which took much longer back then. And Maine's law bears no resemblance whatsoever to any of the other purported historical "analogues" the state has dug up. *See* Part I.C, *infra*. *Heller*'s dictum thus has no relevance here.

At any rate, even if Section 2016 were a "longstanding … law[] imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27, that would not help Maine's cause. "*Bruen* makes clear that text, history,

and tradition are the '[o]nly' ways the Government can justify a regulation that implicates Second Amendment rights." *Perez-Garcia*, 96 F.4th at 1177 (quoting *Bruen*, 597 U.S. at 17). Simply repeating *Heller*'s dictum about the "presumptive[] lawful[ness]" of certain types of restrictions on arms-bearing conduct thus will no longer do. That is not just because the historical pedigree of those categories was not squarely before the *Heller* Court (although that should be reason enough). It is also because *Bruen* was emphatic that "a court [may] conclude that" a restriction on arms-bearing conduct "falls outside the Second Amendment's 'unqualified command'" "[o]*nly* if" the government proves that it "is consistent with this Nation's historical tradition." 597 U.S. at 17 (emphasis added)); *see also Rahimi*, 602 U.S. at 691-92 ("when the Government regulates arms-bearing conduct, … it bears the burden to 'justify its regulation'" by showing that it "is consistent with the principles that underpin our regulatory tradition").

Far from exempting the categories discussed in *Heller*'s dictum from that rule, *Bruen* expressly applied it to one of them. New York argued that the Sullivan Law could be justified as a "law[] forbidding the carrying of firearms in sensitive places." *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). Yet the Court did not treat the law as presumptively constitutional simply because New York made that argument. Nor did it conclude that it must decide whether that was a fair characterization to determine whether the law implicated the Second Amendment.

The Court instead rejected New York's argument by scrutinizing it against historical tradition, explaining that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 31.

*Bruen* itself thus refutes the state's claim that laws that purportedly fall into one of the categories *Heller* identified do not "implicate the right to keep and bear arms" *at all* unless they are "so burdensome that they effectively prohibit the" exercise of the right altogether. Br.15, 21. So does *Heller*. *Heller* did not say that the types of laws it discussed do not implicate the Second Amendment. If that were what the Court thought, then there would have been no reason to discuss them in the first place, let alone to describe them as only "presumptively" lawful. The Court discussed them because, *contra* Br.18-19, such laws *obviously* restrict conduct covered by the plain text of the Second Amendment. Indeed, to say that laws prohibiting the keeping or carrying of firearms, or imposing restrictions on their acquisition, do not even *implicate* the right to keep and bear arms would be to read the Second Amendment out of the Constitution. And to say that *Heller* embraced such a nonsensical position would be to read "presumptively" out of its dictum, as a law cannot violate a constitutional provision that it does not even implicate.

The far more sensible understanding of *Heller*'s dictum is that the Court was simply recognizing the practical reality that "longstanding" measures are more likely

to be consistent with historical tradition than novel ones. But if a particular law is not longstanding, and indeed is nothing like anything found in our Nation's history vis-à-vis *any* right (save laws that were held unconstitutional), then it cannot be deemed presumptively—let alone conclusively—lawful just because it arguably fits into one of the general categories identified in *Heller*.

While that should suffice to foreclose any argument that *Heller*'s dictum entitled certain categories of laws to a formal presumption of constitutionality, at the very least it forecloses any argument that *Heller* immunized those categories from historical scrutiny altogether. At most, that dictum simply shifts the historical-tradition burden from the government to the plaintiff. And as explained below, Section 2016 could not withstand historical-tradition scrutiny no matter who bears that burden. *See* Part I.C, *infra*.

Nor could Section 2016 survive even under the state's crabbed view of what "presumptively" means. The state invokes the Tenth Circuit's decision in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), which held "that laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment" unless they are "put to abusive ends." *Id.* at 120, 122. As the Fifth Circuit has explained, *Rocky Mountain* "commit[ted] a category error": A "regulatory measure" may be "presumptively lawful" if it is "not characterized by 'abuse,'" but that does not mean that it "is not

an abridgement of the Second Amendment right." *Reese*, 127 F.4th at 590 n.2. But that aside, the state once again tells only half the story. *Rocky Mountain* did not hold that laws are put to abusive ends only if they are "so burdensome that they effectively prohibit the" exercise of the right altogether. Br.21. It recognized that "conditions and qualifications" can be abusive if they do not (1) operate "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," and (2) "contain only 'narrow, objective, and definite standards' guiding licensing officials." *Rocky Mountain*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9).

Section 2016 flunks both criteria. Again, Section 2016 has nothing to do with identifying citizens who "pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. "Whereas one might pass a background check or avoid prosecution for drunken carry by demonstrating a clean record or sobriety, respectively, law-abiding citizens cannot overcome Maine's 72-hour ban by measuring themselves against and affirmatively satisfying a standard." Add.15. All they can do is wait. That is why, as Judge Walker cogently explained, Section 2016 "does not actually employ any standard." Add.15. It is not designed to "guid[e] licensing officials," *Bruen*, 597 U.S. at 38 n.9—who do exactly nothing during the 72-hour period. And while Section 2016 may be "objective and definite" in the sense that it "eliminat[es] any possibility for subjective interpretation," Br.22 (quoting *Rocky Mountain*, 121 F.4th at 123), that is because Section 2016's whole point is to

"broadly restrict arms use by the public generally," *Rahimi*, 602 U.S. at 698, not "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Rocky Mountain*, 121 F.4th at 122.

Maine complains that it needs a "cooling-off" period because "[b]ackground checks … reveal nothing about a buyer's current state of mind." Br.34-35. That is not strictly true, but even assuming it were, neither does Section 2016. Indeed, despite recognizing that *Bruen* was focused on "laws that 'are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens,'" Br.34 (quoting *Bruen*, 597 U.S. at 38 n.9), Maine notably does not argue that Section 2016 actually serves that end. It instead just says the law's radical overbreadth should not matter because there is no foolproof way to "confirm that a person is not acting impulsively or in an agitated emotional state." Br.34. That may well be true, but Section 2016 does not meaningfully address that problem, as it not only rests on the dubious assumption that such impulses will fade in three days, but does not even preclude the transfer of a firearm to someone who *does* exhibit such tendencies during those three days.

More fundamentally, any law that can be justified only on the ground that it is impossible to know for certain who will misuse a firearm if permitted to keep and carry one cannot be reconciled with *Heller*, *Bruen*, or the Second Amendment itself, as that same logic could justify virtually any law—and indeed was invoked to try to

justify the very laws *Heller* and *Bruen* held unconstitutional. The district court did not abuse its discretion in concluding that Section 2016, which restricts arms-bearing conduct based on generalized "suspicion o[f] citizens presumably exercising their Second Amendment rights in a lawful way," *Daniels*, 101 F.4th at 778, is a law "put toward abusive ends," *Bruen*, 597 U.S. at 38 n.9.

### C. Section 2016 Is Inconsistent With This Nation's Historical Tradition of Firearm Regulation.

Once the burden shifts, this case is effectively over. Indeed, the historical record is so one-sided that Plaintiffs would prevail even if *they* bore the burden of proving that Section 2016 is *not* consistent with historical tradition.

**1.** A modern regulation fits within historical tradition only if it "impos[es] similar restrictions" on the arms-bearing right "for similar reasons" as historical analogues. *Rahimi*, 602 U.S. at 692. Maine suggests that it faces a lower standard, Br.27, but it never says what that standard entails. No matter—the Supreme Court has not minced words. Even "[w]hen confronting" "modern regulations that were unimaginable at the founding," the "historical inquiry that courts must conduct" asks "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 28-29. Put differently, "a court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692.

The Supreme Court has provided several signposts on this historical journey. "[C]entral to this inquiry" are two questions: the "[w]hy" and the "how." *Id.* As to the former, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* As to the latter, "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at the founding." *Id.*[3]

**2.** With those signposts guiding the way, the path forward is clear—as are the state's missteps. Many measures have been enacted over the centuries to address the unfortunate reality that some people want firearms for illicit purposes—from penalty-backed prohibitions on using firearms for improper purposes, to bans on possession by individuals who are likely to misuse them, to background checks to identify such individuals, to permits and licenses to carry firearms outside the home. But no state for 200 years forced law-abiding citizens to wait out an unadorned "cooling-off" period before they could acquire a firearm. *See* pp.4-9, *supra*.

---

[3] The Court has also given guidance on the *when*. Although "belated innovations of the mid- to late-19th-century" can "confirm[]" original meaning, "to the extent [this] later history contradicts" earlier understandings of the pre-existing right the Founders codified, the earlier understanding "controls." *Bruen*, 597 U.S. at 36-37. "[P]ost–Civil War discussions of the right to keep and bear arms … do not provide as much insight into [the Second Amendment's] original meaning." *Id.* at 36.

In "the early days of the Republic," there was no "open, widespread, and unchallenged" practice, *Bruen*, 597 U.S. at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone could take possession of a firearm, *see, e.g.*, *Silvester*, 41 F.Supp.3d at 962 ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment."). To the contrary, from the very beginning, courts recognized that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises. *Andrews*, 50 Tenn. at 177-78; *see also Heller*, 554 U.S. at 583 n.7.

Waiting-period provisions first came onto the scene in the twentieth century, around the same time that some states started adopting various types of background checks. *See Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring); *Rocky Mountain Gun Owners*, 701 F.Supp.3d at 1137 ("[N]o law requiring a waiting period was enacted in the United States until 1923."). But those early waiting periods, and the few that followed in later decades, were designed to facilitate burgeoning background-check processes, which were a much more time-consuming endeavor back then. *See* pp.4-7, *supra*. It was not until after the Berlin Wall had fallen that the first state saw fit to make people wait to take possession of a firearm *even after*

*they have passed a background check* and demonstrated that they are indeed "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *see* pp.7-9, *supra*.

"Cooling-off" laws like Section 2016 are thus a thoroughly modern innovation even as compared to administrative waiting-period laws—and one that would have been "unimaginable at the founding." *Rocky Mountain Gun Owners*, 701 F.Supp.3d at 1142. And *contra* Br.24-27, that is not because the problem Maine claims Section 2016 is intended to solve—preventing impulsive suicides and homicides committed with legally purchased firearms—arose only in recent years. While firearm misuse may be more common today than in earlier ages, it does not take a doctorate to realize that there have always been people who want to get their hands on a weapon to cause immediate harm to others or themselves. Yet there was no tradition—not at the Founding, not in the Reconstruction era, and not for the better part of the twentieth century—of making people "cool off" for a set number of days before they could take possession of a firearm, let alone of imposing a "cooling-off" period *on people who have already passed a background check*.

**3.** The state does not dispute any of that. Nowhere in its brief or in any of its "expert" reports does Maine purport to identify a tradition of temporarily preventing the general public from exercising *any* fundamental right (let alone the right to keep and bear arms) out of concerns that some people who want to exercise that right are

likely to engage in impulsive and harmful conduct unless given time to "cool off."[4]

Maine likewise does not dispute that the first state law imposing an unadorned "cooling-off" period was not enacted until the 1990s. *See* Add.13 & n.10. Nor does it deny that the (few) waiting-period laws of the early-twentieth century were designed to give licensing authorities time to conduct background checks, not just to make people wait. Instead, Maine claims that those differences do not matter because Section 2016 is relevantly similar to two sets of historical laws—laws restricting people's ability to use or acquire firearms "when intoxicated," and "[l]icensing and permitting laws." Br.27. But to say that the "'how and why'" of those laws "is the same as the 'how and why'" of Section 2016, Br.31, is to deprive those concepts of all meaning.

America's "tradition of firearm regulation" allows "the Second Amendment right" to "be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. Intoxication laws fit that tradition to a T. Again, it does not take an advanced degree to appreciate that someone who is drunk temporarily loses their claim to being sufficiently responsible to use a firearm. But our Nation's tradition does not countenance laws that "broadly

---

[4] Maine notably does not acknowledge the one context (abortion) in which waiting periods were imposed on similar reasoning—likely because this Court (and others) held such laws unconstitutional before *Dobbs*. *See Planned Parenthood*, 641 F.2d at 1023.

restrict arms use by the public generally," without regard to individualized concerns. *Id.* at 698. Yet that is precisely what Section 2016 does. Tellingly, the state identifies no law from any period in this Nation's history that restricted *everyone*'s ability to carry a gun—even just temporarily, say, after a certain time on weekends—on the theory that some might carry while drunk. For good reason: The Founders were manifestly unwilling to assume that every person with a firearm presents a potential danger regardless of whether they actually do. By embracing that assumption, the state flouts this Nation's historical tradition and ignores that a state "cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *Daniels*, 101 F.4th at 778.

For reasons already discussed, the state's analogy to licensing regimes runs aground (at least) on the "why." It took time in the horse-and-buggy days to assess whether someone was law-abiding. And *that* is what the wait was for; "the officials of old" were looking into "each individual's specific characteristics." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). Under Section 2016, however, someone who has already passed an individualized background check still must wait three days, based on the state's view that making everyone "cool off" before taking possession is in the public good. The state cannot identify any historical tradition whatsoever of intentionally delaying the exercise of Second Amendment rights—or any fundamental right, for that matter—for the express purpose of delaying their

exercise. That suffices to doom any claim that Section 2016 is consistent with historical tradition no matter who bears the burden of proof on that question. At the very least, it suffices to foreclose any argument that the district court abused its discretion by finding that Section 2016 is unlikely to pass constitutional muster.

Some of Maine's amici (but not Maine) invoke historical surety laws, *see* Coalition.Br.27, but those laws fail as analogues *a fortiori*. As *Rahimi* explained, "the surety and going armed laws … involved judicial determinations of whether *a particular defendant* likely would threaten or had threatened another with a weapon." 602 U.S. at 699 (emphasis added). Thus, "the tradition the surety and going armed laws represent" is one under which "an individual" "may be disarmed" if *that individual* has been "found by a court to present a threat to others." *Id.* at 698. Section 2016 is not even arguably individualized; its 72-hour disarmament applies to everyone. Surety laws are therefore "not a proper historical analogue" here for the same reason they were not in *Bruen*: Like "New York's gun licensing regime," Maine's cooling-off law failed to heed the lesson "that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* at 699-700; *see Bruen*, 597 U.S. at 55-59.

Ultimately, Maine's defense of Section 2016 boils down to insistence that the state *must* be able to do *something* to try to curb suicide and impulsive gun violence. Plaintiffs wholeheartedly agree that states can and should have "a variety of tools

for combating" those pressing public-policy problems. *See Heller*, 554 U.S. at 636.

"But the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* And our historical tradition does not countenance laws that delay everyone's ability to acquire a firearm on the theory that even law-abiding citizens who have passed a background check may be inflamed by violent passions simply because they want to exercise their constitutional right to keep and bear arms.

## II. The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors Favor Injunctive Relief.

This Court has recognized that certain constitutional rights have "such qualitative importance as to be irremediable by any subsequent relief," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009), and at least three circuits have held that the Second Amendment fits that bill, *see Baird v. Bonta*, 81 F.4th 1036, 1046-47 (9th Cir. 2023); *Wrenn v. District of Columbia*, 864 F.3d 650, 667-68 (D.C. Cir. 2017); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Courts have likewise held that the temporary loss of such a right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *see also, e.g.*, *Planned Parenthood*, 641 F.2d at 1023 (holding, before *Dobbs*, that a 24-hour waiting period on abortions constituted irreparable injury). So too here. A 72-hour loss of Second Amendment rights is every bit as irreparable as a 72-hour loss of any other fundamental right.

If anything, it poses even greater risks since the ability to timely exercise Second Amendment rights may literally be a matter of life or death. The district court recognized that reality, Add.17, which the record amply illustrates, *see, e.g.*, Appx.44-46 (Beckwith Declaration) ¶¶15-19; Appx.55-56 (White Declaration) ¶¶5-7; Appx.62-63 (Hendsbee Declaration) ¶9. Maine nevertheless baldly asserts that "there is no competent evidence in the record that a 72-hour delay in taking possession of a firearm puts survivors of domestic violence at risk." Br.37. It is unclear what Maine thinks "competent evidence" is, or why it thinks academic literature is worth more than the actual, lived experiences of "survivors of domestic violence to whom Beckwith provides firearm training." Br.37. Regardless, the state gives away the game when it responds to those experiences by denying the central premise of the Second Amendment. In Maine's view, even people facing a credible threat to their safety are better off without guns because "gun possession <u>increases</u> the risk of being the victim." Br.37. While Maine is certainly entitled to that belief, it cannot justify frustrating the ability of law-abiding citizens to exercise their right to keep and bear arms in their greatest time of need on the theory that keeping and bearing a firearm is a bad idea. After all, the Second Amendment "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635).

Maine's contention that Plaintiffs "failed to make a sufficient showing of any individualized harm," Br.36, likewise belies both the record and precedent. First, that Plaintiffs sued a few months after Section 2016 took effect in no way "undermin[es] their claim of irreparable harm." Br.36. "Although an unreasonable delay can undermine a showing of irreparable harm," *Covidien LP v. Esch*, 229 F.Supp.3d 94, 99 (D. Mass. 2017), there is nothing unreasonable about waiting to sue until injury-in-fact is clear. Second, no one is arguing "that the Second Amendment confers on gun sellers a right to make money." Br.38. But it is black-letter law that, "[w]here a party has established a concrete injury in fact"—which the FFL Plaintiffs undeniably have in the form of lost sales, *see* pp.11-13, *supra*—"it is 'entitled to assert those concomitant rights of third parties that would be "diluted or adversely affected" should [its] constitutional challenge fail and the statute[ ] remain in force.'" *PhRMA v. Concannon*, 249 F.3d 66, 74 (1st Cir. 2001) (alterations in original) (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)).

That is doubly true when, as here, the challenged law makes injuries to those third parties capable of repetition yet evading review. Maine posits that any injury Section 2016 occasions evaporates once 72 hours elapses: In its telling, Plaintiff Nancy Coshow "failed to make a sufficient showing of any individualized harm" because, although she was forced to wait 72 hours before she could take possession of a firearm, she now "has that firearm." Br.36. Maine thus seems to think the only

50

way a plaintiff could get relief from Section 2016 is by litigating a challenge to final judgment in 72 hours. That argument just proves why "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *PhRMA*, 249 F.3d at 74.

At any rate, Maine's argument takes no account of the irreparable nature of the constitutional injury Section 2016 inflicts. "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). "Any deprivation of any constitutional right fits that bill," *id.*; just as it is impossible to put a dollar-amount on an incursion of First (or Third) Amendment freedoms, it is impossible to put a price on an incursion of the right to keep and bear arms.

That leaves only "the balance of equities and the public interest." Add.17. Here, the state's long exegesis on policy misses the point. Reasonable minds may disagree about whether the right to acquire a firearm upon passing a background check "is *really worth* insisting upon." *Heller*, 554 U.S. at 634. But Maine does not write on a blank slate: "The Second Amendment 'is the very *product* of an interest balancing'" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). This case thus is not about whether suicide and impulsive

gun violence are pressing public-policy problems. They plainly are. Nor is it about whether states need "a variety of tools for combating th[ose] problem[s]." *Heller*, 554 U.S. at 636. They plainly do. This case is about whether the Founders would have countenanced Maine's judgment that the risk that someone who passes a background check might nonetheless be inflamed by fleeting passions justifies delaying all citizens' ability to acquire a firearm. They plainly would not. And Maine cannot defeat preliminary relief by insisting that it knows better than those who chose to enshrine the Second Amendment in the Constitution.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

May 28, 2025

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,981 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman type.

May 28, 2025

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<span style="margin-left:3em">s/Erin E. Murphy</span>
<span style="margin-left:3em">Erin E. Murphy</span>