# In the
# United States Court of Appeals
# for the First Circuit

◆

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY; NANCY COSHOW;
JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE;
TLC GUNSMITHING AND ARMORY; A& G SHOOTING,

*Plaintiffs–Appellees,*

v.

AARON M. FREY, in his personal capacity and in his official capacity as
Attorney General of Maine,

*Defendant–Appellant.*

◆

On Appeal from the United States District
Court for the District of Maine
No. 1:24-cv-00384

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT
OF APPELLEES AND AFFIRMANCE**

◆

ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* makes the following statements:

The National Rifle Association of America has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT...............................1

TABLE OF AUTHORITIES .............................................3

STATEMENT OF *AMICUS CURIAE*.........................................7

CONSENT TO FILE ...............................................7

SUMMARY OF ARGUMENT...........................................8

ARGUMENT.......................................................11

   I. The Second Amendment's plain text covers the purchase of
firearms. ....................................................11

     A.  The Second Amendment's plain text protects Plaintiffs' right
to possess arms. ........................................11

     B.  The right to "keep Arms" includes the acquisition of arms. .........12

       i.  The right to possess arms includes the right to acquire arms. ..12

      ii.  The right to acquire arms is a necessary concomitant of the
right to keep and bear arms. ....................................14

     C.  The government errs in attempting to shoehorn consideration
of the length of a waiting period into the plain text analysis.......21

  II. Maine's Waiting Period Law is not a "presumptively lawful"
qualification on the commercial sale of arms insulated from
further analysis....................................................24

 III. Maine's Waiting Period Law is inconsistent with this Nation's
historical tradition of firearm regulation..........................27

     A.  Intoxication Laws are a poor analogy to the Waiting Period
Law. ..............................................................28

     B.  Licensing Regimes are not a historical analogue to the Waiting
Period Law. .......................................................30

     C.  This Court must not follow in *Ortega*'s racist footsteps................31

CONCLUSION ......................................................34

CERTIFICATE OF COMPLIANCE...........................................35

CERTIFICATE OF SERVICE ............................................36

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Commonwealth*,
 4 Va. 447 (1824) ............................................................... 32

*Andrews v. State*,
 50 Tenn. 165 (1871) ......................................................... 15

*B & L Productions, Inc. v. Newsom*,
 104 F.4th 108 (9th Cir. 2024) ...................................... 17, 18

*Beckwith v. Frey*,
 No. 1:24-cv-00384, 2025 WL 486830 (D. Me. Feb. 13, 2025) ............. 20

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ................................................... passim

*Dred Scott v. Sandford*,
 60 U.S. (19 How.) 393 (1857) ............................................. 32

*Drummond v. Robinson Twp.*,
 9 F.4th 217 (3d. Cir. 2021) .............................................. 15

*Ezell v. City of Chicago*,
 651 F.3d 684 (7th Cir. 2011) ............................................. 15

*Gazzola v. Hochul*,
 88 F.4th 186 (2d Cir. 2023) .............................................. 15

*Guns Save Life, Inc. v. Kelly*,
 2025 IL App (4th) 230662 ................................................. 21

*Hill v. Colorado*,
 530 U.S. 703 (2000) ...................................................... 22

*Jackson v. City and County of San Francisco*,
 746 F. 3d 953 (C.A.9 2014) ............................................... 14

*Luis v. United States*,
 578 U.S. 5 (2016) ........................................................ 15

*McCulloch v. Maryland,*
    17 U.S. 316 (1819).................................................13

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024) ...........................................18, 19

*Nat'l Rifle Ass'n v. Bondi,*
    133 F.4th 1108 (11th Cir. 2025) ............................................15

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)............................................... passim

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York,*
    590 U.S. 336 (2020).................................................14

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan,*
    103 F.4th 1186 (6th Cir. 2024) ............................................14

*Ortega v. Lujan Grisham,*
    741 F. Supp. 3d 1027 (D.N.M. 2024) ...........................................30, 31

*Pena-Rodriguez v. Colorado,*
    580 U.S. 206 (2017).................................................31

*Ramos v. Louisiana,*
    590 U.S. 83 (2020).................................................31

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    127 F.4th 583 (5th Cir. 2025) .................................................17, 18, 19

*Renna v. Bonta,*
    667 F. Supp. 3d 1048 (S.D. Cal. 2023).................................................23

*Richmond Newspapers v. Virginia,*
    448 U.S. 555 (1980).................................................13

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) ............................................17

*Rocky Mountain Gun Owners v. Polis,*
    701 F. Supp. 3d 1121 (D. Colo. 2023) .....................................27, 28, 30

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ............................................................ 16

*United States v. Rahimi,*
  602 U.S. 680 (2024) ...................................................... 26, 29, 33

*Vermont Federation of Sportsmen's Clubs v. Birmingham,*
  741 F. Supp. 3d 172 (D. Vt. 2024) .................................... 28, 30

*Yukutake v. Lopez,*
  130 F.4th 1077 (2025) ........................................... 16, 17, 18

## Constitutional Provisions

U.S. Const. amend. I ............................................................ 22

U.S. CONST. amend. II ................................................ passim

## Other Authorities

*about*, DICTIONARY.COM ........................................................ 12

Brief for Amicus Curiae National African American Gun
  Association, Inc. in Support of Petitioners, July 16, 2021,
  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 .......... 31

Cramer, Clayton E., LOCK, STOCK, AND BARREL: THE ORIGINS OF
  AMERICAN GUN CULTURE (2018) ........................................ 26

Fletcher, Wayne, *Can stores refuse to sell firearms?*, THE GUN ZONE
  (Jul. 16, 2024) ................................................................ 29

Gill, Jr., Harold B., THE GUNSMITH IN COLONIAL VIRGINIA (1974) ......... 26

*have*, DICTIONARY.COM .......................................................... 13

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1
  (4th ed. 1773) ................................................................ 12

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996) .............. 12

Nelson, Steven, *Dealer's Choice: Gun Store Owners Can Deny Anyone They Want*, U.S. NEWS (Jun. 17, 2016) .................................. 29

THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) .............. 12

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (1828) ....................................................................... 12

## STATEMENT OF *AMICUS CURIAE*[1]

**The National Rifle Association of America (NRA)** is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately 4 million members, and its programs reach millions more.

This case concerns *Amicus* because a right delayed is a right denied. The arbitrary dispossession of Second Amendment rights caused by the Waiting Period Law infringes on the individual right to self-defense. NRA has members in Maine who are subject to the Waiting Period Law and is challenging other waiting period laws in other courts across the country.

## CONSENT TO FILE

All parties consented to the filing of this brief.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amicus* and their members contributed money intended to fund its preparation or submission.

# SUMMARY OF ARGUMENT

The Supreme Court has clearly defined its test for evaluating firearms regulations: When the regulated conduct is covered by the Second Amendment's plain text, the Constitution presumptively protects that conduct, and the government must justify its regulation by demonstrating that it is consistent with historical tradition. Maine's Waiting Period Law fails that test.

The Second Amendment's plain text covers the conduct at issue: possessing or taking possession of a newly, legally purchased firearm. The Second Amendment guarantees the individual right to possess and carry firearms. And the right to "keep Arms" protects the right to acquire them. From the earliest American dictionaries through the present, the definition of "having" something includes the right to obtain or acquire it. Moreover, the right to acquire arms is a necessary concomitant of the right to keep and bear them; without some protection on acquisition, the right to keep and bear arms would be toothless.

The government errs in its attempt to shoehorn the length of the waiting period into the plain text analysis. Plaintiffs' desired conduct—possession of arms—is clearly covered by the plain text; the regulation

thereof must be analyzed by history and tradition. Whether a waiting period is constitutional—and whether the length of the waiting period makes a difference to its constitutionality—cannot be determined by the plain text. The government must demonstrate the Waiting Period Law is consistent with this Nation's historical tradition of firearms regulation.

Moreover, the Waiting Period Law is not a condition or qualification on the commercial sale of arms that enjoys a presumption of constitutionality. Even if it was, such regulations do not undergo a less stringent constitutional analysis. *Bruen* was clear that *all* firearms regulations—even those *Heller* listed as "presumptively lawful"—are subject to the same text-and-history test.

The Waiting Period Law does not pass that test. The government's proffered analogues are a poor fit. First, intoxication laws applied only to a finite segment of the population—intoxicated individuals—based on an individualized assessment of dangerousness; the Waiting Period Law assumes everyone is dangerous. Second, licensing regimes are intended to determine whether someone is a law-abiding, responsible citizen who is not prohibited from possessing a firearm; while there may be a delay in possession while that determination is being made, the Waiting Period

Law forces an additional, arbitrary delay *after* someone has been found to be law-abiding and responsible.

Finally, the government relies on a district court case that found a waiting period law constitutional by relying on racist and discriminatory postbellum firearms laws. The Supreme Court has already made clear that such laws should not be relied upon to create a historical tradition; this Court should do the same.

For these reasons, the Waiting Period Law is unconstitutional, and Plaintiffs are likely to succeed on the merits of their case. Therefore, this Court should affirm the district court's grant of Plaintiffs' Motion for Preliminary Injunctive Relief.

**ARGUMENT**

## I. The Second Amendment's plain text covers the purchase of firearms.

The initial inquiry in a Second Amendment challenge is whether "the Second Amendment's plain text covers" the plaintiffs' desired conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). The Supreme Court conducted the plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008). The Court's analysis makes clear that the plain text covers Plaintiffs' desired conduct: possession of their purchased firearms. And even if the Waiting Period Law is characterized as a restriction on acquisition rather than possession, Supreme Court precedent makes clear that the right to acquire arms is inherent to the right to keep and bear arms.

### A. The Second Amendment's plain text protects Plaintiffs' right to possess arms.

The *Heller* Court held that the Second Amendment's "textual elements" "guarantee the individual right to possess and carry weapons." 554 U.S. at 592. This right belongs to "all Americans" and "extends, prima facie, to all instruments that constitute bearable arms." *Id*. at 580, 582. This is precisely the conduct Plaintiffs wish to engage in here: to

possess bearable arms they have purchased. The Waiting Period Law prevents Plaintiffs from possessing their arms. But for the Waiting Period Law, Plaintiffs could possess their firearms immediately after their purchase is complete; instead, they must wait an additional, arbitrary 72 hours before taking possession.

Because "the Second Amendment's plain text covers" Plaintiffs' possession of their purchased firearms, the government must "justify its regulation" that deprives Plaintiffs of their firearms for 72 hours "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## B. The right to "keep Arms" includes the acquisition of arms.

It does not matter if the Waiting Period Law is characterized as a restriction on firearm acquisition rather than possession; the analysis is the same. The right to acquire arms is inherent to the right to possess them.

### i. The right to possess arms includes the right to acquire arms.

The *Heller* Court consulted Founding-era dictionary definitions of Second Amendment terms to conclude that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at

582. To "have" something, both historically and today, include its acquisition. The 1773 edition of Samuel Johnson's *Dictionary of the English Language* defined "have" as "5. To obtain" and "6. To take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[2] Noah Webster's 1828 *American Dictionary of the English Language* similarly defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated).[3]

Today, *Merriam Webster*'s defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 553 (10th ed. 1996). *American Heritage* defines "have" as "6.a. To come into possession of; acquire. b. To receive; get. c. To accept; take." THE AMERICAN HERITAGE COLLEGE DICTIONARY 622 (3d ed. 1993). Even Dictionary.com[4] defines "have" as "3 to get, receive, or

---

[2] The *Heller* Court repeatedly referred to Johnson's definitions. 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear), 597 ("well-regulated").

[3] The *Heller* Court also repeatedly referred to Webster's definitions. 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

[4] Dictionary.com "is the world's leading digital dictionary" with over 5.5 billion word searches each year. *about*, DICTIONARY.COM, www.dictionary.com/e/about/ (last visited June 3, 2025).

take" and "19 to gain possession of." *have*, DICTIONARY.COM, www.dictionary.com/browse/have (last visited June 3, 2025).

Because to "keep Arms" naturally means to "have weapons," *Heller*, 554 U.S. at 582, and because to "have" includes the act of receiving, the plain meaning of the text of the Second Amendment must include the acquisition and receipt of firearms.

> ii. **The right to acquire arms is a necessary concomitant of the right to keep and bear arms.**

Additionally, the right to acquire arms is a necessary concomitant of the right to possess arms.

"A constitution…. requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819). In other words, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980). And "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 580.

With regard to the Second Amendment, four Supreme Court Justices agreed—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to the range in order to gain and maintain the skill necessary to use it responsibly" as well as the right "to take a gun outside the home in order to transfer ownership lawfully." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 364–65 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 340 (Kavanaugh, J., concurring) ("agree[ing] with Justice ALITO's general analysis of *Heller*"); *see also Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, 103 F.4th 1186, 1192 (6th Cir. 2024) ("at least some [firearms] training is protected … because it is a necessary corollary to the right defined in *Heller*. Four Justices seemingly endorsed this view.").

Another "necessary concomitant" of the right to keep and bear arms is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise…. The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F. 3d 953, 967 (C.A.9 2014) (internal quotation marks omitted)…. Without protection for th[is] closely related right[], the Second Amendment would be toothless.

15

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

In a case *Heller* cited approvingly three times, 554 U.S. at 608, 614, 629, the Tennessee Supreme Court held that "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Almost every Circuit to consider the question has agreed with that conclusion to at least some extent. The Third Circuit held that the Second Amendment protects the right to purchase firearms. *Drummond v. Robinson Twp.*, 9 F.4th 217, 226–29 (3d. Cir. 2021), *abrogated on other grounds by Bruen*, 597 U.S. at 19. The Seventh Circuit held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The Second Circuit held that "[t]he right to keep arms, necessarily involves the right to purchase them." *Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) (quoting *Andrews*, 50 Tenn. at 178). And the Eleventh Circuit clearly assumed the right to purchase firearms is covered by the Second Amendment in a recent case involving a purchase ban for adults under 21 in which the court jumped straight to the historical analysis. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1114 (11th Cir. 2025) (en banc); *see*

*also id.* at 1171 (Brasher, J., dissenting) ("we must decide whether the right to keep and bear arms extends to the purchase of firearms. Neither the Commissioner of Florida's Department of Law Enforcement nor the majority opinion disputes that this first step is met in favor of the plaintiffs.").

The Fifth and Ninth Circuits both recognized that *some* right to purchase or acquire firearms is protected by the Second Amendment. The Ninth Circuit held that "[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense," *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc), because "[a]s with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms," *id.* at 677 (quotation omitted). Earlier this year, the Ninth Circuit reaffirmed *Teixeira*'s holding, stating that "the text of the Second Amendment must be understood as protecting the right of individuals to purchase and acquire firearms." *Yukutake v. Lopez*, 130 F.4th 1077, 1090 (2025). "Put simply, the right to 'possess' a firearm—which *Bruen* recognized is protected by the plain text of the Second Amendment—

includes within it the right to *take possession of* a firearm, *i.e.*, to acquire one." *Id*. Also just earlier this year, the Fifth Circuit held that "the right to 'keep and bear arms' surely implies the right to purchase them." *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 590 (5th Cir. 2025).

Both the Fifth and the Ninth Circuits suggest that scope of the plain text's protection of the right to acquire firearms is limited to cases where a regulation is "abusive" or "meaningfully constrains" the right.[5] *B & L Productions, Inc. v. Newsom* recognized that "the Second Amendment protects ancillary rights necessary to the realization of the core right" and "unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." 104 F.4th 108, 18 (9th Cir. 2024) (quotation omitted). The

---

[5] The Tenth Circuit also upheld a prohibition on commercial firearms purchases by 18-to-20-year-olds as a "presumptively lawful" "condition or qualification on the sale of arms" which therefore "falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119–20 (10th Cir. 2024). Due to that "safe harbor," *id.*, the majority found it unnecessary to "decide in this case the full scope of concomitant rights, if any, to 'keep and bear,'" *id.* at 118. But Judge McHugh "would conclude that purchasing firearms is a necessary concomitant of the right to 'keep and bear Arms'" because "acquisition is a prerequisite to possession." *Id.* at 140 (McHugh, J., concurring).

State relies on *B & L Productions* for the proposition that "presumptively lawful" "conditions and qualifications on the commercial sale of arms" only implicate the plain text of the Second Amendment if they "*meaningfully constrain[]* the right to keep and bear" arms." *Id.* at 119 (emphasis added). But *Yukutake* made clear that proposition does not apply here: "particular discrete commercial restrictions" like the restriction on sales on state-owned property at issue in *B & L Productions* "do not stand on the same ground footing as an across-the-board regulation of the acquisition of handguns," like the Waiting Period Law. 130 F.4th at 1091.

Similarly, the Fifth Circuit in *McRorey v. Garland* recognized that "[t]he right to 'keep and bear' can implicate purchase." 99 F.4th 831, 838 (5th Cir. 2024). Like *B & L Productions*, however, the *McRorey* court held that "presumptively lawful" "conditions and qualifications on the commercial sale of arms" only implicate the plain text of the Second Amendment if they are "abusive" or represent "functional prohibitions on keeping." *Id.* at 838–39.[6]

---

[6] The government contends the instant case is closer to *McRorey*, 99 F.4th 838–39, than *Reese*, 127 F.4th at 590. *Reese* involved a ban on the sale or delivery of handguns to adults between the ages of 18 and 20. *Id.*

Respectfully, this Court should find that the right to purchase or acquire firearms is covered by the plain text of the Second Amendment. Every Circuit to have decided the issue recognizes that the right to purchase or acquire firearms implicates the plain text in at least *some* instances. Those that have limited it to certain instances do so by looking at "*how* ... the regulation[] burden[s] a law-abiding citizen's" Second Amendment rights. *Bruen*, 597 U.S. at 29. As discussed in the next section, this is precisely the purpose of the historical analysis under *Bruen*, not the plain text analysis. *See id.*

Moreover, a waiting period is not a condition or qualification on the commercial sale of arms. And even if it were, even "presumptively lawful"

_____

at 586. Setting aside that both *Reese* and the instant case involve banning the delivery of a firearm to a purchaser until a certain amount of time has passed (in *Reese*, until the purchaser turns 21; here, until the 72-hour Waiting Period has elapsed), the government characterizes the regulation at issue in *Reese* as an "outright ban" on firearms acquisition, Appellant's Br. at 23 n.12 (quoting *Reese*, 127 F.4th at 590 & n.2), while suggesting this case is closer to *McRorey*, in which the Fifth Circuit upheld a "law imposing a delay of up to ten days on firearms purchases." *Id*. But the government fails to mention that the up-to-ten-day delay at issue in *McRorey* was the delay that may occur *while a background check is pending*, 99 F.4th at 839—not, as here, an additional, arbitrary waiting period *even after a background check has been completed*.

categories of regulations are subject to *Bruen*'s text-and-history test; they are not insulated from Constitutional scrutiny. *See infra* Part II.

### C. The government errs in attempting to shoehorn consideration of the length of a waiting period into the plain text analysis.

At the plain text stage, the government conflates the basic right to acquire or take possession of arms—Plaintiffs' desired conduct in the instant case—with the right to do so *within a certain time period*. The former is protected by the plain text of the Second Amendment; if there is a relevant time period, that is a question of history and tradition.

As an initial note, this case does not ask whether individuals can obtain firearms "immediately … free of any regulation." *See* Appellant's Br. at 21. Rather, this case involves a law that prevents purchasers from possessing their firearms for 72 hours, "even those who have passed an instant background check at the FFL's dealer's counter"—in other words, those that have already been deemed law-abiding, responsible citizens. *See Beckwith v. Frey*, No. 1:24-cv-00384, 2025 WL 486830, at *3 (D. Me. Feb. 13, 2025). This so-called "cooling off" period is a different deprivation altogether than the wait associated with the completion of a background check to ensure a prospective purchaser is not a prohibited person.

Again, the proposed conduct in the instant case is possessing a newly, legally purchased firearm. The length of any wait imposed on that conduct is irrelevant as an initial matter. The government suggests the length of the wait matters to the plain text: it suggests that a 25-year waiting period would implicate the Second Amendment while a 72-hour waiting period does not. *See* Appellant's Br. at 27. But there is clearly nothing in the Second Amendment's plain text that turns on the length of a waiting period. The government further suggests that the relevant inquiry is whether the waiting period in question is "abusive" or "a de facto prohibition on keeping and bearing arms." *Id.* (quotations omitted). However, this is a question properly answered by historical analysis— "*how* … the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

To argue the extent of a regulation's burden at the plain text stage "conflates the protections offered in the operative phrase 'shall not be infringed' and the conduct to be protected, 'the right of the people to keep and bear arms.'" *Guns Save Life, Inc. v. Kelly*, 2025 IL App (4th) 230662, ¶ 150 (DeArmond, J., dissenting). Plaintiffs' proposed conduct— possessing or taking possession of arms—is protected. Whether and to

what extent that protected conduct is infringed—whether a regulation is permissible or unconstitutional—must be determined through historical analysis.

Moreover, the claim that a right delayed does not even implicate the Constitution would never withstand scrutiny in the context of any other fundamental right. For example, imagine a mandatory 72-hour delay on offering a political stump speech, or posting an opinion online— to prevent the speaker from engaging in impulsive rhetoric. While such a law would not "take away" anyone's right to speak—only delay it—it would still clearly implicate the First Amendment. *Cf. Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting) ("The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips; and they cannot be avoided by regulating the act of extending one's arms to deliver a handbill, or peacefully approaching in order to speak.").

Regardless of the length of the waiting period at issue, Plaintiffs' desired conduct is the same: to possess—or take possession of—bearable arms. This conduct is clearly covered by the plain text of the Second Amendment. Whether or to what extent any waiting period may

represent a permissible burden on that conduct is a question that can only be answered by historical analysis.

## II. Maine's Waiting Period Law is not a "presumptively lawful" qualification on the commercial sale of arms insulated from further analysis.

The Waiting Period Law is not a "commercial regulation." Its very purpose is to impose a burden on the exercise of the individual right to keep and bear arms. And a law that directly burdens an individual's right to self-defense by strategically regulating a business is not a true commercial regulation. By the government's logic, an indefinite or exorbitantly lengthy (say, 25-year) waiting period is merely a commercial regulation and thus presumptively lawful.[7] This cannot be the case. *See Renna v. Bonta*, 667 F. Supp. 3d 1048, 1065 (S.D. Cal. 2023) ("If the commercial sales limitation identified in *Heller* were interpreted as broadly as the State suggests, the exception would swallow the Second Amendment.").

Regardless, even if a waiting period could be categorized as a "presumptively lawful" "condition[] and qualification[] on the commercial

---

[7] Of course, the government readily admits that such a law would not withstand a Second Amendment challenge. Appellant's Br. at 27.

sale of arms," such a regulation must still be historically justified. *See Heller*, 554 U.S. at 626–27 n.26. The Supreme Court has repeatedly stated that its text-and-history test applies to *all* firearms regulations. In *Bruen*, the Supreme Court forth "*the standard* for applying the Second Amendment": "The government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." 597 U.S. at 24 (quotation omitted and emphasis added).

*Bruen* reiterated twice that the "only" way the government can justify a modern regulation is with historical tradition. *Id*. at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (quotation marks omitted and emphasis added); *id*. at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment … does not protect petitioners' proposed course of conduct.") (emphasis added).

*Bruen* and *Heller* both demonstrate that the "presumptively lawful" categories listed in *Heller* are subject to the same standard as any other regulation. Nothing suggests that such categorization exempts them from the plain text or otherwise subjects them to a different constitutional standard. Indeed, *Heller* itself specified that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635.

The *Bruen* Court specifically applied the text-and-history when considering a regulation deemed "presumptively lawful" in *Heller*. New York "attempt[ed] to characterize [its] proper-cause requirement as a 'sensitive-place' law." *Bruen*, 597 U.S. at 30. Regardless of any presumption, the Court consulted "the historical record" to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Id*. at 30–31. *Bruen* thus held the "presumptively lawful" "sensitive place" regulation to the same standard that applies to all firearms regulations.

The Court has clearly and repeatedly defined its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *United States v. Rahimi*,

602 U.S. 680, 681 (2024) ("the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Never has the Court articulated an exception for "presumptively lawful" regulations. Therefore, regulations imposing conditions and qualifications on commercial sales of firearms must be historically justified.

### III. Maine's Waiting Period Law is inconsistent with this Nation's historical tradition of firearm regulation.

Because the plain text protects Plaintiffs' conduct, the government bears the burden of "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. It has not and cannot do so.

Firearms commerce has been popular since the earliest days of the American colonies. In colonial Virginia, for instance, "Gunsmiths were found nearly everywhere: in port towns along the coast, in settled inland areas, and … on the frontier." Harold B. Gill, Jr., THE GUNSMITH IN COLONIAL VIRGINIA 1 (1974); *see also* Clayton E. Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE 30 (2018) ("[T]he evidence is clear that gunsmiths were *very* common in Colonial, Revolutionary, and Early Republic America.").

Yet the first waiting period enacted in the United States was not until 1923, when California enacted a one-day waiting period. *See Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1137 (D. Colo. 2023) ("[N]o law requiring a waiting period was enacted in the United States until 1923."). Thus, there is no Founding or Reconstruction Era tradition of requiring law-abiding citizens to wait an arbitrary period of time to take possession of a newly purchased firearm. In an attempt to overcome this clear lack of historical tradition of imposing arbitrary waiting periods, the government offers ill-fitting analogies that do not support the Waiting Period Law.

Two metrics are vital in determining whether proffered regulations are "relevantly similar under the Second Amendment": "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphasis added). Each of the government's proposed analogues fail on at least one of these metrics.

## A. Intoxication Laws are a poor analogy to the Waiting Period Law.

The government first attempts to rely on laws regulating the use and carry of firearms by intoxicated people to justify the Waiting Period Law. Appellant's Br. at 34–36. Those laws are poor analogies because

they did not assume that everyone is always intoxicated and make them wait a certain predetermined amount of time to sober up; rather, the intoxication laws applied only to currently intoxicated individuals, who could acquire or possess a firearm as soon as they sobered up. The Waiting Period Law, by contrast, assumes everyone is suicidal or homicidal, and requires them to wait a predetermined, arbitrary amount of time to acquire a weapon, no matter how responsible they appear in the interim.

The government relies on *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172 (D. Vt. 2024), and *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1121, for the proposition that intoxication laws and waiting period laws are comparable because "the only difference between the two laws is the reason why the individual makes a reckless decision: one based upon alcohol, and one based upon inflamed passions or fears." *Birmingham*, 741 F. Supp. 3d at 212, *see also Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1144 ("[T]he Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm."). But again, these cases—both out-of-Circuit, district court decisions—ignore a

critical difference in *how* the two laws operate. Intoxication laws prevent possession of a firearm based on an individualized assessment of a specific would-be firearms possessor; waiting period laws assume every would-be possessor is impulsive or reckless, regardless of any evidence to the contrary.[8] "[O]ur nation's historical tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Rahimi*, 602 U.S. at 700. The Waiting Period Law does not follow this tradition.

## B. Licensing Regimes are not a historical analogue to the Waiting Period Law.

The government also relies on licensing laws to support the Waiting Period Law, citing the same two district court cases as it did for intoxication laws. Again, these laws are poor analogies. Both cases note

---

[8] Indeed, firearms retailers can—and often do—make individualized assessments of would-be purchasers who appear impulsive or reckless. "A store might, for instance, have a policy of refusing sales to individuals who … behave erratically." Wayne Fletcher, *Can stores refuse to sell firearms?*, THE GUN ZONE (Jul. 16, 2024), https://thegunzone.com/can-stores-refuse-to-sell-firearms/; *see also* Steven Nelson, *Dealer's Choice: Gun Store Owners Can Deny Anyone They Want*, U.S. NEWS (Jun. 17, 2016, 5:29 PM), https://www.usnews.com/news/articles/2016-06-17/dealers-choice-gun-store-owners-can-deny-anyone-they-want ("Gun dealers tell U.S. News they can and do refuse to sell to people they have a bad feeling about.").

that licensing laws support a delay to determine that a firearms purchaser is a law-abiding, responsible citizen—that is, the purchaser is not a prohibited person. *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1145 ("[T]he Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm [incidental to a licensing law] in order to ensure that those receiving a firearm are law-abiding, responsible citizens."); *see also Birmingham*, 741 F. Supp. 3d at 212 (Both waiting period laws and licensing laws "allow for background checks and mandate delays so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens."). But both of those cases fail to recognize the difference between a delay incidental to a licensing law *before* it is established that the purchaser is a law-abiding, responsible citizen and a delay *after* that fact is established due to an arbitrary "cooling off" period. While both may result in a delay, they do not share a "why."

**C. This Court must not follow in *Ortega*'s racist footsteps.**

Finally, the government points to *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027 (D.N.M. 2024), for the conclusion that there is a "deeply rooted historical tradition of restricting and even outright prohibiting the

sale of firearms to large groups of a fear that some among that group might use those firearms to harm society." Appellant's Br. at 36 (quoting *Ortega*, 741 F. Supp. 3d at 1088–89). But the "tradition" referenced in *Ortega* is one built on racism, which should not be countenanced today.

First, *Bruen* makes clear that discriminatory historical laws cannot establish a tradition. The *Bruen* Court did not consider any historical laws requiring African Americans to acquire discretionary carry licenses when analyzing New York's discretionary licensing law for carrying arms—despite the fact that many were presented to the Court. *See, e.g.*, Brief for Amicus Curiae National African American Gun Association, Inc. in Support of Petitioners at 4–11, July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843. Rather, the Supreme Court "has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 590 U.S. 83, 128–29 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017)).

Second, a key component of these discriminatory laws is that they were not applied to individuals with recognized rights. *See, e.g.*, *Bruen*, 597 U.S. at 60 ("If blacks were citizens, Taney fretted, they would be

entitled … 'to keep and carry arms wherever they went.'" (quoting *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857), *superseded* (1868)) (emphasis omitted); *see also Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824) ("the Bill of Rights … was not intended to apply to our slave population," and "free blacks and mulattoes were also not comprehended in it"). The fact that many states applied regulations to disfavored noncitizens but never to free citizens indicates a recognition that such laws would violate the Constitution. Indeed, *Bruen*'s discussion of *Dred Scott* and other precedents used to disarm Blacks was not done in the context of analogical reasoning to limit the scope of the Second Amendment; it was done to find conduct protected by the right. 597 U.S. at 60–62. Depriving only disfavored groups of certain conduct favored groups could exercise clearly shows that such conduct was within the historical scope of the right. *See id.* at 58 (historical accounts of surety laws being enforced only against Blacks "is surely too slender a reed on which to hang a historical tradition").

Finally, even if it were proper to consider these racist historical laws, their analogical value runs into one of the same problems as intoxication laws: these laws, like intoxication laws, only affect a discreet

segment of the population (here, certain "disfavored" racial or religious groups; the former, intoxicated individuals). Conversely, the Waiting Period Law applies to everyone. Again, that is inconsistent with "our nation's tradition of firearm regulation" of "distinguish[ing] citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Rahimi*, 602 U.S. at 700.

## CONCLUSION

The Waiting Period Law is unconstitutional, and Plaintiffs are likely to succeed on the merits of their case. Therefore, the district court's grant of Plaintiffs' Motion for Preliminary Injunctive Relief should be affirmed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
Erin M. Erhardt
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,610 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2025, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*