No. 25-1160

## UNITED STATES COURT OF APPEALS
### For The First Circuit

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY
COSHOW; JAMES WHITE; J. WHITE GUNSMITHING;  ADAM
HENDSBEE; THOMAS COLE; TLC GUNSMITHING AND ARMORY;
A&G SHOOTING,

Plaintiffs-Appellees,

v.

AARON M. FREY, in their personal capacity and in
their official capacity as Attorney General of Maine,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE (CASE NO. 1:24-cv-00384-LEW)

## REPLY BRIEF OF DEFENDANT-APPELLANT

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
PAUL SUITTER
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel. (207) 626-8800
Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Table of Authorities ........................................................................ ii

Argument............................................................................... 1

    The Second Amendment's plain text does not apply to Maine's
    waiting period law ...................................................................... 1

    Maine's waiting period law is presumptively lawful ................................ 7

    Just like the federal background check law, Maine's waiting
    period law briefly delays sales in order to ensure that buyers
    will act responsibly ..................................................................... 9

    Delays may be imposed on the exercise of other constitutional
    rights ...................................................................................... 13

    Maine's waiting period law is consistent with the Nation's
    historical tradition of firearm regulation................................... 15

Conclusion .............................................................................. 17

Certificate of Compliance ........................................................... 19

Certificate of Service ................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) ............................ 1, 2

*Chavez v. Bonta*, 2025 WL 918541 (S.D. Cal. Mar. 26, 2025) ................................ 1

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ............................... 3, 4, 5, 7, 8

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ....................... 13, 15

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ...................................................... 1

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................... 5

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)............................................. 5, 6, 8

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) ................ 9, 10

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................ 3

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) .............................................. 1, 2

*Mills v. New York City*, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024)...................... 1

*National Rifle Association v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) .................... 6

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1
   (2022) .......................................................................................................Passim

*Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027 (D.N.M. 2024) ....................... 1, 4

*Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006
   (1st Cir. 1981) ............................................................................................... 13, 14

*Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992).................... 13, 15

*Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121
   (D. Colo. 2023) ................................................................................................. 1, 7

*Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007)....................................... 15

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) ................................. 3

*United States v. Rahimi*, 602 U.S. 680 (2024) ................................................ 1, 3, 16

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d. 172 (D. Vt. 2024) ............................................................................................. 1

*Zherka v. Bondi*, No. 22-1108-CV, 2025 WL 1618440 (2d Cir. June 9, 2025) ....... 5

**Statute**

18 U.S.C. § 922(t)(1) .................................................................................... 9

**Other Authorities**

Black's Law Dictionary .................................................................................. 9

Dictionary.com
   https://www.dictionary.com/browse/have ................................................... 4

Merriam-Webster's Collegiate Dictionary
   https://www.merriam-webster.com/dictionary/have ................................... 4

Noah Webster's 1828 American Dictionary of the English Language ................... 4

# ARGUMENT

### *The Second Amendment's plain text does not apply to Maine's waiting period law.[1]*

Appellees state that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024) "make clear beyond cavil that when the government regulates arms-bearing conduct, it must justify that restriction." Appellees' Br., 20. But as the Attorney General explained in his opening brief, Appellant's Br., 14-23, Maine's waiting period law does not regulate "arms-<u>bearing</u> conduct." It regulates the commercial acquisition of firearms and does not implicate the Second Amendment. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024); *Chavez v. Bonta*, No. 19-CV-1226-L-AHG, 2025 WL 918541, at *7 (S.D. Cal. Mar. 26, 2025); *Mills v. New York City*, No. 23-CV-07460 (JSR), 2024 WL 4979387, at *9 (S.D.N.Y. Dec. 4, 2024); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 207 (D. Vt. 2024); *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1072 (D.N.M. 2024); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023); *see also Duncan v. Bonta*, 133 F.4th

---

[1] This reply brief addresses only the likelihood of success on the merits. For the remaining preliminary injunction factors the Attorney General rests on the arguments he made in his initial brief, Appellant's Br., 35-40, arguments which Appellees fail to refute. Of particular significance, Appellees offer nothing to controvert the evidence that a waiting period in Maine would have saved twelve lives in just one year. *Id.*, 39.

852, 860 (9th Cir. 2025) (en banc) (holding that possession of large-capacity magazines "falls outside the text of the Second Amendment" because the Second Amendment protects "arms" and not "accessories" or "accoutrements").[2]

The Second Amendment protects the right to "keep" and "bear" arms. These words confer a right to possess and carry arms, and not a right to acquire them free of any commercial restrictions. Appellees argue that *Bruen* "makes . . . clear" that the Second Amendment bars restrictions that "frustrate[] the ability to keep or bear arms." Appellees' Br., 25. As an initial matter, Maine's law does not frustrate the ability to keep and bear arms. It does not apply at all to firearms that a person is already keeping and bearing and only delays for a brief period some (not all) acquisitions of firearms. In *Bruen*, on the other hand, the state law at issue directly restricted the ability of persons to carry firearms in public, and the "definition of 'bear' naturally encompasses public carry." *Bruen*, 597 U.S. at 32. Plus, the Court in *Bruen* clarified that it was not calling into question "shall-issue" licensing regimes that require applicants to undergo a background check or pass a firearms safety course before being allowed to carry a handgun in public. 597 U.S. at 38 n.9. These laws necessarily impose a delay before a person can take possession of a firearm.

---

[2]  Appellees suggest that *McRorey* and *B & L Products* are no longer good law in light of subsequent panel decisions. Appellees' Br., 29. But the Attorney General has already explained why those later decisions do not undermine the earlier decisions. Appellant's Br., 16-17 & nn. 11 & 12.

Unlike the laws at issue in *Bruen*, *Rahimi, District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), Maine's waiting period law does not make possession of any firearm illegal, does not deprive anyone of their firearms, and does not place any limits on what firearms a person may keep or where they may carry them. In short, the law does not interfere with the ability to keep and bear firearms.[3]

In *Heller*, the Supreme Court looked at dictionaries from 1773 and 1828, which defined "keep" as "[t]o retain; not to lose," "[t]o have in custody," and "[t]o hold; to retain in one's power or possession." 554 U.S. at 582. The Court concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. Given the Court's prior recitation of the dictionary definitions, it is clear that the Court was using "have weapons" as another way of saying "retaining," "holding," or "possessing" weapons. But amicus NRA argues that the Court meant "have" to also include acquiring weapons, pointing to dictionaries that include "to obtain," "to acquire," or "to purchase" as a permissible definition of "have." NRA Br., 13-14.

---

[3] Also misplaced is Appellees' reliance on *United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024), *cert. denied,* 2025 WL 1426701 (May 19, 2025). There, judges, as a condition of pretrial release, barred two defendants from possessing firearms pending trial. *Id*. at 1171. It is no surprise, then, that this prohibition on keeping arms "unquestionably implicate[d]" the Second Amendment. *Id*. at 1181.

3

While the basic possessive "have" lends itself to multiple English definitions, the weakness of the NRA's position is underscored by its need to cherry-pick among definitions far down the list before finding ones that fit its argument. For example, in Noah Webster's 1828 *American Dictionary of the English Language*, the NRA relies on the ninth listed definition, and in Merriam-Webster's *Collegiate Dictionary* it relies on the fourth definition. NRA Br., 13. It is certainly true that in some contexts, "have" can mean "obtain," such as when one says to a restaurant sever, "I'll have the Reuben." But the <u>first</u> definition for "have" in Merriam-Webster is "to hold or maintain as a possession, privilege, or entitlement."[4] And the first definition of "have" at Dictionary.com is "to possess; own; hold for use; contain."[5] *See also Ortega*, 741 F. Supp. 3d at 1073 ("The very first listed dictionary definition listed for 'have,' however, is almost always the definition that *Heller* identified as helpful in understanding the word 'keep' in the Second Amendment: 'to hold or maintain as a possession.'").

Appellees claim that under the Attorney General's view, the first step in the *Bruen* analysis would become meaningless because "nearly all laws restricting arms-bearing conduct (save a blanket prohibition on keeping or bearing arms) will regulate something more specific than keeping and bearing arms simpliciter." Appellees'

---

[4] *See* https://www.merriam-webster.com/dictionary/have.
[5] *See* https://www.dictionary.com/browse/have.

Br., 27.  It is not clear what Appellees mean by "more specific," but to be clear, the Attorney General is not arguing that only laws completely banning the keeping or bearing of arms implicate the Second Amendment.  Laws that restrict or impose conditions on the keeping and bearing of arms will often (if not usually) implicate the plain text of the Second Amendment.  *See, e.g., Bruen*, 597 U.S. 1 (law requiring persons to show "proper cause" in order to carry a concealed firearm outside of the home); *Heller*, 554 U.S. 570 (law generally prohibiting the possession of handguns); *Zherka v. Bondi*, No. 22-1108-CV, 2025 WL 1618440 (2d Cir. June 9, 2025) (law prohibiting felons from possessing firearms).  But Maine's waiting period does not impose conditions or restrictions on keeping and bearing firearms.  It regulates the commercial acquisition of firearms and is not covered by the plain text of the Second Amendment.

Amicus NRA notes that in *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023), the Second Circuit stated that the right to keep arms "necessarily involves the right to purchase them."  NRA Br., 16.[6]  But the Second Circuit went on to say that this statement means only that "commercial regulations on firearms dealers, whose

---

[6] The NRA claims that in *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), the Seventh Circuit held that the Second Amendment protects the right to purchase firearms.  NRA Br., 16.  This is not true.  At issue in *Ezell* was a city ordinance banning firing ranges, and the court held that the Second Amendment includes the right to acquire and maintain proficiency in the use of firearms.  *Ezell*, 651 F.3d at 704.  The court said nothing about the extent to which the Second Amendment includes a right to obtain firearms.

services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of <u>eliminating</u> the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola*, 88 F.4th at 196 (emphasis added). At issue in *Gazzola* was a law imposing various requirements on firearm dealers. The Second Circuit rejected the Second Amendment challenge to the law because the plaintiffs failed to show that the law was "so restrictive that it threatens a citizen's right to acquire firearms." *Id*.[7] Maine's waiting period law similarly does not threaten a citizen's right to acquire firearms. Not all firearm purchases are subject to the waiting period and, in any event, the law does not prevent any sales but only briefly delays them.[8] In short, *Gazzola* fully supports the Attorney General's arguments.

---

[7] As the Attorney General explained in his initial brief, a waiting period could be so onerous, such as by requiring buyers to wait 25 years, that it would implicate the Second Amendment. Appellant's Br., 21. Amicus NRA correctly notes that "there is clearly nothing in the Second Amendment's plain text that turns on the length of a waiting period." NRA Br., 22. But there is also nothing in the plain text about the acquisition of arms. What the plain text does cover is the right to keep and bear arms, and if a regulation makes it functionally impossible to acquire arms, it could implicate that right. But Maine's waiting period is not such a regulation.

[8] The NRA argues that in *National Rifle Association v. Bondi*, 133 F.4th 1108, 1114 (11th Cir. 2025) (en banc), the Eleventh Circuit "clearly assumed the right to purchase firearms is covered by the Second Amendment" because the court "jumped straight to the historical analysis." NRA Br., 16. But the court likely did so only because the government did not dispute that the right to keep and bear arms includes the purchase of firearms. *Id*. at 1171 (Brasher, J, dissenting). There was thus no reason to apply the first step of the *Bruen* test. Also, it is worth noting that the court upheld the challenged law, which restricted minors from purchasing firearms, because it was intended to "stop immature and impulsive individuals. . . from harming themselves and others with deadly weapons." *Id*. at 1130. Maine's law is also intended to stop impulsive individuals from hurting themselves or others.

***Maine's waiting period law is presumptively lawful.***

That the Second Amendment does not apply to Maine's waiting period law is reinforced by the Supreme Court's statement that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26. This presumption of lawfulness is because such laws – like Maine's waiting period law – do not directly implicate the Second Amendment.

Appellees argue that the Supreme Court in *Heller* said that only "longstanding" conditions and qualifications on the commercial sale of firearms are presumptively lawful. Appellees' Br., 35. But the Supreme Court likely intended "longstanding" to modify the first item in the list of presumptively lawful regulations – prohibitions on the possession of firearms by felons and the mentally ill. Or the Court may have simply been characterizing all of the items in the list as being longstanding categories of firearm regulations but not suggesting that a specific regulation falling into one of the categories must itself be longstanding to be entitled to the presumption. If the Court meant the latter, Maine's waiting period law falls into the longstanding category of "conditions and qualifications on the commercial sale of arms." At least one federal court apparently concluded that a waiting period law need not be longstanding to be "presumptively lawful under *Heller*." *Rocky*

*Mountain Gun Owners*, 701 F. Supp. 3d at 1136.[9]  And in *Gazzola*, a case relied

upon by amicus NRA (NRA Br., 16), the Second Circuit applied the presumption

without considering whether the specific law at issue (which, among other things,

required firearm dealers to install security alarms systems at each point of entrance,

exits, and sale) was longstanding.  88 F.4th at 195.[10]

Appellees argue that Maine's waiting period law does not impose

"conditions" or "qualifications" on the commercial sale of firearms.  Appellees' Br.,

33-34.  They agree that "the obligation to secure a background check before selling

a firearm is a classic condition on commercial sale."  *Id*., 34.  But, according to

Appellees, "[c]onditions and qualifications are things people can satisfy" and

Maine's waiting period law "is not something one can satisfy or secure; all one can

do is wait it out."  *Id*.  Appellees are incorrect.  Waiting 72 hours is easily a "thing[]

people can satisfy."  The "thing" that firearms dealers must do is wait for a brief

---

[9]  Appellees note that in *Bruen*, the Supreme Court did not treat New York's law as presumptively constitutional even though the state characterized it as a law forbidding carrying firearms in sensitive places (one of the categories of *Heller*'s presumptively lawful regulatory measures).  Appellees' Br., 36; *see also* NRA Br., 26.  But in *Bruen*, the Supreme Court held that the state was wrong in characterizing the law as a sensitive place regulation because under the state's definition (any crowded place protected by police), the entire island of Manhattan would be a "sensitive place."  *Bruen*, 597 U.S. at 31.  In other words, the Supreme Court rejected the argument that the law fell within one of the categories of presumptively lawful regulations.

[10]  In quoting the relevant language from *Heller*, the court omitted "longstanding," suggesting that it understood that "longstanding" modified only the first item in the list of presumptively lawful regulations.  *Id*., 195.

period of time before giving a buyer possession of a firearm.[11]  In short, a waiting

period law is just as much a condition or qualification on the commercial sale of

firearms as is a background check.

### Just like the federal background check law, Maine's waiting period law briefly delays sales in order to ensure that buyers will act responsibly.

Neither Appellees nor their amici dispute that the federal law requiring

licensed dealers to conduct a criminal background check before transferring a

firearm is constitutional.  Under that law, sales can be delayed for up to three days

(or, in the case of a person under the age of 21, up to ten days) pending completion

of the background check.  *See* 18 U.S.C. § 922(t)(1).  So, Appellees apparently

acknowledge that in at least some circumstances, the Second Amendment does not

prohibit imposing delays on the acquisition of firearms.  And the Supreme Court has

made clear that laws requiring a background check or passage of a firearms safety

course (which necessarily involve delays) before being allowed to carry a handgun

in public are lawful because they are "designed to ensure only that those bearing

arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  *Bruen*, 597

U.S. at 38 n.9; *see also Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 227 (4th

---

[11] Appellees note that the definition of "condition precedent" in Black's Law Dictionary excludes a "lapse of time."  Appellees' Br., 35.  But the Supreme Court did not say that "conditions precedent" on the commercial sale of firearms are presumptively constitutional.  It referred to "conditions and qualifications," and it presumably was not referring to "conditions" as a technical term used in contract law but as another word for "requirements" or a "prerequisites."

Cir. 2024) ("By equating 'infringement' with any temporary delay, the plaintiffs improperly discount the Supreme Court's guidance that requirements such as background checks and training instruction, which necessarily occasion some delay, ordinarily will pass constitutional muster without requiring the government to justify the regulation at step two."), *cert. denied,* 145 S. Ct. 1049 (2025).[12]

If it is constitutional to impose delays on conduct clearly covered by the Second Amendment (bearing arms) in order to ensure that those bearing arms are responsible, then Maine's waiting period is also constitutional. As discussed above, the commercial acquisition of a firearm is not implicated by the plain text of the Second Amendment, but if it were, the waiting period law, just like a background check law, simply imposes a brief delay to help ensure that purchasers will be responsible when bearing arms.[13]

Appellees attempt to draw distinctions between a background check law and Maine's waiting period law, but these distinctions are of no constitutional

---

[12] In *Maryland Shall Issue*, the plaintiffs argued (as Appellees argue here) that "any 'temporary deprivation' of the ability to purchase a handgun violates the Second Amendment right to keep and bear arms." *Id*., 216. The Fourth Circuit held that *Bruen* foreclosed this argument. *Id*. The court also suggested that a delay of up to two weeks before a person is allowed to purchase a handgun would not constitute a denial of Second Amendment rights. 116 F.4th at 226-27 & n.15

[13] Appellees claim that the Attorney General does not argue that the waiting period law is intended to ensure that those bearing arms are law-abiding and responsible. Appellees' Br., 40. That is not so. *See, e.g.,* Appellant's Br., 16 ("By deterring impulsive behavior, [the waiting period law] helps ensure that purchasers will act responsibly with their newly acquired firearms").

significance.  Appellees claim a waiting period is different because it assumes that every buyer may act irresponsibly with the firearm, while a background check prohibits a sale only if a buyer's individual background demonstrates that they may act irresponsibly.  But this claim ignores the fact that both waiting period and background check laws delay <u>all</u> sales to help ensure that a buyer will act responsibly.  In other words, just like Maine's waiting period law, a background check assumes that every buyer may act irresponsibly until it has been demonstrated otherwise.  The only difference is that with a background check the assurance comes from the absence of any disqualifying conduct in the past, while with a waiting period the assurance comes from the person continuing with the firearm acquisition after the "cooling off" period has passed.[14]

Appellees argue that Maine's waiting period law is distinguishable because unlike with a background check law, the "state does not do anything" during the waiting period to assess the buyer's individual characteristics.  Appellees' Br., 32.  But delaying sales, by itself, is what guards against persons using firearms while in

---

[14]  Appellees claim that among states with waiting period laws, Maine is an "outlier."  Appellees' Br., 10.  But for the three waiting period laws upheld by district courts in other jurisdictions, the only difference that Appellees identify is that the New Mexico waiting period law has an exception for persons with concealed handgun licenses.

an agitated emotional state.[15]  Nothing in *Bruen* or any other case identified by Appellees supports the proposition that laws delaying sales to ensure that buyers are responsible are constitutional only if they involve an individualized inquiry into the buyers.  Moreover, if Maine did require buyers to undergo some sort of mental health assessment before being allowed to purchase a firearm, that would likely result in delays well beyond 72 hours and be more intrusive.  And it is difficult to believe that Appellees agree that such a requirement would be constitutional.[16]

According to Appellees, Maine's waiting period law does not "meaningfully address" the problem of persons acting impulsively or in an agitated emotional state with a firearm because it "rests on the dubious assumption that such impulses will fade in three days" and "does not even preclude the transfer of a firearm to someone who <u>does</u> exhibit such tendencies during those three days."  Appellees' Br., 40.  But below, Appellees did not dispute the expert evidence in the record that waiting

---

[15]  It is thus not true, as Appellees claim, that Maine is "delaying the exercise of Second Amendment rights just for the sake of delaying their exercise."  Appellees' Br., 20.  The undisputed evidence is that waiting periods save lives.

[16]  Amicus NRA argues that the problem with Maine's waiting period law is that it delays sales to persons who background checks have determined to be "law-abiding responsible citizens."  NRA Br., 21.  But the fact that a person has passed a background check does not mean that they are presently acting responsibly.  By definition, a background check looks backward and says nothing about a person's current mental status.  As Professor Donohue notes, the person who shot to death eight people in Atlanta in 2021 legally bought the firearm (and likely passed a background check) on the day of the shooting.  Donohue Decl., ¶ 47 (App. 127).  Presumably, the NRA does not contend that the murderer was a "law-abiding, responsible citizen."

period laws save lives by reducing suicides and homicides. Appellant's Br., 39-40. They cannot now try to controvert that undisputed evidence by referring to it as a "dubious assumption." If Appellees wished to contest the record evidence on their motion for preliminary injunction, the time to so was before the district court, rather than waiting to do so here for the first time.

And Appellees apparently do not understand why waiting periods work. It is not because they preclude a sale to a person in an agitated emotional state. It is because once the emotional state has passed, the person does not carry through with their impulsive acts. And, again, the undisputed expert evidence is that this delay works.

### *Delays may be imposed on the exercise of other constitutional rights.*

Citing to *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981), Appellees suggest that if a waiting period cannot be imposed on the pre-*Dobbs* constitutional right to access abortion care, it cannot be imposed on the constitutional right to keep and bear arms. Appellees' Br., 3 & 45 n.4. This argument fails for several reasons. First, the standards for assessing infringement of the different rights are not the same. In *Bellotti*, the standard was whether the regulation imposed a substantial burden on the right to an abortion.[17] For firearm

---

[17] The Supreme Court later adopted a standard under which pre-viability abortion restrictions were unconstitutional if they imposed an "undue burden" on a person's ability to obtain an abortion. *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S.

regulations, the test is whether it implicates the plain text of the Second Amendment and, if it does, whether it is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17. So, the fact that imposing a waiting period on accessing abortions might have run afoul of now-defunct Fourteenth Amendment doctrine says nothing about whether imposing a waiting period on the purchase of firearms violates the actual test that *Bruen* instructs courts to apply to Second Amendment cases.

Second, the *Bellotti* Court found that by delaying abortions, even a 24-hour waiting period increases patients' health risks, and that because of patients' and health care facilities' schedules, a 24-waiting period often produces "a substantially longer delay than 24 hours." 641 F.2d at 1014.[18] There is no competent evidence suggesting that delaying some purchases of firearms for 72 hours results in health or safety risks.[19] Finally, eleven years after this Court's decision in *Bellotti*, the

---

833, 878 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022).

[18] The *Bellotti* Court also noted that the waiting period meant that patients would have to make at least two separate trips to the medical facility, and that for many patients, this would result in "substantial" burdens "in terms of time, money, travel and work schedules." *Id*. at 1015. Maine's waiting period law does not require multiple trips. A buyer can, for example, agree to purchase a firearm online or by telephone, thereby triggering initiation of the waiting period. *See* https://www.maine.gov/dps/sites/maine.gov.dps/files/inline-files/Advisory%20on%20Waiting%20Period%20Law_1.pdf. After 72 hours, the buyer can then make a single visit to the seller to take possession of the firearm.

[19] Appellees claim that the "record evidence" "shows that the first few days are the most critical for someone facing a credible threat of violence from the intimate

14

Supreme Court upheld the constitutionality of a law imposing a 24-hour waiting period on abortions. *Casey*, 505 U.S. at 886, *overruled on other grounds*, *Dobbs*, 597 U.S. at 231.[20]

### *Maine's waiting period law is consistent with the Nation's historical tradition of firearm regulation.*

Appellees agree that Maine's waiting period law need only be "relevantly similar" to laws from our Nation's early history. Appellees' Br., 41. Appellees then go astray by claiming that Maine's law fails this test because until recently no state "forced law-abiding citizens to wait out an adorned 'cooling-off' period before they could acquire a firearm." *Id.*, 42. In other words, they argue that the Attorney General must essentially identify a "historical twin" despite that the Supreme Court

---

partner." Appellees' Br., 3; *see also id.*, 49. But the record does no such thing, as the declarations to which they cite provide no actual evidence. Ms. Beckwith, who is not an expert, simply states, without any citation, that "[m]any studies show that domestic-violence victims face the highest risk of death in their first 3 months after leaving their abuser." App. 44-45, ¶ 16. While she also states that from her own experience she knows "how fraught and anxiety-ridden the first several days can be," *id.*, this statement does not mean that those first few days are, in fact, a period of heightened risk. And two gun dealer Appellees simply relate incidents involving customers who wanted firearms immediately because of concerns about their safety. App. 55-56, ¶¶ 5-7; App. 62-63, ¶ 9.

[20] Appellees also suggest that delays cannot be imposed on the exercise of First Amendment free speech rights. Appellees' Br., 3. But that is not always true. As this Court has recognized, consistent with the First Amendment, advance notice can sometimes be required before persons engage in public demonstrations. *See, e.g.*, *Sullivan v. City of Augusta*, 511 F.3d 16, 38–39 (1st Cir. 2007) (collecting cases).

has held that this not the test, and that the government must only identify a "representative historical <u>analogue</u>." *Bruen*, 597 U.S. at 30 (emphasis in original).

Appellees are correct that waiting period laws are recent, but, as the Attorney General's experts demonstrated, this was because there was no need for such laws in the eighteenth and nineteenth centuries. Appellant's Br., 24-27. Gun homicides and suicides were uncommon, and guns were not immediately available. *Id*. So while amici Montana and other states are correct that "human impulsivity is not a new problem," Mont. Br., 10, the undisputed evidence is that the impulsive use of firearms is a relatively recent development.[21]

Citing *Rahimi*, 602 U.S. at 700, Appellees suggest that historically, the only time that Second Amendment rights can be burdened is when a person has been found "to pose a credible threat to the physical safety of others." Appellees' Br., 45. But Appellees are obviously incorrect. As Professor Spitzer explained, licensing and permitting laws date to the 1600s. Spitzer Decl., ¶ 34 (App. 89). These laws did not apply just to persons found to pose a "credible threat." Rather, the very purpose of

---

[21] Amici Montana and other states also claim that the Attorney General "point[ed] to no 'rapid advancements in gun technology.'" Mont. Br., 10. This claim is simply not true. The Attorney General's experts explained that there were advancements in both manufacturing, which made firearms readily available, and in firearm technology, which made firearms easier and more convenient to use. Appellant's Br., 25-27.

these laws was to assess whether a person could be entrusted with a firearm. *Id.*, ¶ 33 (App. 88-89). As Professor Spitzer explained:

> The existence and functioning of old licensing laws make clear that the government could take whatever time was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand.

*Id.*, ¶ 56 (App. 101); *see also id.*, ¶ 13 (App. 78) ("[B]y their nature, [licensing/permitting laws] incorporated the passage of time between the attempt by individuals to acquire or use weapons and the granting of permission by the government to then do so."). And, again, the Supreme Court in *Bruen* approved of laws requiring individuals to pass a background check or a firearms safety course before being allowed to carry a firearm in public. 597 U.S. at 38 n.9. Such laws apply regardless of whether an individual is found to pose a "credible threat."

## CONCLUSION

For the reasons set forth above and in his initial brief, the Attorney General respectfully requests that this Court vacate the district court's preliminary injunction order.

Dated: June 18, 2025                    Respectfully submitted,

                                        AARON M. FREY
                                        Attorney General


                                        /s/ Christopher C. Taub
                                        CHRISTOPHER C. TAUB
                                        Chief Deputy Attorney General
                                        Christopher.C.Taub@maine.gov

                                        THOMAS A. KNOWLTON
                                        Deputy Attorney General
                                        Chief, Litigation Division
                                        Thomas.A.Knowlton@maine.gov

                                        PAUL SUITTER
                                        Assistant Attorney General
                                        Paul.Suitter@maine.gov

                                        Office of the Maine Attorney General
                                        6 State House Station
                                        Augusta ME  04333-0006
                                        Tel.  (207) 626-8800
                                        Fax (207) 287-3145

## CERTIFICATE OF COMPLIANCE

This brief contains 4,748 words, excluding the items exempted by Federal Rule of Appellate Procedure 27(a)(2)(B), and complies with the length limit in Federal Rule of Appellate Procedure 27(d)(2).  For this Certification, I relied on the word count function of the word-processing software used to prepare this brief (Microsoft Word 2007).  I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size.

<span style="display:block; text-align:right;">
s/ Christopher C. Taub<br>
Christopher C. Taub<br>
Chief Deputy Attorney General<br>
Office of the Maine Attorney General<br>
Bar No. 65217<br>
Six State House Station<br>
Augusta, Maine  04333-0006<br>
Tel. (207) 626-8800
</span>

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 18th day of June, 2025, I filed the above brief electronically via the ECF system.  I further certify that on this, the 18th day of June, 2025, I served the above brief electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

ERIN E. MURPHY
erin.murphy@clementmurphy.com

JOSHUA A. TARDY
jtardy@rudmanwinchell.com

KEVIN J. WYNOSKY
kevin.wynosky@clementmurphy.com

MATTHEW ROWEN
matthew.rowen@clementmurphy.com

PAUL D. CLEMENT
paul.clement@clementmurphy.com

s/ Christopher C. Taub
Christopher C. Taub
Chief Deputy Attorney General
Office of the Maine Attorney General
Bar No. 65217
Six State House Station
Augusta, Maine  04333-0006
Tel. (207) 626-8800
